No. 26-926

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA; GAVIN NEWSOM, *in his official capacity as Governor of California*; ROBERT BONTA, *in his official capacity as Attorney General of California*,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Central District of California

_____

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR AN INJUNCTION PENDING APPEAL (RELIEF REQUESTED BY FEBRUARY 19)**

_____

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ...................................................................................... 1

STATEMENT ............................................................................................. 6

ARGUMENT .............................................................................................. 9

    A.    The federal government is likely to prevail on the merits. ................... 9

    B.    The other injunction factors strongly favor the government. ............. 22

CONCLUSION ......................................................................................... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ..................................................................23

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ...................................................................22

*Blackburn v. United States*,
100 F.3d 1426 (9th Cir. 1996) ....................................................... 10, 12

*Clifton v. Cox*,
549 F.2d 722 (9th Cir. 1977) ......................................................... 14, 15

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315 (3d Cir. 2025) ...................................................................13

*Feldman v. Arizona Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) .....................................................................9

*Ga. Latino Alliance for Human Rights v. Gov. of Georgia*,
691 F.3d 1250 (11th Cir.2012) ................................................................23

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .............................................. 4, 10, 13, 14

*Hancock v. Train*,
426 U.S. 167 (1976) ...................................................................................10

*Johnson v. Maryland*,
254 U.S. 51 (1920) .....................................................................................15

*Mayo v. United States*,
319 U.S. 441 (1943) ............................................................................ 9, 10

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ...............................................................10

*Morgan v. California*,
743 F.2d 728 (9th Cir. 1984) ...................................................................14

*National TPS Alliance v. Noem*,
    150 F.4th 1000 (9th Cir. 2025)..................................................................22

*North Dakota v. United States*,
    495 U.S. 423 (1990) .................................................................... 10, 13

*Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ...................................................... 22, 23

*State of Arizona v. State of California*,
    283 U.S. 423 (1931) ................................................................................10

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ........................................................ 13, 14

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010).......................................... 4, 10, 11, 12

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................................9

## Statutes

28 U.S.C. § 2241(c)(2)..............................................................................14

Cal. Penal Code § 19.................................................................................7

No Vigilantes Act,
    Senate Bill No. 805, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025) ............... *passim*

No Secret Police Act,
    Senate Bill No. 627, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025) .........................7

## Other

Lindsay Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*,
    Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR .....................7

Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*,
    TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8 ........................11

Press Release, California announces new online portal to report misconduct by
    federal agents,,
    Cal. (Dec. 3, 2025), https://www.gov.ca.gov/2025/12/03/ californiaannounces-
    new-online-portal-to-report-misconduct-by-federal-agent/. ...............................24

U.S. Postal Service,
    Employee & Labor Relations Manual, § 831.332(c). .........................................16

## INTRODUCTION

For more than 200 years, the Supreme Court has repeatedly held that, absent express congressional authorization, states have no authority whatsoever to directly regulate the federal government's operations. States may sometimes regulate contractors or other non-federal actors who interface with the federal government if the regulation does not substantially interfere with federal operations. And they may regulate federal officers in ways that do not influence how those officers carry out federal law. But a state law that *directly* regulates the federal government's operations is straightforwardly invalid, no matter the size of the burden it imposes.

The district court misconstrued these precedents and allowed the State of California to supplant the federal government's judgments regarding how federal law-enforcement officers should carry out their missions. This Court should enjoin the offending law. Because California's stipulation against enforcement of the law against the federal government is scheduled to expire on February 19 at noon (and because California threatens to criminally prosecute federal officers any time thereafter), we respectfully request relief by noon tomorrow, including, if necessary, an administrative injunction pending this Court's full review of this motion. We have sought an injunction pending appeal from the district court and will promptly notify this Court when the district court rules.

This case concerns California's objections to how the United States conducts law-enforcement operations. The federal government has determined that, to protect the safety of law-enforcement officers and for operational purposes, it is sometimes necessary for federal officers to wear facial coverings as well as to conceal their identities and/or agency associations while engaged in law-enforcement activities. California disagrees. California is free to regulate its own law-enforcement officers consistent with its views. But it cannot regulate the federal government.

The California legislature nonetheless passed—and Governor Newsom signed—two blatantly unconstitutional laws that purport to do just that. One law purports to require any non-uniformed "federal law enforcement officer" to "visibly display identification," dictates the required contents of that identification, sets forth a comprehensive list of narrowly drawn exceptions to that requirement, and subjects federal officers who do not comply to criminal penalties. The second purports to prohibit federal law-enforcement officials from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties," subject to "narrowly tailored exemptions," and also backed by criminal penalties. Though he ultimately signed the bill anyway, even Governor Newsom acknowledged as to the facial-covering ban that "[i]t appears we don't have the legal authority for federal agents, but we do for other law enforcement authorities." Lindsey Holden,

*California lawmakers pass bill to ban ICE agents from wearing masks*, Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR.

Yet the district court denied the United States' motion to preliminarily enjoin the identification requirements. It reasoned that neither those requirements nor the facial-covering ban directly regulated the federal government because, in the court's view, the United States could comply without substantially disrupting federal operations. The court acknowledged that "the challenged provisions dictate how a federal officer may carry out his law enforcement duties," yet allowed California to regulate federal law enforcement because the United States purportedly did not show "that its current practices with respect to masking and identification are essential to federal law enforcement operations such that state regulations in those areas seek to interfere with or control federal law enforcement functions." The court enjoined the facial-covering ban only because that ban discriminatorily singled out federal law-enforcement officials and did not also apply to state officials.

The district court's understanding of States' authority to regulate federal law-enforcement operations is indefensible and inverts the constitutional structure; and this Court should enjoin California's enforcement of its unlawful identification requirements (Section 10 of the "No Vigilantes Act") against the federal government pending appeal. States are categorically prohibited from directly regulating the federal government, full stop. That prohibition applies even if the federal

government could comply with the state regulation with ease—and indeed, as this Court has held, even if the state simply bans the federal government from engaging in conduct that federal law *already* prohibits. *See United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010). The district court thus relied almost entirely on cases addressing state regulation of federal contractors, suppliers, and other non-federal entities. But it is well established that "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022). The district court inexplicably did not discuss (or even acknowledge) the distinction between state regulation of those entities and state regulation of the federal government itself.

Moreover, even on the mistaken assumption that some showing of state interference with federal objectives were necessary (it is not), the government clearly made that showing. The government submitted detailed declarations describing severe, persistent threats to federal agents that necessitate existing personal-identity protections. For instance:

- Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for doxxing, assaulting, and murdering Immigration and Customers Enforcement (ICE) and Customs and Border Protection (CBP) personnel in a tiered bounty system.

- Activists opposed to enforcement of federal law repeatedly photograph, film, and publish the personal identities of ICE officers and other federal task force

4

personnel and post that information online to intimidate agents and their families and facilitate retaliation;

- Protestors routinely follow known ICE agents to their hotels;

- Once activists find out officers' identities, they continue to search for officers' family members and their homes; and

- Doxxing of officers is encouraged across the Internet.

The district court engaged with none of this beyond observing that doxxing, harassing, assaulting, and threatening federal officials is illegal—as if the federal government cannot legitimately protect its officers from illegal conduct. Further, ICE routinely conducts investigations and surveillance in plainclothes, as do officials in many other federal law-enforcement agencies. In those circumstances, requiring federal officers to wear visible identification would obviously compromise operational security. The district court vaguely gestured towards the law's exceptions, but given that the law expressly applies to law-enforcement officers who are not in uniform, those exceptions are plainly inadequate to protect all plainclothes operations, even if they were much clearer and thus provided clear mechanisms for federal officers to avoid the potential for criminal liability.

The other factors overwhelmingly favor the federal government as well. An attempt by a State to regulate how the United States conducts law-enforcement operations, backed by criminal penalties, presents the quintessential example of irreparable harm from a preempted law. The prospect of California having authority

5

to arrest and prosecute federal officers carrying out their law-enforcement responsibilities, even for a single day, is untenable. Although California agreed not to enforce these laws against the federal government while the preliminary injunction motion was pending, that stipulation expires on February 19 at noon. This Court should prevent this dangerous conflict between federal and state authority and enjoin California's unconstitutional requirements—as the district court should have done.

## STATEMENT

**1.** This case concerns two California statutes enacted last fall, the No Vigilantes Act and the No Secret Police Act. Both Acts took effect on January 1, 2026, but California agreed to stay enforcement of the laws against federal law-enforcement agencies and officers until the district court ruled on the United States' motion for a preliminary injunction. A2.

**a.** As relevant here, the No Vigilantes Act purports to require non-uniformed law-enforcement officers—defined to include "any federal law enforcement officer," No Vigilantes Act § 10(d)(2)—to conspicuously display identification (which must include the officer's agency and either a name or badge number, or both) when performing their enforcement duties. *Id.* § 10(a). The identification requirement contains certain exceptions for undercover officers, certain specified plainclothes operations, officers wearing personal protective equipment that

6

prevents display, exigent circumstances, undefined active SWAT or tactical team activities, and operations involving certain public officials. *Id.* § 10(b)(1)–(6). An exemption is also permitted "[w]hen there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the peace officer." *Id.* § 2(a)(3)(E).

A willful and knowing violation of the identification requirement is criminally punishable as a misdemeanor, unless the employing agency has issued a written policy in accordance with a separate provision of the Act that essentially requires a policy similar to the statute's substantive provision. *Id.* § 10(c), (e). Under California law, misdemeanors are punishable by up to six months' imprisonment in county jail, a $1,000 fine, or both. Cal. Penal Code § 19.

**b.** The No Secret Police Act bans law-enforcement officers from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties" in California, again with certain limited exceptions. No Secret Police Act § 3(a). Willful and knowing violations of the mask ban are "punishable as an infraction or a misdemeanor." *Id.* § 3(d). The facial-covering ban purports to apply to federal law-enforcement officials but does not apply to California state officials.

**2.** In this litigation, as relevant here, the United States moved for a preliminary injunction against the provisions discussed above as applied to the federal government. The district court denied an injunction against the identification-display

7

requirements and granted an injunction as to the facial-covering ban. After rejecting certain of the State's threshold arguments in relevant part, the district court acknowledged that States are prohibited from directly regulating the federal government, but held that for direct regulation to exist the United States must show that "the law itself obstructs the federal government's operations." A14. The district court held that, "[a]lthough the challenged provisions dictate how a federal officer may carry out his law enforcement duties," "the United States has not met its burden to show that enforcement of the challenged provisions . . . would interfere with or take control of federal law enforcement operations." A15. In particular, "[t]he United States has not shown that its current practices with respect to masking and identification are essential to federal law enforcement operations such that state regulations in those areas seek to interfere with or control federal law enforcement functions." A16. The court declined to enjoin the identification provision on that basis, though it ultimately enjoined the facial-covering ban because, although the district court believed that ban fell within the State's regulatory authority, it discriminates against the federal government because it does not apply to state officials. A20-23. The court held that the equitable factors supported an injunction of the facial-covering ban, but not the identification requirements, largely based on its assessment of the merits. A23-30.

The district court stayed its order until noon on February 19. A30. California has since represented that it reads the order to continue California's stipulation that it will not enforce the identification requirements against federal officials until that date. But California has indicated that it may enforce the Act's criminal penalties against federal officials after the stay expires. California rejected requests to extend the stipulation pending this appeal.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). All of those factors support the United States and warrant injunctive relief here.

### A.    The federal government is likely to prevail on the merits.

**1.** The Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers

9

vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819). Accordingly, "states may not directly regulate the Federal Government's operations." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). Countless Supreme Court and Ninth Circuit precedents repeat this prohibition.[1]

Those cases establish that this prohibition is absolute unless Congress expressly authorizes otherwise (something no one contends here). Courts cannot apply balancing tests or ask how great the intrusions on federal operations are; "[n]o other adjustment of competing enactments or legal principles is possible." *Mayo*, 319 U.S. at 445. States cannot control federal operations even if state regulation would not meaningfully impair federal functions—and indeed, even if it would simply replicate federal requirements. *See United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010) ("A state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law."); *see also id.* at 992 ("[T]here is no exception to the doctrine of intergovernmental immunity for state statutes consistent with federal law."). Simply put, "[t]he United States may perform its functions without conforming to the police regulations of a state." *State of Arizona v. State of California*, 283 U.S. 423, 451 (1931).

---

[1] *See, e.g.*, *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *Hancock v. Train*, 426 U.S. 167, 179 (1976); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022).

That settled framework makes this the easiest of cases. The No Vigilantes Act requires "any federal law enforcement officer," *see* No Vigilantes Act § 10(d)(2), who is not uniformed, when "performing their enforcement duties," to "visibly display identification," *id.* § 10(a), dictates the required contents of that identification, sets forth what purports to be a comprehensive list of narrowly drawn exceptions to that requirement, *id.* § 10(b)(1)-(6), and subjects federal officers who do not comply with the requirements to criminal penalties, *id.* § 10(c), (e). And "[h]ere, the [law does] not merely regulate the federal government incidentally; rather, it is expressly intended to do so." *Arcata*, 629 F.3d at 991. Indeed, the legislative findings declare the law is about the "federal government['s]" "broad immigration enforcement efforts in California" that sometimes involve "the absence of visible names, officer identification number, or other individually identifying information, the failure to be clearly and conspicuously identifiable as federal law enforcement." *id.* § 1(a)–(b). Governor Newsom called both laws a "direct response" to immigration enforcement activities in California.[2] Even the district court correctly noted that "the challenged provisions dictate how a federal officer may carry out his law enforcement duties." A15. That should have ended the matter.

---

[2] *See* Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*, TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8

**2.** So clear are these principles that neither California nor the district court identified *any* case where a State was authorized to prescribe how federal officers carry out their official duties or otherwise directly regulate the federal government, let alone allowing States to do so as long as their rules do not substantially impair federal operations. Instead, cases overwhelmingly reject that position.

For example, in *Arcata*, this Court did not probe whether it was "necessary" for the military to recruit minors or how inconvenient state regulation would be; this Court said state regulation of the federal government would be invalid even if federal law prohibited the same conduct. 629 F.3d at 991-92. In *Blackburn*, this Court held that a California law requiring warning signs and safety ropes could not be applied to federal property. The Court's analysis of intergovernmental immunity did not probe whether the federal government could comply with the law and still perform its functions. 100 F.3d at 1435.

More broadly, when regulation expressly targets the federal government itself, that regulation is necessarily "direct" and thus forbidden; the *existence* of a direct regulation (which is all that is required for the federal government to be immune from that regulation) is distinct from the *burdens* associated with that regulation. In *North Dakota*, for example, the Supreme Court addressed whether state reporting and labeling requirements for out-of-state liquor suppliers could be applied to suppliers of liquor to a military base. But if a state instead purported to prohibit

federal military bases within the state from storing liquor at the bases, there is no question that this would be a forbidden direct regulation—even if the ban would not harm (and might even help) military operations.

The district court's purportedly contrary quotations elide a critical difference: the court relied on cases involving federal *contractors* and other contexts where regulations are not treated as directly regulating federal operations. *See, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022); *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025); *United States v. California*, 921 F.3d 865 (9th Cir. 2019). Here, however, the state enactment at issue directly and explicitly operates on federal officers by attempting to prescribe how they carry out their federal responsibilities. Many cases cited by the district court mentioned this distinction expressly. *See Geo Grp.*, 50 F.4th at 755 ("The scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality."); *Core Civic*, 145 F.4th at 321 (noting that even New Jersey conceded that its law would be invalid if, like this law, it applied to the federal government itself: "New Jersey contends that a law regulates the federal government directly only if the law's text applies to it."); *North Dakota*, 495 U.S. at 436 ("There is no claim in this case, nor could there be, that North Dakota regulates the Federal Government directly … Both the reporting requirement and the labeling regulation operate against suppliers, not

13

the Government…"); *California*, 921 F.3d at 880 (no direct regulation in that case because challenged law was "directed at the conduct of *employers*, not the United States or its agents, and no federal activity is regulated"). Even Judges of this Court who have opined that particular state regulations of federal contractors are permissible have acknowledged that the same regulation would be impermissible if applied to the federal government directly. *See Geo Grp., Inc.*, 50 F.4th at 765 n.2 (Murguia, J., dissenting) (challenged state law "directly regulates only federal contractors, not the federal government itself"). The district court wrongly treated federal-contractor and indirect-regulation cases as analogous while ignoring the critical distinction.

Other cases on which the district court relied construed the federal habeas statute, which applies to persons "in custody for an act done or omitted in pursuance of an Act of Congress." 28 U.S.C. § 2241(c)(2). Those cases interpret a federal jurisdictional statute regarding the proper forum for a federal officer to assert a defense from state prosecution, and do not remotely suggest that a State has authority to regulate the conduct of federal officers. *See Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977); *see also Morgan v. California*, 743 F.2d 728, 731-32 (9th Cir. 1984). And in any event, the standard announced in those cases—where habeas relief is unavailable if a federal officer "employs means which he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some

14

criminal intent," *Clifton*, 549 F.2d at 728 (discussing habeas statute)—would never support the State's assertion of authority here.

The district court also found the state enactments at issue here "analogous to traffic laws that, in a similar sense, dictate how a federal officer may operate a vehicle on state roads but are nonetheless enforceable against federal officers, subject to immunities." A15-16. There is plainly no basis for comparing a State's conception of how law-enforcement officers should carry out their duties to routine traffic ordinances, and the district court offered no explanation of why it regarded the two as comparable. The Supreme Court has stated that federal officers might be subject to "general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920). But the narrowness of this potential exception is evident from the very case in which it was announced, in which the Supreme Court held that a State may not require a Post Office employee to obtain a license from the State because the federal government alone can determine the qualifications of its own officers. *Id.* at 55.

This case plainly does not fall within any such narrow exception for "general rules" that only "incidentally" affect federal employment. The challenged law applies expressly to "federal law enforcement officers," and reflects a judgment about how law-enforcement operations in particular should be carried out. And even

15

in the context of traffic laws, although the federal government generally instructs federal officials to follow local law, *see, e.g.*, U.S. Postal Service, Employee & Labor Relations Manual, § 831.332(c), if the federal government permitted law enforcement to (for example) chase dangerous suspects at high speeds and a state purported to restrict federal law-enforcement officers from engaging in that practice, there is no question such a law would be invalid. The same is true here.

**3.** The district court's rationale for concluding that California's law would not impede federal law enforcement only underscores the problems with allowing States (and federal courts) to second-guess what is truly essential for federal officers to discharge their duties. The district court expressed its opinion "that the presence of masked and unidentifiable individuals, including law enforcement, is more likely to heighten the sense of insecurity for all." A16-17. The court doubted that federal officers really need to withhold their identities, reasoning that federal agencies do not explicitly require masking or withholding identification in all situations. A17. And, in its equities discussion, the court praised California's laws as "serv[ing] the public interest by promoting transparency which is essential for accountability and public trust" and found "no cognizable justification for law enforcement officers to conceal their identities during their performance of routine, non-exempted law enforcement functions and interactions with the general public." A17.

Those statements defeat the whole point of the intergovernmental immunity doctrine: a State cannot substitute its own judgment for the United States' about how federal officials should perform their duties. And the district court's approach is untenable on its face. On that court's view, all 50 states could prescribe direct regulations of the federal government based on its own policy views. To take just a few (of countless possible) examples, could a state:

- Prescribe how bright law-enforcement uniforms should be?

- Demand that law-enforcement officials wear pink to distinguish them from other officials?

- Restrict use of K9 teams based an animal-rights (or other) considerations?

- Place restrictions on the types of weapons law-enforcement officers can carry?

- Impose conditions on use of those weapons?

- Ban law-enforcement officials from carrying weapons entirely?

Under the court's approach, these and countless other state regulations of federal law enforcement (to say nothing of state regulation of other federal government operations) would be permissible—subject only to the United States satisfying a district court that it was "necessary" for the federal government to not follow state

17

regulation, in order to pursue practices the district court deemed "reasonable." That is not the law.

**4.** Even on the district court's own terms, its analysis was mistaken. The district court held that the United States has a "burden to show that enforcement of the challenged provisions . . . would interfere with . . . federal law enforcement operations." A15. As discussed above, there is no such burden, but in any event the federal government easily surmounted it.

As ICE's declarant explained, the challenged provisions "if enforced against DHS, would create significant obstacles to [ICE Enforcement and Removal Operations'] ability to safely and effectively enforce federal laws in the State of California." A36. That is because "[p]rotecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes." A37; *see also* A44-45 (similar as to CBP); A53-54 (similar as to FBI); A59-60 (similar as to DEA).

As to officer safety, "DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system," with $2,000 offered for gathering intelligence or doxxing agents, $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE and CBP officers/agents, and up to $50,000 for the assassination of high-ranking officials.

A37-38. "[I]mmigration activists and other members of the public[] routinely photograph, film, and publish online ICE ERO enforcement actions to include" officers' personal identities and then post the interactions online for the sole purpose of harassing government officials. A37. "During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as 'doxx these people,' 'find out who they are and where they live,' and 'we will find out who you are and who your family members are.'" A37. Protestors follow officers to their hotels and post their hotel locations online. A38-39. Doxxing is encouraged across the Internet and, once activists find out officers' identities, they continue to search for officers' family members and their homes. A39. Activists have similarly doxxed, harassed, and assaulted CBP and U.S Border Patrol officials, *see* A46-47. FBI Special Agents across the country have likewise been targeted for harm, including harassment, assault, and murder. A53

The district court acknowledged that the United States' declarations "cite increases in threats and assaults against federal officers and detail specific incidents of federal officers suffering such harms," and stated that it did "not discount these real harms that impact federal officers." A16. But it reasoned that "these harms are the result of criminal behavior" and so "[a] rule that prohibits law enforcement officers from wearing masks or requires them to have visible identification does not facilitate or enable criminals to harm law enforcement officers." A16. But the fact

that these harms are the result of criminal behavior is a non-sequitur. As ICE's declaration explained—reflecting common sense—"protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats." A39. And the district court's contention that requiring visible identification does not as a practical matter "enable" criminals to harm law-enforcement officers (even if that is not the intent of the law) is a non-starter; of course it does.

As for operational considerations, "ICE routinely conducts investigations and surveillance in plainclothes to locate and apprehend illegal aliens, particularly in public courts or community areas where targets may attempt to evade detection," and a requirement to wear identification would obviously "compromise operational security by alerting targets to the presence of law enforcement and increasing the likelihood of flight." A40. And "[t]he visible identification requirement would therefore undermine ICE's ability to apprehend even those individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves." A40; *see also* A54 (FBI engages in "surveillance [that] hinges on an investigator's ability to remain undetected or unidentified"); A59 ("most DEA investigations require Special Agents to conduct surveillance and meet with confidential informants, and their ability to do so safely depends on not being identified as law enforcement").

The district court observed that the No Vigilantes Act exempts active undercover operations or investigative activities. A4; A17-18. But California does not define these (or many other) terms and it is at best doubtful that California would construe its law to exempt all or even most plainclothes operations; if it did, that would swallow the rule that "[a] law enforcement officer operating in California that is not uniformed . . . shall visibly display identification." At an absolute minimum, federal officials relying on their own interpretation of the exceptions would run the risk of criminal penalties if they turned out to be wrong. The federal government does not have to clear undercover or other operations with California lest some zealous prosecutor later decide the exceptions were not met.

Concealing identification also assists in law-enforcement operations because of the numerous activists in California who blow whistles or otherwise alert potential targets to the presence of law enforcement. A17. But in contrast to its analysis of safety considerations, the district court dismissed this argument because it viewed such activities as *legal* (in its apparent view, alerting targets to the presence of law enforcement and related activities are protected by the First Amendment). A17. Even if that is correct—and it is likely at least not *categorically* correct—the mere fact that it would be lawful for members of the public to disseminate information does not mean that the government is compelled to provide it in the first place. And as noted, none of this matters anyway because California categorically lacks authority

21

to directly regulate the federal government regardless of the perceived necessity and prudence of the federal practices at issue.

**B.    The other injunction factors strongly favor the government.**

Under this Court's sliding-scale approach to the preliminary-injunction factors, "a stronger showing of one element may offset a weaker showing of another." *National TPS Alliance v. Noem*, 150 F.4th 1000, 1016 (9th Cir. 2025) (quotation marks omitted). Because the United States is certain, not merely likely, to prevail on appeal, a lesser showing is required for the remaining factors. But those factors decisively favor the United States as well.

Irreparable harm necessarily results from the enforcement of a preempted state law. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on Supremacy Clause violation); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("[T]he first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."). The district court correctly held that, as to the facial-covering ban, the United States' likelihood of success was sufficient to presume irreparable harm. A23. Similarly, since the identification requirements are invalid, that alone suffices to show irreparable harm.

But that is not all. Although the district court was wrong to require an interference with federal functions, the challenged requirements here would, for all the reasons given above, substantially hamper federal operations in California as well as endanger the lives and well-being of federal officers and their families. *See supra* p.18-21. On top of that, federal officers face a credible threat of prosecution—as even the district court recognized. A8. That independently qualifies as irreparable harm. *See Ga. Latino Alliance for Human Rights v. Gov. of Georgia*, 691 F.3d 1250, 1269 (11th Cir.2012) (likelihood of irreparable harm because plaintiffs were "under the threat of state prosecution for crimes that conflict with federal law"); *accord Valle Del Sol*, 732 F.3d at 1029. It is difficult to imagine a more obvious sovereign irreparable harm than a state criminally prosecuting federal officials based on a policy disagreement with the federal government about how the federal government conducts law-enforcement operations or mitigates threats to officer safety.

The balance of equities and the public interest likewise favor the United States. Because the challenged laws are invalid under the Supremacy Clause, they are not in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (public interest represented by "the Constitution's declaration that federal law is to be supreme"). But in addition, the challenged provisions are not just legally baseless—they are irresponsible and dangerous. By seeking to directly regulate the United States and criminally prosecute its officials

based on the performance of their official duties, California has set up a direct conflict between state and federal authority. And indeed, shortly after the United States filed its motion for a preliminary injunction, California established an online portal soliciting information from the public "regarding potentially unlawful activity by federal agents and officers across [California]."[3] The portal is explicitly intended to "help the California Department of Justice create a record of potential unlawful conduct by federal agents, and inform possible legal actions the state may take."

These statements, along with the challenged laws themselves, raise the serious possibility that California intends to have its state law enforcement pursue federal law-enforcement officials, including by attempting to make arrests of federal officials and to criminally prosecute them. The public interest—and the rule of law—strongly support enjoining California's obviously unconstitutional law before California escalates the situation further. At the very least, it is untenable to have California police agencies and prosecutors make these decisions. Having local law enforcement doggedly pursue federal law enforcement while federal officials are enforcing federal law—based on (at best) novel and dubious legal theories—is dangerous and clearly contrary to the public interest. At the very least, this Court should demarcate the lawful parameters in advance rather than wait for California to

---

[3] See Press Release, California announces new online portal to report misconduct by federal agents, Cal. (Dec. 3, 2025), https://www.gov.ca.gov/2025/12/03/californiaannounces-new-online-portal-to-report-misconduct-by-federal-agent/.

pursue criminal charges based on its policy disagreements with the federal government.

## CONCLUSION

The Court should enjoin enforcement of the No Vigilantes Act's identification requirements (Section 10 of the Act) against the federal government pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *andrew.bernie@usdoj.gov*

February 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,582 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman font.

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE

**ADDENDUM**

# TABLE OF CONTENTS

Ordering Granting in Part and Denying in Part the United States' Motion for
a Preliminary Injunction,
District Court Docket No. 63 (filed February 9, 2026) .....................................A1

Declaration of Sergio Albarran,
District Court Docket No. 11-2 (filed November 25, 2025) .........................A31

Declaration of Michael R. Vargas,
District Court Docket No. 11-3 (filed November 25, 2025) .........................A42

Declaration of Michael H. Glasheen,
District Court Docket No. 11-4 (filed November 25, 2025) .........................A51

Declaration of Matthew W. Allen,
District Court Docket No. 11-5 (filed November 25, 2025) .........................A56

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

| Present: The Honorable | CHRISTINA A. SNYDER |
|---|---|

| Catherine Jeang | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                              Not Present

**Proceedings:**      (IN CHAMBERS) - PLAINTIFF THE UNITED STATES OF
AMERICA'S MOTION FOR PRELIMINARY INJUNCTION
(Dkt. 11, filed on November 25, 2025)

## I.    INTRODUCTION

Plaintiff, the United States of America ("the United States"), filed this action against the State of California, California Governor Gavin Newsom, and California Attorney General Robert Bonta (collectively, "California") on November 17, 2025, to challenge the constitutionality and prevent the enforcement of two recently-enacted state laws: SB 627 (the "No Secret Police Act") and SB 805 (the "No Vigilantes Act"). Dkt. 1 ("Compl."). The Complaint alleges that the No Secret Police Act and the No Vigilantes Act violate the Supremacy Clause of the United States Constitution by directly regulating the federal government. Id. ¶ 8. The Complaint also alleges that the No Secret Police Act violates the Supremacy Clause by discriminating against the federal government. Id. at ¶ 9.

On November 25, 2025, the United States filed a motion for a preliminary injunction to enjoin California from enforcing the challenged provisions of the No Secret Police Act and No Vigilantes Act. Dkt. 11 ("Mot.").[1] On December 22, 2025, California

---

[1] The United States also filed several supporting fact declarations. Dkt. 11-2 ("Albarran Decl."), dkt. 11-3 ("Vargas Decl."), dkt. 11-4 ("Glasheen Decl."), dkt. 11-5 ("Allen Decl.").

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL                    'O'

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

filed an opposition.  Dkt. 29 ("Opp.").[2]  On January 5, 2026, the United States filed a reply in support of its preliminary injunction motion.  Dkt. 42 ("Reply").

In addition to these submissions, the Court granted the following amici leave to file amicus briefs: Prosecutors Alliance Action, dkt. 46; Public Counsel, the Center for Human Rights and Constitutional Law, the Inland Coalition for Immigrant Justice, Immigrant Defenders Law Center, and the American Civil Liberties Union Foundation of Southern California, dkt. 48; the Center for Policing Equity, the Yale Law School Justice Collaboratory, and the National Immigration Law Center, dkt. 50; Public Rights Project, on behalf of local government leaders from across the state of California, dkt. 52; and Asian Americans Advancing Justice Southern California and the Sikh American Legal Defense and Education Fund, dkt. 54.

On January 14, 2026, the Court held a hearing.  Having carefully considered the parties' arguments, and the submissions of amici, the Court finds and concludes as follows.

## II.    RELEVANT BACKGROUND

The following facts are alleged in the complaint and evidentiary record.

### A.    The Challenged Acts

The No Secret Police Act and the No Vigilantes Act were signed into law by California Governor Gavin Newsom on September 20, 2025, in response to recent federal enforcement operations in California.  Compl. ¶¶ 3, 4-5.  The Acts were set to take effect on January 1, 2026, but California agreed to stay enforcement of the laws against federal law enforcement agencies or officers, until such time as the Court rules on the United States' instant motion for a preliminary injunction.  Id.; dkt. 20.

---

[2] California also filed several supporting fact declarations.  Dkt. 29-2 ("Bell Decl."), dkt. 29-3 ("Shuchart Decl."), dkt. 29-4 ("Wong Decl."), dkt. 29-5 ("Schrader Decl."), dkt. 29-6 ("Franklin Decl."), dkt 29-7 ("Hurst Decl."), dkt. 29-8 ("Velez Decl."), dkt. 29-9 ("Shouhed Decl."), dkt. 29-10 ("Mundwiler Decl."), dkt. 29-11 ("Speranza Decl."), dkt. 29-12 ("Le Blanc Decl."), dkt. 29-13 ("Miranda Decl."), dkt. 29-14 ("Anderson Decl."), dkt. 29-15 ("Solorzano Decl."), dkt. 29-16 ("Aguiluz Decl."), dkt. 29-17 ("De La Riva Decl."), dkt. 29-18 ("Carrasco Decl.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                     **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

1.      The No Secret Police Act (SB 627)

The No Secret Police Act prohibits any law enforcement officer from wearing a
facial covering in the performance of his duties, except as specified, unless the agency
employing the officer has posted a compliant policy regarding facial coverings.  SB 627 §
3 ("facial covering prohibition").  The Act permits a law enforcement officer to wear a
facial covering in the following excepted circumstances: Special Weapons and Tactics
(SWAT) team duties; active undercover operations or assignments authorized by
supervising personnel or court order; tactical operations where protective gear is required
for physical safety; occupational health and safety; protection of identity during
prosecution; and reasonable accommodations.  Id. § 2(b)(3), § 3(c).  The Act defines a
law enforcement officer as a peace officer, as defined in Cal. Penal Code § 830,
employed by a city, county, or other local agency as well as any officer or agent of a
federal law enforcement agency or any law enforcement agency of another state or any
person acting on behalf of a federal law enforcement agency or law enforcement agency
of another state.  Id. § 3(e).  This definition does not include law enforcement officers
employed by the State of California.  The Act makes a willful and knowing violation of
this provision punishable as an infraction or a misdemeanor.  Id. § 3(d).

The Act also provides that any person who is found to have committed assault,
battery, false imprisonment, false arrest, abuse of process, or malicious prosecution while
wearing a facial covering in a knowing and willful violation of SB 627 § 3 shall not be
entitled to assert any privilege or immunity for his tortious conduct against a claim of
civil liability and shall be liable for the greater of actual damages or statutory damages of
$10,000.  Id. § 3(g).[3]

The Act also requires any law enforcement agency operating in California to, by
July 1, 2026, maintain and publicly post a written policy regarding the use of facial
coverings.  SB 627 § 2 ("policy statement provision").  The Act defines a law
enforcement agency as any entity of a city, county, or other local agency, that employs a
peace officer described in Cal. Penal Code § 830, any law enforcement agency of another
state, and any federal law enforcement agency.  Id. § 2(d)(2).  This definition does not

---

[3] This civil liability provision is not within the scope of the United States' challenge
under the intergovernmental immunities doctrine because its application against federal
officers exercising federal duties is already limited by existing laws that restrict civil
actions against federal officers for tortious conduct.

A003

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

include California state agencies. The criminal penalties of § 3(d) do not apply to any law enforcement officer acting in their capacity as an employee of a law enforcement agency that complies with the policy statement provision in § 2. Id. § 3(f).

The No Secret Police Act declares its provisions to be severable. Id. § 4. The United States challenges the policy statement provision and the facial covering prohibition as unconstitutional.

       2.      The No Vigilantes Act (SB 805)

The No Vigilantes Act requires any law enforcement officer operating in California to visibly display identification that includes their agency and either a name or badge number to the public when performing their enforcement duties.[4] SB 805 § 10 ("visible identification provision"). This requirement does not apply to any officer engaged in active undercover operations or investigative activities, exigent circumstances, SWAT operations, and other limited circumstances. Id. § 10(b). The Act makes a willful and knowing violation of this provision punishable as a misdemeanor. Id. § 10(c). For the purpose of this provision, the Act defines law enforcement duties as "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes," and it defines a law enforcement officer as any peace officer as defined in Cal. Penal Code § 830, and any federal law enforcement officer. Id. § 10(d). This definition includes California state law enforcement officers.

The Act also requires law enforcement agencies operating in California to maintain and publicly post a written policy on the visible identification of sworn personnel. SB 805 § 2 ("policy statement provision"). The Act defines a law enforcement agency as any state or local entity that employs a peace officer described in Cal. Penal Code § 830, any law enforcement agency of another state, and any federal law enforcement agency. Id. § 2(c)(2). This definition includes California state agencies. Section 10 and its penalties do not apply to personnel of a law enforcement agency that complies with the policy statement provision in § 2. Id. § 10(e).

---

[4] Both parties agree that uniformed and non-uniformed federal officers are covered by SB 805 § 10(a).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL                    'O'

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title    | The United States of America v. State of California et al | | |

The No Vigilantes Act declares its provisions to be severable. Id. § 11. The United States challenges the policy statement provision and the visible identification provision as unconstitutional.

### B.    The United States Files Suit

The United States filed this action alleging that the provisions of the No Secret Police Act and the No Vigilantes Act that apply to federal law enforcement agencies and officers violate the Supremacy Clause of the United States Constitution and the intergovernmental immunity doctrine by impermissibly regulating the federal government. Compl. ¶¶ 72-78. Alternatively, the United States argues that the No Secret Police Act discriminates against the United States because it does not apply to all California law enforcement officers. Id. ¶¶ 80-85. The United States does not allege that the No Vigilantes Act unlawfully discriminates against the federal government. The United States asserts that federal law enforcement agencies cannot and will not comply with the challenged Acts, which the United States claims are unconstitutional and recklessly disregard officers' safety and federal operational needs. Id. ¶¶ 51, 68. The United States alleges that the threat of criminal prosecution facing individual federal officers will have the likely effect of impeding federal law enforcement in California. Id. ¶ 70.

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20; accord Am. Trucking Ass'n, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011) (interpreting Winter and explaining that the "sliding scale" test for preliminary injunctive relief remains valid). Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." Bernhardt v. Los Angeles Cty., 339 F.3d 920, 926 (9th Cir. 2003) (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988)).

A005

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

A plaintiff seeking a preliminary injunction must show more than the "possibility" of irreparable injury; he must demonstrate that irreparable injury is "likely" in the absence of preliminary relief. Winter, 555 U.S. at 22; Am. Trucking, 559 F.3d at 1052. It is not enough that the claimed harm be irreparable—it also must be imminent. Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). Conclusory affidavits are insufficient to demonstrate irreparable harm. Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985).

## IV.    DISCUSSION

### A.    Standing

The United States argues that it has pre-enforcement standing to bring this suit to enjoin California's laws before they take effect. Mot. at 9. The United States argues that it satisfies the requirements for pre-enforcement standing by asserting "an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a [state] statute, and there exists a credible threat of prosecution thereunder." Id. (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)). The United States argues that the very fact that a state is attempting to regulate the conduct of the federal government inflicts a "sovereign injury" on the United States. Id. Beyond sovereign injury, the United States argues that the two challenged Acts threaten the strong federal interest in the zealous enforcement of the law by reducing the number of federal law enforcement officers willing to engage in certain operations without the discretion to conceal their identities. Id. at 10. The United States clearly asserts that it will not direct its law enforcement agencies or officers to comply with the two challenged Acts. Id. (citing Albarran Decl. ¶ 9; Vargas Decl. ¶¶ 7, 23; Allen Decl. ¶ 13; Glasheen Decl. ¶ 15). The United States argues that as a consequence, federal officers are threatened with state criminal prosecution. Id. The United States argues that public statements of state officials are evidence that the threat of future enforcement against federal agencies and officers is substantial. Id. at 10-11.

In opposition, California argues that the United States does not satisfy the standard for pre-enforcement standing. Opp. at 11. First, California argues that the United States' claims that the challenged Acts will likely deter law enforcement officers from taking safety measures or reduce the number of officers willing to engage in certain operations are merely conjectural and do not establish an actual or imminent injury. Id. at 11-12. Second, California argues that the United States' declarants' statements are equivocal

A006

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

such that they do not constitute a concrete plan to violate the state laws.  Opp. at 12.
Specifically, California cites to statements that the agencies will violate the state laws
where "appropriate to do so," Glasheen Decl. ¶ 15, or that the state laws "interfere with
discretion to authorize" uniform and facial-covering modifications, Vargas Decl. ¶ 19.
Id.  Third, California argues that even if the United States unequivocally refused to
comply with the policy statement provisions of the two challenged Acts, such
noncompliance would not establish a credible threat of prosecution because the
challenged Acts provide no penalties for noncompliance with the policy statement
provisions.  Id. (citing Cal. Gov't Code §§ 7288, 7289).  California argues that each law's
policy statement provision is merely a safe harbor, exempting law enforcement officers
from prosecution if their agency complies.  Id. (citing Cal. Penal Code § 185.5(f),
13654(e)).  Finally, California argues that the United States has not shown that
prosecuting authorities have communicated a specific warning or threat to initiate
proceedings, and that a generalized threat of prosecution is insufficient.  Id.  California
contends that certain officials' public statements which communicate a general openness
to charging federal officers with violations of state law do not evince a specific intention
to charge officers with violations of these particular laws.  Id. at 12-13.

    In reply, the United States argues that the federal government has unequivocally
stated that ICE officers will not comply with either law, and that federal officers will
continue exercising their discretion to use masks and to not display their identification in
appropriate circumstances.  Reply at 2-3.  The United States asserts that "no federal
agency intends to issue the policy statements that California requires."  Id. at 3.  The
United States argues that it has the sovereign authority to manage federal law
enforcement activity and need not cede that authority to California by complying with
California's purported requirements for federal law enforcement officers.  Id.  The United
States contends that this "sovereign injury" alone suffices to establish standing.  Id.
Additionally, the United States argues that California's refusal to disavow enforcement of
the challenged Acts and California's new online portal for the public to report
misconduct by federal officers across California are evidence that the state intends to
enforce the laws.  Id. at 2-4.

    "Whether the question is viewed as one of standing or ripeness, the Constitution
mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or
controversy,' that the issues presented are 'definite and concrete, not hypothetical or
abstract.'"  Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir.

A007

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

2000) (en banc) (quoting <u>Railway Mail Ass'n v. Corsi</u>, 326 U.S. 88, 93 (1945)). "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." <u>Id.</u> at 1138. Article III requires the United States as plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. <u>See</u> <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016).

"For pre-enforcement plaintiffs, the injury is the anticipated enforcement of the challenged statute in the future. One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality." <u>Peace Ranch, LLC v. Bonta</u>, 93 F.4th 482, 487 (9th Cir. 2024) (citing <u>Steffel v. Thompson</u>, 415 U.S. 452, 459 (1974)). To establish pre-enforcement standing, a plaintiff must allege the following three factors: (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) the conduct is "proscribed by a statute," and (3) there must be "a credible threat of prosecution" under the statute. <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 159 (2014) (quoting <u>Babbitt v. Farm Workers</u>, 442 U.S. 289, 298 (1979)).

Here, the Court finds that the United States has established the first two <u>Driehaus</u> factors with respect to the two challenged Acts. The United States and its supporting declarants have asserted multiple times that federal law enforcement agencies and officers intend to engage in federal law enforcement activities that are not in compliance with the No Secret Police Act or the No Vigilantes Act. <u>See</u> Compl. ¶¶ 11, 15, 51, 68; Albarran Decl. ¶¶ 9, 20; Vargas Decl. ¶¶ 7, 23; Glasheen Decl. ¶ 15; Allen Decl. ¶¶ 13, 19.

With regard to the third <u>Driehaus</u> factor, the Court finds that there is a credible threat of prosecution under the statutes for federal law enforcement officers who violate either the facial covering prohibition of the No Secret Police Act, SB 627 § 3, or the visible identification provision of the No Vigilantes Act, SB 805 § 10. Notwithstanding the stipulated stay of enforcement pending resolution of the instant motion for a preliminary injunction, California has not disavowed its intent to enforce the two challenged Acts against federal officers. "Here, the state's refusal to disavow enforcement . . . is strong evidence that the state intends to enforce the law and that [plaintiff] face[s] a credible threat." <u>California Trucking Ass'n v. Bonta</u>, 996 F.3d 644, 653 (9th Cir. 2021); see also <u>Peace Ranch, LLC v. Bonta</u>, 93 F.4th 482, 490 (9th Cir.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

2024) ("This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement.").

However, the Court also finds that the third <u>Driehaus</u> factor has not been established by the United States with respect to the two challenged Acts' policy statement provisions because these provisions do not carry any penalties for noncompliance, and there will not be any compliance costs because "no federal agency intends to issue the policy statements that California requires." Reply at 3.[5] Thus, the United States has not "demonstrate[d] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." <u>Babbitt v. United Farm Workers Nat. Union</u>, 442 U.S. 289, 298 (1979). Therefore, the United States has standing to challenge only the provisions of the challenged Acts for which there are substantial and credible risks of prosecution: the No Secret Police Act's facial covering prohibition and the No Vigilante Act's visible identification provision. Accordingly, to the extent that the United States' motion for a preliminary injunction seeks to enjoin the policy statement provision of either law, the motion is denied on the grounds that the United States lacks standing.

**B.    Facial Challenge**

California argues that the United States has not satisfied the standard for bringing a facial challenge to either the facial covering prohibition or the visible identification provision. Opp. at 17. California argues that the United States cannot show that, in all circumstances, masking or concealing identification by federal officers is both subjectively necessary and objectively reasonable. <u>Id.</u> California argues that whether an individual federal officer is immune from state prosecution under Supremacy Clause immunity depends on specific facts and should be litigated as an as-applied challenge. <u>Id.</u> at 17-18.

In reply, the United States argues that its facial challenges are proper, and that it need not show that Supremacy Clause immunity protects individual officers from

---

[5] Even if a federal agency intended to comply with either policy statement provision, compliance costs would not confer standing to challenge the policy statement provisions because the compliance costs would be voluntarily incurred. <u>See</u> <u>Twitter, Inc. v. Paxton</u>, 56 F.4th 1170, 1176 (9th Cir. 2022) (actions taken by plaintiff in response to a civil investigative demand, which "is not self-enforcing," were insufficient to create an Article III injury "because the actions were voluntary.").

A009

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | | Date | February 9, 2026 |
|----------|------------------------|---|------|------------------|
| Title | The United States of America v. State of California et al | | | |

prosecution in all circumstances.  Reply at 9-10.  Instead, the United States argues that the provisions of the two challenged Acts are facially invalid because there is no circumstance in which it would be lawful for California to require federal agencies to adopt California's preferred policies or to remove discretion from federal agencies and officers to determine their unform and identification practices.  Id. at 10.  In other words, the United States argues that the challenged Acts are facially invalid because they violate the Supremacy Clause.  Id. at 11.

Supremacy Clause immunity and the intergovernmental immunity both arise out of the Supremacy Clause of the Constitution and are employed by the federal government to challenge the enforcement of state laws.  However, the doctrines are applied at different stages of enforcement, by different parties, and require different inquiries.  Supremacy Clause immunity can be raised by a federal officer being prosecuted for a violation of state law, and the officer must show that "his acts are both (1) authorized by the laws of the United States and (2) necessary and proper to the execution of his responsibilities." Morgan v. People of State of Cal., 743 F.2d 728, 731 (9th Cir. 1984) (citing In re Neagle, 135 U.S. 1, 75 (1890); Connecticut v. Marra, 528 F. Supp. 381, 385 (D. Conn. 1981)). On the other hand, the intergovernmental immunity doctrine can be raised by the United States to challenge the validity of a state law, as in the instant case.  Under the intergovernmental immunity doctrine, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."  North Dakota v. United States, 495 U.S. 423, 435 (1990).  The Court finds that the challenged Acts are each subject to facial challenges as potentially violating the intergovernmental immunity doctrine, irrespective of whether Supremacy Clause immunity would bar state prosecutions of federal officers for violating the Acts in only some or in all circumstances.  Nonetheless, as the Court explains further below, the availability of a Supremacy Clause immunity defense to individual officers facing prosecution for the violation of state laws during the exercise of federal duties informs the Court's analysis of how the intergovernmental immunity doctrine protects "the delicate balance between federal and state law enforcement powers."  Com. of Ky. v. Long, 837 F.2d 727, 749 (6th Cir. 1988).  Accordingly, the Court proceeds to consider the United States' claims that the challenged provisions are facially invalid under the intergovernmental immunity doctrine.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**               **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

### C.   Preliminary Injunction

The Court considers the four <u>Winter</u> factors in turn.

####   1.   Likelihood of Success on the Merits

The United States argues that the challenged provisions violate the Supremacy Clause of the Constitution. Mot. at 11. "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." <u>Arizona v. United States</u>, 567 U.S. 387, 398 (2012). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 458 (1991). "In the tension between federal and state power lies the promise of liberty." <u>Id.</u> at 459.

The Supremacy Clause mandates that the Constitution and the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. This principle of federal supremacy gives Congress the power to preempt state law. <u>Arizona v. United States</u>, 567 U.S. 387, 399 (2012). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 541 (2001) (internal citations omitted).

Here, the United States does not invoke express preemption, implied field preemption, or conflict preemption as bases for its challenge to the Acts. There is no federal law or regulation that requires federal law enforcement officers to wear facial coverings or to conceal their agency, name, or badge number while exercising federal law enforcement duties. In fact, some federal laws and regulations require visible identification in certain circumstances. <u>See e.g.,</u> 10 U.S.C. § 723(a) (federal law enforcement personnel are required to visibly display their name or other identifier and the name of the federal agency they serve when responding to a civil disturbance); 8 C.F.R. §287.8(c)(2)(iii)(A) (2025) (DHS regulations require ICE agents to identify themselves as immigration officers at the time of any arrest). Furthermore, no federal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

agency has a policy that affirmatively requires its law enforcement officers to wear facial coverings for the purpose of concealing their identity, and no agency policy prohibits its law enforcement officers from wearing visible identification as required by the No Vigilantes Act.

Instead, the United States invokes the intergovernmental immunity doctrine. "The doctrine of intergovernmental immunity arose from the Supreme Court's decision in McCulloch v. Maryland, which established that 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.'" United States v. City of Arcata, 629 F.3d 986, 991 (9th Cir. 2010) (quoting McCulloch, 17 U.S. 316, 317 (1819)) (internal citation omitted). Today, the intergovernmental immunity doctrine "generally immunizes the Federal Government from state laws that [1] directly regulate or [2] discriminate against it." United States v. Washington, 596 U.S. 832, 835 (2022) (citing South Carolina v. Baker, 485 U.S. 505, 523 (1988)). If a state law either directly regulates or discriminates against the federal government, intergovernmental immunity applies "unless Congress provides 'clear and unambiguous' authorization for such regulation." Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 180 (1988) (quoting EPA v. State Water Res. Control Bd., 426 U.S. 200, 211 (1976)). Here, California does not claim any such congressional authorization. Therefore, the challenged provisions violate the Supremacy Clause if they either directly regulate the federal government or discriminate against it.

a)    Direct Regulation of the Federal Government

The United States argues that the express terms of the Acts directly regulate the federal government by "constraining the conduct of federal agents." Mot. at 13 (quoting United States v. City of Arcata, 629 F.3d 986, 991 (9th Cir. 2010)). The No Secret Police Act prohibits "any officer or agent of a federal law enforcement agency," SB 627 § 3(e), from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties," SB 627 § 3(a). Mot. at 13. The No Vigilantes Act requires "any federal law enforcement officer," SB 805 § 10(d)(2), to "visibly display identification," SB 805 § 10(a). Mot. at 13. The United States argues that the challenged provisions are direct regulations because enforcement against the federal government would substantially hamper federal operations. Id. (citing CoreCivic, Inc. v. Governor of New Jersey, 145 F.4th 315, 327 (3d Cir. 2025); Pub. Utils. Comm'n of State of Cal. v. United States, 355 U.S. 534, 543 (1958)). The United States argues that the Acts risk

A012

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | | Date | February 9, 2026 |
|---|---|---|---|---|
| Title | The United States of America v. State of California et al | | | |

chilling federal activities by subjecting federal officers to criminal liability for
noncompliance, and that states cannot subject federal officers to state criminal liability
for actions undertaken in accordance with federal law. Id. at 14 (citing Tennessee v.
Davis, 100 U.S. 257, 263 (1879); In re Neagle, 135 U.S. 1, 75 (1890)).  The United States
also argues that if federal officers were forced to comply with the challenged Acts, they
would be publicly exposed to doxxing, harassment, assaults, and threats.  Mot. at 14.  The
United States contends that permitting officers to wear masks or to conceal their identity
is critical or may be necessary to protect agents' safety and to mitigate the risk of evasion
by investigative subjects.  Id.  For these reasons, the United States concludes that the
challenged provisions threaten to "destroy the federal function" of law enforcement in
California.  Id. at 15 (quoting United States v. Fresno Cnty., 429 U.S. 452, 463 n.11
(1977)).

         In opposition, California argues that each of the challenged provisions is a
legitimate exercise of California's police powers that "at most, only incidentally affects"
federal immigration and law enforcement.  Opp. at 13 (quoting Texas v. United States
Dep't of Homeland Sec., 123 F.4th 186, 205 (5th Cir. 2024)).  California argues that by
regulating facial coverings that are merely incidental to law enforcement officers' duties,
the facial covering prohibition of the No Secret Police Act does not control, impede, or
grant "virtual power of review" over federal law enforcement activities, and therefore it
does not amount to an unconstitutional direct regulation.  Id. (quoting Geo Grp., Inc. v.
Inslee, 151 F.4th 1107, 1117 (9th Cir. 2025)).  Similarly, California argues that the
visible identification provision of the No Vigilantes Act does not run afoul of
intergovernmental immunity because it is a generally applicable statute that does not
threaten to "transform," "prevent," or "destroy" federal law enforcement functions.  Id. at
16 (quoting Geo Grp., Inc. v. Newsom, 50 F.4th 745, 750 (9th Cir. 2022); Inslee, 151
F.4th at 1118; and Mot. at 15).  California argues that federal officers are not per se
immune from liability under either the No Secret Police Act or the No Vigilantes Act
because the United States cannot show that noncompliance is always necessary and
proper to carrying out federal law enforcement duties.  Opp. at 14, 17 (citing Clifton v.
Cox, 549 F.2d 722, 729-30 (9th Cir. 1977)).  Therefore, California argues that it may
properly enact and enforce these generally applicable criminal laws.  Id. at 15.  California
contends that the provisions are consistent with how federal law enforcement officers
have operated for decades and that the Acts' broad exceptions accommodate a wide range
of law enforcement activities, such as undercover operations, investigative activities,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

exigent circumstances, and officers engaged in SWAT or tactical-team responsibilities. Id. at 16-17.

In reply, the United States argues that the challenged Acts do not merely incidentally impact federal operations but rather "regulate federal agencies and officers down to minute details subject to criminal prosecution." Reply at 5. The United States argues that Ninth Circuit precedent invalidating less intrusive regulations supports its position. Id. The United States contends that the obligations of the challenged Acts, if enforced, will substantially burden the federal government's operations. Id. at 6. And the United States argues that California has no historic police power to regulate federal agencies' policies or federal officers' uniforms and gear. Id. Furthermore, the United States argues that whether the ill effects of the challenged Acts could be mitigated through their narrow exceptions or other measures is irrelevant because California has no authority to impose these requirements on federal officers in the first place. Id. at 6 n.6. The United States argues that California's contention that the challenged Acts do not prohibit the federal government from enforcing federal law misses the point because states cannot "constrain" or "control" the conduct of federal officials. Id. at 7-8 (citing United States v. City of Arcata, 629 F.3d 986, 991 (9th Cir. 2010); Johnson v. Maryland, 254 U.S. 51, 56-57 (1920).

The Court first considers whether the challenged provisions are within the powers reserved to the states by the Tenth Amendment of the Constitution. Cf. United States v. City of Arcata, 629 F.3d 986, 992 (9th Cir. 2010) (challenged ordinance "regulating the federal government's military recruitment efforts is not a power reserved to the states."). Here, unlike in Arcata, the challenged provisions, restricting law enforcement officers in California from wearing masks indiscriminately and requiring visible identification, are within the state's police powers. See Buchanan v. Warley, 245 U.S. 60, 74 (1917) ("The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad."); see also Gonzales v. Raich, 545 U.S. 1, 42 (2005) (O'Connor, J., dissenting) ("The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens.") (citing cases).

But an exercise of state police powers may still violate the intergovernmental immunity doctrine if it directly regulates the federal government—i.e., if the law itself obstructs the federal government's operations. See United States v. California, 921 F.3d 865, 880 (9th Cir. 2019) ("[T]he United States' position that no obstruction is required in

A014

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

intergovernmental immunity cases ignores the origins of the doctrine and the occasions in which it has been applied."). The Supremacy Clause commands that "[t]he United States may perform its functions without conforming to the police regulations of a state." State of Arizona v. State of California, 283 U.S. 423, 451 (1931).

Accordingly, courts take "a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." North Dakota v. United States, 495 U.S. 423, 435 (1990); see also Com. of Ky. v. Long, 837 F.2d 727, 749 (6th Cir. 1988) ("Under principles announced long ago in McCulloch v. Maryland, the national government cannot be made to tolerate undue interference from the states in the enforcement of federal law. But neither should any state be made to tolerate unwarranted interference with its duty to protect the health and welfare of its citizens.").

Therefore, the determination of whether a state law "directly regulates" the federal government in violation of intergovernmental immunity demands a functional inquiry into whether the regulations at issue "interfer[e] with or control[] the operations of the Federal Government." United States v. Washington, 596 U.S. 832, 838 (2022); see also Com. of Ky. v. Long, 837 F.2d 727, 746 (6th Cir. 1988) ("But while it is necessary for federal officials to be able to enforce federal laws without undue interference from the states, on the other hand the Supremacy Clause was not intended to be a shield for 'anything goes' conduct by federal law enforcement officers."). The critical question is whether state laws "affect incidentally the mode of carrying out [federal] employment," or rather seek to "control" federal functions. Johnson v. State of Maryland, 254 U.S. 51, 56-57 (1920).

"Applying the functional approach that intergovernmental immunity demands," CoreCivic, Inc. v. Governor of New Jersey, 145 F.4th 315, 325 (3d Cir. 2025), the Court finds that the United States has not met its burden to show that enforcement of the challenged provisions, which prohibit law enforcement officers in California from wearing masks and require law enforcement officers in California to have visible identification, would interfere with or take control of federal law enforcement operations. Although the challenged provisions dictate how a federal officer may carry out his law enforcement duties—prohibiting a facial covering and requiring the display of visible identification that includes their agency and either a name or badge number in non-exempted circumstances—the Court finds them analogous to traffic laws that, in a

A015

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

similar sense, dictate how a federal officer may operate a vehicle on state roads but are nonetheless enforceable against federal officers, subject to immunities.

The United States has not shown that its current practices with respect to masking and identification are essential to federal law enforcement operations such that state regulations in those areas seek to interfere with or control federal law enforcement functions.  At the hearing and in its briefing, the United States argued that discretionary policies for masking and identification are critical to officer safety because the exposure of federal agents' identities subjects those agents to greater risks of being doxxed, harassed, assaulted, or threatened.  The United States points to its supporting declarations which cite increases in threats and assaults against federal officers and detail specific incidents of federal officers suffering such harms.  The United States argues that these increased risks, in turn, increase security costs the federal government incurs to protect its officers.  The Court recognizes that federal law enforcement officers, like many public figures, including judges, politicians, and celebrities, are exposed to the risk of being doxxed, harassed, assaulted, or threatened by virtue of their public occupations.  The Court does not discount these real harms that impact federal officers.  However, these harms are the result of criminal behavior.[6]  A rule that prohibits law enforcement officers from wearing masks or requires them to have visible identification does not facilitate or enable criminals to harm law enforcement officers.

At the hearing, the United States argued that federal law enforcement, specifically immigration law enforcement, is already more difficult in states and cities with "sanctuary" policies prohibiting cooperation between federal and local law enforcement, and the political environment and heightened rhetoric around federal immigration enforcement makes federal officers' jobs particularly dangerous.  But the United States has not adequately explained how discretionary masking and identification policies are essential to the operations or safety of federal law enforcement amid this tense political environment.  Security concerns exist for federal law enforcement officers with and without masks.  If anything, the Court finds that the presence of masked and unidentifiable individuals, including law enforcement, is more likely to heighten the

---

[6] California law prohibits doxxing, stalking, criminal threats, assaults, and resisting executive officers.  See, e.g., Cal. Pen. Code § 653.2; 646.9; 422; 241; and 69.  Federal law also prohibits certain threats, 18 U.S.C. § 875, and assaulting, resisting, or impeding federal officers, 18 U.S.C. § 111.

A016

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

sense of insecurity for all. <u>See</u> dkt. 48 at 6-7. Moreover, the notion that it is necessary for federal law enforcement officers to conceal their identification is belied by the historical tradition of law enforcement officers not masking their identities and the current practice of some federal officers who choose to expose their identity alongside colleagues with masks. <u>See</u> Schrader Decl. ¶¶ 7, 18-20. If masking or concealing identification were as critical to federal operations as the United States asserts, the Court would expect that federal agencies would not leave such decisions to the discretion of individual officers. But notably, no federal law or agency regulation explicitly requires masking or concealing identification. Thus, the challenged provisions do not "override[] federal decisions." <u>Boeing Co. v. Movassaghi</u>, 768 F.3d 832, 840 (9th Cir. 2014).

Likewise, the Court is not persuaded by the United States' arguments that enforcement of the challenged provisions against federal officers would interfere with federal duties by facilitating evasion of arrest. The United States argues that federal law enforcement officers have encountered situations where people blow whistles to alert those nearby of the presence of enforcement operations, and that there are websites dedicated to tracking federal immigration officers. First, blowing whistles, recording officers, posting those recordings online, or otherwise communicating about the public presence of a law enforcement officer is generally protected by the First Amendment. <u>See</u> <u>City of Houston, Tex. v. Hill</u>, 482 U.S. 451, 461, 462-63 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); <u>Askins v. U.S. Dep't of Homeland Sec.</u>, 899 F.3d 1035, 1044 (9th Cir. 2018) (The First Amendment protects "the right to record law enforcement officers engaged in the exercise of their official duties in public places."); <u>Smith v. City of Cumming</u>, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). Second, the United States has not demonstrated how enforcement of the challenged provisions would specifically facilitate evasion of arrest. It is not evident to the Court that a masked federal agent is any less susceptible to tracking or to having their local public presence revealed through whistling or other forms of communication.

Nonetheless, the Court acknowledges that there may be situations where masking or concealing identification is reasonable or even essential to federal operations, such as

A017

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL     'O'

| Case No. | 2:25-cv-10999-CAS-AJRx | | Date | February 9, 2026 |
|----------|------------------------|---|------|------------------|
| Title | The United States of America v. State of California et al | | | |

for undercover operations. The challenged provisions include numerous exempted
circumstances that account for these situations. See SB 627 § 2(b)(3); SB 805 § 2(a)(3).
The United States has not identified any situation where a violation of the challenged
provisions may be both reasonable and not exempted under the Acts. To the extent there
exist any such situations, the burdensome effect of enforcement on the operations of the
federal government is mitigated by Supremacy Clause immunity to prosecution.
"[Supremacy Clause] immunity will shield a federal agent from state prosecution only
when his acts are both (1) authorized by the laws of the United States and (2) necessary
and proper to the execution of his responsibilities." Morgan v. People of State of Cal.,
743 F.2d 728, 731 (9th Cir. 1984) (citing In re Neagle, 135 U.S. 1, 75 (1890)); see also
Idaho v. Horiuchi, 253 F.3d 359, 362 (9th Cir.), vacated as moot, 266 F.3d 979 (9th Cir.
2001) ("[T]he Supreme Court has held that the Supremacy Clause cloaks federal agents
with immunity if they act reasonably in carrying out their responsibilities.").

Finally, the threat of prosecution facing federal officers for a violation of state
criminal law cannot be a cognizable interference with federal operations. If that were the
case, then no state criminal law would be enforceable against federal employees
exercising their federal duties. But the law is clear that federal officers do not have
*absolute* immunity from state prosecution. Johnson v. State of Maryland, 254 U.S. 51, 56
(1920) ("Of course an employee of the United States does not secure a general immunity
from state law while acting in the course of his employment."); see also State of Colorado
v. Symes, 286 U.S. 510, 518 (1932) ("Federal officers and employees are not, merely
because they are such, granted immunity from prosecution in state courts for crimes
against state law."). To be sure, a federal officer may be immune from state prosecution
under a generally applicable state law when discharging federal duties. In re Neagle, 135
U.S. 1, 76 (1890). But such Supremacy Clause immunity depends on the facts of each
case. See Clifton v. Cox, 549 F.2d 722, 728 (9th Cir. 1977) ("[W]e do not mean to imply
that the exercise of authority in and of itself places a federal officer beyond the reach of a
state's criminal process. The significant question of whether the conduct was necessary
and proper under the circumstances must still be answered."). Supremacy Clause
immunity for individual federal officers facing state prosecutions is a constitutional
safeguard "to prevent states from nullifying federal laws by attempting to impede
enforcement of those laws." Morgan v. People of State of Cal., 743 F.2d 728, 731 (9th
Cir. 1984); see also Wyoming v. Livingston, 443 F.3d 1211, 1221 (10th Cir. 2006)
("Both qualified immunity and Supremacy Clause immunity reduce the inhibiting effect
that a civil suit or prosecution can have on the effective exercise of official duties by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

enabling government officials to dispose of cases against them at an early stage of litigation."). Supremacy Clause immunity thus ensures a constitutional balance of state and federal powers without requiring the facial invalidation of state laws that incidentally affect the federal government.

On the evidentiary record before the Court, the effects of the challenged provisions on federal operations are likely to be minimal and comparable to the effects of enforcement of any other generally applicable[7] rules, such as speed limits. Cases in which the Ninth Circuit found state or local regulations to violate the intergovernmental immunity doctrine are distinguishable from the instant case by the degree of interference with the federal government's functions or operations.[8] The closest analog that the United States cites is United States v. City of Arcata, 629 F.3d 986 (9th Cir. 2010). There, the Ninth Circuit found that "[b]y constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly." Arcata, 629 F.3d at 991. In Arcata, the ordinances at issue "specifically target[ed] and restrict[ed] the conduct of military recruiters," by prohibiting them from recruiting or attempting to recruit individuals under the age of eighteen, which the Court found to be intrusive of the federal government's expressly, constitutionally delegated "power to 'raise and support Armies' and to 'make Rules for the Government and Regulation of the land and naval

---

[7] At the hearing, the United States argued that these provisions are not "generally applicable" because they only apply to law enforcement officers. The Court disagrees. The provisions apply neutrally to law enforcement officers in California, just as generally applicable laws may apply only to drivers, employers, physicians, or other subsections of the general population. The Court considers the fact that SB 627 does not apply to state law enforcement officers under the discrimination prong of the intergovernmental immunity doctrine.

[8] See, e.g., United States v. Fresno Cnty., 429 U.S. 452, 463 n.11 (1977) (a tax burden exclusively on federal employees could threaten "to destroy the federal function performed by" the government employees); Geo Grp., Inc. v. Newsom, 50 F.4th 745, 757 (9th Cir. 2022) ("AB 32 would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice."); Boeing Co. v. Movassaghi, 768 F.3d 832, 840 (9th Cir. 2014) ("SB 990 directly interferes with the functions of the federal government [by] mandat[ing] the ways in which Boeing renders services that the federal government hired Boeing to perform.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

Forces.'" Id. at 991-92 (quoting U.S. Const. art. I, § 8, cls. 12, 14). Here, by contrast, the challenged Acts do not intrude on any federal power or function and only "affect the federal government incidentally as the consequence of a broad, neutrally applicable rule" for law enforcement officers in California. Id. at 991.

The intergovernmental immunity doctrine prohibits states from "interfering with or controlling the operations of the Federal Government," United States v. Washington, 596 U.S. 832, 838 (2022). The United States has not demonstrated that the challenged provisions threaten to interfere with or control federal law enforcement operations. Accordingly, the Court concludes that the United States is not likely to succeed on the merits of its complaint that the two challenged Acts directly regulate the federal government in violation of the intergovernmental immunity doctrine.

b)    Discrimination against the Federal Government

Alternatively, the United States argues that the No Secret Police Act is unconstitutional because it unlawfully discriminates against the federal government. Mot. at 15.[9] The United States argues that the facial covering prohibition of the No Secret Police Act violates the intergovernmental immunity doctrine because it applies to federal law enforcement officers, but not to California state law enforcement officers. Id. at 15-16. The United States argues that there is no justification for the Act treating California state officers better than federal officers who perform comparable duties including investigations, stops, searches, and arrests. Id. at 16-17. The United States contends that there is no relevant distinction between federal and state law enforcement, pointing to the fact that federal and state law enforcement agencies often coordinate in investigations and enforcement actions. Id. at 17 (citing Glasheen Decl. ¶ 8).

In opposition, California argues that the No Secret Police Act does not unlawfully discriminate because federal and state law enforcement officers do not engage in the same enforcement activities and thus are not similarly situated. Opp. at 15. California contends that the vast majority of state agencies that employ peace officers have limited jurisdiction, and those officers do not have significant interactions with the general

---

[9] The United States does not challenge the No Vigilantes Act as discriminatory against the federal government. The visible identification provision of the No Vigilantes Act applies equally to local, state, and federal law enforcement officers. See SB 805 § 10(d)(2).

A020

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

public. Id. California argues, for example, that investigators of the Dental Board of California, voluntary fire wardens, and some Department of Motor Vehicles employees are designated as peace officers. Id. California argues that state officers who regularly engage in investigations, stops, searches, and arrests typically wear uniforms and badges and clearly identify themselves as law enforcement during those activities, whereas federal law enforcement officers increasingly engage in large-scale enforcement operations while wearing facial coverings and without clearly identifying themselves as law enforcement. Id. at 15-16.

In reply, the United States argues that it is irrelevant that some state peace officers have limited jurisdiction and do not have significant interactions with the general public because other California peace officers, such as state troopers, marshals, and university officers, do engage in similar law enforcement functions as federal officers. Reply at 8-9. The United States argues that differential treatment of these similarly situated officers is unjustified, and that federal officers should not be denied the discretion to determine how to uniform themselves that California officers are permitted. Id. at 9.

Even though the United States has failed to demonstrate that the facial covering prohibition of the No Secret Police Act unduly interferes with federal functions, the Court acknowledges that it is nonetheless an incidental regulation on law enforcement officers. The intergovernmental immunity doctrine prohibits imposing such a regulatory burden, albeit minimal and incidental to operations, in a discriminatory manner against the federal government. The inquiry for a discriminatory burden under the intergovernmental immunity doctrine is distinct from the inquiry into whether a state law directly regulates the federal government. See United States v. Washington, 596 U.S. 832, 838-39 (2022). There is no de minimis exception to a discriminatory burden. United States v. California, 921 F.3d 865, 880 (9th Cir. 2019) (holding that "*any* discriminatory burden on the federal government is impermissible.") (emphasis in original).

"A state law or regulation impermissibly discriminates against the federal government if it treats a state entity more favorably than it treats a comparable federal entity." Geo Grp., Inc. v. Inslee, 151 F.4th 1107, 1118 (9th Cir. 2025) (citing Dawson v. Steager, 586 U.S. 171, 175-76 (2019)). Furthermore, the Ninth Circuit has held that a state law may not "single[] out" the federal government for greater burdens "than that which applies elsewhere in the State," even where the statute seeks to address a specific harm controlled by the federal government. Boeing Co. v. Movassaghi, 768 F.3d 832,

A021

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

842 (9th Cir. 2014) ("The fact that Santa Susana is especially contaminated does not
render the law non-discriminatory because California's generally-applicable
environmental laws do not impose the SB 990 radioactive cleanup standards at the Santa
Susana site."); see also United States v. King Cnty., Washington, 122 F.4th 740, 757 (9th
Cir. 2024) (finding unlawful discrimination had occurred where "[the county executive
order] 'explicitly treat[ed]' contractors who serve ICE charter flights 'differently' from
those who do not.").

The No Secret Police Act's facial covering prohibition applies to "law enforcement
officers," who are defined as any "peace officer, as defined in Section 830 [of the Cal.
Penal Code], employed by a city, county, or other local agency as well as any officer or
agent of a federal law enforcement agency or any law enforcement agency of another
state or any person acting on behalf of a federal law enforcement agency or law
enforcement agency of another state." SB 627 § 3(e). This definition does not "single
out" the federal government because it also applies to local law enforcement officers and
law enforcement officers for states other than California. However, it excludes California
state law enforcement officers, such as California Highway Patrol officers.

In evaluating the government's unlawful discrimination claim, it is critical that the
Court compare *similarly situated* federal and state actors. See Nwauzor v. GEO Grp.,
Inc., 127 F.4th 750, 763-64 (9th Cir. 2025) ("Dawson's holding requires a comparison
between the employees of the federal and state governments to ensure that similarly
situated federal and state employees are treated equally."). "So if the State defines the
favored class by reference to job responsibilities, a similarly situated federal worker will
be one who performs comparable duties." Dawson v. Steager, 586 U.S. 171, 177 (2019).
The Court is not persuaded by California's arguments that state law enforcement officers
are not similarly situated to federal law enforcement officers. First, California concedes
that some state law enforcement officers perform similar law enforcement functions to
federal officers, including the types of interactions with the public that the facial covering
prohibition generally targets. Opp. at 15. Second, those state law enforcement officers
are not differently situated merely because state law enforcement officers have not
recently engaged in "large-scale operations while wearing facial coverings," like some
federal law enforcement officers. Opp. at 16. While the Act may be a direct response to
recent federal law enforcement practices, the Act's text plainly addresses the harms
caused by the use of facial coverings by "law enforcement" generally during enforcement
activities. See generally SB 627 § 1. The Act, therefore, does not directly regulate

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

federal functions or target federal practices but rather generally applies to law enforcement officers in California. However, the Act treats federal law enforcement officers differently[10] than similarly situated state law enforcement officers.

Accordingly, the Court finds that the United States is likely to succeed on the merits of its claim that the facial covering prohibition of the No Secret Police Act unlawfully discriminates against the federal government in violation of the intergovernmental immunity doctrine.

2.    Likelihood of Irreparable Harm

The United States argues that it will face irreparable harm in the absence of preliminary relief. Mot. at 17. First, the United States argues that irreparable harm necessarily results from the enforcement of a preempted state law. Mot. at 17. Second, the United States argues that the laws will substantially hamper federal operations by subjecting federal agents to criminal and civil liability for noncompliance, which will chill federal law enforcement activities. Id. at 18. Third, the United States argues that the challenged Acts would thwart federal law enforcement activities by endangering federal officers and their families. Id. The United States contends that ICE officers are facing an 8000% increase in death threats and a 1000% increase in assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them.[11] Id. Finally, the United

---

[10] A state law or regulation would not be "impermissibly discriminatory if it 'duplicate[s] requirements otherwise mandated under' state law that are imposed on similarly situated state [actors]." Geo Grp., Inc. v. Inslee, 151 F.4th 1107, 1118 (9th Cir. 2025) (quoting United States v. California, 921 F.3d 865, 873 (9th Cir. 2019)). But California also confirmed at the hearing that state law enforcement officers who perform similar functions to federal law enforcement officers, such as California Highway Patrol officers or officers within the California Department of Justice Division of Law Enforcement, are not subject to prosecution under any other state law for wearing facial coverings.

[11] Defendants and amici argue that these figures are inaccurate or exaggerated. See Shuchart Decl. ¶ 13 ("My understanding is that these numbers do not differentiate between serious assaults and routine forms of unwanted touching that are inherent risks of conducting hands-on law enforcement work."); Dkt. 46 at 5 ("The reported 8,000% increase in death threats on ICE agents can perhaps be explained by DHS's exceedingly liberal definition of 'threat.'"); see also J. Queally et al., Attacks on ICE up 1,000%?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

States argues that if the challenged Acts were allowed to stand, other states could be emboldened to impose similar unconstitutional restraints on the federal government, which would severely undermine the federal government's ability to uniformly enforce federal law. Id. at 19.

In opposition, California argues that the United States has not demonstrated irreparable harm. Opp. at 18. First, California argues that the Ninth Circuit rejected the argument that "a Supremacy Clause violation alone constitutes sufficient harm to warrant an injunction." Id. (quoting United States v. California, 921 F.3d 865, 894 (9th Cir. 2019)). Second, California argues that the United States provides no explanation for its conclusory assertions that law-enforcement operations will be compromised if individual officers cannot wear a mask or conceal identifiers. Id. California contends that this claim is contradicted by the fact that officers currently have the discretion to not wear a mask and to display their identifiers. Id. California contends that the United States' claim that the challenged Acts will endanger law enforcement officers and their families by publicly exposing their identities is unsupported and undermined by federal law enforcement officers' routine public appearances without masks and with identification displayed, including while working in public buildings, testifying in open court, appearing on television, or attending recruiting events. Id. at 19. California contends that the United States' claim that the threat of enforcement will chill the enforcement of federal law and deter prospective federal law enforcement officers from applying for jobs is likewise speculative and conclusory. Id. California points out that undercover operations are unimpacted by the challenged Acts because of their express exemptions. Id. And California argues that the challenged Acts cannot irreparably harm the United States because they are consistent with federal laws and longstanding agency policies regarding law enforcement officers' identification. Id.

In reply, the United States argues that United States v. California, 921 F.3d 865 (9th Cir. 2019), is distinguishable because in that case, the United States had not pleaded that the challenged statute imposed an economic or operational burden on it or anyone else. Reply at 11-12. Here, the United States argues that the challenged Acts will likely substantially hinder federal law enforcement. Id. at 12. The United States argues that

---

Trump administration claim not backed up by court records, LOS ANGELES TIMES (Dec. 1, 2025), https://www.latimes.com/california/story/2025-12-01/dhs-1000-percent-increase-attacks-on-ice-agents-times-analysis.

A024

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**              **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

federal officers' discretion to wear masks highlights rather than undermines the federal government's argument that the individual determination should be left to federal agencies and their officers. Id. The United States also disputes California's contention that the challenged Acts are consistent with federal law. Id. The United States contends that the challenged Acts cabin federal officers' discretion with respect to masking and displaying identification in ways that conflict with current federal practice, and previous longstanding agency policy is irrelevant. Id. at 13.

As an initial matter, the Court notes that preemption cannot be a basis for a finding of irreparable harm in this case because the challenged Acts are not preempted by federal law. Next, the Court finds that the United States has failed to show that it will suffer irreparable harm absent an injunction on the enforcement of any provision for which it has failed to demonstrate a likelihood of success on the merits of its constitutional claims. For the same reasons the Court finds that the challenged provisions do not interfere with federal functions, the Court also finds that the United States does not establish a likelihood of irreparable injury beyond alleged constitutional violations.

With respect to the facial covering prohibition, the Court finds that the finding of a likelihood of success on the merits of the United States' claim that the provision unconstitutionally discriminates against the federal government is sufficient to presume irreparable injury. See Baird v. Bonta, 81 F.4th 1036, 1040 (9th Cir. 2023) ("It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."); Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal., 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."); Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1059 (9th Cir. 2009) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.") (citation omitted).

The Ninth Circuit's holding in United States v. California, did not alter this general presumption of irreparable harm based on a constitutional violation. 921 F.3d 865, 894 (9th Cir. 2019). In California, the Ninth Circuit merely remanded to the district court to apply the three remaining Winter factors after reversing the district court's denial of a preliminary injunction as to a statutory provision based on the district court's errors in deciding the first Winter factor. Id. Similarly, in Geo Grp., Inc. v. Newsom, the Ninth

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

Circuit remanded to the district court to consider the remaining three <u>Winter</u> factors *in the first instance* after finding that appellants were likely to prevail on their claim that a state law violated the Supremacy Clause. 50 F.4th 745, 763 (9th Cir. 2022). Neither decision contradicts case law presuming irreparable harm where there is a showing of a constitutional violation. In fact, the Ninth Circuit noted in <u>California</u> that the district court's application of the presumption of irreparable harm for the other challenged statutes in that case "was consistent with [the Ninth Circuit's] previous recognition that preventing a violation of the Supremacy Clause serves the public interest." 921 F.3d 865 at 893 (citing <u>United States v. Arizona</u>, 641 F.3d 339, 366 (9th Cir. 2011); <u>Cal. Pharmacists Ass'n v. Maxwell-Jolly</u>, 563 F.3d 847, 852–53 (9th Cir. 2009); <u>Am. Trucking Ass'ns v. City of Los Angeles</u>, 559 F.3d 1046, 1059–60 (9th Cir. 2009)).

Thus, while the United States has not presented compelling evidence of any economic or operational burden from the enforcement of a facial covering prohibition or a visible identification requirement for federal law enforcement officers, its showing that the facial covering prohibition likely violates the Supremacy Clause is nonetheless sufficient to establish that enforcement of that provision would amount to irreparable harm.[12]

Accordingly, the United States has not shown that it is likely to suffer irreparable harm in the absence of injunctive relief, except as to the facial covering prohibition of the No Secret Police Act.

        3.        <u>Balance of Equities and the Public Interest</u>

The United States argues that the balance of equities and the public interest weigh in its favor because "[f]rustration of federal statutes and prerogatives are not in the public interest." Mot. at 19 (quoting <u>United States v. Alabama</u>, 691 F.3d 1269, 1301 (11th Cir. 2012)). The United States also argues that it is not in the public interest to subject federal agents to increased harassment, doxxing, and violence. <u>Id.</u> The United States argues that California attempts to thwart the will of the people of the United States who elected this Administration to enforce federal law. <u>Id.</u> at 20. The United States argues that while California may disagree with the United States' priorities, it has no legitimate interest in

---

[12] Absent a finding that the facial covering prohibition likely unconstitutionally discriminates against the United States, the Court would conclude that the United States has not established sufficient irreparable injury to justify injunctive relief.

A026

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

interfering with the enforcement of federal law or putting federal agents at risk. Id. Finally, the United States argues that the public interest is impaired by placing state and federal officials on a "dangerous collision course," and that California's insistence that it can arrest and prosecute federal agents, including during the discharge of their duties, risks tension and conflict between state and federal law enforcement agencies. Id.

In opposition, California argues that the alleged harm to the United States is minimal because no federal law or policy requires agents to mask or withhold their identities and both statutes are carefully tailored to allow legitimate uses of masks and identity concealment. Opp. at 20. California argues that an injunction is not needed to prevent conflict between state and federal law enforcement agencies, which have long operated under dual federal and state regulation. Id. California also argues that all law enforcement agents should be entitled to protection from harassment and doxxing, and that the United States offers no evidence that masking or refusing to wear a badge or identification number does anything to ameliorate the risks of harassment or doxxing. Id. California argues that the equities heavily favor California because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Id. at 20-21 (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012)). California contends that a preliminary injunction will frustrate the state's attempt to ameliorate harms that California faces and that both challenged Acts reflect a legislative choice to ensure both that California's own law enforcement officers are not at risk and that California's residents know whether they are interacting with criminals or legitimate law enforcement officers. Id. at 21.

California and several amici argue that unidentifiable law enforcement officers pose significant safety risks to themselves and the public. Opp. at 21. California also argues that masked or unidentifiable federal agents undermine state and local law enforcement by damaging public trust and increasing the risk of a violent confrontation between California residents and federal agents who appear to be criminals. Opp. at 21-22. Finally, California argues that the unnecessary concealment of federal officers' identities limits the ability of individuals to challenge any unlawful acts those law enforcement officers may commit. Id. at 22. California argues that a preliminary injunction would make it easier for federal officers to evade accountability that is vital to democracy. Id.

In reply, the United States argues that permitting California to regulate federal law enforcement under the threat of prosecution regardless of federal policies is a recipe for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|---|---|---|---|
| Title | The United States of America v. State of California et al | | |

chaos and disaster.[13]  Reply at 14.  The United States argues that impersonating law
enforcement officers is already illegal, and California's solution to such harms should be
to prosecute impersonators rather than to criminalize legitimate federal activities.  Id.
The United States argues that the purposes of the challenged Acts to prevent fear among
the public, promote public safety, and increase transparency in law enforcement are
irrelevant and do not consider that the challenged Acts create safety threats to federal
officers, their families, and the public by interfering with the enforcement of federal laws.
Id.  The United States argues that California's policy justifications cannot salvage their
facially unconstitutional laws.  Id.

The last two Winter factors weigh the "balance of hardships between the parties"
and measure the public interest in issuing the injunction.  Cottrell, 632 F.3d at
1137.  "When the government is a party, these last two factors merge."  Drakes Bay
Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556
U.S. 418, 435 (2009)).

The Court is persuaded by the evidence in California's supporting declarations and
the arguments in the amicus briefs that enforcing the challenged Acts against federal law
enforcement officers is in the public interest.[14]  The Acts complement criminal penalties
for impersonating law enforcement by imposing neutral constraints on the ability of law

---

[13] At the hearing, counsel for the United States argued that permitting California to
regulate federal law enforcement officers in this case would open the door to a litany of
state regulations of the federal government without any "limiting principle."  But there
are limiting principles: the Supremacy Clause and the intergovernmental immunity
doctrine, considered in this order.  Moreover, the Court considers only this matter and the
evidentiary record before the Court, not hypothetical policies of other states or future
administrations.

[14] As Prosecutors Alliance Action points out in its brief, and consistent with the
objectives of these Acts, the Federal Bureau of Investigations has recently advised law
enforcement personnel to "adequately identify themselves during operations" to make it
less difficult for community members to distinguish between legitimate officers
conducting lawful operations and imposters engaging in criminal activities.  Dkt. 46 at
14-15.  The U.S. Marshals Service has also recognized that identification "ensure[s]
accountability and build[s] safer communities through transparency and collaboration."
Id.

A028

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                           **'O'**

| Case No. | 2:25-cv-10999-CAS-AJRx | | Date | February 9, 2026 |
|---|---|---|---|---|
| Title | The United States of America v. State of California et al | | | |

enforcement officers in California to conceal their identities, with numerous exempted circumstances so that the constraints do not interfere with law enforcement functions. The Court finds that these Acts serve the public interest by promoting transparency which is essential for accountability and public trust. Moreover, the Court finds no cognizable justification for law enforcement officers to conceal their identities during their performance of routine, non-exempted law enforcement functions and interactions with the general public.

However, the Court need not resolve the competing policy interests of the United States and California relating to the masking and identification of law enforcement officers because the last two Winter factors are guided by the Court's conclusion regarding the first factor. See Baird v. Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023) ("A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor.") If California's laws violate the Supremacy Clause, they cannot be in the public interest. See United States v. California, 921 F.3d 865, 893 (9th Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest."); Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852-53 (9th Cir. 2009) (where there are no adequate remedies to a state violation of federal law, "the interest of preserving the Supremacy Clause is paramount."). On the other hand, where there is no constitutional violation demonstrated, the public interest is served by permitting valid state statutes to be effectuated. Maryland v. King, 567 U.S. 1301, 1303 (2012); see also State of Colorado v. Symes, 286 U.S. 510, 518 (1932) ("[I]t is axiomatic that the right of the states, consistently with the Constitution and laws of the United States, to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it."). Here, the United States has established a likelihood of success on the merits only for its constitutional claim challenging the facial covering prohibition of the No Secret Police Act.

In conclusion, the Court finds that the last two Winter factors favor California with respect to each of the challenged provisions for which the United States did not establish a likelihood of success on the merits. Accordingly, the Court concludes as follows: there is no basis to enjoin SB 805, the No Vigilantes Act. The No Vigilantes Act does not violate the Supremacy Clause by directly regulating the federal government. Further, because it does not treat federal officers differently from state officers, the No Vigilantes

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL   'O'

| Case No. | 2:25-cv-10999-CAS-AJRx | Date | February 9, 2026 |
|----------|------------------------|------|------------------|
| Title | The United States of America v. State of California et al | | |

Act does not discriminate against the federal government.  Therefore, no injunction shall issue against the enforcement of the No Vigilantes Act.

With regard to SB 627, the No Secret Police Act, the United States has failed to demonstrate that the facial covering prohibition directly regulates the federal government. The Court finds that federal officers can perform their federal functions without wearing masks.  However, because the No Secret Police Act, as presently enacted,[15] does not apply equally to all law enforcement officers in the state, it unlawfully discriminates against federal officers.  Because such discrimination violates the Supremacy Clause, the Court is constrained to enjoin the facial covering prohibition.

## V.   CONCLUSION

In accordance with the foregoing, the Court **GRANTS IN PART** the United States' motion for a preliminary injunction.  California may not enforce the facial covering prohibition of the No Secret Police Act, SB 627 § 3, against federal law enforcement officers.  The Court **DENIES** the United States' motion for a preliminary injunction with respect to all other challenged provisions of the No Secret Police Act and the No Vigilantes Act.

Pursuant to the request of the United States, the Court **STAYS** the effect of this order.  The stay shall remain in place until 12:00 noon on **February 19, 2026**.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |

---

[15] At the hearing, counsel for the United States acknowledged that the No Secret Police Act would not be unlawfully discriminatory if it was amended to apply to all law enforcement officers in California.

A030

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

THE UNITED STATES OF
AMERICA,

　　　　　Plaintiff,

　　　v.

STATE OF CALIFORNIA; GAVIN
NEWSOM, Governor of California,
in his Official Capacity; ROBERT
BONTA, Attorney General of
California, in his Official Capacity,

　　　　　Defendants.

No. 2:25-cv-10999

**DECLARATION OF SERGIO ALBARRAN**

I, Sergio Albarran, declare as follows:

1.　　I am employed by the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") as a Field Office Director ("FOD") within the ERO San Francisco Field Office ("ERO-SFR"). I have held this position since June 1, 2025. I have also served as the Acting FOD in the San Diego Field Office on several occasions, most recently, from September 2023 through January 2024. I have directly supervised and managed national security, criminal, and immigration investigations in the ERO Los Angeles, ERO San Diego, and ERO San Franciso Field Offices, which together cover the entire State of California.

2.　　I began my tenure with the United States Government on November 9, 2008, with the ICE Los Angeles Field Office, in Los Angeles, California, where I worked as an Immigration Enforcement Agent, an Acting Supervisory Immigration Enforcement Agent,

1

and an Acting Supervisory Detention and Deportation Officer, among other titles. My tenure at the Los Angeles Field Office consisted of conducting criminal and administrative investigations and my area of responsibility covered the Los Angeles, Orange, Ventura, San Bernadino, Riverside, Santa Barbara, and San Luis Obispo Counties. On December 14, 2014, I became a Deportation Officer in the Los Angeles Field Office and, on or about March 18, 2018, I was selected as a Supervisory Detention and Deportation Officer at the San Diego Field Office. On September 13, 2020, I was selected as the Assistant FOD at the San Diego Field Office. In that position, I oversaw all enforcement tactical teams, which includes the Fugitive Operations Teams ("FOT"), Task Force, Special Operations Groups, Special Response Team ("SRT"), and Intelligence Unit ("IU") for the San Diego and Imperial Counties. On June 19, 2022, I was selected as the Deputy FOD for the San Diego Field Office.

3.       During my tenure with DHS, I have been selected to serve several detail assignments. Specifically, on or about September 10, 2023 through January 31, 2024, I served a detail assignment as the Acting FOD for the San Diego Field Office. In that position, I was the senior official responsible for the Fugitive Operation Program ("FOP"), SRT, Training Unit Program ("TUP"), Criminal Alien Program ("CAP"), Task Force, IU, Mission Support Unit ("MSU"), the El Centro Sub-Office, Alternatives to Detention ("ATD") Program, Non-Detained Unit, Otay Mesa Detention Center, Imperial Regional Detention Facility, San Luis Regional Detention Center, Southwest Border Emergency Operations Center Region IX, San Diego Incident Command Post ("ICP"), and the congressional and community outreach for San Diego and Imperial Counties.

4.       In or about February 2024 through August 2024, I was detailed to the Office of the DHS Secretary as the Deputy Executive Director over the DHS Joint Requirements Counsel in Washington D.C. In that position, I was responsible for advancing the objectives set by the Secretary of Homeland Security toward building a more unified and operationally effective and efficient organization. This included overseeing all

2

components within DHS and leading all efforts for investment, as well as changes to training, organization, laws, and operational processes and procedures.

5.     In or about January 2025 through February 2025, I was detailed as the Acting Deputy Assistant Director for the ICE Targeting Operations Division in Washington D.C. I was responsible for the Law Enforcement Support Center, the Pacific Enforcement Response Center ("PERC"), and the National Criminal Analysis and Targeting Center, which provide identification and investigative support to all ICE field offices and other federal, state, and local law enforcement agencies.

6.     In or about March 2025 through May 2025, I was detailed as the Acting Center Director for the PERC in Santa Ana, California. The PERC protects and defends the United States by sharing timely and relevant ICE information with law enforcement partners nationwide and issuing immigration detainers on criminal aliens in real-time.

7.     On June 1, 2025, I was promoted to my current position of FOD for ERO-SFR. In that capacity, I oversee all of ERO-SFR's operational units, multi-agency tactical units, and multi-agency task force which includes the Federal Bureau of Investigation, Drug Enforcement Administration, United States Marshals Service, and detention facilities. I oversee all criminal and administrative investigations and law enforcement operations in Northern California, which cover a total of 49 counties. My area of responsibility also covers Hawaii, Guam, and Saipan. I am the senior official responsible for the Special Operations Division, FOP, SRT, TUP, CAP, Task Force, IU, MSU, ATD, Non-Detained Unit, and detention centers.

8.     The purpose of this declaration is to inform the Court about conditions on the ground in the State of California with respect to federal immigration enforcement operations. In particular, the declaration seeks to relay those conditions as they pertain to California's recently enacted "No Secret Police Act" (Senate Bill 627) and "No Vigilantes Act" (Senate Bill 805), both of which take effect on January 1, 2026.

9. Because the No Secret Police Act and No Vigilantes Act are flagrantly unconstitutional, DHS officers/agents will not comply with either law.

10. If federal officers/agents were forced to comply with the No Secret Police Act and No Vigilantes Act, serious harm to officers and operational effectiveness would result, as explained further below.

## BACKGROUND

11. Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and U.S. Customs and Border Protection ("CBP").

12. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former U.S. Immigration and Naturalization Service and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which is the focus of this declaration and which consists of 25 field offices led by FODs; (2) Homeland Security Investigations, which consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 26 field offices led by Chief Counsel.

13. ICE ERO personnel include ICE deportation officers who are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs-officer authority under 19 U.S.C. § 1589a. It is the mission of ICE ERO to identify, arrest, criminally prosecute, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter and/or remain in the United States illegally— including those who cross the border illegally, a federal misdemeanor, and those who

4

illegally reenter the United States after having been removed, a federal felony, as well as those aliens ordered removed from the United States who have failed to depart—or otherwise undermine the integrity of federal immigration laws and border control efforts. ICE ERO oversees programs and conducts operations to identify and apprehend removable aliens, criminally prosecute aliens when applicable, to detain these individuals when necessary, and to remove illegal aliens from the United States. ICE ERO prioritizes the apprehension, arrest, criminal prosecution, and removal of aliens who are known or suspected terrorist, members or associates of transnational criminal organizations, threat to national security, or threaten the safety of our nation's communities and the integrity of U.S. laws.

14.    ICE ERO is responsible for interior enforcement of U.S. immigration laws in the State of California through three primary Areas of Responsibility ("AORs"): ERO-San Francisco, ERO-Los Angeles, and ERO-San Diego. The State of California has 58 counties which are divided among these three AORs—San Diego and Imperial Counties are under the San Diego AOR; the Los Angeles, Orange, Ventura, San Bernardino, Riverside, Santa Barbara, and San Luis Obispo Counties are under the Los Angeles AOR; and the remaining 49 counties are under the San Francisco AOR.

15.    ERO administers several programs in furtherance of its mission to enforce the U.S. immigration laws. In particular, the FOP consists of FOTs and Task Force Units that target, arrest, and criminally prosecute at-large aliens who are not in the custody of a law enforcement agency and present a danger to national security or are a risk to public safety, as well as those who entered the United States illegally, are subject to orders of removal, or otherwise undermine the integrity of federal immigration laws and border control efforts. This includes the identification, apprehension, criminal prosecution, detention, and removal of aliens from the United States, the service of legal documents on removable aliens, and immigration case management during removal proceedings.

1   Additionally, the CAP focuses on the Federal Government's identification, arrest, and

2   removal of aliens who are incarcerated at federal, state, county, or local detention facilities.

3   **CALIFORNIA'S NO SECRET POLICE ACT**

4   **AND NO VIGILANTES ACT**

5   16.    On September 20, 2025, California enacted the "No Secret Police Act"

6   (Senate Bill 627) and the "No Vigilantes Act" (Senate Bill 805), which take effect on

7   January 1, 2026.

8   17.    The No Secret Police Act makes it a misdemeanor crime for federal law

9   enforcement officers to wear certain kinds of facial masks in the performance of their

10  duties in California, subject to limited exceptions. It also requires federal law enforcement

11  agencies to adopt and publicly post a written policy regarding the use of facial masks by

12  July 1, 2026.

13  18.    The No Vigilantes Act requires, under threat of criminal punishment, non-

14  uniformed federal law enforcement officers to visibly display identification that includes

15  their agency and either a name or badge number, or both, when performing their

16  enforcement duties in California, subject to limited exceptions. The Act further requires

17  federal law enforcement agencies to adopt and publicly post a written policy regarding the

18  visible identification of sworn personnel by January 1, 2026.

19  19.    Based on my experience and the nature of my official duties as the FOD for

20  ERO-SFR, I am familiar with the officer safety and operational effectiveness

21  considerations that influence when ICE officers should conceal their identities and/or

22  agency associations while performing law enforcement activities. In my opinion, these

23  laws, if enforced against DHS, would create significant obstacles to ERO's ability to safely

24  and effectively enforce federal laws in the State of California. These laws also purport to

25  impose requirements and obligations on ICE officers that are not required by DHS policy

26  or federal law.

27

28

20.     Because DHS does not intend to comply with the requirements imposed on the Federal Government either by the No Vigilantes Act or the No Secret Police Act, ICE officers working in California face the threat of criminal liability under those Acts.

## PROTECTING OFFICERS' PERSONAL IDENTITES IS CRITICAL FOR OFFICER SAFETY AND OPERATIONAL EFFECTIVENESS

21.     Protecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes.

### *Officer Safety*

22.     Protecting the personal identities of federal officers and their families is necessary in part due to the increasingly common threats of targeted harassment of and retaliation against federal immigration agents for simply doing their jobs.

23.     Individuals, including immigration activists and other members of the public, routinely photograph, film, and publish online ICE ERO enforcement actions to include the personal identities of ICE officers and other federal task force personnel. The photographs and films are posted online for the sole purpose of intimidating and harassing government employees and are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways.

24.     During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as "doxx these people," "find out who they are and where they live," and "we will find out who you are and who your family members are." DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system. Cartels have disseminated a structured bounty program to incentivize violence against federal personnel, with payouts escalating based on rank and action taken: (1) $2,000 for gathering intelligence or doxxing agents (including photos and family details); (2) $5,000–$10,000 for kidnapping or non-lethal

7

assaults on standard ICE/CBP officers/agents; and (3) up to $50,000 for the assassination of high-ranking officials.

25. These threats have created an intensely hostile environment that jeopardizes the safety of officers and their families. Some additional examples of these kinds of incidents are as follows:

a. On or about February 21, 2025, a flyer was posted in numerous locations throughout Orange County. The flyer identified several ICE officers' photograph, job title, full name, city, phone number, and age.

b. On July 15, 2025, a phone analysis of a known Tren de Aragua criminal gang member disclosed a photograph of an unmasked San Diego ICE official while that official was conducting an enforcement activity. The photograph displayed the officer's face and was shared with another TDA gang member in the phone's contact list.

c. On August 28, 2025, an ERO Los Angeles officer was followed home from work and, upon arriving at his home, approached by three individuals wearing ski masks. With the officer's wife and children present, one of the masked individuals pushed the officer at his waist, grabbed the officer's wife by her arm and screamed, "I will throw this coffee at you, bitch." During this incident, all three masked individuals were yelling profanities at the officer and his wife while their children were in the vehicle. Local police arrived on the scene and arrested one of the individuals. Four additional agitators arrived in support of the original three, and the local police officers recommended that the ERO officer and his family depart the residence. As a result of this incident, this officer and his family has since required ICE security surveillance at his home address.

26. Protesters have attempted to follow ICE personnel in their vehicles outside facilities where enforcement actions take place. Despite law enforcement personnel conducting countersurveillance maneuvers, several officers on temporary duty have been

followed back to their hotels. After discovering the location of the officers' hotels, protesters have doxxed the officers by posting their hotel locations on social media, resulting in the hotels becoming overwhelmed by protesters demanding the hotels evict the officers.

27.     Protesters have presented other safety threats including by blocking traffic in and around officers' hotels, unleashing a barrage of honking at all hours of the day and night, and in one instance, slashing the tires of an unmarked government vehicle parked at the hotel parking lot.

28.     Doxxing of ICE officers/agents has also been encouraged across the web. Some examples of websites perpetrating the doxxing of ICE staff and contractors are ICESpy.org, ICEList.is, and ICEList.info. During protests at each of our respective offices, there have been numerous attempts by activists, protesters, and agitators to identify and doxx our staff as they enter and exit federal properties. In addition, it is a regular occurrence for members of the public to interfere with and attempt to document/identify our agents conducting field operations.

29.     Some individuals are taking pictures of ICE officers' faces and running those pictures through facial recognition applications that will search all of social media. Once a match is made, they will continue to search for family members, including children. Once all the family members are identified, they'll attempt to locate their home. All the findings are posted on anti-ICE websites.

30.     Masking or otherwise protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats. That is, masking reduces the risk of officers' personal identities being shared publicly, which helps ensure that officers' privacy and safety, and that of their family members, remains intact. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists.

31.     Masking is also an important tool to protect officers from unpredictable health and safety hazards that arise during enforcement activities. Activists in California have subjected ERO officers to being spit on and having unidentified objects thrown at them while conducting enforcement activities. Masking can minimize exposure to these, and other types, of health hazards. ICE officers should therefore have the ability to prepare themselves for these hazards at any time during any law enforcement operation, irrespective of whether the operation is an active undercover operation, a tactical operation, or whether an operation is occurring in exigent circumstances. Moreover, ICE personnel should have the options of using any facial covering they feel is appropriate to meet operational needs and to protect from health hazards.

### *Operational Effectiveness*

32.     In addition to mitigating safety risks, protecting the personal identities of federal immigration officials is necessary for operational purposes to effectively accomplish DHS's immigration enforcement mission.

33.     For instance, ICE routinely conducts investigations and surveillance in plainclothes to locate and apprehend illegal aliens, particularly in public courts or community areas where targets may attempt to evade detection.

34.     California's attempt to require ICE officers/agents to wear visible identification would compromise operational security by alerting targets to the presence of law enforcement and increasing the likelihood of flight.

35.     The visible identification requirement would therefore undermine ICE's ability to apprehend even those individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves.

36.     Masking also prevents suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, masking is

10

critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent.

37. Given the personal threats and violence that ICE officers/agents face, denying them the opportunity to protect their identities and provide an extra layer of security with the choice to wear facial masks would chill federal law enforcement operations.

38. The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission and increases the likelihood of targeted violence against officers.

### CONCLUSION

39. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, belief, and reasonable inquiry.


Dated on this 24th day of November 2025.

SERGIO
ALBARRAN

Digitally signed by
SERGIO ALBARRAN
Date: 2025.11.24
10:10:49 -08'00'

11

# UNITED STATES DISTRICT COURT FOR THE

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his Official Capacity; ROBERT BONTA, Attorney General of California, in his Official Capacity,<br><br>                Defendants. | No. 2:25-cv-10999 |

## DECLARATION OF MICHAEL R. VARGAS

I, Michael R. Vargas, declare as follows:

1. I am employed by the U.S. Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP), as a Division Chief within the Law Enforcement Operations Department. CBP is a component within DHS. CBP's central mission is to facilitate the flow of legal immigration and trade while preventing the illegal smuggling and trafficking of people and contraband. CBP has facilities and personnel throughout the State of California. The CBP Office of Field Operations (OFO) has Field Offices in San Francisco, Los Angeles, and San Diego. USBP has Sectors in San Diego and El Centro.

2. I entered on duty with USBP on December 7, 2003. I currently serve as the Acting Deputy Chief of the USBP El Centro Sector where I managed and directed a workforce of 1,100 professional staff and Border Patrol Agents. In my former role as a Division Chief with USBP, my responsibilities included direction and oversight of the

Law Enforcement Operations Department, which includes three USBP stations along with the Sector Intelligence Unit, Special Operations Detachment and Foreign Operations Branch. Prior to these roles, I served as Deputy Patrol Agent in Charge of the El Centro Station, managing the station's Mission Readiness Operations and Operations and Specialty Units from 2022 to 2024, and held other leadership positions in the El Centro Station. I have also served as an Assistant Chief at USBP Headquarters, Special Operations, and various attaché and advisor positions representing CBP in Panama, Estonia, Latvia, Lithuania, and the Dominican Republic.

3.    The mission of USBP is to detect and apprehend all unauthorized entries, maintain situational awareness across all domains, and apply appropriate consequences to deter future violations. By impeding or denying unlawful entries between ports of entry and delivering timely, effective law enforcement responses, USBP contributes to DHS's overarching border security mission. To accomplish this mission, USBP uses a layered approach, which includes patrolling the border itself and nearby areas, including populated areas, where undocumented individuals can fade quickly into the general population. Additionally, CBP regularly conducts operations in coordination with Immigration and Customs Enforcement (ICE). On June 6, 2025, in support of ICE, CBP officers and agents were sent to Los Angeles, California as part of Operation At Large.

4.    From October 28, 2025 to present, I have served as the Operations Commander for Operation At Large Los Angeles, and I operate out of the Border Patrol Incident Command Post (BP ICP). In this position, I oversee all USBP operations in the greater Los Angeles area. I ensure the Border Patrol agents have all the proper resources, not only in terms of material, but the requisite training needed to operate in such a complex and fluid environment. I oversee logistics, prosecutions, use of force events, personnel, and intelligence. I report directly to the Incident Commander or act as the Incident Commander in his absence. The BP ICP reports to the National Incident Command Center.

5.     I make this declaration based upon my personal knowledge, consultation with colleagues, and my review of official CBP records. If called to testify regarding the information contained herein, I would and could do so competently.

6.     The purpose of this declaration is to inform the Court regarding the current conditions on the ground in the State of California with respect to CBP operations. In particular, the declaration seeks to relay those conditions as they pertain to California's recently enacted "No Secret Police Act" (Senate Bill 627) and "No Vigilantes Act" (Senate Bill 805), both of which take effect on January 1, 2026, and the anticipated impact of these bills on CBP's operations in the State of California.

**California's No Secret Police Act and No Vigilantes Act Pose Serious Risks to CBP's Law Enforcement Activities and to CBP Officers and Agents**

7.     It is my belief that the No Secret Police Act and No Vigilantes Act pose serious safety risks to the USBP agents under my command and to OFO personnel who operate in the State of California and pose operational risks to CBP's ability to carry out its law enforcement activities in the State. I understand that CBP will not require CBP agents or officers to comply with either law beyond what is required by applicable federal law, regulation, and DHS, CBP, and/or USBP policy.

8.     Consistent with the requirements of federal law, in certain circumstances, CBP permits its officers or agents to wear facial masks or eyewear (or a combination of both) and remove their badges, nameplates, or unique identifiers. Specifically, officers or agents are authorized to wear their uniforms this way in circumstances where it is necessary to protect their individual safety and privacy interests, their safety as Agency personnel in the conduct of their assigned duties, and the operational efficacy of the organization in carrying out its mission.

9.     Keeping officers and agents safe is a key priority for CBP, and it is my priority to protect the USBP agents under my command. If agents are not safe, USBP cannot accomplish its mission. Unfortunately, while conducting operations in California,

3

**A044**

especially over the last several months, USBP agents and other CBP personnel have faced difficult conditions and dangers beyond those typically inherent in their law enforcement responsibilities.

10.     Not only have these brave men and women experienced increased harassment and assaults—public data[1] shows that there were 290 reported assaults on officers and agents in California in FY2025 compared to 76 assaults in FY2024—but now they are increasingly concerned, with good reason, that these threats will follow them home. Modern technology and the current political environment have made it easier for bad actors to find and widely distribute personal information about officers and agents conducting their assigned duties, using this information or encouraging others to use it to target the individuals. These actors seek to intimidate officers and agents and interfere with their ability to carry out the Agency's mission and support the President's priorities.

11.     Media and members of the public wait outside the location where USBP operates in Los Angeles seeking to identify agents and, at times, following their vehicles. USBP has to operate out of a secure location because of the threat posed by this activity. I am aware that, across the country, there are social media sites that post pictures of USBP agents seeking to identify them and obtain personal information about them. Nationwide, CBP personnel have had their photos posted online without their consent, some accompanied by their names and/or license plate numbers. Photos of CBP personnel have been posted to websites like ICEList.is.

12.     DHS has credible intelligence indicating that criminal organizations have placed targeted bounties on ICE and CBP personnel in a tiered bounty system. Cartels are offering payouts to criminals based on rank of the targeted personnel and action taken: $2,000 for gathering intelligence or doxxing officers/agents (including photos and family details), $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP

---

[1] CBP Assault and Use of Force Dashboards, available at: https://www.cbp.gov/newsroom/stats/assaults-use-force (last viewed November 20, 2025).

**A045**

officers/agents; and up to \$50,000 for the assassination of high-ranking officials. California's laws would directly support the efforts of these criminal organizations by making it easier for bad actors to dox and threaten CBP personnel.

13.    Numerous incidents, within and outside California, support the conclusion that CBP agents and officers are reasonable in their fear that exposing their identities would put themselves and their families at risk. In June 2025, a USBP agent supporting the Los-Angeles-based Operation at Large had his "personal phone number, current address and his parents' address" published online, and his family received several threats alluding to his official position. Text messages sent to the agent included: "I'm going to kill you when I see you bitch" and "Your family and everyone is gonna be targeted... Be ready".

14.    Around the same time, outside of Los Angeles, extremists posted (on Instagram) the address of a hotel where USBP agents were staying, prompting another user to respond: "Burn them" and another to reply, "Got a match".

15.    In August, an Instagram page posted photos of a USBP agent operating in Los Angeles with the bold heading: "WARNING: SUSPECTED KIDNAPPER/TERRORIST" and several personal details about the agent, including his full name, and the purported town of his residence and his hometown. In October, in similar fashion, the same Instagram page posted several images of a USBP agent working in California—including pictures of his face when conducting his official duties, his nameplate, and his purported town of residence and hometown, again with the bold header: "WARNING: SUSPECTED KIDNAPPER/TERRORIST".

16.    Other incidents across the nation have created an atmosphere of fear and uncertainty for federal officers and agents performing their assigned duties. These incidents further demonstrate that the risks of forcing federal agents and officers in California to remove their masks and display identification are not just speculative.

a.  In May 2025, in Jacksonville, Florida, a USBP agent received harassing calls from a woman who found his cell phone number online after a video of the agent identifying himself was shared widely online.

b.  In July 2025, Miami Sector reported that a USBP agent was surrounded by 6-8 civilians while assisting with a vehicle stop. The agent asked the civilians to step back and all but one did. The subject shouted the agent's name and threatened to dox him. After he was arrested and while in transit, the subject made statements indicating his familiarity with the agent's schedule and mentioned the names and personal interests of other agents.

c.  At the Chicago Broadview Processing Center, CBP personnel have reported individuals photographing their license plates as they enter and exit the facility.

d.  In Houlton, Maine, a Border Patrol Acting Division Chief's service vehicle was photographed and the photo was posted on Facebook with the caption: "UNMARKED ICE VEHICLE, Be on the lookout for this unmarked car or personal vehicle of this ICE agent" with the license plate number included.

17.    USBP agents and CBP personnel are accustomed to performing their assigned duties in a public setting, which sometimes means facing public scrutiny. However, the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers. I am aware that officers and agents express concerns about being doxed when performing their assigned duties and worry about their personal safety and the safety of their families.

18.    USBP leadership has authorized its personnel, when wearing Class C uniforms and plain-clothes undercover uniforms, to wear facial coverings, which may include eye protection, facial masks, or a combination of both. The Class C uniform is the daily uniform typically worn when conducting USBP duties like linewatch, transportation

6

checks, interior patrols, checkpoint operations, and training. In certain circumstances, USBP personnel have also been authorized to remove their name plates or identification numbers. Such uniform modifications have been authorized when the risk of doxxing to officers and agents is likely. These modifications have been authorized for officers and agents throughout CBP's history when operationally appropriate and necessary.

19.     These two new California laws interfere with CBP's discretion to authorize such modifications, thereby undermining the safety of CBP officers and agents. Not only will these laws diminish officers' and agents' sense of personal safety in the performance of their assigned duties, but I anticipate that it will also increase the likelihood that officers and agents are subject to doxxing and threats. Subjecting officers and agents to potential criminal and/or civil liability will also disincentivize them from taking these critical measures to protect themselves against this unprecedented threat.

20.     This, in turn, creates a strain on CBP's already stretched manpower. When personnel are doxed, the agency sometimes must expend valuable resources responding to threats or providing additional protections for its personnel. These resources could otherwise be used to fulfill CBP's primary mission.

21.     Removing these flexibilities will also harm CBP operations and our ability to perform the mission effectively. Such uniform modifications may be operationally necessary when conducting surveillance and other investigative activities, for example. If images of a CBP officer or agent's face become widely distributed, then that officer or agent will be less safe and effective when conducting surveillance, plainclothes operations, or undercover operations. Revealing an officer's personal identity or agency affiliation could also enable investigative subjects to circumvent detection, which is precisely what many surveillance and plainclothes operations are intended to avoid.

22.     Although the California laws appear to provide certain exceptions where the wearing of masks or concealing or removal of law enforcement identification is permitted, these determinations should be made by CBP, not by the State of California. CBP is the

7

**A048**

1  only authority equipped with the information and expertise to decide whether and when

2  these significant and widespread safety and operational considerations warrant allowing

3  uniform modifications for its personnel.

4      23.   When these laws go into effect in January, CBP will not be able to comply

5  with the California laws without placing agents, officers, other CBP personnel, and the

6  operations of the agency at great risk.

7      24.   Because CBP will not comply with these California laws, CBP agents

8  working in California face the threat of criminal liability under those laws. This is likely

9  to chill CBP's law enforcement activities and could discourage individuals from applying

10  to positions with CBP.

11  **CONCLUSION**

12      25.   The challenged laws pose significant risks to officers and agents and their

13  families, public safety, and to the operational success of enforcement activities in

14  California.

15      26.   This declaration is based upon my personal knowledge and information made

16  available to me in my official capacity. I declare, under penalty of perjury, that the

17  foregoing is true and correct to the best of my knowledge, information, and belief.

18

19  Dated on this 25th day of November, 2025.

20  MICHAEL R    Digitally signed by
    MICHAEL R VARGAS

21  VARGAS    Date: 2025.11.25 05:08:12
    -08'00'

22  _____

23  Michael R. Vargas

24  U.S. Border Patrol

25  U.S. Customs and Border Protection
    U.S. Department of Homeland Security

26

27

28  8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1       **UNITED STATES DISTRICT COURT FOR THE**

2       **CENTRAL DISTRICT OF CALIFORNIA**

3       **WESTERN DIVISION**

4

5   THE UNITED STATES OF
AMERICA,

6

7            Plaintiff,

      v.                 No. 2:25-cv-10999

8

9   STATE OF CALIFORNIA; GAVIN
NEWSOM, Governor of California,

10  in his Official Capacity; ROBERT
BONTA, Attorney General of

11  California, in his Official Capacity,

12

13          Defendants.

14

15    **DECLARATION OF MICHAEL H. GLASHEEN**

16    I, Michael H. Glasheen, declare as follows:

17     1.    I am the Operations Director of the National Security Branch in the Federal

18  Bureau of Investigation (FBI) and have been in this position since September 2025. I

19  oversee all FBI national security investigative and intelligence operations. As part of the

20  FBI's decentralized command structure, I am also responsible to the FBI Deputy Director

21  for the management and operations of the FBI's Sacramento Field Office, San Diego Field

22  Office, and San Francisco Field Office in the state of California.

23     2.    I joined the FBI in 2001 as a Special Agent. My previous executive roles

24  include serving as the Operations Director for the Field Services Response Branch,

25  Director of the Threat Screening Center, Special Agent in Charge of the Washington Field

26  Office's Counterterrorism Division, Section Chief of the International Terrorism

27

28                       1

**A051**

1  Operations Section in the Counterterrorism Division at FBI Headquarters, and Assistant

2  Special Agent in Charge for counterterrorism investigations in the Seattle Field Office.

3      3.    I make the following statements based on my personal knowledge and

4  information made available to me in my official capacity, and my conclusions have been

5  reached in accordance therewith.

6      4.    I submit this declaration in support of the United States' claims and motion

7  for a preliminary injunction in this case. I understand the United States seeks to enjoin the

8  enforcement of California's recently enacted "No Secret Police Act" (Senate Bill No. 627)

9  and "No Vigilantes Act" (Senate Bill No. 805) against the federal government. I

10  understand both laws will take effect on January 1, 2026.

11      5.    I understand the No Secret Police Act prohibits, under threat of criminal

12  punishment, federal law enforcement officers from wearing certain kinds of facial masks

13  or coverings that obscure their facial identities in the performance of their duties in

14  California, subject to narrow exceptions. This state law also requires any federal law

15  enforcement agency operating in California to publicly post a written policy regarding the

16  use of facial coverings by July 1, 2026.

17      6.    I understand the No Vigilantes Act requires, under threat of criminal

18  punishment, non-uniformed federal law enforcement officers to display identification that

19  includes their agencies and either names or badge numbers, or both, to the public when

20  performing their enforcement duties in California, subject to narrow exceptions. This state

21  law also requires any federal law enforcement agency operating in California to publicly

22  post a written policy regarding the visible identification of sworn personnel by January 1,

23  2026.

24      7.    The FBI is the primary investigative agency of the federal government with

25  authority and responsibility to investigate all violations of federal law not exclusively

26  assigned to another agency, to conduct investigations and activities to protect the United

27  States and its people from terrorism and threats to national security, and to further the

28

1   foreign intelligence objectives of the United States. *See, e.g.*, 28 U.S.C. § 531 *et seq.*;

2   Executive Order 12,333; 28 C.F.R. § 0.85.

3        8.    The FBI's mission is to protect and defend the United States against terrorist

4   and foreign intelligence threats, to uphold and enforce the criminal laws of the United

5   States, and to provide leadership and criminal justice services to federal, state, municipal,

6   and international agencies and partners. In order to defend the country from a range of

7   national security and major criminal threats, the FBI uses an intelligence-driven and threat-

8   focused approach, combining its investigative and intelligence operations to be more

9   analytical and preventative, more aware of emerging threats, and better able to stop them

10  before they turn into crimes, including acts of terrorism.

11       9.    Enforcement of the No Secret Police Act or the No Vigilantes Act against the

12  FBI could reasonably be expected to harm or endanger the lives or physical safety of FBI

13  Special Agents and their families.

14       10.   Displaying a Special Agent's personally identifying information (PII) (e.g.,

15  face, name, badge number) during an investigation or operation could subject the Special

16  Agent and his or her family to unwarranted attention, threats, and harassment, or endanger

17  their lives or physical safety. The FBI's concern regarding the vulnerability of Special

18  Agents and their families being targeted for harm is considerably heightened by the

19  increasing availability of Special Agents' PII on the Internet. Internet access to a Special

20  Agent's PII poses a real threat that third parties will access the information, engage in data

21  mining, identity theft, and other crimes, and seek to inflict violence on the Special Agent

22  or his or her family in retaliation for the Special Agent's participation in the investigation.

23       11.   The FBI does not base these officer safety concerns on idle speculation. FBI

24  Special Agents around the country have been targeted for harm, including harassment,

25  assault, and murder.

26

27

28

3

1      12.    Enforcement of the No Secret Police Act and the No Vigilantes Act against
2   the FBI also could reasonably be expected to harm national security and the integrity of
3   ongoing and future FBI investigations or operations, and risk circumvention of the law.

4      13.    For example, an FBI Special Agent may conduct surveillance operations to
5   obtain investigative intelligence relevant to an investigation. The law enforcement
6   techniques used to conduct these surveillance operations may involve the same techniques
7   used by the FBI in ongoing criminal and national security investigations. Disclosure of
8   non-public details about who, when, how, and under what circumstances the FBI conducts
9   surveillance would allow subjects of FBI investigations and other potential criminals to
10  develop and use countermeasures to defeat or avoid different types of surveillance
11  operations, thus rendering the techniques useless to the FBI and other law enforcement
12  agencies. This is especially true because the success of surveillance hinges on an
13  investigator's ability to remain undetected or unidentified. Revealing non-public details
14  about the FBI's methodology for conducting surveillance and the agent's identity, whether
15  by face, name, or agency association, during the operation, would jeopardize the FBI's
16  ability to conduct surveillance covertly and risk circumvention of the law.

17     14.    In order to mitigate these harms and threats to officer safety and the
18  effectiveness of FBI investigations and operations, it is essential that FBI Special Agents
19  have discretion to wear masks and otherwise protect their identities, and in some instances
20  their association with the FBI, from public disclosure, where they deem it appropriate to
21  do so.

22     15.    Based on my consideration of the matter, I have concluded that enforcement
23  of the No Secret Police Act and the No Vigilantes Act against the FBI could reasonably
24  be expected to cause significant harm to the FBI's ability to carry out its mission.
25  Therefore, the FBI and its Special Agents will defy these state laws where they deem it
26  appropriate to do so.

27

28                                          4

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on November 24, 2025.

3

4

5    MICHAEL H. GLASHEEN

6    Operations Director
     National Security Branch
7    Federal Bureau of Investigation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

**A055**

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>      v.<br><br>STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his Official Capacity; ROBERT BONTA, Attorney General of California, in his Official Capacity,<br><br>                  Defendants. | No. 2:25-cv-10999 |

**DECLARATION OF MATTHEW W. ALLEN**

I, Matthew W. Allen, declare as follows:

1.     I am employed by the United States Department of Justice, Drug Enforcement Administration (DEA) as the Chief of Operations. I have held this position since July 30, 2025.

2.     My career as a federal law enforcement officer began as a DEA Special Agent in 2002. As a Special Agent, I worked in a Southern California Drug Task Force, a Mobile Enforcement Team, and in DEA's Office of Professional Responsibility. Further, I have led Special Response Teams (SRT) in executing high-risk search and arrest warrants. In the performance of my Special Agent duties, I served in an undercover role on numerous occasions.

3.     In my current position as Chief of Operations, I am the principal advisor to the Administrator and Deputy Administrator of DEA on enforcement-related matters. Under their direction, I am responsible for the overall direction of all programs and

1

1   activities of DEA's Operations Division components throughout the world, including

2   establishing and implementing DEA policy in all areas of operations.  As relevant to this

3   litigation, my experience includes serving as the Special Agent in Charge of the Los

4   Angeles Division, from 2023 to 2025, as the Resident Agent in Charge of the Orange

5   County Resident Office, from 2016 to 2018, and as a Group Supervisor in the Riverside

6   District Office from 2013 to 2016.

7       4.    This declaration is submitted in support of the United States' claims and

8   motion for a preliminary injunction in the above-captioned matter. The purpose of this

9   declaration is to inform the Court about DEA's law enforcement operations in California

10   as they pertain to California's recently enacted "No Vigilantes Act" (Senate Bill 805) and

11   "No Secret Police Act" (Senate Bill 627), both of which take effect in relevant part on or

12   after January 1, 2026.

13       5.    Based on my experience and the nature of my official duties, I am familiar

14   with the anticipated impacts on DEA that would occur throughout the State of California

15   if DEA were forced to comply with the No Vigilantes Act or the No Secret Police Act.

16       6.    This declaration is based upon my personal knowledge and information made

17   available to me in my official capacity. I provide this declaration based on the best of my

18   knowledge, information, belief, and reasonable inquiry into the above-captioned case.

19   **BACKGROUND**

20       7.    DEA's mission "is to enforce the controlled substances laws and regulations

21   of the United States and bring to the criminal and civil justice system of the United States,

22   or any other competent jurisdiction, those organizations and principal members of

23   organizations, involved in the growing, manufacture, or distribution of controlled

24   substances appearing in or destined for illicit traffic in the United States."

25   https://www.dea.gov/about/mission. In the hierarchy of drug cases worked by local, state,

26   tribal, and federal law enforcement officers, DEA Agents work the highest level of drug

27   trafficking cases, often involving international organized crime groups who regularly use

28                 2

violence targeted toward competitors, innocent members of the public, informants, and law enforcement officers.  In addition, in January 2025, DEA Agents were granted and conferred the authority to perform the functions of an immigration officer, as set forth in Title 8, Chapter 12.

8.    DEA has three separate divisions operating in California.  Headquarters for each division are in San Diego, Los Angeles, and San Francisco. Sub-offices exist in numerous locations throughout the state.  Approximately 348 DEA Special Agents currently operate in California, approximately 146 of which operate in the Los Angeles Division.  In addition, because of the large quantities of illicit drugs that move through the state, DEA Special Agents assigned to offices elsewhere in the U.S. at times come to California, in furtherance of their investigations, to conduct law enforcement operations.

## ANTICIPATED IMPACTS OF CALIFORNIA'S LAWS ON DEA's LAW ENFORCEMENT ACTIVITIES

9.    The No Vigilantes Act requires, under threat of criminal punishment, non-uniformed federal law enforcement officers to publicly display identification that includes their agency and either a name or badge number, or both, when performing their enforcement duties in California, subject to narrow exceptions.  The Act further requires federal law enforcement agencies to adopt and publicly post a written policy regarding the visible identification of sworn personnel by January 1, 2026.

10.    The No Secret Police Act prohibits, under threat of criminal punishment, federal law enforcement officers from wearing certain kinds of facial masks in the performance of their duties in California, subject to narrow exceptions.  It also requires federal law enforcement agencies to adopt and publicly post a written policy regarding the use of facial masks by July 1, 2026.

11.    If DEA were forced to comply with either of these laws, serious harm to officer safety and operational effectiveness could result.

3

**A058**

1    12.    These laws also purport to impose requirements and obligations on DEA

2    agents that go beyond DEA policy or federal law.

3    13.    DEA does not intend to comply with the requirements imposed on the Federal

4    Government either by the No Vigilantes Act or the No Secret Police Act. DEA Special

5    Agents working in California therefore presumably will be subject to criminal charges

6    under those Acts.

7    ***Anticipated Impacts on Officer Safety and Operational Effectiveness***

8    14.    DEA Special Agents do not always visibly identify themselves as DEA,

9    because to effectively execute many of their duties, the Special Agent's law enforcement

10    identity must be protected.  For example, most DEA investigations require Special Agents

11    to conduct surveillance and meet with confidential informants, and their ability to do so

12    safely depends on not being identified as law enforcement.

13    15.    An ongoing concern for many DEA Special Agents is the fact that members

14    of the media and the public may take still photos and videos of DEA Special Agents during

15    law enforcement operations that can capture Agents' facial features and other identifiers.

16    These photos and videos can be shown on media outlets and on social media websites and

17    can be used to publicly harass and intimidate federal officers and their families.

18    Relatedly, the use of online facial recognition technology to identify DEA Agents could

19    enable the criminal organizations that DEA investigates—many of which are well-funded

20    and international in scale—to target DEA Agents, which would significantly jeopardize

21    the safety of Agents and their families.  Wearing a facial covering and otherwise protecting

22    against the ability to identify the Agent through a photo or video can mitigate these kinds

23    of threat to agents' safety.

24    16.    As an example of this kind of safety concern, in June 2025, the image of a

25    DEA Special Agent was posted on the social network BlueSky, with a caption "Trying to

26    identify any of these FBI, Homeland Security, and ATF goons who invaded a Minneapolis

27    community to kidnap and terrorize its members."  The image appears to have been taken

28    4

1    when the DEA Special Agent, who was not wearing a facial covering, was assisting in the

2    execution of a search warrant.  Another BlueSky user followed with a post identifying the

3    DEA Special Agent by name and title and citing the use of multiple facial recognition

4    models to match the image in question to the agent's picture on another site.

5        17.    Forcing DEA Special Agents to reveal their personal identities or their

6    affiliation with DEA could also jeopardize DEA's law enforcement operations.  As noted,

7    *supra* ¶ 14, DEA Special Agents often need to protect their identities as DEA Agents.  This

8    need arises not only in the context of undercover operations but in the case of surveillance

9    that takes place preceding the planned arrest of an individual.  In these situations, revealing

10   agents' identities and agency associations would enable suspects to circumvent law

11   enforcement by allowing them to recognize agents and thus attempt to flee.  Similarly,

12   revealing agents' identities and agency associations in DEA's covert operations would

13   enable suspects to identify those agents who may be involved in future undercover

14   operations, which would obstruct those future actions.

15       18.    In order to mitigate the above kinds of threats to safety and operational

16   effectiveness, decisions on when and how to protect the personal identities of DEA Special

17   Agents and their associations with DEA must be made by DEA management.  Losing this

18   discretion will jeopardize critical investigative tools such as covert surveillance and

19   undercover operations.  Simply put, if the identities of DEA Special Agents are not

20   protected, they cannot do their jobs effectively and safely.

21       19.    Because DEA does not intend to comply with the requirements imposed on

22   the federal government under the No Secret Police Act and the No Vigilantes Act, DEA

23   agents working in California face the threat of criminal charges under those Acts.  This

24   could chill DEA's enforcement activities.

25                          **CONCLUSION**

26       20.    I declare under penalty of perjury that the foregoing is true and correct to

27   the best of my knowledge, information, and belief.

28                              5

**A060**

1     Dated on this 25th day of November 2025

2

3

4

5

6     Matthew W. Allen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28     6