No. 26-926

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

V.

STATE OF CALIFORNIA, *et al*.,
*Defendants-Appellees*.

—————————

## On Appeal from the United States District Court
## for the Central District of California
No. 25-cv-10999
The Honorable Christina A. Snyder

—————————

## OPPOSITION TO MOTION FOR INJUNCTION PENDING APPEAL

—————————

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
  *Senior Assistant*
  *Attorneys General*
JOSHUA A. KLEIN
  *Supervising Deputy*
  *Solicitor General*
ANNA FERRARI
LEE I. SHERMAN
  *Supervising Deputy*
  *Attorneys General*

MICA L. MOORE
  *Deputy Solicitor General*
KRISTI A. HUGHES
ZELDA VASSAR
ASHA ALBUQUERQUE
ALYSSA ZHANG
CAMERON A. BELL
  *Deputy Attorneys General*
ZACHARY W. SORENSON
  *Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 S. Spring Street, Suite 1702
Los Angeles, CA  90013-1230
(213) 269-6138
mica.moore@doj.ca.gov

*Attorneys for Defendants*

February 23, 2026

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 8

Statement .................................................................................. 11

Argument .................................................................................. 17

I.    The federal government cannot show that SB 805 likely violates the Supremacy Clause ........................................................ 18

II.    The remaining equitable factors strongly weigh against an injunction pending appeal .................................................... 30

Conclusion ................................................................................ 32

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Ass'n of Univ. Professors v. Rubio*
802 F. Supp. 3d 120 (D. Mass. 2025)........................................................14

*Askins v. U.S. Dep't of Homeland Sec.*
899 F.3d 1035 (9th Cir. 2018) .................................................................26

*Blackburn v. United States*
100 F.3d 1426 (9th Cir. 1996) .................................................................21

*Boeing Co. v. Movassaghi*
768 F.3d 832 (9th Cir. 2014) ...................................................................22

*Clifton v. Cox*
549 F.2d 722 (9th Cir. 1977) ...................................................................20

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) ...................................................................30

*Colorado v. Symes*
286 U.S. 510 (1932)...................................................................20, 27, 31

*Ctr. for Competitive Pol. v. Harris*
784 F.3d 1307 (9th Cir. 2015) .................................................................18

*Doe v. Reed*
561 U.S. 186 (2010)..................................................................................29

*Escobar Molina v. D.H.S.*
2025 WL 3465518 (D.D.C. Dec. 2, 2025)................................................15

*Feldman v. Ariz. Sec'y of State's Off.*
843 F.3d 366 (9th Cir. 2016) (en banc) ...................................................17

*GEO Grp., Inc. v. Inslee*
151 F.4th 1107 (9th Cir. 2025) ................................................................20

# TABLE OF AUTHORITIES
## (continued)

Page

*GEO Grp., Inc. v. Newsom*
  50 F.4th 745 (9th Cir. 2022) (en banc) ..................................................21, 23

*Hancock v. Train*
  426 U.S. 167 (1976) .................................................................................20

*Hernandez v. Mesa*
  589 U.S. 93 (2020) ...................................................................................20

*Idaho v. Horiuchi*
  253 F.3d 359 (9th Cir. 2000) (en banc) ...........................................20, 27, 31

*Johnson v. Maryland*
  254 U.S. 51 (1920) ...................................................................................19

*Lux v. Rodrigues*
  561 U.S. 1306 (2010) ...............................................................................17

*M'Culloch v. Maryland*
  17 U.S. 316 (1819) ...................................................................................18

*Martin v. United States*
  605 U.S. 395 (2025) .................................................................................20

*Maryland v. King*
  567 U.S. 1301 (2012) ...............................................................................31

*N.Y. State Rifle & Pistol Ass'n v. Bruen*
  597 U.S. 1 (2022) ...................................................................................8, 28

*North Dakota v. United States*
  495 U.S. 423 (1990) .................................................................................28

*Puente Arizona v. Arpaio*
  821 F.3d 1098 (9th Cir. 2016) .................................................................30

*Semayne's Case*
  77 Eng. Rep. 194 (K.B. 1603) .................................................................11

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Texas v. U.S. Dep't of Homeland Sec.*
  123 F.4th 186 (5th Cir. 2024) .................................................................. 19, 20

*United States v. California*
  921 F.3d 865 (9th Cir. 2019) .................................................................. 20, 30

*United States v. City of Arcata*
  629 F.3d 986 (9th Cir. 2010) ....................................................................... 18

*United States v. Eaton*
  2025 WL 3487521 (E.D. Okla. Dec. 4, 2025) ............................................ 25

*United States v. Hart*
  26 F. Cas. 193 (C.C.D. Pa. 1817) ............................................................... 19

*United States v. Washington*
  596 U.S. 832 (2022) ..................................................................................... 18

*W. Va. State Bd. of Educ. v. Barnette*
  319 U.S. 624 (1943) ..................................................................................... 27

*Wilson v. Arkansas*
  514 U.S. 927 (1995) ..................................................................................... 11

*Winter v. Nat. Res. Def. Council*
  555 U.S. 7 (2008) ......................................................................................... 17

STATUTES

1 Stat. 700-701 (1799) ...................................................................................... 12

18 U.S.C.
  § 111 ............................................................................................................. 25
  § 2261A ........................................................................................................ 26

2025 Cal. Stat. ch. 126 (SB 805) ..................................................................... 13

## TABLE OF AUTHORITIES
### (continued)

**Page**

Cal. Gov. Code
　§ 7288.................................................................................................*passim*
　§ 7289.................................................................................................16

Cal. Penal Code
　§ 185.5...............................................................................................16
　§ 538d................................................................................................16
　§ 653.2...............................................................................................26
　§ 13653..............................................................................................16
　§ 13654.................................................................................9, 16, 23, 28

Cal. Veh. Code
　§ 165..................................................................................................21
　§ 21806..............................................................................................21
　§ 25252..............................................................................................21

Mass. Gen. Laws ch. 41, § 98D .................................................................12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. VI, cl. 2..........................................................................18

**OTHER AUTHORITIES**

8 C.F.R. § 287.8....................................................................................25

Berzon et al., *When Trump Officials' Claims About Shootings
　Unravel in Court*, N.Y. Times (Feb. 10, 2026),
　tinyurl.com/5w4524bf..........................................................................24

*Book of General Laws and Liberties Concerning the Inhabitants
　of Massachusetts* (1648) .......................................................................12

Frias, *Federal Agents Open Fire At Family Truck in San
　Bernardino*, NBC L.A. (Aug. 16, 2025), tinyurl.com/45da48jy .................13

# TABLE OF AUTHORITIES
## (continued)

**Page**

Godar, State Democracy Research Initiative, *Explainer: Can States Prosecute Federal Officials* (July 17, 2025), perma.cc/32DP-6YHA ...............27

Goldman, *Fake ICE Agent Robs 2 People in N.J., Cops Say* (Jan. 28, 2026), tinyurl.com/mva8j49m ...............14

Letter from Sen. Tillis to Secretary Noem (Feb. 2, 2026), perma.cc/87WY-58BZ ...............15

Levin, *DOJ Cases Against Protesters Keep Collapsing as Officers' Lies Are Exposed in Court*, The Guardian (Feb. 21, 2026), tinyurl.com/4ntkz62z ...............24

Maldonado, *Apparent Immigration Agent Impersonation in Brooklyn Leads to Attempted Rape*, CBS News (Feb. 12, 2025), perma.cc/4C65-3XYJ ...............31

*Minutes of the Common Council of the City of New York*, 1784-1831 (Dec. 28, 1807) ...............12

Phoenix Police Dep't, Operations Order 4.7.00 ...............12

Press Release, *City of San Bernardino* (Aug. 16, 2025), www.sanbernardino.gov/m/newsflash/Home/Detail/630 ...............13

Smith, *Videos Contradict U.S. Account of Minneapolis Shooting by Federal Agents*, Wall Street Journal (Jan. 24, 2026) tinyurl.com/y3m6ej5z ...............27

Tucker, *Man Accused of Impersonating ICE Officer, Sexually Assaulting Woman at Raleigh Motel*, WBTV (Jan. 29, 2025), tinyurl.com/3js5suc6 ...............14

U.S. Marshals Service, *The Badge and Other Forms of Identification*, perma.cc/L58K-NY88 ...............12

vii

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

U.S. Secret Service, *History*, perma.cc/5F6S-GL48 ....................................... 13

**INTRODUCTION**

Transparent, accountable policing is a cornerstone of American democracy. For centuries, law enforcement officers at every level of government have identified themselves by wearing badges or uniforms or displaying other forms of identification. When law enforcement officers identify themselves, it helps preserve public safety—including officer safety—by ensuring that people can readily tell the difference between law enforcement officers and lawbreakers. Unless officers are identifiable as peace officers, they can easily be mistaken for criminals—criminals that members of the public may lawfully attack in self-defense. People need to know when they can exercise their rights of self-defense, including their constitutional right to use firearms that they may "carry[] . . . publicly for self-defense." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022). Visible officer identification also ensures that members of the public can monitor officers' actions and report misconduct. That builds public trust in law enforcement and deters wrongdoing.

Our Nation has recently witnessed a startling number of episodes, including in California, in which federal agents have departed from the longstanding tradition of transparent, accountable policing. The record in this case, for example, details the experience of Andrea Velez, a 32-year-old American citizen who was "grabbed," "slammed . . . into [a] sidewalk," arrested, and transported to a holding

8

cell by "a group of masked men in plain clothes and sneakers." SA-66.[1] Although Velez later learned that the men were federal immigration agents, they did not display any identification. *Id.* And when Velez "asked the masked man [who slammed her into a sidewalk] to identify himself by showing [her] his badge number [or] ID," he told her that she "didn't need to know any of that." *Id.* Velez thought criminals "were kidnapping [her]," and she "later learned that [her] mother and sister witnessed the incident and reported to the Los Angeles Police Department that [she] was kidnapped." SA-67.

In response to this recent, unprecedented departure from longstanding law enforcement traditions, the California Legislature enacted SB 805. The statute requires officers to "visibly display identification," including "their agency" and "*either* a name *or* badge number." Cal. Penal Code § 13654(a) (emphasis added). Although willful violations of the statute can be prosecuted as misdemeanors, *see id.* § 13654(c), an agency's officers are shielded from liability if it "maintains and publicly posts a written policy" memorializing the identification requirement, *id.* § 13654(e). And the statute provides expansive exceptions, including for officers "engaged in active undercover operations" or "investigative activities," Cal. Gov. Code § 7288(a)(3)(A), and those who have a "reason to believe identification

---

[1] All citations to "A##" refer to the federal government's addendum. Citations to "SA-##" refer to the supplemental addendum filed with this brief.

would pose a significant danger to [their] physical safety," *id.* § 7288(a)(3)(E). The statute also applies only if officers are engaged in "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes." *Id.* § 7288(c)(1).

The federal government seeks an emergency injunction to block SB 805 from taking effect. In the federal government's view, SB 805 is invalid in all applications to federal officers under the intergovernmental-immunity doctrine. But courts have most often applied that doctrine when state laws discriminate against federal operations. For good reason, the federal government does not argue that SB 805 is discriminatory—it applies equally to all law enforcement officers. And although nondiscriminatory state laws are sometimes invalid when they regulate federal operations, the federal government is mistaken in asserting that there is a categorical bar on all forms of state regulation. States may apply generally applicable traffic laws, health and safety regulations, tort standards, and criminal laws, among many other types of regulations, to federal agents.

SB 805 is not materially different from those permissible forms of regulation. The statute merely requires federal agents operating within California to adhere to our Nation's longstanding tradition of visibly displaying identification. In light of the statute's broad exceptions and limited scope, the federal government cannot show that SB 805 will burden federal law enforcement operations in any material

10

way—certainly not in all applications to federal officers. The federal government's principal concern appears to be "doxxing"—that is, publishing identifying information about an officer with the intent to harass them. But SB 805 does not require officers to display their names. They can remain anonymous by displaying a badge number—a number that can be periodically changed to decrease the risk of personal identification. Providing that minimal information to the public plays a critical role in allowing witnesses to report misconduct so that the responsible officers can be held accountable. The motion for an injunction pending appeal should be denied.

## STATEMENT

1. Law enforcement officers wield authority that private citizens do not. For example, they are empowered to make arrests, conduct searches, and use force, including lethal force. Citizens in turn must comply with lawful orders by peace officers even if they could resist—even violently—a civilian who attempted the same actions. For that reason, laws dating back to the 13th century have required officers to identify themselves before exercising their authority.[2] Seventeenth-century Massachusetts, for example, required every constable to "have a black staffe of five foot long . . . as a badge of his office" so that "no man may plead

---

[2] *See, e.g.*, *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603); *Wilson v. Arkansas*, 514 U.S. 927, 932 & n.2 (1995) (collecting examples).

11

ignorance." *Book of General Laws and Liberties Concerning the Inhabitants of Massachusetts* 13 (1648), perma.cc/3PJ9-ECN6. And an early New York City law required "Staves of Office" to be individually "numbered . . . with [officers'] respective numbers." *Minutes of the Common Council of the City of New York*, 1784-1831, at 682 (Dec. 28 1807), perma.cc/8G75-XWRS. The law imposed penalties for officers who "appear[ed] with or us[ed] any other Staff than such as corresponds with their number." *Id.* Many jurisdictions have adopted modern counterparts to those laws. *See generally* SA-28-49.[3]

There is also a longstanding tradition of federal law enforcement agents identifying themselves. For example, the Fifth Congress required that armed boats used for customs collection "be distinguished from other vessels, by an ensign and pendant," and specified that the boats could lawfully "fire at" noncompliant vessels only "after such pendant and ensign shall be hoisted." 1 Stat. 700-701 (1799). The U.S. Marshals—the first federal law enforcement agents—have long worn badges and carried identification cards; one illustrative policy from the 1880s directed that "[e]ach deputy [Marshal] will wear his badge of office outside, on the left lapel of his coat [while] on duty." U.S. Marshals Service, *The Badge and Other Forms of Identification*, perma.cc/L58K-NY88. The U.S. Secret Service has issued standard

---

[3] *See, e.g.*, Phoenix Police Dep't, Operations Order 4.7.00, at 9, perma.cc/7DHP-76SK; Mass. Gen. Laws ch. 41, § 98D.

badges since 1873, shortly after its founding.  U.S. Secret Service, *History*, perma.cc/5F6S-GL48.  And today, all federal law enforcement officers "are trained to identify themselves and carry badges."  SA-46.  Until recently, for example, ICE agents would usually wear clothing "marked as 'ICE'" and "have a credential, bearing their badge number, visible on their person."  SA-15.

Recently, there has been a growing number of incidents in which members of the public have not been able to identify federal law enforcement agents because of their lack of visible identification.  *See, e.g.*, SB 805 § 1(b).  This confusion has resulted in federal law enforcement officials being mistaken for criminals and vice versa, creating serious risk of harm to peace officers and members of the public.  In one recent case, unidentified federal agents in unmarked vehicles forced a car in to stop and, after being asked to provide identification, broke its windows; after the driver began pulling away, agents fired several shots at the car.[4]  Afterwards, the agents and the driver separately requested assistance from local police:  the driver told police that "masked men had tried to pull him over, broke his car window, and shot at him," and said "he did not know who they were."[5]  Imposters masquerading

---

[4] Frias, *Federal Agents Open Fire At Family Truck in San Bernardino*, NBC L.A. (Aug. 16, 2025), tinyurl.com/45da48jy.

[5] Press Release, *City of San Bernardino* (Aug. 16, 2025), https://www.sanbernardino.gov/m/newsflash/Home/Detail/630.

as anonymous ICE agents have taken advantage of the surge of unidentified federal officials to commit robberies, sexual assaults, and other crimes.[6]

The confusion and threat to public safety, including officer safety, resulting from federal agents' failure to visibly identify themselves has become so widespread that in October 2025, the FBI issued a report warning that the "recent increase in ICE enforcement actions" had spurred "criminal actors impersonating ICE agents to commit violent crime." SA-06. The FBI recommended that "law enforcement personnel adequately identify themselves during operations and cooperate with individuals who request further verification." SA-08. The report also warned that the "difficult[y] for the community to distinguish between legitimate officers conducting lawful law enforcement action and imposters engaging in criminal activity . . . damages trust between the local community and law enforcement." SA-06. Related concerns have also been raised by courts and lawmakers from both parties. *See, e.g., Am. Ass'n of Univ. Professors v. Rubio*,

---

[6] *E.g.*, Goldman, *Fake ICE Agent Robs 2 People in N.J., Cops Say*, NJ.com (Jan. 28, 2026), tinyurl.com/mva8j49m; Tucker, *Man Accused of Impersonating ICE Officer, Sexually Assaulting Woman at Raleigh Motel*, WBTV (Jan. 29, 2025), tinyurl.com/3js5suc6.

802 F. Supp. 3d 120, 174 (D. Mass. 2025) (Young, J.) ("In all our history we have never tolerated an armed masked secret police.").[7]

2.  Last year, California enacted two laws to reduce the risk of impersonation and ensure that citizens can readily identify law enforcement officers.  The first, SB 805, sets standardized visible identification requirements for all law enforcement operating in California by generally requiring officers to "display identification that includes their agency and either a name or badge number . . . when performing enforcement duties."  Cal. Gov. Code § 7288(a)(2).  "Enforcement duties" are narrowly defined to include only "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes."  *Id.* § 7288(c)(1).  This baseline requirement is coupled with a broad set of exceptions, including exceptions that apply during undercover operations; during certain plainclothes operations; when using personal protective equipment; if exigent circumstances exist, including "an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence"; or if "there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the . . .

---

[7] *See also, e.g.*, Letter from Sen. Tillis to Secretary Noem (Feb. 2, 2026), perma.cc/87WY-58BZ; *Escobar Molina v. D.H.S.*, 2025 WL 3465518, at *37 (D.D.C. Dec. 2, 2025).

15

officer." *Id.* § 7288(a)(3). The statute also requires law enforcement agencies to adopt policies requiring visible identification except in the identified circumstances. *Id.* § 7288(a). For agencies that do not do so, officers may be charged with a misdemeanor if they engage in a "willful and knowing violation" of the statute's requirements. Cal. Penal Code § 13654(c); *see id.* § 13654(e).[8]

The second recently enacted law, SB 627, prohibits law enforcement officers from wearing facial coverings except in specified circumstances. Cal. Penal Code § 185.5(a), (c); Cal. Gov. Code § 7289(b)(3). SB 627 requires agencies to adopt written polices, and makes violations by officers a misdemeanor if their agency has not adopted a policy. Cal. Penal Code § 185.5(d), (f). SB 627 applies to local and federal law enforcement agencies, but not state agencies. *Id.* § 185.5(e).

3. The federal government sued to enjoin both statutes under the intergovernmental-immunity doctrine. The district court preliminarily enjoined enforcement of the facial covering prohibition, concluding that SB 627 discriminates against the federal government because it does not apply to state agencies. A20-23. But the court rejected the federal government's remaining

---

[8] SB 805 also expands liability for impersonating peace officers to include impersonating federal officers, Cal. Penal Code § 538d(f), and authorizes officers to "request an alleged law enforcement officer to present identification" if there is "probable cause or reasonable suspicion to believe the alleged law enforcement officer has. . . impersonat[ed] a peace officer," *id.* § 13653(a).

arguments. As relevant here, it held that SB 805 does not discriminate against or impermissibly regulate the federal government. A29-30.

## ARGUMENT

An injunction pending appeal is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *see Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). The party seeking relief must establish that it is likely to succeed on the merits, that it will be irreparably injured, and that the balance of equities favors relief. Courts "demand[] a significantly higher justification" than they do for a stay, because an injunction "grants judicial intervention that has been withheld by lower courts." *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers). Here, the federal government cannot meet that high bar: Because SB 805 is generally applicable and at most incidentally burdens federal operations, it is materially indistinguishable from a host of state laws that have long been applied to federal officers without violating the intergovernmental-immunity doctrine. And barring SB 805's enforcement would substantially harm the State and the public by allowing secret, unaccountable policing practices—practices irreconcilable with our national traditions—to go unchecked within California's borders.

17

**I. THE FEDERAL GOVERNMENT CANNOT SHOW THAT SB 805 LIKELY VIOLATES THE SUPREMACY CLAUSE**

1.  The Supremacy Clause, U.S. Const. art VI, cl. 2, is the only constitutional provision at issue in this case. State laws generally violate the Supremacy Clause only where preempted by a federal statute, and "principles of federalism dictate that [courts] employ a strong presumption against preemption." *Ctr. for Competitive Pol. v. Harris*, 784 F.3d 1307, 1318 (9th Cir. 2015), *abrogated in part on other grounds*, 594 U.S. 595 (2021). In rare circumstances, a state law that is not preempted may violate the Supremacy Clause under the separate doctrine of intergovernmental immunity. The concern that "lies at the heart" of that doctrine is "preventing discrimination against the Federal Government." *United States v. Washington*, 596 U.S. 832, 841 (2022). Accordingly, many cases striking down state laws on intergovernmental-immunity grounds have involved discrimination. *See, e.g.*, *M'Culloch v. Maryland*, 17 U.S. 316, 425-437 (1819) (tax on the Bank of the United States, without any comparable tax on banks chartered by Maryland); *Washington*, 596 U.S. at 835 (worker's compensation law that applied only to federal workers); *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010) (ordinances restricting federal government's military recruitment efforts).

The federal government does not argue that SB 805's identification requirement is preempted by federal law. Nor does it contend that SB 805 discriminates against the federal government. It instead argues that SB 805 is

invalid because it "regulates" federal officials. *E.g.*, Mot. 1. Invoking a line of cases invalidating state laws that "directly regulate" federal employees, *Washington*, 598 U.S. at 835, the federal government contends that *any form* of nondiscriminatory state regulation of federal employees—no matter how minimal the impact on federal operations—is per se invalid on intergovernmental-immunity grounds, *see, e.g.*, Mot. 10 ("this prohibition is absolute"). That remarkable position defies common sense, principles of federalism, and centuries of precedent.

"It is well settled that generally applicable state laws can apply to federal agents." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024). Indeed, "[t]hat was decided long ago by Mr. Justice Washington in *United States v. Hart*," which established that federal employees "do[] not secure a general immunity from state law while acting in the course of [their] employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (citing *United States v. Hart*, 26 F. Cas. 193 (C.C.D. Pa. 1817) (No. 15,316)). In *Hart*, Justice Washington made clear that a federal mail carrier could lawfully be subjected to state and local laws forbidding breaches of the peace. 26 F. Cas. At 194. In *Johnson*, the Supreme Court recognized that local laws that "might affect incidentally the mode of carrying out [federal] employment"—such as generally applicable traffic laws "regulating the mode of turning at the corners of streets"—may be applied to federal officials. 254 U.S. at 56 (Holmes, J.). Courts have also applied other state

19

criminal and civil laws, including generally applicable tort doctrines, to federal officials.[9] The Supreme Court has suggested that state environmental regulations do not impose an impermissible "prohibition on the Federal Government" if they "simply . . . regulate the amount of pollutants which [a] federal installation[] may discharge." *Hancock v. Train*, 426 U.S. 167, 180 (1976). And this Court has upheld the application of health and safety regulations to federal detention facilities, including provisions allowing state inspections of those facilities. *United States v. California*, 921 F.3d 865, 884-885 (9th Cir. 2019).

In the federal government's view, States may regulate federal operations only in "cases involving federal *contractors*." Mot. 13. That is incorrect. Although States certainly have greater flexibility to apply their laws to federal contractors, *see, e.g.*, *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116 (9th Cir. 2025), that does not mean States are categorically barred from extending generally applicable regulations to federal employees. Many of the civil and criminal cases discussed above, *supra* pp. 14-15 & n.9, involved federal employees. And as the federal

---

[9] *See, e.g.*, *Hernandez v. Mesa*, 589 U.S. 93, 111 (2020) (noting "continuing viability of state-law tort suits against federal officials"); *Martin v. United States*, 605 U.S. 395, 413 & n.2 (2025) (similar); *Colorado v. Symes*, 286 U.S. 510, 518 (1932) (no general immunity for federal employees from state criminal law); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (same); *Idaho v. Horiuchi*, 253 F.3d 359, 361-362, 376-377 (9th Cir. 2000) (en banc) (same), *vacated as moot* 266 F.3d 979 (9th Cir. 2001); *Texas*, 123 F.4th at 206 n.23 (collecting other examples).

government acknowledges, generally applicable rules such as "traffic laws" may apply to federal employees. Mot. 15. There is no basis in precedent for the federal government's proposed distinction between "routine" nondiscriminatory state laws and nonroutine nondiscriminatory laws. *Id.* Nor does the federal government offer any definition or standard for applying that approach in practice. How, for example, would the federal government's proposed distinction apply to other generally applicable state laws that regulate law enforcement agents, such as laws imposing standardized requirements on "emergency vehicle[s]" operated by "[a]ny federal, state, or local agency, department, or district employing peace officers," Cal. Veh. Code § 165?[10] The federal government does not say.

Cases in which courts have struck down generally applicable laws on intergovernmental-immunity grounds have involved substantial burdens on federal operations. For example, in *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc), the Court invalidated a state law banning private detention facilities because it would have required the federal government "to entirely transform its approach to detention [or] abandon its California facilities." In *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996), the Court

---

[10] *See, e.g.*, Cal. Veh. Code § 25252 ("[e]very authorized emergency vehicle shall be equipped with at least one steady burning red warning lamp visible from at least 1,000 feet "); *id.* § 21806 (requiring drivers to pull over and stop "[u]pon the immediate approach of an authorized emergency vehicle which is sounding a siren and which has at least one lighted lamp exhibiting red light").

declined to apply against the federal government an "intrusive regulation" that would have required federal employees to place warning signs and safety ropes throughout "virtually every square inch" of Yosemite National Park, *id.* at 1436 n.5, thereby "destroy[ing] [its] visual beauty and riparian environment," *id.* at 1435. And in *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014), the Court invalidated state standards for the "cleanup of radioactive contamination" where they "affect[ed] nearly all of [the federal government's] decisions with respect to the cleanup, including the environmental sampling that is required, the cleanup procedures to be used, and the money and time that will be spent."

2. SB 805 is not comparable to laws previously deemed invalid on intergovernmental-immunity grounds. The statute requires only that local, state, and federal law enforcement officers "visibly display identification that includes their agency and either a name or badge number" in certain circumstances. Cal. Gov. Code § 7288(a)(2). SB 805 thus does no more than require federal officers to abide by the same tradition that has guided law enforcement in this country at every level of government for generations. *Supra* pp. 6-8. Indeed, until very recently, the federal government routinely trained its immigration officers to "identify themselves and carry badges." SA-46. The "plainclothes" practices described by the federal government at, *e.g.*, Mot. 5, 20, "were extremely uncommon practices for ICE officers prior to this year," SA-15.

22

SB 805's scope is also limited in other ways. It applies, not to all law enforcement operations, but only to "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes." Cal. Gov. Code § 7288(c)(1). And its broad exceptions cover "officer[s] engaged in active undercover operations or investigative activities," "officer[s] wearing personal protective equipment," "officer[s] engaged in protective operations . . . where the display of identification might compromise the safety, anonymity, or tactical effectiveness of the protection detail," and officers responding to "[e]xigent circumstances," "including if the officer is responding to those circumstances while off-duty." Cal. Penal Code § 13654(b). The statute also allows agencies provide exemptions "[w]hen there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the peace officer." Cal. Gov. Code § 7288(a)(3)(E).

In light of SB 805's limited scope, the federal government cannot show that it would "transform" law enforcement operations, *GEO Grp.*, 50 F.4th at 750, grant the State "a virtual power of review" over its activities, *id.* at 756, or otherwise impose a "level of control over federal operations that the Supremacy Clause does not tolerate," *id.* at 757. The federal government's principal contention is that compliance will lead to increased harassment, stalking, and "doxxing" of officers. *See, e.g.*, Mot. 4-5, 18-19; *supra* p. 6 (defining "doxxing"). Numerous recent

23

reports provide reason to doubt the federal government's asserted threats to officer safety. *See, e.g.*, Levin, *DOJ Cases Against Protesters Keep Collapsing as Officers' Lies Are Exposed in Court*, The Guardian (Feb. 21, 2026), tinyurl.com/4ntkz62z; Berzon et al., *When Trump Officials' Claims About Shootings Unravel in Court*, N.Y. Times (Feb. 10, 2026), tinyurl.com/5w4524bf. In any event, SB 805 does not pose the threat alleged by the federal government because the law does not compel the disclosure of personally identifying information. Law enforcement officers may satisfy SB 805 by disclosing only their agency and badge number. *See* Cal. Gov. Code § 7288(a)(2) (requiring display of "name *or* badge number" (emphasis added)). Badge numbers are anonymous and can be "changed regularly." SA-17. "There is no logical reason that an officer would be placed at risk by displaying an anonymized number that is meaningful only as an index to agency records." *Id.*

The federal government's list of hypotheticals (at Mot. 17) merely *underscores* the limited scope—and constitutional validity—of SB 805. Nothing in the district court's opinion suggests that "all 50 states could prescribe direct regulations" that give rise to a patchwork of conflicting requirements. *Id.* If such a burden existed, the intergovernmental-immunity analysis could very well turn out differently. Here, however, the federal government has not alleged—let alone substantiated—any such burden. Nor has it shown that SB 805's modest

24

identification requirements, which merely codify longstanding law enforcement practices, bear any resemblance to extreme hypothetical laws requiring officers to wear "pink" uniforms, refrain from using "K9 teams based [on] animal-rights . . . considerations," or avoid "carrying weapons entirely." *Id.*

The federal government also asserts that identification will "compromise operational security by alerting targets to the presence of law enforcement," Mot. 20, and facilitating the work of "numerous activists," Mot. 21. But SB 805 does not require ICE or any other law enforcement agency to use marked vehicles or provide advance notice or warning of their operations to the public. And federal regulations already require immigration officers effectuating an arrest to identify themselves as immigration officers as soon as it is practicable to do so. 8 C.F.R. § 287.8(c)(2)(iii). That longstanding regulatory requirement is difficult to square with the federal government's newfound theory that officer identification will "substantially hamper" immigration enforcement operations. Mot. 23. To the extent the federal government is concerned about *unlawful* forms of interference with its enforcement efforts, state and federal law impose serious criminal penalties on those who "assault[], resist[], oppos[e] . . . or interfer[e]" with federal officers "while engaged in or on account of the performance of official duties." 18 U.S.C. § 111; *see, e.g.*, *United States v. Eaton*, 2025 WL 3487521, at *3 (E.D. Okla. Dec. 4, 2025) (describing criminal charges against individual who allegedly

25

"doxxed" and threatened law enforcement officers).[11] The federal government makes no attempt to show that those penalties are inadequate.

Before the district court, the federal government expressed concern that members of the public will gather to protest federal immigration operations, or film or photograph officers during the discharge of their duties. *See* SA-94; SA-98 (immigration enforcement "creates a lot of strong responses in certain communities," including "protesters who . . . will film officers" or "track[] ICE online"); A059 (similar). As the district court recognized, however, the First Amendment safeguards "the right to photograph and record matters of public interest," including "law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018); *see* A17. In recent years, recordings of civilian encounters with law enforcement—such as the recordings of George Floyd's killing and the shootings of Walter Scott and Philando Castile—have played a critical role in allowing the public to hold governments accountable and promote dialogue about policing practices. Just last month, recordings of Alex Pretti's fatal shooting contradicted federal officials' claims that officers fired "defensive shots"

---

[11] *See also* Cal. Penal Code §§ 653.2 (prohibiting doxxing); 646.9 (stalking); 422 (criminal threats); 241 (assault); 18 U.S.C. § 2261A (stalking).

26

after Pretti approached them with an "inten[t] to 'massacre law enforcement.'"[12] In a democracy built on principles of accountability and "consent of the governed," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943), the possibility that SB 805's identification requirement may facilitate civilian oversight of law enforcement does not render it constitutionally suspect in any way.

The federal government also asserts that SB 805 will "chill" federal operations by threatening criminal liability. *E.g.*, A49; *see* Mot. 21. But as an en banc panel of this Court recognized in rejecting similar "chill[ing]" concerns raised by the federal government, "Supremacy Clause immunity is not absolute and so presupposes that federal agents can be prosecuted for violating state law." *Idaho*, 253 F.3d at 376 (Kozinski, J.); *see Colorado*, 286 U.S. at 518.[13] The practice of "prosecuting federal agents or officials for violations of state laws" is a "long-used tactic" that "stretches back to at least the early 1800s." Godar, State Democracy Research Initiative, *Explainer: Can States Prosecute Federal Officials* (July 17, 2025), perma.cc/32DP-6YHA.

---

[12] Smith, *Videos Contradict U.S. Account of Minneapolis Shooting by Federal Agents*, Wall Street Journal, (Jan. 24, 2026) tinyurl.com/y3m6ej5z.

[13] The en banc decision in *Idaho* was later vacated on mootness grounds. 2s66 F.3d at 979. But it remains persuasive authority for the Court's consideration.

27

In any case, the threat of "chilling" federal agents is exceedingly weak here. SB 805 allows the federal government to shield its officers from criminal prosecution by simply adopting a policy memorializing the statute's identification requirements. Cal. Penal Code § 13654(e). If it does so, SB 805 will leave enforcement of the identification requirements entirely to the federal government. *See id.* Although the federal government brought a challenge in district court to SB 805's requirement to adopt an identification policy, *see* A009, it has not renewed that challenge in seeking emergency relief before this Court.

Another critical flaw in the federal government's immunity arguments is that they focus exclusively on purported burdens to federal operations. Due respect for federalism requires application of a "functional approach" to claims of intergovernmental immunity—an approach that "accommodat[es] . . . the full range of *each* sovereign's legislative authority." *North Dakota v. United States*, 495 U.S. 423, 425, 435 (1990) (plurality) (emphasis added). California's interests in applying SB 805 to federal officers are compelling. The statute's identification requirements enable the public to report misconduct and ensure that responsible officers can be held accountable. Identification requirements also promote public safety and facilitate the ability of law-abiding citizens to exercise their self-defense rights, including their rights under the Second Amendment to bear and use arms in self-defense in public places. *See Bruen*, 597 U.S. at 32. When citizens are being

28

detained or forcibly restrained, they need to know if they can lawfully resist. As the FBI and others have recognized, *supra* p. 9, there have been an alarming number of incidents in recent months in which the absence of visible forms of identification on federal officers has made it easier for criminals to impersonate federal agents and far more difficult for private citizens to distinguish between criminals and law enforcement agents. *See, e.g.*, *supra* pp. 8-9.

In light of the strong state interests underlying SB 805, as well as the statute's broad exceptions, Cal. Gov. Code § 7288(a)(3)(A)-(E), and limited scope, *id.* § 7288(c)(1), the federal government has not shown that it is invalid in any applications, let alone *all applications* to federal agents. As relevant here, the only relief sought by the federal government is an injunction prohibiting the State from enforcing SB 805 against any federal officer, regardless of the circumstances. SA-88; Mot. 25. Because such sweeping relief would require speculation about hypothetical future applications "beyond the particular circumstances" before the Court, the federal government must meet the demanding standard applicable to facial challenges. *Doe v. Reed*, 561 U.S. 186, 194 (2010). That would require a showing that "no set of circumstances exists under which the Act would be valid."

29

*Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016).[14]  The federal

government has not satisfied that high bar here.

## II.  THE REMAINING EQUITABLE FACTORS STRONGLY WEIGH AGAINST AN INJUNCTION PENDING APPEAL

The federal government also fails to show that the remaining equitable factors

support an injunction pending appeal.  Its main contention is that "[i]rreparable

harm necessarily results from the enforcement of a preempted state law."  Mot. 22;

*see id.* at 23.  But "general pronouncements that a Supremacy Clause violation

alone causes sufficient harm" and "conclusory assertions" made by DHS officials

are insufficient to justify equitable relief.  *United States v. California*, 921 F.3d at

894.  And for the foregoing reasons, *supra* pp. 18-23, the federal government has

not persuasively shown that SB 805 will "hamper federal operations" or "endanger

the lives . . . of federal officers."  Mot. 23.

In contrast, the State and the public interest would be irreparably—and

substantially—harmed if SB 805 were enjoined.  The State necessarily "suffers

irreparable injury whenever an enactment of its people or their representatives is

enjoined."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997);

---

[14] Although this Court has not previously addressed the standard for facial relief in intergovernmental-immunity cases, cases like *Puente* define the standard applicable in preemption cases.  Because preemption and intergovernmental immunity both arise from the Supremacy Clause, it would be anomalous to adopt different standards for facial claims under those two doctrines.

30

*see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And an injunction would ill-serve the important public interests in accountability and public safety, including officer safety. "[V]isible identification" serves as a "critical check[] on law enforcement behavior," enabling the public to identify and report officers who engage in misconduct. SA-63.[15] And when people cannot tell the difference between law enforcement agents and "a 'stick-up crew," SA-71, they are far more likely to attack officers in self-defense, *see, e.g.*, SA-63. The absence of visible identification also enables criminals to impersonate law enforcement agents and prey on innocent civilians—as the FBI has recently warned. *Supra* p. 9; *e.g.*, Maldonado, *Apparent Immigration Agent Impersonation in Brooklyn Leads to Attempted Rape*, CBS News (Feb. 12, 2025), perma.cc/4C65-3XYJ (describing robbery and attempted rape by man who said "Immigration" but "did not hold up a badge or any type of identification").

These weighty concerns are not abstract or theoretical. In recent months, they have played out all too frequently on the streets of our country, including in California. *See, e.g.*, *supra* pp. 3-4, 8-9. By denying the requested injunction and

---

[15] In light of the weighty public interest in accountability, it is not at all clear why the federal government views California's portal for reporting officer misconduct with suspicion. Mot. 24. As the federal government acknowledges, the portal is "intended to help the California Department of Justice create a record of potential unlawful conduct by federal agents, and inform possible legal actions," *id.*—legal actions that California has well-settled authority to undertake. *Supra* p. 15; *Colorado*, 286 U.S. at 518; *Idaho*, 253 F.3d at 376.

allowing SB 805 to take effect, the Court would provide the State with a modest, generally applicable means to ensure that all law enforcement agents within its borders, including those who work for the federal government, respect a tradition that has guided officers at every level of government for generations.

## CONCLUSION

The motion for an injunction pending appeal should be denied.

Dated:  February 23, 2026

Respectfully submitted,

*Mica L. Moore*

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
MICA MOORE
  *Deputy Solicitor General*
ANNA FERRARI
LEE I. SHERMAN
  *Supervising Deputy Attorney General*
KRISTI A. HUGHES
ZELDA VASSAR
ASHA ALBUQUERQUE
ALYSSA ZHANG
CAMERON A. BELL
  *Deputy Attorneys General*
ZACHARY W. SORENSON
  *Associate Deputy Solicitor General*

*Attorneys for Defendants-Appellees*

32

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,598 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

**SUPPLEMENTAL ADDENDUM**

# TABLE OF CONTENTS

**Page**

Exhibit G to Declaration of Cameron A. Bell,

    D. Ct. Dkt. 29-2 ........................................................................SA-01

Declaration of Scott Shuchart

    D. Ct. Dkt. 29-3 ........................................................................SA-11

Expert Report and Declaration of Dr. Stuart Schrader

    D. Ct. Dkt. 29-5 ........................................................................SA-21

Declaration of Stanford O'Neill Franklin

    D. Ct. Dkt. 29-6 ........................................................................SA-59

Declaration of Andrea Velez

    D. Ct. Dkt. 29-8 ........................................................................SA-65

Declaration of Peter James Mundwiler

    D. Ct. Dkt. 29-10 ......................................................................SA-69

Complaint

    D. Ct. Dkt. 1..............................................................................SA-74

Excerpts of Preliminary Injunction Hearing Transcript ........................SA-90

Rob Bonta
Attorney General of California
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anna Ferrari, SBN 261579
Lee I. Sherman, SBN 272271
Supervising Deputy Attorneys General
Kristi A. Hughes, SBN 235943
Zelda Vassar, SBN 313789
Asha Albuquerque, State Bar No. 332901
Alyssa Zhang, SBN 360105
Cameron A. Bell, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DECLARATION OF CAMERON A. BELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

1

SA-01

I, Cameron A. Bell, declare under penalty of perjury that the following is true and correct:

1. I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice.

2. The Attorney General is counsel to Defendants Attorney General Rob Bonta, Governor Gavin Newsom, and the State of California. I make this declaration in support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

3. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

4. Attached hereto as **Exhibit A** is a true and correct copy of a June 13, 2025 article authored by Pedro Rios and published by Cal Matters, entitled *ICE raids in San Diego foreshadowed the roundups, protests now spreading across California,* available on the Cal Matters' official website at: https://calmatters.org/commentary/2025/06/ice-san-diego-foreshadowed-protests/.

5. Attached hereto as **Exhibit B** is a true and correct copy of a June 19, 2025 article authored by Martin Kaste and published by NPR, entitled *As courts review military in LA, immigration enforcement accelerates*, available on NPR's official website at https://www.npr.org/2025/06/19/g-s1-73569/as-courts-review-military-in-l-a-immigration-enforcement-accelerates.

6. Attached hereto as **Exhibit C** is a true and correct copy of an August 8, 2025 article authored by Rachael Uranga and Brittny Mejia and published by the Los Angeles Times, entitled '*They run, we chase': Immigration raids test limits of probable cause*, and available on the Los Angeles Times' official website at

2

https://www.latimes.com/california/story/2025-08-08/they-run-we-chase-agents-employ-aggressive-and-some-say-illegal-tactics-on-l-a-streets.

7.     Attached hereto as **Exhibit D** is a true and correct copy of a June 11, 2025 article authored by Orlando Mayorquín and Jesus Jiménez and published by the New York Times, entitled *Agents Use Military-Style Force Against Protesters at L.A. Immigration Raid*, available on the New York Times' official website at https://www.nytimes.com/2025/06/06/us/los-angeles-immigration-raid.html.

8.     Attached hereto as **Exhibit E** is a true and correct copy of a June 27, 2025 article authored by Carlos Granda and published by ABC7, entitled *Huntington Park Police Arrest Man Possibly Posing as Border Patrol Agent,* available on ABC7's official website at https://abc7.com/amp/post/huntington-park-police-arrest-man-possibly-posing-border-patrol-agent/16868054/.

9.     Attached hereto as **Exhibit F** is a true and correct copy of a November 20, 2025 U.S. Marshals Service press release authored by Ryan Guay, Supervisory Deputy U.S. Marshal, entitled *Real Officers Have Nothing to Hide: If In Doubt, Ask to Verify*, available on U.S. Marshals Service' official website at https://www.usmarshals.gov/news/press-release/real-officers-have-nothing-hide-if-doubt-ask-verify.

10.     Attached hereto as **Exhibit G** is a true and correct copy of a 2025 Public Safety Awareness Report OPE-26-SA-02 by the Federal Bureau of Investigation, Office of Partner Engagement, entitled *Criminal Actors Impersonate ICE Agents to Commit Violent Crime*, available on Property of the People's official website at: https://propertyofthepeople.org/document-detail/?doc-id=26364028.

11.     Attached hereto as **Exhibit H** is a true and correct copy of an excerpt from the California Department of Justice, Division of Law and Enforcement, Policies and Procedures Manual 2024, Sections 1046-1046.3.11.  A redacted but publicly available copy of the policy is online at

3

https://oag.ca.gov/system/files/media/2024-law-enforcement-policy-and-procedures-manual.pdf.

12.    Attached hereto as **Exhibit I** is a true and correct copy of a September 16, 2025 article authored by the U.S. Department of Homeland Security (DHS), entitled *ICE Receives More than 150,000 Applications to Join ICE Law Enforcement to Help Remove Worst of the Worst Criminal Illegal Aliens from U.S.* and available on DHS's official website at https://www.dhs.gov/news/2025/09/16/ice-receives-more-150000-applications-join-ice-law-enforcement-help-remove-worst.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 22, 2025, in Los Angeles, California.

*/s/ Cameron A. Bell*
CAMERON A. BELL
DEPUTY ATTORNEY GENERAL

SA-04

# EXHIBIT G

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

FEDERAL BUREAU OF INVESTIGATION     OFFICE OF PARTNER ENGAGEMENT     PUBLIC SAFETY AWARENESS REPORT



**PUBLIC SAFETY AWARENESS REPORT**
FEDERAL BUREAU OF INVESTIGATION
OFFICE OF PARTNER ENGAGEMENT

(U) PREPARED BY THE FBI OFFICE OF PARTNER ENGAGEMENT AND FBI NEW YORK

17 OCTOBER 2026
[OPE-26-SA-02]



(U) Warning: This document is classified: UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE. The information marked (U//LES) in this document is the property of the Federal Bureau of Investigation and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials and individuals with a need to know. Distribution beyond these entities without FBI authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceedings without first receiving authorization from the originating agency. Rec

(U) Public Safety Awareness Report template approved for fiscal year 2026, as of 1 OCTOBER 2025.
(U) Please direct comments and queries regarding this product to the FBI Office of Partner Engagement's Enhanced Engagement Unit at PSAR_Production@fbi.gov. Press or media inquiries should be directed to NPO@fbi.gov.

## (U//FOUO) Criminal Actors Impersonate ICE Agents to Commit Violent Crime

### (U) SITUATIONAL AWARENESS

(U//LES) This Situational Awareness report informs state, local, and federal law enforcement (LE) partners about criminal actors impersonating ICE agents to commit violent crime. Due to the recent increase in ICE enforcement actions across the country, criminal actors are using ICE's enhanced public profile and media coverage to their advantage to target vulnerable communities and commit criminal activity. This not only effects the victims and communities but also has broader negative consequences on law enforcement agencies. These criminal impersonations make it difficult for the community to distinguish between legitimate officers conducting lawful law enforcement action and imposters engaging in criminal activity, which damages trust between the local community and law enforcement officers.

- (U//FOUO) As of 7 August 2025, three unknown subjects wearing all black, including black vests claimed to be immigration officers and robbed an ATM located in a restaurant in New York. The subjects tied one victim's hands together and

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

000002

054      SA-06
Exhibit G

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

placed a garbage bag over their head. A second victim was upstairs when the break-in happened but upon hearing the subjects' claim they were immigration officers came downstairs and surrendered to the subjects. The victim was kicked to the ground, had their hands tied, and realized the subjects were not actually immigration officers and robbing the restaurant. [1]

- (U//LES) As of 14 April 2025, an individual impersonated an ICE agent and threatened immigrants. The individual from New York posted a photo of themselves on social media wearing an ICE jacket standing outside of an identified home improvement retailer corporation with the caption "It's my 14th shift and all the illegal aliens are gone! It worked!" A separate post on a different social media platform revealed the same subject posted a picture of himself wearing an ICE jacket with the caption "No. I'm not ice." [2]

- (U) As of 21 April 2025, an individual in Florida pretended to be an ICE agent and kidnapped a female victim who was in the process of becoming a legal US resident. The subject approached the victim and claimed she was there to pick up the victim. The subject unzipped their jacket and revealed a shirt that said ICE. The victim believed the subject was a real ICE agent and got in the car with the subject. The victim was taken to an apartment complex by the subject but was able to escape. [3]

- (U) As of 13 February 2025, an individual claiming to be an ICE agent approached a Hispanic woman in Brooklyn, New York. The individual directed the woman to a nearby stairwell where the individual punched her, tried to rape her, and stole her purse and cellphone. The individual was arrested by the NYPD and charged with rape, robbery, assault, burglary and criminal possession of stolen property. [4]

- (U) As of 29 January 2025, a subject was arrested in North Carolina for impersonating an ICE agent and sexually assaulting a woman. The subject allegedly entered the victim's motel room and threated to deport the woman if she did not have sex with him. The subject told the victim he was a sworn law enforcement officer and showed her his business card with badge on it. [5]

## (U) CONSIDERATIONS

(U) The following indicators include, but are not limited to any individual, or group; these indicators should be observed in context. An indicator alone does not accurately determine this threat activity; organizations should evaluate the totality of the suspicious behavior:

- (U) Individuals with suspicious/false identification or credentials (i.e. the photo does not match, the material appears fake).

- (U) Individuals with outdated, incorrect protective gear or equipment.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

- (U) Use of cloned emergency vehicles where the identifiers (decals, markings, logos, lights, license plates) differ from the official government vehicles.

- (U) Social Media posts from illegitimate or fraudulent sources claiming to be a government or law enforcement authority, advertising efforts to imitate or act as ICE to intimidate vulnerable communities.

## (U) OPPORTUNITIES

(U//FOUO) In addressing the ICE Impersonation schemes, law enforcement has the opportunity to:

- (U//FOUO) Coordinate with local, state, and federal law enforcement agencies regarding immigration operations in the area to help verify legitimate vs. non legitimate operations.

- (U//FOUO) Conduct community outreach programs to raise awareness of impersonation schemes and what to do in case they are targeted. Community outreach efforts boost the law enforcement's image and helps the community recognize officials in their area to counteract potential damage or mistrust caused by impersonators.

- (U) Conduct public awareness campaigns to educate and train the community on common impersonation tactics.

- (U//FOUO) Ensure law enforcement personnel adequality identify themselves during operations and cooperate with individuals who request further verification, such as calling their local precinct to verify the officer's identity.

## (U) RESOURCES

- (U) To report any leads, threats, and suspected criminal activity, you may also visit https://tips.fbi.gov/ or contact your local FBI Office: https://www.fbi.gov/contact-us. **Note:** *This website cannot be used to report emergencies or immediate threat to life. For emergencies or immediate threat to life, please call 911*

- (U) We also encourage the law enforcement use of the unclassified information sharing system **eGuardian** for reporting suspicious activity reports (SARs) to the FBI. Access eGuardian via the Law Enforcement Enterprise Portal (LEEP): https://www.cjis.gov/. If the information is urgent in nature, then please contact your local FBI field office directly and follow up with an eGuardian report.

(U) THE INFORMATION IN THIS PUBLIC SAFETY AWARENESS REPORT (PSAR) PREPARED BY THE FBI OFFICE OF PARTNER ENGAGEMENT AND THE NEW YORK FIELD OFFICE, IS PROVIDED TO ENHANCE PUBLIC SAFETY AND FOR SITUATIONAL AWARENESS PURPOSES ONLY. NO INFORMATION CONTAINED IN THIS PSAR, NOR ANY INFORMATION DERIVED THEREFROM, MAY BE USED IN ANY PROCEEDING (WHETHER CRIMINAL OR CIVIL), TO INCLUDE ANY TRIAL, HEARING, OR OTHER PROCEEDING BEFORE ANY COURT, DEPARTMENT,

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

000004

056     SA-08

Exhibit G

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

AGENCY, REGULATORY BODY, OR OTHER AUTHORITY OF THE UNITED STATES WITHOUT PRIOR APPROVAL FROM THE FBI. THESE RESTRICTIONS APPLY TO ANY INFORMATION EXTRACTED FROM THIS DOCUMENT AND USED IN DERIVATIVE PUBLICATIONS OR BRIEFINGS.

## (U) END NOTES

[1] (U//FOUO) FBI | Case Information | 8 September 2025 | 7 August 2025 | "[TITLE REDACTED]" | UNCLASSIFIED//FOR OFFICIAL USE ONLY | UNCLASSIFIED//FOR OFFICIAL USE ONLY.
[2] (U//LES) FBI | Case Information | 18 April 2025 | 18 April 2025 | "[TITLE REDACTED]" | UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE | UNCLASSIFIED//LAW ENFORCEMENT SENSTIVE.
[3] (U) News Article | Miami Herald | "Woman Poses as ICE Agent to Kidnap Ex-boyfriend's Wide at Work, Florida Cops Say" | 21 April 2025 | https://www.miamiherald.com/news/state/florida/article304699521.html | accessed on 26 August 2025.
[4] (U) News Article | ABC7NY | "Man arrested in attempted rape after allegedly posing as ICE agent in Brooklyn" | 13 February 2025 | https://abc7ny.com/post/brooklyn-heights-attack-man-arrested-attempted-rape-allegedly-posing-ice-agent/15902769/ | accessed on 26 August 2025.
[5] (U) News Article | WBTV | "Man Accused of Impersonating ICE Officer, Sexually Assaulting Woman at Raleigh Motel" | 29 January 2025 | www.wbtv.com/2025/01/29/man-accused-impersonating-ice-officer-sexually-assaulting-woman-raleigh-motel/ | accessed on 26 August 2025.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

000005

057

SA-09

Exhibit G

# PSAR Product Feedback Form



*Fill in the below fields with as much detail as possible.*

*Public Safety Awareness Reports (PSARs) share information and intelligence to enhance awareness of FSLTT law enforcement, intelligence, and homeland security customers.*

**Your input will help OPE continue to improve future PSARs.**

| | |
|---|---|
| **YOUR AGENCY:** *(enter your employer name)* | |
| **PUBLIC SAFETY CATEGORY:** *(choose from the listing)* | Select from listing... |
| **PSAR PRODUCT ID:** | |

**PSAR USE:**
How do you plan to use the information in this PSAR to support your agency's public safety mission?

- ☐ Observe, identify, and/or disrupt threats
- ☐ Share with law enforcement, intelligence, and/or homeland security partners
- ☐ Allocate more resources (e.g., personnel, equipment)
- ☐ Initiate your own analysis in developing an analytical product
- ☐ To better understand or reprioritize law enforcement investigations
- ☐ Author or adjust policies, guidelines, preparedness efforts, training, and other response plans
- ☐ Do not plan to use
- ☐ Other:

| | |
|---|---|
| What are your recommendations to improve PSAR products? | |
| Do you have new PSAR topic suggestions? Please share your ideas: | |
| Please share any other comments, thoughts, or questions with us: | |

**SUBMIT**

FEDERAL BUREAU OF INVESTIGATION

Shapiro

000006

058       **SA-10**

Exhibit G

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DECLARATION OF SCOTT SHUCHART IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

SA-11

## <u>DECLARATION OF SCOTT SHUCHART</u>

I, Scott Shuchart, declare under penalty of perjury that the following is true and correct:

1.     My name is Scott Shuchart. I am over 18 years old and a resident of Maryland. I make this declaration based on my own knowledge and general expertise in the field of immigration enforcement and law enforcement policy. I have also reviewed the United States' motion for preliminary injunction and supporting declarations that the United States filed in this matter. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to the matters set forth below.

2.     I began my legal career as a law clerk on the U.S. Court of Appeals for the Ninth Circuit in San Francisco.

3.     From 2010 to 2018, I served as the Senior Advisor to the Officer for Civil Rights and Civil Liberties in the Office for Civil Rights and Civil Liberties (CRCL) within the Department of Homeland Security (DHS). In that role, I consulted on policy and provided civil rights oversight for all of DHS's component agencies, including U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).

4.     Outside of government, I have litigated immigration cases and complex federal cases against federal agencies. For example, I served on the litigation team that prevailed in *Negusie v. Holder*, 555 U.S. 511 (2009). From 2019 to 2022, I was the Senior Director for Legal Strategy at Kids in Need of Defense (KIND), leading impact litigation and training for attorneys representing unaccompanied minors in the immigration system. I was also a Senior Fellow covering immigration issues for the Center for American Progress from 2018 to 2019.

5.     From 2022 to 2025, I served as a senior official at ICE. From May 2022 to November 2023, I was Counselor to the Director of ICE, as well as for

2

some of that time the Acting Assistant Director for External Affairs. From November 2023 to January 2025, I was the Assistant Director for Regulatory Affairs and Policy. In that role, I had senior responsibility for ICE's written policies and regulations.

6.    When I worked at ICE, it had approximately 21,000 personnel, largely divided between the two principal operational directorates, Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI), each with between around 9,000 and 10,000 officers and agents and support personnel, as well as a large legal department and other service units. Policy that applied to all of ICE was made in the policy office I headed, while policies applicable only to ERO or HSI might be made by the Executive Assistant Director of the specific directorate.

7.    Through this experience inside and outside of government, I have a thorough understanding of many of the policies and practices of ICE's Enforcement and Removal Operations (ERO) directorate, including those applicable to uniform appearance, use of force, and wearing of indicia.

8.    Federal law regulating law enforcement officer (LEO) uniforms and indicia is limited. The area is largely governed by policies created by individual federal departments and agencies. The principal applicable federal statute, to my knowledge, is 10 U.S.C. § 723, which was first enacted in 2021. Under that provision, "Whenever . . . Federal law enforcement personnel provide support to Federal authorities to respond to a civil disturbance, each individual employed in the capacity of providing such support shall visibly display" a name tag or individual identifier (e.g., badge number) and the name of the entity employing the individual. However, this requirement is not applicable to plain-clothes or undercover personnel. I understand that by policy and practice ICE assures compliance with § 723 by special response teams (SRT) fielded by HSI—teams

3

SA-13

similar to SWAT units—but that § 723 has not been understood to apply to routine civil law enforcement by its personnel, who are generally not uniformed.

9.   Certain policies that have been made available for public inspection have bearing on ICE's use of masks and displays of indicia. These policies include:

a.   The ICE Employee Code of Conduct,[1] effective 2012, which provides as paragraph 5.15, "Standard of Attire," "ICE Employees must present a professional and positive image to the public and our colleagues both within and outside of ICE. While on official duty, employees must adhere to any applicable dress code policy where they are stationed";

b.   The ICE Body Armor Policy,[2] effective 2005, which provides in part that "All ICE armed officers are strongly encouraged to wear their issued body armor while performing law enforcement duties," and that ERO (formerly DRO) officers "*shall* wear their issued body armor while in performance of their law enforcement duties" (emphasis added); and

c.   The dress code policy for ICE's Health Service Corps (IHSC) unit,[3] effective 2020, reiterates the principles in the Employee Code of Conduct.

10.   ICE has been subject to litigation over deceptive arrest tactics, including deceptive attire. In particular, litigation has challenged ICE officers identifying themselves, verbally and in appearance, as working for any other law enforcement agency, or simply as "police." In early 2025, ICE settled the class

---

[1] U.S. Immigration and Customs Enforcement, Employee Code of Conduct, Directive No. 1033.1 (Aug. 7, 2012), available at https://tinyurl.com/3wv2298v.

[2] U.S. Immigration and Customs Enforcement, ICE Body Armor Policy, Directive No. 5-1.0 (Feb. 4, 2005), redacted version available at https://tinyurl.com/4rza89mu.

[3] U.S. Immigration and Customs Enforcement, IHSC Dress Code, IHSC Directive No. 5-1.0, ERO Directive No. 11770.2 (Feb. 3, 2020), available at https://tinyurl.com/6tptvcfk.

SA-14

action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California will not engage in the ruse of identifying themselves as police, including by not wearing jackets that say "POLICE" unless they also say "ICE" with equal prominence.[4]

11. I am aware that, since January 2025, ICE and other federal law enforcement officers have increasingly appeared in public conducting civil immigration enforcement (a) with their faces covered with masks, bandanas, or gaiters; and (b) without uniforms, agency name identifiers, or individual identifiers like badge numbers. These were extremely uncommon practices for ICE officers prior to this year. Rather, in a typical ICE ERO enforcement action, officers would wear body armor and a jacket or vest clearly marked as "ICE" or "ICE POLICE" and would generally have a credential, bearing their badge and number, visible on their person.

12. I am aware that, since January 2025, ICE leadership has stated publicly that it supports officers wearing masks and failing to display agency or individual identifiers due to fears of "doxxing" and other concerns for individual officer safety. Prior to 2025, I am not aware of the agency making any effort to conceal officer appearances with masks or hide badges, although concerns for officer safety are long-standing and predated 2025.

13. I am aware that in support of the motion for preliminary injunction in this matter, the United States has submitted declarations from DHS providing an escalating set of numbers purporting to show a massive increase in assaults on law enforcement personnel—as much as an 8,000% increase in assaults on ICE personnel over the rate some years ago. My understanding is that these numbers do not differentiate between serious assaults and routine forms of unwanted touching that are inherent risks of conducting hands-on law enforcement work. It is telling in this regard that, per the declaration of Michael R. Vargas, ECF 11-3 at ¶10, assaults

---

[4] The settlement agreement is available at https://tinyurl.com/5n6pnbr4.

SA-15

on CBP officers are up by a factor of less than 4, not ICE's alleged 80 times. These increases need to be considered in the context that interior immigration enforcement, and in particular un-targeted, at-large interior immigration enforcement in public places, has increased by comparable percentages, so it is not clear that the level of risk to officers per operation has actually increased by a meaningful amount.

14.  Based on my years of experience in law enforcement policy and oversight, successful adherence to policy depends on rigorous oversight outside the officer's chain of command. Prior to this year, officer conduct at DHS was overseen by an interlocking set of oversight offices created by statute: the Office of the Inspector General (OIG), *see* 6 U.S.C. § 113(b); the Office for Civil Rights and Civil Liberties (CRCL), *id.* §§ 113(d)(3) & 345; the Office of the Immigration Detention Ombudsman (OIDO), *id.* § 205; and an office of professional responsibility (OPR) within each operational component, *see id.* § 211(j) (Customs and Border Protection OPR), § 253 (ICE OPR). The way these offices would function included internal management referrals for use-of-force incidents and investigations of public complaints (including news stories and congressional inquiries). Once received, a matter would be de-conflicted among the oversight bodies, investigated by one of them, and the findings of that investigation could result in policy reform recommendations, officer discipline, or referral for criminal prosecution. While the OPRs remain, and the DHS OIG continues to function, both CRCL and OIDO were effectively abolished when their entire staffs were terminated this spring. *See generally Robert F. Kennedy Human Rights v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-01270 (D.D.C.) (litigation challenging suspension of CRCL and OIDO functions).

15.  Law enforcement oversight depends on investigators after the fact being able to discover which officers or agents were involved in potential misconduct. A visible identifier—ideally a name tag, or when necessary, an

identification number—is critical to that inquiry. Only by recording the specifics of the personnel with whom they interact can members of the public file meaningful, actionable reports or complaints about improper conduct by officers. Investigating an excessive force or unlawful arrest complaint at DHS, for example, would be effectively impossible without a name or numerical identifier that would allow an oversight office to identify the personnel involved in the incident. I am unaware of any officer safety or privacy reason to fail to display a badge number or similar identifier, even in circumstances where an officer's own name could present some risk of exposure. It is true that officers generally bear one badge number throughout their tour at an agency. But even if—and I am unaware of this being a well-founded concern—outside observers were able to link badge numbers to officer names, the agency could always issue a short-term identification number, to be worn on uniforms and changed regularly, for visibility and accountability. There is no logical reason that an officer would be placed at risk by displaying an anonymized number that is meaningful only as an index to agency records.

16.     While there are circumstances in which an officer wearing a medical mask or larger face covering may be necessary or sensible in light of specific risks, concealing the face also creates significant risks to officers and to the individuals with whom they interact. Non-verbal communication through facial expressions and clarity of speech, particularly when dealing with hearing impaired or limited English proficient persons, can be beneficial in a high-tension encounter.

17.     The fact that ICE appears to have blessed its personnel wearing irregular face coverings, rather than a uniform mask with a reasonable accompanying policy, in my view undermines the suggestion that wearing those masks is necessary to officer safety. By contrast, the body armor policy cited above expressly prohibits officers from wearing any body armor sourced themselves as opposed to supplied by the agency.

7

SA-17

18. The failure to display agency or individual identifiers, officers' wearing of masks, and the driving of unmarked vehicles also increase the risk of federal officers being mistaken, by the public or by other (state, local, or tribal) law enforcement agencies, as criminal elements warranting a law enforcement response. It seems self-evident that civilians engaging in conduct like making nonconsensual stops, bundling people into unmarked vehicles and driving off, brandishing long guns, and using tear gas or other less-lethal munitions would be committing serious crimes. And so it is critical for public safety that federal agents deploying those tactics be understood by their targets, the general public, and especially other law enforcement elements as legitimate law enforcement personnel.

19. I have reviewed the declaration of Sergio Albarran (ECF 11-2) filed by Plaintiff in this action. I take issue with numerous statements therein, including:

a. Mr. Albarran suggests at ¶ 23 that "immigration activists" photograph enforcement actions "for the sole purpose of intimidating and harassing government employees." From my experience in law enforcement, it is clear to me that constitutionally protected photographing of open-air law enforcement operations is generally used to secure individuals' legal rights, to establish legal claims, and to encourage accountability for officers acting out of compliance with policy and procedure. I have received communications from immigration and community groups offering trainings for legal and other observers to be prepared to document (including by photographing) improper law enforcement conduct, not to threaten officer security, but to facilitate lawful officer behavior.

b. I agree with Mr. Albarran's general view, as stated at ¶¶ 30-31, that masks can serve health or safety purposes, when there are known hazards or in "high-risk operations." I am unclear why, for months

8

at a stretch, ICE personnel have uniformly been wearing masks in certain cities under these sorts of rationales. It is hard to credit the suggestion that every patrol is a "high-risk enforcement operation[] involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists"—particularly when, compared to the prior period, the fraction of ICE arrests involving serious criminality has gone down[5] during this period of masked and un-identified officer operations.

c.  Mr. Albarran conflates critical issues at ¶¶ 32-38. While it is obviously true that surveillance and investigative activities may need to be conducted in plain clothes, in tactical operations, ICE policy is to wear body armor that clearly singles officers and agents out as non-civilians. The question in those operations is not whether they blend in with civilians, but whether they are distinguishable from terrorists or bank robbers who also wear body armor and masks.

d.  I find that the contrast between Mr. Vargas's and Mr. Albarran's declarations undermines Mr. Albarran's declaration. Mr. Vargas carefully describes actual CBP policies regarding deviations from uniform standards that have been authorized in certain circumstances "when the risk of doxxing to officers and agents is likely" (Vargas ¶ 18). As far as I can tell, Mr. Albarran does not indicate that ICE has actually considered these issues at the policy level, or created an articulable standard—like "risk of doxxing is

---

[5] *See, e.g., ICE has arrested nearly 75,000 people with no criminal records, data shows*, NBC News (Dec. 7, 2025) https://www.nbcnews.com/politics/immigration/ice-arrested-nearly-75000-people-no-criminal-records-data-shows-rcna247377.

likely"—for when deviations from ordinary practice are appropriate. This is consistent with my understanding from public statements by current ICE leadership that line officers have been allowed to come up with masking and other practices on-the-fly, without meaningful consideration of tradeoffs. If this contrast in presentation points to a difference in fact—that CBP has a masking/removal of nametag policy, and ICE does not—it further demonstrates the danger of ICE's ad hoc approach. In my experience, it is not a law enforcement best practice to allow line officers to decide when to follow agency uniform and identification policy and when they can invent their own vigilante costumes.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of December 2025, in Chevy Chase, Maryland.

Scott Shuchart

10

SA-20

Rob Bonta
Attorney General of California
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anna Ferrari, SBN 261579
Lee I. Sherman, SBN 272271
Supervising Deputy Attorneys General
Kristi A. Hughes, SBN 235943
Zelda Vassar, SBN 313789
Asha Albuquerque, SBN 332901
Alyssa Zhang, SBN 360105
Cameron A. Bell, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**EXPERT REPORT AND DECLARATION OF DR. STUART SCHRADER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

SA-21

**EXPERT REPORT AND DECLARATION OF DR. STUART SCHRADER**

I, Stuart Schrader, declare under penalty of perjury that the following is true and correct:

1. I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions on the No Secret Police Act (Senate Bill No. 627) and the No Vigilantes Act (Senate Bill No. 805).

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## OVERVIEW

3. I have reviewed the No Secret Police Act (Senate Bill No. 627) and the No Vigilantes Act (Senate Bill No. 805). I understand these laws to have been introduced in response to operations by federal law-enforcement agencies, particularly Immigration and Customs Enforcement, in the State of California. I have also reviewed the Motion for a Preliminary Injunction filed by the U.S. Department of Justice on November 25, 2025, as well as the attached Declarations by agents of Immigration and Customs Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug Enforcement Administration.

4. The Office of the Attorney General of the California Department of Justice asked me to provide expert opinions on the historical context for these laws and the operations of federal law enforcement that the laws would affect.

5. In what follows, I discuss the history of policing and the development of traditions that the No Secret Police Act and No Vigilantes Act make explicit as legal requirements. I focus on the importance of the uniform, badge and badge number, and nameplate as material representations of the traditions and character of policing in the United States. Police uniforms and badges are central to the professional and operational identity of police because the development of police forces required the differentiation of professionals from other parties, including

2

vigilantes and the military. The history of policing in the United States offers a stark distinction: police are public and professional actors, different from private and vigilante actors.

6. After an overview of sources of evidence and methods of investigation, in the first section, I explain my understanding of the justifications provided by the U.S. Department of Justice for abrogating longstanding traditions of police visibility and discuss how the No Secret Police Act and No Vigilantes Act appear to be consistent with longstanding policies of the Department of Homeland Security that existed before 2025. Next, I provide a summary of three key traditions of policing in the United States: the distinction between police and other government officials or private citizens; the public and visible character of police in the United States; and the civilian, rather than military, character of police. In the next section, I provide a brief explanation of how these traditions developed and why there is strong consensus on these traditions. I then briefly discuss the reasoning behind the adoption and development of police uniforms and badges. I explain how the traditions of policing in the United States developed in contrast to those of other countries, even as the United States also influenced other countries. Further, I show that a consistent tendency has emerged within the policing profession toward greater distinctiveness and visibility regarding the appearance of uniforms and greater clarity regarding the standards and expectations of identification—until the recent appearance of masked and unidentified federal law-enforcement officers engaged in street operations. I conclude by discussing federal law-enforcement training and policies that contradict recent practices, followed by a summary of my findings and opinions.

7. Based on my expertise, I have reached the following conclusions:

(a) These two laws are consistent with the history and traditions of policing in the United States. They seek to codify and standardize longstanding and common practice of police agencies. They are unlikely to change or distort how

3

most police operations unfold, but they would require greater transparency and clarity for the public regarding federal law enforcement agencies and officers that are actively conducting enforcement operations. They could also reduce the likelihood of individuals impersonating sworn officers.

(b)     In contrast, recent enforcement operations by federal officers have been marked by a departure from standard practice and longstanding tradition. Specifically, the widespread wearing of face coverings, irregular and inconsistent uniforms or lack of uniforms, and absence of clearly visible official and specific identification, including nameplates and badge numbers, all contravene traditions of policing in the United States.

## BACKGROUND AND QUALIFICATIONS

8.     I am an Associate Professor in the Department of History at Johns Hopkins University. I earned my Ph.D. in American Studies from New York University in 2015. My teaching and scholarship focus on policing, prisons, war, and empire. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

9.     I have produced scholarship on the history of policing in the United States, including in leading peer-reviewed journals and edited volumes of scholarly essays. My first book, *Badges Without Borders: How Global Counterinsurgency Transformed American Policing*, was published by the University of California Press in 2019. *Badges Without Borders* examines how U.S. experts spread ideas about police reform around the globe during the Cold War, and how these ideas reverberated domestically in a period of social upheaval. My second book, *Blue Power: How Police Organized to Protect and Serve Themselves*, will be published in April 2026 by Basic Books. My academic research has been supported by the John W. Kluge Center at the Library of Congress, the Lyndon Baines Johnson Foundation, the American Council of Learned Societies, the Social Science Research Council, and more.

SA-24

10. I have presented my scholarship at dozens of scholarly conferences and symposia, including the annual meetings of the American Historical Association, American Studies Association, Organization of American Historians, Social Science History Association, Society for Historians of American Foreign Relations, and Urban History Association. I have also presented findings of my research at many universities, including Harvard University, Macalester College, Middlebury College, Tufts University, University of South Carolina, University of Washington, Yale University, and more.

## RETENTION AND COMPENSATION

11. I am being compensated for services performed in the above-entitled case at an hourly rate of $250. I am receiving no other compensation for these services. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## SOURCES OF EVIDENCE AND METHODS OF INVESTIGATION

12. For decades, scholars have analyzed the civilian origins of police in the United States and the comparative distinctiveness of police in the United States from their counterparts in other countries, as well as from the military, paramilitaries, or vigilante groups. Some of the now-classic historical research on policing emerged in the aftermath of the political upheavals of the 1960s, when so-called "social history" gained popularity. The study of policing went hand-in-hand with the study of ordinary people, social orders, and social control. There has been another efflorescence of historical scholarship on policing that began to coalesce in response to political protests against policing circa 2014 but has only grown in the decade or so since then.

13. This declaration draws from this existing scholarship, as well as my own original research on the distinctiveness of police. In addition, I have reviewed numerous original or "primary" sources within the professional literature on policing, as well as documents produced by police agencies and policing experts. I

SA-25

have particularly examined historical research that details the introduction of police uniforms in the nineteenth century as representing the genesis of traditions of policing that persist to the present.[1] I have also survey peer-reviewed scholarship on police uniforms in psychology and related fields concerned with assessments of perceptions of uniforms.[2] I published one of the few recent peer-reviewed articles on the history of police uniforms, in the *Journal of Urban History*, whose findings I discuss below.[3]

**RECENT FEDERAL LAW ENFORCEMENT OPERATIONS**

14. The U.S. Department of Justice, in its Motion for a Preliminary Injunction, claims that federal law-enforcement officers are "are navigating an intensely hostile environment" (page 7). The reason is that officers have engaged in novel types of immigration enforcement actions, including wearing plainclothes and masks, and not identifying themselves to the public. These practices lack popular legitimacy. Officers have conducted such operations in and around Los Angeles, Washington, DC, Chicago, Charlotte, New Orleans, and Minneapolis/St. Paul, as well as some other locations, in 2025. The Motion describes forms of protest and critique, as well as criminal activity, that have resulted after these enforcement actions. The Motion then declares, "federal law enforcement agencies allow their officers to choose whether to wear masks to protect their identities"

[1] Eric H. Monkonnen, *Police in Urban America, 1860–1920* (New York: Cambridge University Press, 1981).

[2] For example, Daniel J. Bell, "Police Uniforms, Attitudes, and Citizens" *Journal of Criminal Justice* 10, no. 1 (1982): 42–55; Richard R. Johnson, Darryl Plecas, Shawne Anderson, and Harry Dolan, "No Hat or Tie Required: Examining Minor Changes to the Police Uniform" *Journal of Police and Criminal Psychology* 30 (2015): 158–165; Ming S. Singer and Alan E. Singer, "The Effect of Police Uniform on Interpersonal Perception" *The Journal of Psychology* 119, no. 2 (1985): 157–161.

[3] Stuart Schrader, "More than Cosmetic Changes: The Challenges of Experiments with Police Demilitarization in the 1960s and 1970s" *Journal of Urban History* 46 no. 5 (2017): 1002–1025.

6

SA-26

(page 8). It also declares that "the success of federal law enforcement actions often depends on officers' anonymity" (page 8). This claim is inconsistent with longstanding traditions of policing, as explained in what follows.

15.     Aside from this Motion, leaders within the Department of Homeland Security have largely confirmed and occasionally denied that federal officers are hiding their identities, but copious media coverage, including photojournalism, shows that officers have been wearing balaclavas, gaiters, and other masks of various types, inconsistently displaying badges, and donning mismatched uniforms or casual clothing, as well as generic patches or insignia that read only "police" or "federal agent" rather than their specific unit.[4]

16.     Federal law-enforcement officers within the Department of Homeland Security are, however, expected to wear uniforms and visible credentials to allow their clear and immediate identification, according to internal guidelines. Although not all operational policies and requirements of Immigration and Customs

---

[4] Media coverage and analysis of these federal operations has been extensive. I cite a selection here, emphasizing the employment of masks and irregular identification: Hamed Aleaziz, Brent McDonald, and Amogh Vaz, "How Washington Became a Testing Ground for ICE" *New York Times*, October 1, 2025, available at https://tinyurl.com/2kztswmn; Lisa Desjardins and Andrew Corkery, "Rise of ICE Agents Wearing Masks Creates Opportunity for Imposters to Conduct Crimes" *PBS News Weekend*, July 27, 2025, available at https://tinyurl.com/ysyrm6j8; Bora Erden, "How to Make Sense of the Federal Forces on the Streets" *New York Times*, October 24, 2025, available at https://tinyurl.com/3e7tfyec; Leila Fadel, Adam Bearne, Barry Gordemer, H.J. Mai, "Masked Immigration Agents Are Spurring Fear and Confusion across the U.S." *NPR Morning Edition*, July 10, 2025, available at https://tinyurl.com/2t6wb37f; Jenny Jarvie, "ICE Agents Wearing Masks Add New Levels of Intimidation, Confusion during L.A. Raids" *Los Angeles Times*, July 7, 2025, available at https://tinyurl.com/3tc6sbxr; Patrik Jonsson, "Immigration Police Say They Mask to Stop Retribution. They May Be Risking Trust" *Christian Science Monitor*, July 28, 2025, available at https://tinyurl.com/5emv37yj; Nathan Solis and Richard Winton, "'Who are these people?' Masked Immigration Agents Challenge Local Police, Sow Fear in L.A." *Los Angeles Times*, June 24, 2025, available at https://tinyurl.com/27kck3v8.

7

SA-27

Enforcement and Customs and Border Protection are readily available to the public, I have encountered in my research explicit policies that are consistent with the No Secret Police Act and No Vigilantes Act, discussed below in Paragraph 53.

### OVERVIEW OF THREE KEY TRADITIONS AMONG POLICE

17. Police in the United States maintain traditions that are widely accepted and often venerated. I focus on three here: differentiation of police from civilians or other officials; the public and visible character of police; and the distinction of police from military.

18. The first tradition is the differentiation of police from civilians or other government officials through symbolism: badge, uniform, and weapon. The badge is both a real thing and a metaphor. The badge is a tangible symbol that an officer has undergone training and sworn an oath of service, but "the badge" is also a term that both police and outsiders use to refer to the profession. Phrases like "behind the badge," "before the badge," or "the badge means you care" are widely understood to refer to police officers and key aspects of their professional identities. If an officer loses his or her physical badge, a penalty often results. If an officer is stripped of his or her position as a member of the force, the badge will be confiscated. Today, the physical badges that most officers wear also include a unique identifying number, enabling the possibility that anyone who interacts with an officer could know who the officer is.

19. Another tradition that police in the United States maintain is their public, visible character. Usually, this tradition is explained through comparative reference to police elsewhere or in different types of societies, particularly non-democratic or authoritarian societies, where so-called secret police are common.[5] Police in the United States do represent state power and dispense "non-negotiably coercive force" according to "situational exigencies," but tradition holds that they

---

[5] Sabrina Tavernise, "ICE Agents Are Wearing Masks. Is That Un-American?" *New York Times*, September 5, 2025, available at https://tinyurl.com/477da82f.

SA-28

do so publicly, with accountability to their commanding officers, government officials, and the public.[6] Critics contend that accountability is often inadequate, but it would be possible only because police in the United States do not operate in secret or in the shadows. Tradition holds that if police were hidden, non-uniformed, and unidentifiable, they would be licensed to abrogate rights and constitutional protections. The contrast scholars often draw, therefore, is between public and democratic policing or secret and clandestine forms of policing. This tradition of democratic policing is what the No Secret Police Act and No Vigilantes Act are intended to uphold.

20. A third tradition that police in the United States maintain is their civilian character. Police are not the military. It is nevertheless true that police departments have drawn strong influences from the military, particularly the Army.[7] Distinguishing police from military has still been important within the profession. In fact, in the nineteenth century, when the militia could not adequately contain social unrest, public officials were sometimes inspired to create a formal police force, which was separate.[8] Many important and influential police leaders have been veterans, and a significant percentage of police officers at any given time have a military background.[9] Further, many tactics that police have adopted, including even basic ones like patrol, originate with the Army. The same is true for many police technologies and matériel. Even police uniforms resemble military dress

---

[6] Egon Bittner, *The Functions of the Police in Modern Society* (Chevy Chase, MD: National Institute of Mental Health, 1970), 46.

[7] Julian Go, *Policing Empires: Militarization, Race, and the Imperial Boomerang in Britain and the US* (New York: Oxford University Press, 2024).

[8] Monkonnen, *Police in Urban America*, 36; Sidney L. Harring, *Policing a Class Society: The Experience of American Cities, 1865–1915* (Chicago: Haymarket Books, Second Edition, 2017). Militias later became consolidated as the National Guard.

[9] Stuart Schrader, "Cops at War: How World War II Transformed U.S. Policing" *Modern American History* 4, no. 2 (2021): 159-179.

SA-29

uniforms. The need for clear distinctions, therefore, is strong.

21.     Scholars and journalists refer to erosions of the distinctiveness of police by military influence as "militarization."[10] Despite multiple forms of such influence, police in the United States remain distinctive from the country's military in mission, operations, and institutional identity, while the military is by custom and law typically not allowed to engage in domestic law enforcement. Comparison with other countries is instructive. France (along with several Francophone postcolonial states) maintains a gendarmerie, answerable to the Ministry of Defense and composed of officers who are technically soldiers. In colonial and postcolonial settings, the gendarmerie has typically been stationed in rural areas, and its officers lived in barracks, separate from the population, and trained in military formations and in wielding rifles. There is no direct equivalent to the military-linked gendarmerie in the United States, though state police forces have borne some resemblances, particularly in their early decades. Decentralized and civilian police forces have prevailed in this country.[11]

22.     These three traditions comprise the reigning orthodoxy that defines the institution of policing beyond the differences among individual police departments.[12]

---

[10] The literature on "militarization" is extensive. See, Scott W. Phillips, "Police Militarization" *FBI Law Enforcement Bulletin*, August 14, 2017, available at https://tinyurl.com/mppjjeap; Peter B. Kraska, ed., *Militarizing the American Criminal Justice System: The Changing Roles of the Armed Forces and the Police* (Boston: Northeastern University Press, 2001).

[11] Olly Owen, "Policing after Colonialism," in *The SAGE Handbook of Global Policing*, Ben Bradford, Beatrice Jauregui, Ian Loader, and Jonny Steinberg, ed. (Washington, DC: SAGE, 2016), 303–319. Other countries in Europe, including Italy, Spain, and the Netherlands, also developed a gendarmerie model.

[12] The scholar Micol Seigel refers to what I am calling traditions as "mythologies" that "legitimize police power" and rely on "borders" or "boundaries" to "delimit police work." In short, these are widely accepted stories that shape how police understand themselves and present themselves to the public. Micol Seigel, "Violence Work: Policing and Power" *Race & Class* 59, no. 4 (2018): 15–33.

SA-30

**THE HISTORICAL DEVELOPMENT OF POLICE TRADITIONS**

23.     These traditions that define policing in the United States developed over nearly two centuries and were not predestined. They matter because police developed and evolved as distinctive from private actors or groups. Defining themselves as different from vigilantes and avoiding the appearance of a standing army—which was political anathema in the young republic—were crucial for police to obtain public acceptance and legitimacy as protectors of the public. This acceptance and legitimacy were and remain fragile, but they are replenished through adherence to these traditions.

24.     As historians Simon Balto and Max Felker-Kantor write, "'[t]he police' as Americans have come to know them simply did not exist in colonial and early American life."[13] Watchmen, marshals, sheriffs, bailiffs, and constables all pre-dated the bureaucratic organizations commonly understood as modern police forces in the United States. So too did bounty hunters, vigilantes, posses, mobs, and slave patrols. The public-private distinction was not rigid in the eighteenth and nineteenth centuries, and volunteers and private groups also obtained the blessing of officials. In this vein, so-called "vigilance committees," which originally aimed to protect African American people fleeing slavery, bore resemblance to early police forces, particularly when they adopted formal charters and obligations, as well as fiscal ties, to local merchants and governments.[14] These committees also were direct precursors to police forces in some towns. But modern police differed from the informal, amateur organizations that preceded them.

25.     In most places across the United States, there is a clear before and after: at some point, a formal police force came into existence, controlled by local

---

[13] Simon Balto and Max Felker-Kantor, "Police and Crime in the American City, 1800–2020," in *Oxford Research Encyclopedia of American History*, https://tinyurl.com/bp8jj8en.

[14] Jesse Olsavsky, "The Black People Who Fled Slavery Had A Lot to Teach their Northern Allies" *Hammer & Hope* 8 (Fall 2025), https://tinyurl.com/54t6j6b7.

SA-31

officials and funded by public budgets. Officers were paid for their work, and, it must be said, they were usually under direct sway of the ruling political party. This transition did not occur overnight, but it did occur.[15] The activity of policing conducted by various different actors and the longstanding police power became vested in an institution referred to as "the police," which would now comprise regularly employed professionals.[16] Marshals, sheriffs, bailiffs, and constables all became more professional, to be more like their police counterparts. In contrast, volunteer watchmen largely disappeared. Vigilantes, posses, and mobs became subject to sanction and penalty, to be enforced by police officers. Mob violence, in fact, was a widespread problem to be tamed in the early part of the nineteenth century, and police were the solution.[17] Policing by vigilantes and irregular volunteers became illegitimate, and social-control powers were arrogated to professionals. This shift can be considered the successful monopolization of the means of violence by the state, to draw on sociologist Max Weber's canonical definition.[18] The No Vigilantes Act, in particular, aims to ensure that the distinction

---

[15] David H. Bayley, *Patterns of Policing: A Comparative International Analysis* (New Brunswick, NJ: Rutgers University Press, 1985); Matthew Guariglia, *Police & the Empire City: Race & the Origins of Modern Policing in New York* (Durham, NC: Duke University Press, 2023); Alex S. Vitale, *The End of Policing* (New York: Verso, 2017).

[16] A founding father of the field of political science, John Burgess, once referred to the police power as: "the 'dark continent' of our jurisprudence. [. . .] the convenient repository of everything for which our juristic classifications can find no other place," quoted in: Santiago Legarre, "The Historical Background of the Police Power" *University of Pennsylvania Journal of Constitutional Law* 9 (2006): 745–796, 747n11; Mark Neocleous, *A Critical Theory of Police Power*: *The Fabrication of Social Order* (New York: Verso, 2021); Stuart Schrader, "Harm of the Law" *Artforum* (May/June 2020).

[17] Samuel Walker, *A Critical History of Police Reform: The Emergence of Professionalism* (Lexington, MA: Lexington Books, 1977).

[18] Weber writes, "a state is a human community that (successfully) claims the monopoly of the legitimate use of physical force within a given territory"; Max

(continued…)

SA-32

between sworn police and vigilantes or other private actors remains sturdy and clear.

### I.     Historical Adoption of Police Uniforms

26.     Why police forces emerged and what made the creation of police forces necessary in specific cities may remain a subject of conversation among scholars. But scholars maintain a broad consensus about what they looked like when they did coalesce. Officers would be uniformed and bear a standard badge.

27.     New York City provided a template for many police forces, according to historian Eric Monkonnen, and its police force was the first to adopt an official uniform, in addition to a required badge.[19] The required, standard uniform emerged in New York City in 1853. It was adorned with a badge or "shield" that officers would wear while on duty.[20] Both New York City and Boston, which created a police force earlier, drew inspiration from London's metropolitan police department.

28.     The police badge and uniform distinguished the professional police officer from non-professional contenders, like vigilantes, or the military. Among the most notable features of the new London police department was its adoption of a recognizable blue uniform, which contrasted with the military's red uniform.

29.     Not all police officers in the nineteenth-century United States were initially keen to wear a uniform. Objections in New York City, for instance, included the cost to the public purse, the diminution of independence, and fears of

---

Weber, "Politics as a Vocation," in *From Max Weber: Essays in Sociology*, translated, edited, and with An Introduction by H. H. Gerth and C. Wright Mills (New York: Oxford University Press, 1946).

[19] Monkonnen, *Police in Urban America*.

[20] "Early New York City Police 'Badges' & Emblems of Office—1800-1845," *The History of Policing in the City of New York*, October 11, 2020, https://tinyurl.com/yea2a85f.

SA-33

resembling a standing army.[21] But the badge and uniform composed a public symbol, recognizable to all, of the authority of the police.

30.     Notably, members of the most well-known and largest vigilante organization in the history of the United States, the Ku Klux Klan, wore their own recognizable uniforms but typically hid their faces behind hoods. These vigilantes engaged in extrajudicial violence and did not want to be easily identified.[22]

31.     The police uniform solved a problem for the public. In the era before telecommunications, how could an ordinary person find an officer when in need? The uniform was one way to make officers stand out. Against rank-and-file reluctance in New York City and elsewhere, departments prevailed in compelling officers to start wearing a uniform. This change highlights how despite internal cultures among officers, the bureaucracies of police departments were shaped both by adherence to formal rules and rituals and by strict lines of command authority to enforce them. These uniforms, in turn, shaped how police would interact with members of the public. As historian Robert Fogelson writes, "By the 1890s most policemen were uniformed, armed, and readily available virtually everywhere in urban America."[23]

32.     Uniforms became ubiquitous, but their appearance was not stable. Departments debated what color uniforms should be. Officers wanted to stand out but also appear authoritative. If departments afforded them high-quality uniforms, it would contribute to a sense they were appreciated.[24] Pushes for greater legitimacy and competence among officers by supervisory officers have intersected with

---

[21] Robert M. Fogelson, *Big-City Police* (Cambridge, MA: Harvard University Press, 1977); Monkonnen, *Police in Urban America*.

[22] Linda Gordon, *The Second Coming of the KKK: The Ku Klux Klan of the 1920s and the American Political Tradition* (New York: Liveright, 2017).

[23] Fogelson, *Big-City Police*, 15.

[24] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police* (Washington, DC: Government Printing Office, 1967), 136.

14

SA-34

demands by rank-and-file officers for more respect by members of the public and better compensation; uniforms have crystallized both pressures.

## II.    Historical Adoption of Police Badges

33.    The badge is as essential as the uniform to the history of police developing accountability to the public. In many places, badges predated uniforms. Different police departments maintain different badge designs. Badges may reference local history or draw iconography from a deep well, going back in some cases to ancient or medieval periods. The shape of the badge or shield, according to some, even evokes the shield carried by a medieval knight. Although the police badge is a relatively modern invention, by drawing from much older traditions, this iconography asserts forms of authority that exceed contemporary forms of governance. The scholars David Correia and Tyler Wall suggest that the badge is best understood like a costume that transforms an ordinary person into someone with transcendent and sacred authority. "Through its theatrics," they write, "the badge does important political work by giving symbolic form to police authority." They continue, "The badge renders the violent work of policing legitimate and justified, but also noble and sacred. The anthropologist Michael Taussig calls the police badge a 'magical talisman,' the holy artifact that endows the police community with a mystical authority not just earthly and pragmatic, but nearly divine and transcendent."[25] Although most police officers may not describe the badge in such terms, all know that donning the badge and uniform is transformative because it changes how members of the public respond and how to expect members of the public to behave.

## III.    Professionalization of Policing and Democracy in the United States

34.    Over time, the social responsibilities associated with the police power narrowed, and police officers came to be tasked mainly with the control of disorder

---

[25] David Correia and Tyler Wall, *Police: A Field Guide* (New York: Verso, 2018), 115, 116.

and deterrence of crime, or what has been labeled "public safety." Other responsibilities, including hygiene, commercial inspections, or child welfare, were delegated to other government or private agencies, or else eliminated. Maintaining social peace, defined according to the country's class, racial, gender, political, and social order, became the function of police. This limited mission was to be represented by their public persona and symbolic features. As Correia and Wall put it, "The police uniform must be understood as part of a process of uniformity, the production of order. [. . .] The police body is uniformed to represent order."[26] Conversely, it could be argued that irregular, haphazard, mismatched, and informal—non-uniform—dress among police would represent a type of disorder. The No Secret Police Act and No Vigilantes Act embody efforts to enhance "public trust" (SB 627 Sec. 2 (b)(1)(A)) and "public safety" (SB 805 Sec. 13) in alignment with the scope of the police mission as it has developed in the past 150 or more years in the United States.

35.     The primary term for the process of shedding unrelated responsibilities and developing aptitude in crime control is "professionalization." Police professionalization is a never-finished process of reform, modernization, elevation of standards, introduction of new technologies, and so forth.[27] Its advocates demand that police recruits be qualified and undergo training both "before the badge" and during service across a career.[28] Professionalizers also recommend that police be compensated adequately for the work they do, in distinct contrast to vigilantes.

36.     Professionalization has occurred in waves. It is possible to identify the approximate onset of three major waves: one around the 1930s, one around the

---

[26] Correia and Wall, *Police: A Field Guide*, 153.

[27] Bayley, *Patterns of Policing*; Fogelson, *Big-City Police*; Stuart Schrader, *Badges Without Borders: How Global Counterinsurgency Transformed American Policing* (Oakland: University of California Press, 2019).

[28] Samantha Simon, *Before the Badge: How Academy Training Shapes Police Violence* (New York: New York University Press, 2024).

SA-36

1960s, and one around the 2010s. In the first wave, the main objective was to delink police from partisan urban political machines and grant them political independence. In the second wave, the main objective was to upgrade standards and regain legitimacy after the crises of urban unrest and rising crime. The third wave's objectives were similar to those of the second, after another bout of civic unrest and public criticism of policing. Yet the three traditions I have mentioned have been constant across the periods, even if they have been continually contested and then re-asserted: the distinction of police from ordinary people or other officials; the public character of police; and the distinction of police from military. Uniforms and badges have been key markers of these traditions.

37.     The Los Angeles Police Department, under the leadership of William H. Parker in the middle of the twentieth century, exemplified some forms of professionalization. Parker instituted a "Daily Training Bulletin" that conveyed lessons about proper policing techniques, discipline, fitness, the courts, public relations, and many other topics. The collected Daily Training Bulletins provide a remarkable window into how police professionalizers like Parker understood their task. The Bulletins include a few important points about the relevance of appearance of officers to public trust and approval, such as, "Since the public readily identifies an officer by his uniform, his conduct is subject to either considerable criticism or commendation."[29] Among the recommendations are for even plainclothes officers to be prepared to display a badge or "pin the badge quickly on his lapel" in an emergency.[30] These types of recommendations, now decades old, represented an effort to rationalize policing practices and uphold the legitimacy of the institution. The No Secret Police Act and No Vigilantes Act

---

[29] I have reviewed the two-volume collection of the Bulletins, totaling around 500 pages. W.H. Parker, *Daily Training Bulletins of the Los Angeles Police Department, vol. 1* (Springfield, IL: Charles C. Thomas, 1954), 200.
[30] W.H. Parker, *Daily Training Bulletins of the Los Angeles Police Department, vol. 2* (Springfield, IL: Charles C. Thomas, 1958), 96.

extend these efforts in the present. They continue the professionalization of policing.

### IV.   Professionalization of Policing and Comparisons with Other Countries

38.     Professionalization deepened and reinforced the traditions of policing in the United States through training and policy, fashioning the institution into its contemporary form. The first round of professionalization aimed to grant police independence and political neutrality, rooting out corruption. This experience shaped how police experts came to understand the difference between police of the United States and those of authoritarian regimes, including Nazi Germany and Imperial Japan, as well as the Soviet Union. In these types of regimes, as well as in colonial settings, police were understood to be under centralized authority, and their accountability was "upward-facing," designed to protect the regime. Operations were frequently secret: regime opponents would disappear, rather than being subject to public judicial processes, for instance. And, as with the U.S. political machines, police gained appointments through ties to the party in power.[31] Although the analogy to political machines was not always perfect, professionalizers believed that democratization and professionalization was a way to assure that police accountability became "downward-facing," toward the public.[32] Police departments remained hierarchical bureaucracies, and officers answered to their supervisors. But law enforcement and other types of discretionary social control became central to their mission. Regime protection or politicized operations would not be the sole focus. Downward-facing accountability would require that police be identifiable to the public.

[31] Andy Aitchison, "Policing after State Socialism," in *The SAGE Handbook of Global Policing*, Ben Bradford, Beatrice Jauregui, Ian Loader, and Jonny Steinberg, ed. (Washington, DC: SAGE, 2016), 321–336.
[32] Owen, "Policing after Colonialism," 306.

SA-38

39.     In 1955, Allen Dulles, director of the Central Intelligence Agency contrasted the United States and the Soviet Union through reference to police. He reported, "If I were asked to point out the most obvious difference between the free world and the Communist dominated areas it would be this. The free world provides for law enforcement that protects the rights and liberties of the individual." In contrast, "Law enforcement in the Communist world looks first and foremost to safeguarding the ruling regime without regard for individual rights."[33] Police in a democratic society were supposed to serve the public and be recognizable to members of the public as such.

40.     Yet not only Soviet-linked police forces became undemocratic and authoritarian. These same characteristics emerged among U.S.-backed police forces, such as in Brazil during the dictatorship period (1964–1985). The scholars Martha Huggins, Mika Haritos-Fatouros, and Philip Zimbardo write about how Brazilian police experienced "deindividuation": "sense of anonymity—'no one knows who I am' and 'no one cares what I do'." Behavioral constraints and "cognitive controls," they argue, were lifted because police operated in clandestine fashion. "This violent actor is submerged in groups, acting in the dark, wearing a uniform, mask, hood, or painted face. Under such circumstances, responsibility for action is minimized: we are not socially accountable if unidentifiable."[34] Similarly, in Guatemala at the height of the long civil war (1960–1996), "government death squads roamed the streets of the capital in unmarked cars, windows blackened, to hunt their victims. The unidentified agents of army intelligence and the police took thousands of people away to clandestine interrogation centers to torture information

---

[33] Allen Welsh Dulles, "Intelligence" *The Police Chief* (November 1955), 11.

[34] Martha Huggins, Mika Haritos-Fatouros, and Philip Zimbardo, *Violence Workers: Police Torturers and Murderers Reconstruct Brazilian Atrocities* (Berkeley: University of California Press, 2002), 257.

out of them."[35] The police or army uniform does deindividuate, but the visibility of a police officer's face, and a badge number and name plate, contrast with this uniformity. Without those balancing controls, constraints easily disintegrate: "The Brazilian police were almost always in a group, often acting in the dark, sometimes in a common uniform, and sometimes masked or hooded. These props in the theater of repression helped to produce the deindividuating anonymity for Brazilian violence workers that assisted their carrying out horrific duties."[36]

41.    In the United States, the foremost police professionalizer of the mid-twentieth century, Orlando W. Wilson, identified the solemn importance of uniforms and badges in his widely adopted textbook *Police Planning*. Regulations were important to Wilson's vision of policing, and he suggested that wearing uniforms and badges was imperative; wearing anything that did not conform to departmental regulations was not allowed. Further, officers were not to wear uniforms outside of duty, except under limited circumstances, such as while commuting to a shift. Uniforms could not be worn by any officer who was suspended, and badges could not be transferred or modified. No badges other than the official one could be worn. When officers were engaged in duties that necessitated plain clothes, they "shall be prompt to identify themselves when the necessity arises, and at the scene of an emergency where it is desirable to display the badge continuously, it shall be attached" to a plainclothes officer's outerwear.[37]

42.    Thus, the No Secret Police Act and No Vigilantes Act represent new steps in the ongoing professionalization process for police. They align with the history of police reform in the United States and contrast with horrifying episodes of abuse enabled by secrecy and deindividuation that are hallmarks of undemocratic

[35] Kate Doyle, "Preface to English Translation," in *From Silence to Memory: Revelations of the AHPN* (Eugene: University of Oregon Libraries, 2013), xvii.
[36] Huggins, Haritos-Fatouros, and Zimbardo, *Violence Workers*, 259.
[37] O.W. Wilson, *Police Planning* (Springfield, IL: C.C. Thomas, 1957, 2nd edition), 372–373.

20

SA-40

regimes and mob violence.

## INCREASING CONSENSUS WITHIN THE POLICE PROFESSION OVER PUBLIC VISIBILITY AND IDENTIFICATION

43.     Despite the consistent status and importance of uniforms and badges outlined above, in practice, there have been discussions within the profession over time concerning how to achieve the best results, as well as modifications of the details of how police identify themselves. Further, there have always been tactical or weather-related exceptions to the expectation that officers prominently display a badge and wear a visible uniform—and otherwise be identifiable, including by not hiding their faces. The tactical exemptions the No Secret Police Act and No Vigilantes Act contain conform to the history of exceptions to these traditions and also reflect recognition that changes to police practice and standards do occur. I understand these laws as another step in the process of codifying the results of discussion within the profession, which have tended toward standardizing the public image of police.

44.     When police legitimacy was imperiled amid social upheaval in the 1960s, one particularly innovative police chief named Victor Cizanckas engaged in a campaign of reforms that centered on uniforms. The chief recognized that uniforms were crucial tools in achieving public legitimacy. His goal was to change interactions between his officers and the residents of the small city of Menlo Park, in California, reducing mistrust and antagonism. Cizanckas believed the "demilitarizing" police could improve communication with the public and compliance of those who interacted with police. He began an experiment in demilitarization in 1969.[38]

45.     This experiment ran in the opposite direction from contemporary federal law-enforcement operations, by making police seem less intimidating,

---

[38] Schrader, "More Than Cosmetic Changes."

SA-41

anonymous, and unapproachable. The most visible form of demilitarization of the police in Menlo Park was a change to officer uniforms. Instead of the traditional blue uniform modeled on military dress uniforms, with weapons visible at the waist, officers began to wear standardized green blazers, which concealed weapons, radios, handcuffs, and other implements. Officers did not display a metal badge, though the blazers were instead embroidered with a logo. A nameplate substituted for a badge to provide identification of the individual officer. This demilitarized uniform led to positive effects, including attracting more highly educated recruits. Among the public, crime did not increase, and there were fewer assaults on officers. Additionally, members of the public did not readily know officers' ranks, meaning that people were more likely to speak to a patrol officer without requesting a supervisor. Overall, public opinion of the police in Menlo Park improved, with officers found to be "friendlier."[39] After Cizanckas left his leadership role in Menlo Park, however, traditional uniforms returned; assaults on officers increased with the return to traditional uniforms.[40] In this case, uniforms and identifying placards did not disappear, but they changed, with the goal of changing the image of the police. The conclusion to draw is that how police present themselves has an impact on public perceptions and behavior, which the No Secret Police Act and No Vigilantes Act explicitly recognize.

46.     The police nameplate or nametag is another tool for improving police

---

[39] Schrader, "More Than Cosmetic Changes"; Victor I. Cizanckas and Fritzi Feist, "A Community's Response to Police Change" *Journal of Police Science and Administration* 3, no. 3 (1975): 284–291; James H. Tenzel and Victor I. Cizanckas, "The Uniform Experiment" *Journal of Police Science and Administration* 1, no. 4 (1973): 421–424; D. F. Gundersen, "Credibility and the Police Uniform" *Journal of Police Science and Administration* 15, no. 3 (1987): 192–195.

[40] One study challenges the finding that assaults on officers decreased with the uniform change and then increased when traditional uniforms returned. Robert Mauro, "The Constable's New Clothes: Effects of Uniforms on Perceptions and Problems of Police Officers" *Journal of Applied Social Psychology* 14, no. 1 (1984): 42–56.

SA-42

transparency, as well as trust and legitimacy among the public. The nameplate was introduced much later than badges and uniforms. But police officers sometimes resisted this change, such as in New York City in the mid-1970s. The contemporary reluctance of federal law-enforcement officers to make their credentials visible echoes this resistance. The New York City patrol officers' union, which did not exist during the initial scrum over requiring uniforms in the nineteenth century, opposed requiring nameplates or nametags. The union made a few different arguments. One was that the proposed plastic material for the nameplate was flammable. Another was that easy identification of officers posed a risk. According to the police union, "people would harass, abuse, and threaten police officers and their families." Nevertheless, the change was adopted, with officers subject to penalty for failing to wear the requisite insignia. The risks did not outweigh the benefit to the public, who would now be able to identify officers more easily. Despite resistance within the rank and file to this change, pressure for transparency and accountability succeeded. In this way, the No Vigilantes Act's requirement of "identification that includes [officers'] agency and either a name or badge number, or both name and badge number" (Sec. 2 (a)(2)) codifies what became an accepted practice after a period of disagreement in locales like New York City. Within the country's biggest municipal police force, acceptance of nametags is thus around 50 years old.

47.     Worries about easy identification of officers were not confined to the United States. Similar resistance to requirements for nametags emerged elsewhere at the same time, with patrol officers worried about punitive measures imposed by superior officers. As one scholar suggested, regarding a parallel situation of the adoption of nametags in Germany, "The men opposed to this were not those who reported that they had difficulties in their relations with the public, but those who

had difficulties with their supervisors."[41] The concern was less about how members of the public might treat officers or their families than about how supervisory officers would deal with complaints against officers they disfavored. In sum, officers were concerned about internal discipline measures more than what is today called "doxxing," as referenced by the U.S. Department of Justice's Motion.

48. One study of police uniforms argues that "Dress is both a symbol and a defense. Clothing serves as a filter and a barrier, communicating to others nonverbally who we are or would like to be and the kind of world in which we would like to live."[42] Although there have been changes in how police appear, and there has been internal contestation over values and authority, as represented by uniforms, badges, and appearance, there is no question that there is strong linkage between the traditions of policing in the United States up to today and their visible appearance. The trend has been toward greater transparency and identifiability in normal operations, which the No Secret Police Act and No Vigilantes Act codify.

### I.     Historical Example of Police Response to Threats from the Public

49. Threats to police officers and their families are not new. By the 1980s, law-enforcement experts and legal advocates pressed police to use tort claims to gain civil remedy for physical or verbal "assault." These remedies were separate from criminal prosecution. Although it was already common for members of the public to sue after suffering alleged or confirmed abuse, now advocates suggested that officers should sue the public if they experienced abuse. One emphasis was "infliction of mental distress," including through harassment. This harassment could also target an officer's family and include "obscene or threatening phone

---

[41] "New York City Police Get Nametags" *Police Labor Review* (February 1975), 3; Michael Banton, "The Sociology of the Police III" *The Police Journal* 48, no. 4 (1975): 299–315, 308.

[42] James H. Tenzel, Lowell Storms, and Hervey Sweetwood, "Symbols and Behavior: An Experiment in Altering the Police Role" *Journal of Police Science and Administration* 4, no. 1 (1976): 21–27.

SA-44

calls," issuing a false message that an officer had been hurt or killed, injuring or killing an officer's family pet, damaging an officer's personal property, or directly harming an officer's family members. There were two proposed remedies, injunctive relief and common-law tort action. Nowhere in the suggested remedies was hiding an officer's face or identity, and the advocates noted that officers do not have a right of privacy while conducting their duties.[43]

## II.  Contemporary Examples of Police Visibility

50.    As the professionalization process continues, and police reform continually reappears on the national agenda after high-profile incidents of abuse, public accountability remains a central concern. The President's Task Force on 21st Century Policing, appointed by President Barack Obama, for instance, made a series of recommendations designed to improve policing and lessen the likelihood of civil protest and disorder. One was: "Law enforcement agencies should adopt policies requiring officers to identify themselves by their full name, rank, and command (as applicable) and provide that information in writing to individuals they have stopped."[44]  A concomitant suggestion was that officers should carry a printed card with this name, rank, command, and contact information to distribute in all encounters. This recommendation has been unevenly adopted in the years since the report was released.

51.    In recent years, police officers have brought several lawsuits against their departments for purported violations of the Fair Labor Standards Act related to uniforms. Generally, the legal question has revolved around whether officers should be paid for time spent "donning" and "doffing" their required uniforms. Because wearing a uniform is a banausic part of the job, time spent putting it on and taking it

---

[43] Charles E. Friend, *Police Rights: Civil Remedies for Law Enforcement Officers* (Wilmette, IL: Callaghan & Co., 1987), 40–41, 104, 108–109.

[44] President's Task Force on 21st Century Policing. *Final Report of the President's Task Force on 21st Century Policing* (Washington, DC: Office of Community Oriented Policing Services, 2015), 27.

SA-45

off is also required and therefore should be compensated, some plaintiffs have argued. Federal courts have come to differing decisions, but the rule of thumb is that if officers are required to don and doff their uniforms on the premises of the police department, then compensation is warranted. These cases concern labor law, rather than police operations, but their premise is that police uniforms (and implicitly badges adorning them) are standard and required tools.[45]

### III.  Federal Law Enforcement Training Guidance and Policies on Uniforms, Badges, and Masks

52.     Among federal law-enforcement officers, there is a distinction between officers who typically wear plainclothes like FBI agents and those who wear uniforms, such as the green uniforms of Border Patrol. But all are trained to identify themselves and carry badges. Training and standard policies have not entailed hiding officer identities except under specific circumstances.

53.     Standard policies of the Department of Homeland Security require that officers wear visible badges and nameplates and standard uniforms. For instance, I have reviewed the Uniform and Grooming Standards of the U.S. Border Patrol (USBP), which dictate that agents "wear officially authorized uniform items when performing USBP duties"; that "[o]fficial credentials will be carried at all times while on duty"; and that "[b]adges and nameplates or unique identifiers must be worn on the outermost uniform garment and visible to the public when practicable."[46] Similarly, the collective bargaining agreement between Customs and Border Protection and the National Border Patrol Council confirms: "The employer

---

[45] "'Donning and Doffing' Police Uniforms and Protective Gear Under the Fair Labor Standards Act" *FBI Law Enforcement Bulletin*, June 11, 2011, available at https://tinyurl.com/3a562ury.

[46] U.S. Border Patrol, Internal Operating Procedure: Uniform and Grooming Standards 2025, July 2, 2025, available at https://tinyurl.com/2w3625ep, 4. See also, U.S. Customs and Border Protection, Inspector's Field Manual (IFM), 2006, released by FOIA, December 11, 2011, available at https://tinyurl.com/4xm5ydw5.

has determined that the maintenance of a uniformed force of employees will promote the law enforcement mission of the Agency" and "Uniformed personnel will be required to wear name plates with the wearer's initial and last name."[47] In this sense, the No Secret Police Act and No Vigilantes Act accord with standard practice of the Department of Homeland Security and would not contradict existing policy and labor agreements.

54.    Federal officers do engage in tactical operations that necessitate face coverings or other types of safety gear that obscure identities. And inclement weather is a common reason for officers to wear neck gaiters or other face coverings. During the peak of the Covid-19 pandemic (2020–2021), federal law-enforcement officers wore face masks to avoid infection. The No Secret Police Act and No Vigilantes Act both include exemptions for tactical and safety reasons that would therefore not prevent officers from wearing face coverings for limited and specific purposes.

55.    Within the available documentation from the Federal Law Enforcement Training Centers (FLETCs), operational since 1970, or materials from the International Police Academy that operated from 1963 to 1975, there is scant evidence of officers receiving training that entails masking, outside of specific situations requiring particular types of protection.[48] The No Secret Police Act and

[47] Collective Bargaining Agreement Between the National Border Patrol Council and U.S. Customs and Border Protection, 2019, available at https://tinyurl.com/4wx8h4mr, 54. ICE's field manual refers to an earlier version of this collective bargaining agreement in its chapter on uniforms: ICE Detention and Deportation Officer's Field Manual, 2003, released by FOIA, March 27, 2006, available at https://tinyurl.com/3tr7dexs.

[48] Proving a negative is difficult, but in my review, I have encountered no evidence of training recommendations to wear face coverings or irregular uniforms in normal operations for federal law-enforcement officers or others they are training. I have reviewed every published issue of the International Police Academy's newsletter *IPA Review*, published from 1967 to 1975 by the U.S. Agency for International

(continued…)

No Vigilantes Act, therefore, are consistent with the training materials produced by federal law enforcement that I have reviewed.

56.     The activities described in the Motion for a Preliminary Injunction and the accompanying Declaration by Immigration and Customs Enforcement officer Sergio Albarran, which include "masking or otherwise protecting the personal identities of immigration officers," are inconsistent with the traditions of policing in the United States. Albarran's Declaration argues that officers should "have the ability to prepare themselves for [. . .] hazards at any time during any law enforcement operation."[49] It is well within the traditions and training of police to prepare for hazards. The vast majority of police in the United States do so daily without hiding their faces, removing badges and nameplates, or otherwise obscuring their identities. This has been standard practice for well over a century. It has also been standard practice for federal officers until recently. The Declarations provided by officers from Immigration and Customs Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug Enforcement Administration do not acknowledge this history or the existing policies of these respective agencies, which are consistent with the No Secret Police Act and No Vigilantes Act.

## SUMMARY OF OPINIONS

57.     Police in the United States have maintained a profile since the

Development. I have also reviewed Frederick S. Calhoun, *The Trainers: The History of the Federal Law Enforcement Training Center and the Professionalization of Federal Law Enforcement* (Glynco, GA: FLETC, 1996), as well as the FLETCs' YouTube channel, X account, and website, along with the FLETCs' strategic plans commencing in fiscal years 2009, 2016, and 2018, plus all published issues of *FLETC Journal* from 2007 to 2018. I have also reviewed available photos in the Customs and Border Protection media library: https://www.cbp.gov/medialibrary/photos. Over the past 13 years of my career, I have also reviewed countless other police publications, including many issues of the *FBI Law Enforcement Bulletin* and *The Police Chief* magazine from the 1940s through the 1990s.

[49] Paragraphs 30 and 31.

SA-48

institution's inception that is guided by three main traditions. Police are distinctive from other civilians or government officials, as indicated by their badge, uniform, and weapon. Police are public and accountable to the public, and they do not operate primarily in secret or clandestine ways, except for tactical purposes. Police are civilian, not military.

58.     All of these traditions have been challenged. Police do not always adhere perfectly to them. Critics poke holes and call out hypocrisy. Scholars document inconsistency and transformations, not least of which is the so-called militarization of policing.

59.     Yet the traditions persist, widely accepted within the profession and among the public. When Americans recoil at the sight of law-enforcement officers dressed irregularly, carrying military-style weapons, and hiding their faces, names, and identifying insignia, the reason is that these all violate widely accepted traditions that define the orthodoxy of police practice in this country.

60.     Based on my expertise and familiarity with the historical literature on policing, as well as my review of recent and contemporary documentation of federal law-enforcement training and operations, I believe that there would be minimal impediments, obstacles, or harms to federal law-enforcement operations caused by enforcement of the No Secret Police Act and No Vigilantes Act.

61.     Further, based on my review of the No Secret Police Act and No Vigilantes Act, I find that these laws are consistent with policing practice and orthodoxy across a large period of U.S. history. Further, they extend longstanding efforts to professionalize policing by upgrading police transparency, accountability, and legitimacy. None of these attributes is guaranteed, which is why new policies and laws are often deemed necessary, as public expectations change in response to events and political change.

62.     These two laws contain exemptions that would not preclude federal officers from taking measures to avoid hazards or from engaging in specific types

SA-49

of tactical operations that may require briefly hiding their identities. The Declarations provided by officers representing Immigration and Customs Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug Enforcement Administration identify circumstances in which it is necessary to conceal officers' identities. The laws allow this practice, rather than banning it.

63. To conclude, I find the descriptions of federal law-enforcement operations on pages 7 and 8 of the Motion for a Preliminary Injunction from the U.S. Department of Justice (and expanded in the attached Declarations) to be inconsistent with the traditions and history of policing in the United States. In contrast, I find the No Secret Police Act and No Vigilantes Act to be consistent with the traditions and history of policing in the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 20ᵗʰ day of December 2025, in Brooklyn, New York.

_____

Dr. Stuart Schrader

30

SA-50

# EXHIBIT A

# Stuart Schrader

Curriculum Vitae

Johns Hopkins University
stuart.schrader@jhu.edu
973-727-7545

330B Gilman Hall
3400 N. Charles Street
Baltimore, MD 21218

## PROFESSIONAL APPOINTMENTS

2024–    Associate Professor (with Tenure), Department of History, Johns Hopkins University

Director, Chloe Center for the Critical Study of Racism, Immigration, and Colonialism, Johns Hopkins University

2021–24   Associate Research Professor, Center for Africana Studies, Johns Hopkins University

2019–23   Associate Director, Program in Racism, Immigration, and Citizenship, Johns Hopkins University

2018–21   Lecturer, Johns Hopkins University

2018    Agnese N. Haury Postdoctoral Fellow, Center for the United States & the Cold War, Tamiment Library

2017–18   Fellow, Crime and Punishment in American History, Charles Warren Center for Studies in American History, Harvard University

2015–17   Postdoctoral Fellow, Global American Studies, Charles Warren Center for Studies in American History, Harvard University

## EDUCATION

2015   Doctor of Philosophy, New York University, New York, NY
Program in American Studies, Department of Social & Cultural Analysis

2005   Master of Arts, New School University, New York, NY

2000   Bachelor of Arts, Vassar College, Poughkeepsie, NY

## SCHOLARLY PUBLICATIONS

### Monographs

2026   *Blue Power: How Police Organized to Protect and Serve Themselves*, Basic Books, forthcoming.

2019   *Badges Without Borders: How Global Counterinsurgency Transformed American Policing* (University of California Press, American Crossroads Series).

- Scholarly reviews: *American Historical Review*, *American Quarterly* (review essay), *Choice Reviews*, *Contexto Internacional*, *Diplomatic History*, *Georgetown Security Studies Review*, *H-Diplo* (review symposium), *International Labor and Working-Class History* (review essay), *International Politics Reviews* (review symposium), *Journal of American History*, *Kalfou*, *La Vie Des Idées* (French), *Law & Social Inquiry*, *The Metropole* (Urban History Association), *Michigan Law Review*, *Punishment & Society*, *Race & Class*, *Small Wars Journal*, *Social Justice* (review essay)

November 19, 2025

032

SA-52

Exhibit A

Stuart Schrader

Curriculum Vitae

- Popular reviews: *Al Bosla* (Arabic), *The Baffler*, *Bookforum*, *Boston Review*, *Jacobin*, *Johns Hopkins Magazine*, *Protean*

**Journal Special Issue**

2022  "Global Counterinsurgency and the Police-Military Continuum" *Small Wars & Insurgencies* 33.4–5 (Authored introduction and edited double issue of journal).

**Edited Volume**

2026  *The Imperial Entanglements of Policing*, Duke University Press, forthcoming. Co-edited with Julian Go.

**Articles (refereed)**

2021  "Cops at War: How World War II Transformed U.S. Policing" *Modern American History* 4.2: 159–179.

2020  "More Than Cosmetic Changes: The Challenges of Experiments with Police Demilitarization in the 1960s and 1970s" *The Journal of Urban History* 46.5: 1002–1025.

2019  "To Protect and Serve Themselves: Police in US Politics Since the 1960s" *Public Culture* 31.3: 601–623.

2016  "To Secure the Global Great Society: Participation in Pacification" *Humanity: An International Journal of Human Rights, Humanitarianism and Development* 7.2: 225–253.

2015  "'The Anti-Poverty Hoax': Development, Pacification, and the Making of Community in the Global 1960s" *Cities: The International Journal of Urban Policy and Planning* 44: 139–145. Co-authored with Ananya Roy & Emma Shaw Crane.

**Chapters (refereed)**

2023  "Avoiding the Security Trap: The Contributions of Terence Hopkins and World-Systems as Methodology for Critical Police Studies" in *World-Systems Analysis at a Critical Juncture*, Corey R. Payne, Roberto Patricio Korzeniewicz, and Beverly J. Silver, eds. (Routledge). Co-authored with Brendan McQuade.

2019  "A Carceral Empire: Placing US Prisons and Policing in the World" in *Shaped by the State: Toward a New Political History of the Twentieth Century*, Brent Cebul, Lily Geismer, Mason B. Williams, eds. (University of Chicago Press).

2015  "Gray Areas: The War on Poverty at Home and Abroad" in *Territories of Poverty* (University of Georgia Press). Co-authored with Ananya Roy and Emma Shaw Crane.

2012  "Policing Political Protest: Paradoxes of the Age of Austerity" in *Is This What Democracy Looks Like?* (Social Text: Periscope).

**Selected Articles**

2024  "Cop Cities Mock Cities" *Los Angeles Review of Books*, October 12.

2023  "Cages Without Borders" *Inquest*, November 30.

2021  "Freedom Education" *Public Books*, October 4, 2021. Co-authored with NDB Connolly.

2

033

SA-53

Exhibit A

# Stuart Schrader

Curriculum Vitae

2020   "Defund the Global Policeman" *n+1*, Fall.
- Italian translation, *Collettivo le Gauche*, November 7, 2021.

2020   "Harm of the Law" *Artforum*, May-June.

2018   "Tear Gas and the U.S. Border" *Process: A Blog for American History* (Organization of American Historians), processhistory.org, December 6.

2018   "The Long Counterrevolution: United States–Latin America Security Cooperation" *SSRC Items*, items.ssrc.org, September 18.

2018   "Henri Lefebvre, Mao Zedong, and the Global Urban Concept" *Global Urban History*, globalurbanhistory.com, May 1.

2017   "Nicaragua: Central America's Security Exception" *NACLA Report on the Americas* 49.3: 360–365.

2017   "In Memoriam: Marilyn Young" *Critical Asian Studies* 49.2: 285–288. Co-authored with Christy Thornton.

2016   "When NACLA Helped Shutter the U.S. Office of Public Safety" *NACLA Report on the Americas* 48.2: 181–187.

2016   "Reading Jane Jacobs in the Era of #BlackLivesMatter" *Harvard Design Magazine* 42: 52–53.

2012   "Reflections on Occupy Wall Street, the State and Space" *City: Analysis of Urban Trends, Culture, Theory, Policy, Action* 16.1/2: 243–248. Co-authored with David Wachsmuth.

## Review Essays

2020   "Rank-and-File Antiracism: Historicizing Punk and Rock Against Racism" *Radical History Review* 138: 131–143.

2011   "Embedded in the Street: Studying Up, Studying Down" *American Quarterly* 63.4: 1039–1049.

## Book Reviews

2025   *The Policing Machine*, by Tony Cheng, *American Journal of Sociology* 131.1: 260–263.

2022   *The Punitive Turn in American Life*, by Michael S. Sherry, *Journal of Social History* 55.4: 1111–1113.

2021   *Beyond the Usual Beating*, by Andrew Baer, *American Historical Review* 126.3: 1296–1297.

2020   *The Counterrevolution*, by Bernard Harcourt, *Social Justice* 46.2/3: 167–172.

2020   *Policing Life and Death*, by Marisol LeBrón, *The AAG Review of Books* 8.3: 174–176.

2020   *Sorting Out the Mixed Economy*, by Amy Offner, *NACLA Report on the Americas* 52.2: 231–232.

2018   *The FBI in Latin America*, by Marc Becker, *Radical Americas* 3.1.

2017   *Vagrant Nation*, by Risa Goluboff, *The Journal of Southern History* 83.2: 472–473.

3

Stuart Schrader

Curriculum Vitae

2016    *A World of Homeowners*, by Nancy H. Kwak, *The Journal of American History* 103.3: 838–839.

## PUBLIC HUMANITIES
### Documentary Films

Consulting Producer: *Power*, dir. Yance Ford, 2024.

Research Consultant: *Riotsville, USA*, dir. Sierra Pettengill, 2022.

### Museum Exhibits

Co-curator: "Revolution In Our Lifetime": The Black Panther Party and Political Organizing in Baltimore, 1968–1974, Peale Center for Baltimore History and Architecture, Baltimore, MD, April–July 2024.

Consultant: Counter/Surveillance: Control, Privacy, Agency, Wende Museum, Culver City, CA, October 2024–October 2025.

## FELLOWSHIPS AND GRANTS
### External

2022    Kluge Fellowship, John W. Kluge Center, U.S. Library of Congress
2021    Inheritance Baltimore: Humanities and Arts Education for Black Liberation, Just Futures, Andrew W. Mellon Foundation, co-investigator
2021    Maxcy Visiting Fellow, Maxcy College, University of South Carolina
2020    Publication Grant, Textbook & Academic Authors Association
2019    Solidarity Fund Travel Grant, American Studies Association
2014    Mellon/American Council of Learned Societies Dissertation Completion Fellowship
2014    Annette K. Baxter Grant, American Studies Association
2013    Samuel Flagg Bemis Dissertation Research Grant, Society for Historians of American Foreign Relations
2013    Moody Research Grant, Lyndon Baines Johnson Foundation
2012    Dorothy Evans Fellowship, Vassar College
2012    Visiting Research Fellow, Blum Center for Developing Economies, University of California Berkeley
2012    Alumni Initiative Travel Award, Social Science Research Council
2011    Dissertation Proposal Development Fellowship, Social Science Research Council
2010    Travel Fellowship, Skellig Foundation, Dublin, Ireland

### Internal

2025    Faculty-Student Engagement and Enrichment Fund Award, JHU
2023    Nexus Award, JHU, co-investigator
2021    SNF Agora Institute Faculty Grant, JHU, co-investigator
2019    Provost's PhD Professional Development Innovation Initiative Grant, JHU, co-investigator

4

SA-55

Exhibit A

# Stuart Schrader

## Curriculum Vitae

2016    Postdoctoral Award for Professional Development, Harvard
2014    Mellon Dissertation Fellowship, NYU (declined)
2013    Provost's Global Research Initiative Fellowship, NYU
2013    Summer Research Grant, Department of Social & Cultural Analysis, NYU
2013    Dean's Student Travel Grant, Graduate School of Arts & Sciences, NYU
2012    Predoctoral Summer Fellowship, Graduate School of Arts & Sciences, NYU
2012    Travel Grant, Department of Social & Cultural Analysis, NYU
2010    Dean's Student Travel Grant, Graduate School of Arts & Sciences, NYU
2009    Henry M. MacCracken Fellowship, NYU

**AWARDS**

2023    Johns Hopkins Alumni Association Excellence in Teaching Award, Krieger School of Arts and Sciences, JHU
2017    Teaching Excellence, Derek Bok Center for Teaching and Learning and Dean of Undergraduate Education, Faculty of Arts and Sciences, Harvard University
2016    Teaching Excellence, Derek Bok Center for Teaching and Learning and Dean of Undergraduate Education, Faculty of Arts and Sciences, Harvard University
2015    Ralph Henry Gabriel Dissertation Prize, Finalist (second place), American Studies Association
2014    Gene Wise – Warren Susman Prize (best graduate student paper presented at annual meeting), American Studies Association

**INVITED TALKS**

"Police Power in Building Authoritarian and Social Control"
2025    Harvard Kennedy School, Criminal Law as a Tool of Authoritarian Control Speaker Series, October 29.

"National Security for Imperial Insecurity: Race and Counterinsurgency Across the Pacific"
2025    NYU, Marilyn B. Young Memorial Lecture, Discussant with Moon-Ho Jung (University of Washington), September 9.

"Imperial Entanglements: New Approaches to the Critique of Police Power"
2024    University of California, Santa Barbara, Department of Global Studies, January 10.

"'Not Unless This Country Plunges into Fascism': Black Radical Critiques of Preventive Counterrevolution and the Global Security State"
2022    Binghamton University, Towards a New World Order? The U.S., China, and the Rise of the Far Right, Keynote Address, October 21.

"Badges Without Borders: How Global Counterinsurgency Transformed American Policing"
2022    University of Iowa, Department of American Studies, January 21.

5

036

SA-56

Exhibit A

Stuart Schrader

Curriculum Vitae

2021  L'Université Paris 1 Panthéon-Sorbonne, Séminaire Sociologie Politique de l'International, October 20.

2021  Middlebury College, Rohatyn Center for Global Affairs, May 4.

2021  University of South Carolina, Maxcy College, March 3.

2020  University of Texas Rio Grande Valley, Department of Political Science, December 4.

2020  The New School, Program in Historical Studies, Critical History Today Lecture Series, September 14.

2020  Yale University, International Security Studies, Speaker Series in Grand Strategy and International Security Studies, March 3.

2019  Macalester College, Kofi Annan Center for Global Citizenship, International Roundtable, Keynote Address, October 11.

2019  University of Washington, Henry M. Jackson School of International Studies, May 9.

2018  Towson University, Department of History, February 12.

2017  Johns Hopkins University, Arrighi Center for Global Studies, December 8.

2017  Tufts University, Fletcher School of Law and Diplomacy, May 9.

2017  Hampshire College, School of Critical Social Inquiry, January 26.

2016  University of California, Santa Cruz, Politics Department, December 2.

2015  NYU, Gallatin School of Individualized Study, December 8.

"Militarization as Globalization: How World War II Transformed U.S. Police"

2021  Dartmouth College, Dickey Center for International Understanding, Speaker Series, January 14.

2020  University of New Mexico, Department of History, International Studies Institute, and Latin American & Iberian Institute, February 14.

"The Invention of the Urban Guerrilla: Social Science, Counterinsurgency, and Revolutionary Black Movements in the Global 1960s"

2019  Johns Hopkins University, Department of History, Seminar, December 2.

2018  NYU, Center for the United States & the Cold War, Cold War Seminar, March 1.

"Global Policemen: Imperialism and Law and Order in Baltimore"

2019  University of Baltimore, Division of Legal, Ethical and Historical Studies, March 26.

"The Forgotten History of the Car Barn: Police Repression and Resistance in the Cold War"

2019  Georgetown University, History Department Americas Initiative and Center for Latin American Studies, February 19.

**CONFERENCES**

**Paper Presentations and Panel Commentary at Association Conferences**

- American Historical Association Annual Meeting: 2020
- American Studies Association Annual Meeting: 2025, 2024, 2020*, 2019, 2018, 2017, 2015, 2014, 2013, 2012

6

037

SA-57

Exhibit A

Stuart Schrader

Curriculum Vitae

- Organization of American Historians Annual Meeting: 2022, 2021, 2020*
- Society for Historians of American Foreign Relations Annual Meeting: 2023, 2021, 2020*, 2019, 2018, 2017, 2016, 2015, 2014
- Social Science History Association Annual Meeting: 2023, 2022, 2021, 2019, 2017, 2015, 2012
- Urban History Association Biennial Meeting: 2025, 2023, 2020*, 2018

\* Canceled due to Covid-19

**Other Recent Conference Presentations**

2025   University of Chicago, Labor and Working Class History Association Annual Meeting, June 13.

2024   University of Basel and Geneva Graduate Institute, Peace and Security Now, June 6.

2023   Pontifical Catholic University of Minas Gerais, Brazilian Association of International Relations Annual Meeting, July 26.

2021   Middlebury College, New Directions in the Study of Global Police Power, October 1.

2020   University of Chicago, Reimagining/Reinventing Police, July 30.

2020   John Jay College, Historical Memory Project, The Military-Industrial Complex in the Americas: Continuities and Discontinuities, February 28.

2019   University of Toronto, Centre for the Study of the United States, America's Carceral Landscapes Symposium, November 1.

2019   University of Tennessee, Knoxville, Department of Sociology and Antipode Foundation International Workshop, Policing Rage in the Urban Age of Crisis & Extremes, May 17.

2019   University of Wisconsin, Milwaukee, Center for 21st Century Studies, Insecurity Conference, May 4.

2019   Duke University Center for International and Global Studies, Workshop on Realism, Liberal Internationalism, History: Conceiving a New Research Agenda, February 9.

**PROFESSIONAL MEMBERSHIPS**

American Historical Association
American Studies Association
Social Science History Association
Society for Historians of American Foreign Relations

7

038   SA-58

Exhibit A

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail:  Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** | 2:25-cv-10999-CAS-AJR |
| Plaintiff, | **DECLARATION OF STANFORD O'NEILL FRANKLIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,** | |
| Defendants. | |

1

SA-59

## DECLARATION OF STANFORD O'NEILL FRANKLIN

I, Stanford O'Neill Franklin, declare as follows:

**Introduction**

1. I am a law enforcement professional with over thirty years of progressive leadership and operational experience across multiple agencies, including the Maryland State Police, Baltimore Police Department, Maryland Transit Administration Police Force, and others. Currently, I provide consulting services, training, and expert witness testimony on law enforcement issues. My credentials and experience are detailed further below.

2. I submit this declaration in support of the California legislative efforts commonly referred to as the "No Secret Police Act" (Senate Bill 627) and the "No Vigilantes Act" (Senate Bill 805), which seek to restrict government agents, including federal agents, from wearing masks or concealing their identities during non-undercover, public enforcement operations. I have reviewed these laws and believe that they promote transparency and accountability; core principles I have witnessed foster community trust and legitimacy in law enforcement.

**Professional Background**

3. My law enforcement career spans over three decades, including positions such as Major and Lieutenant Colonel, commanding patrol operations, special operations, professional standards, training, and human resources. I have overseen criminal and drug-related investigations, coordinated Homeland Security efforts, and served as an instructor on policing ethics and professionalism.

4. I have served as an accepted expert witness in both United States District Courts and Maryland Circuit Courts, providing opinions on police training, use of force, constitutional law, and narcotics investigations.

2

SA-60

5.      Throughout my career, I have emphasized ethical policing, transparency, and community relations. I have trained law enforcement officers on the importance of professionalism, proper use of force, and fostering public trust.

6.      My knowledge and experience put me in a strong position to assess the operational and community implications of policies governing law enforcement conduct, including the masking and concealing of identities of officers and agents.

**Overview of SB 627 and SB 805**

7.      I understand that SB 627 restricts the wearing of facial coverings by law enforcement officers, except under circumstances.  I understand that SB 805 requires law enforcement officers to visibly display identification that includes their agency and either a name or badge number, or both name and badge number, when performing enforcement duties in public spaces such as neighborhoods, shopping centers, schools, and private properties. I understand the purpose of these laws to require agents to display clear identification and restrict the use of face coverings or other masking that renders them unidentifiable.

8.      These laws do not apply to undercover operations where concealment of identity is necessary to protect officer safety or the success of covert investigations.

**Importance of Transparency in Law Enforcement**

9.      In my experience, transparency is vital to establishing and maintaining public trust in law enforcement. Clear identification of officers during enforcement activities assures the public that government actions are lawful, justified, and subject to accountability.

10.      Many local and state agencies already have policies mandating officers to identify themselves upon request by members of the public. This practice fosters confidence that justice is administered fairly and without abuse.

11.      Transparency signals integrity and respect for the community's right to

3

SA-61

understand government actions occurring within their own neighborhoods.

**Concerns About Masking and Concealing Law Enforcement's Identity in Public Operations**

12. Masking agents or concealing their identities during public enforcement creates an atmosphere of secrecy that undermines trust. When government actors conceal their identities in public forums, it invites suspicion, fear, and doubt among the community.

13. The public naturally questions the lawfulness of operations conducted by anonymous individuals and may doubt the motives behind such enforcement activities.

14. Based on my law enforcement experience, I am aware that secrecy in non-covert operations can increase the risk of misconduct or abuse of authority, as masked agents might feel less accountable for their actions.

**Dangers Posed by Impersonators and Masking and Concealing Law Enforcement Identities**

15. There have been numerous recent incidents across the country of individuals impersonating ICE agents and other federal law enforcement officers.[1,2,3] These impersonators have unlawfully detained, searched, and threatened people, causing fear and confusion within communities. Such impersonations endanger public safety and damage the credibility of legitimate law enforcement operations.

16. California, like other states, is no stranger to this type of criminal behavior. In 1992 Los Angeles residents were targeted by criminals impersonating

---

[1] CNN report on the rise of ICE impersonator incidents in 2025: [cnn.com](https://www.cnn.com/2025/10/02/us/ice-impersonator-incidents-rise-invs-vis)

[2] FBI warning about criminals posing as ICE agents to rob, kidnap, and commit crimes: [nypost.com](https://nypost.com/2025/11/17/us-news/fbi-warns-of-crooks-posing-as-ice-agents-to-commit-crimes-heres-what-to-look-out-for/)

[3] FBI urging ICE to identify themselves due to impersonators committing violent crimes: [borderreport.com](https://www.borderreport.com/hot-topics/border-crime/fbi-urges-ice-to-id-themselves-as-criminals-impersonate-officers/)

4

SA-62

police officers.[4] They targeted a variety of people in several different circumstances, to include robbery, extortion, sex crimes and more. Vulnerable populations, such as sex workers and immigrants, rarely if ever reported such crimes, making them frequent targets.

17. When genuine federal agents wear masks or conceal their identities in the field during routine enforcement, the public may be unable to distinguish them from impostors. This confusion can lead to dangerous confrontations, as people may take defensive actions believing they are being accosted unlawfully.

18. These conditions jeopardize both public safety and the ability of lawful officers to carry out their duties effectively. Legitimate law enforcement relies on clear, identifiable presence to command compliance, cooperation, and respect from the public.

19. Masking and identity-concealing policies and practices that fail to distinguish between covert operational needs and routine public enforcement amplify these dangers, exacerbating mistrust and risking harm to officers and the communities they serve.

**Risks of Secrecy and Lack of Accountability**

20. From my police internal affairs experience, I have learned that visible identification and transparency serve as critical checks on law enforcement behavior, helping to prevent corruption and fostering ethical conduct. As such, this has become an important block of ethical police training in police academies and in-service training programs.

21. The widespread involvement of local and state law enforcement in enforcement operations around the clock demonstrates the feasibility and importance of clear identification to maintain community trust.

---

[4] Los Angeles, CA - 1992 article talks about police impostors committing felonies, including home invasions. This issue has been linked to serious crimes where criminals pose as officers to gain trust and access. (Source: Los Angeles Times - [link](https://www.latimes.com/archives/la-xpm-1992-11-09-me-199-story.html)

5

22.    Masking and identity-concealing policies and practices that apply broadly and indiscriminately, without distinction for legitimate undercover needs, jeopardize this trust and jeopardize the legitimacy of policing efforts.

**Balancing Operational Security and Transparency**

23.    I recognize there are legitimate scenarios where anonymity is crucial, such as undercover or covert operations that would be compromised by disclosure of officer identity. However, these scenarios constitute a limited subset of law enforcement activities.

24.    The California laws rightly focus on visible public enforcement where transparency and identification are reasonable and necessary expectations.

25.    Policies that balance the protection of genuine undercover operations while eliminating unnecessary masking and concealing of identities during routine enforcement serve both officer safety and public trust.

**Conclusion**

26.    For the reasons stated above, I believe SB 627 and SB 805 are critical measures to enhance government transparency, promote accountability, and protect the integrity of law enforcement activities conducted in public.

27.    I am available to provide any further assistance or clarification on these matters as needed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of December 2025, in Los Angeles, California

_____

Stanford O'Neill Franklin

6

SA-64

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DECLARATION OF ANDREA VELEZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

SA-65

## <u>DECLARATION OF ANDREA VELEZ</u>

I, Andrea Velez, declare as follows:

1.     I make this declaration from my personal knowledge and if called to testify to these facts, I could and would do so competently.

2.     My name is Andrea Velez. I am a United States citizen and a resident of Los Angeles, California. I am 32 years old. I work as a production coordinator for a shoe company.

3.     I am submitting this declaration to describe how masked, unidentified men handcuffed and detained me in downtown Los Angeles on June 24, 2025.

4.     At approximately 9:00 AM on June 24, 2025, my mother and sister dropped me off at work in downtown Los Angeles. Moments later, a group of masked men in plain clothes and sneakers jumped out of several unmarked SUVs and began chasing and attacking people down the street. All the men wore gaiter masks. Some wore "Police" vests over hoodies or t-shirts. They didn't identify themselves, so I was scared.

5.     One masked man charged at me. He wore plain clothes and a generic vest that read "Police" on it, and he was carrying a Taser. He was approximately 6 feet tall and aggressive. In comparison, I am under 5 feet tall (4 feet 11 inches). I was terrified. I used my work bag as a shield. He grabbed me and slammed me into the sidewalk. As I tried to gather my belongings, the masked man ran back to me. He threatened me with arrest for assaulting and interfering with an officer.

6.     I asked the masked man to identify himself by showing me his badge number, ID, or a warrant. He said that I "didn't need to know any of that," and his "Police" vest should be enough confirmation. I told the masked man my name and repeatedly said that I am a United States citizen, but the man did not respond. Instead, he snatched my bag and cellphone and placed me in handcuffs. The masked man dragged me towards an unmarked SUV with no license plate. I yelled out my mother's phone number in hopes that a bystander would tell her what

2

happened to me. I thought that my mother was probably going to wait for me to come home, and I was worried that I would never make it back home.

7.     The masked man shoved me into the back seat of the SUV and slammed the door. I felt intense fear as I sat alone in the back of the car. I thought they were kidnapping me. I later learned that my mother and sister witnessed the incident and reported to the Los Angeles Police Department (LAPD) that I was kidnapped, and because of my mother's call, LAPD showed up to the raid.

8.     I heard helicopters whizzing by and saw officers in LAPD uniforms. I began yelling for help and knocking on the windows of the car. Despite my handcuffs, I managed to open the car door. I ran to an LAPD officer and asked for help: "I don't know who these people are, and I'm being kidnapped." I also told him, "If I did anything wrong, I want LAPD to arrest me. I trust people in uniforms."

9.     Within moments, the masked man noticed I wasn't in the car and ran up screaming, "She's mine." The man cinched my handcuffs even tighter. He hoisted me off the ground and carried me back to the car. He threw me in the back seat, jumped into the car, and drove off without providing any further explanation for why I was taken or where we were going.

10.     Another masked man in a red shirt rode along with us. While driving, the masked man called others, asking them "how many bodies they got that day." When the man heard the total count, he began screaming with rage. During the calls, he referred to me as "an alleged United States citizen," but he did not ask for or check the ID in my bag.

11.     The masked men took me to a parking structure, where I was asked to provide identification and allowed to make one phone call. I was then taken to a holding cell, and then shackled in a van. While I was in the van, I observed masked and plainclothes agents in unmarked cars deliver new groups of arrestees and drive off. Around 2:00 PM, a man removed me from the van, and I was interrogated and

3

photographed. Then, two detectives wearing sneakers and plain clothes took me to the Metropolitan Detention Center in downtown Los Angeles.

12. After being detained for more than 48 hours, I was brought to court and learned for the first time that I was being charged with assaulting a federal officer. I was in shock and disbelief at the false claim that I had struck a federal agent on the face. I am not aggressive, and I am petite. On July 10, 2025, my charges were dropped without prejudice.

13. Since that day, I no longer feel safe. Being detained by masked, unidentified men while on my way to work has caused me lingering trauma. I began therapy because I have enduring anxiousness that leaving my home might lead to another incarceration. I work on a hybrid schedule now because I'm afraid of going to downtown Los Angeles every workday. I believe I was racially profiled during this incident. Though I try to detach from my trauma, my community continues to be targeted simply because of the color of our skin. Federal agents are still rounding up people every day. We are left to be vulnerable, forced to fend for ourselves. Dignity, safety, and justice are not privileges—they are fundamental rights. I never imagined this would occur in America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of December 2025, in Los Angeles, California

_Andrea Velez_ (signature)

Andrea Velez

4

SA-68

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DECLARATION OF PETER JAMES MUNDWILER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

SA-69

## DECLARATION OF PETER JAMES MUNDWILER

I, Peter James Mundwiler, declare as follows:

1. I make this declaration from my personal knowledge and if called to testify to these facts, I could and would do so competently.

2. My name is Peter James Mundwiler. I am a resident of Pasadena, California, where I have lived for four years. I am 45 years old. I am currently an Exhibition Manager for an art gallery.

3. I am submitting this declaration to describe an incident I observed of masked men who failed to identify themselves while they were conducting what appeared to be an immigration enforcement activity in Pasadena, California on June 21, 2025.

4. On June 21st, I arrived at the intersection of Marengo Avenue and Parke Street in Pasadena around 7:00 a.m. There were cars parked askew in the street and people were honking their car horns. I saw multiple men wearing face masks and vests with what appeared to be different law enforcement insignias.

5. Shortly after I arrived, these men got into their unmarked cars and left. I spoke to some of the people at the scene, and they told me that the men had taken a person. I got in my car and started driving in the direction that the men were going because I wanted to see if they were going to take anyone else. They were in three unmarked cars and a couple of them had hidden flashing lights. They were driving towards downtown Los Angeles.

6. As I was driving, I saw that the unmarked cars suddenly stopped right in front of the Metropolitan Detention Center on Alameda Street. I was going to drive around their cars when they all exited their vehicle and started walking towards me. One of the men slapped the hood of my car. Another got out of the unmarked car with an assault rifle that looked like an AR15. He stood in front of the hood of my car and pointed the gun at me. Three other men came to my driver-side door, pounded on the window, and ordered me to open it. Two men came to

2

SA-70

the passenger-side door too. One of the men brought a "window breaker" tool and threatened to smash my window. I was terrified because I did not know what they were going to do. They were behaving like thugs and pointing the gun carelessly. I was afraid they were going to break my window and beat me up in the street. They were all taking photographs of me as well.

7. The men all had gaiter-style masks on and were wearing plain clothes, including jeans, t-shirts, and baseball caps. One of them was wearing a polo shirt with a flamingo print and another was wearing a black button-up shirt. The man in the flamingo print shirt was also wearing a tan vest that said "ERO/POLICE." Another man had a vest that said "POLICE" on it. They had different mismatched vests and masks. Nobody was matching, and it felt like a "stick-up crew" in costumes. As this was happening, nobody identified themselves either. Below is a picture of the masked man who came out of the unmarked blue Ford and pointed the gun at me and a picture of the men who approached my car window.



3

SA-71



8.     After a few minutes, an officer from the Federal Protective Services, who was in uniform and was wearing a badge number, approached us and asked what was going on. At this moment, the masked men suddenly stopped threatening me and told me to leave. I think I was only able to leave because the Federal Protective Services agent interceded.

9.     The experience of encountering unidentified and masked men made me very afraid. I was scared that somebody might come to my home and take me, so I bought security cameras that I still use to this day. A week or two after this encounter, I saw a shopping cart with cans that had been abandoned in front of my house and was worried that these masked men had come to my house and taken

SA-72

someone from the community. I also felt very alone and decided to connect with people who were protesting and responding to immigration enforcement activities.

10. This experience also undermined my perception of law enforcement. I never feared law enforcement before this incident and have had generally positive experiences with them. I also have family members that are police officers. But this was the worst experience I have ever had with someone in a law enforcement capacity. These masked men were particularly violent, and to this day, I have not been able to identify them or their agencies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __18__ day of December 2025, in Los Angeles, California.

Peter James Mundwiler

5

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General, Civil Division

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

BILAL A. ESSAYLI
First Assistant U.S. Attorney
Central District of California

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Director

ELISABETH J. NEYLAN
CRISTEN C. HANDLEY
Trial Attorneys
Civil Division
Federal Programs Branch
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| THE UNITED STATES OF AMERICA, | No. 2:25-cv-10999 |
|---|---|
| Plaintiff, | |
| v. | **COMPLAINT** |
| STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his Official Capacity; ROBERT BONTA, Attorney General of California, in his Official Capacity, | |
| Defendants. | |

Complaint of the United States

SA-74

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1. When President Trump took office, "[o]ur southern border [was] overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation 10,866, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025).

2. Under his leadership—and in response to the electoral mandate—the Federal Government is employing its available legal measures to end that crisis in accordance with its well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding United States Supreme Court precedent. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394–95 (2012).

3. California Governor Gavin Newsom has vowed to "push[] back"[1] against the President's commitment to enforcing our Nation's immigration laws. His latest resistance—imposing a mask ban and identification requirement on federal agents operating in California—violates the United States Constitution, as even Governor Newsom apparently appreciated when he acknowledged in discussing the mask ban that "[i]t appears we don't have the legal authority for federal agents."[2]

4. Nevertheless, Governor Newsom signed the "No Secret Police Act" (Senate Bill 627) into law on September 20, 2025. The Act, which takes effect on January 1, 2026, criminalizes federal law enforcement officers' wearing masks in the performance of their duties in California. The Act also requires federal law enforcement agencies operating in the State

---

[1] Ashleigh Fields, *Newsom signs legislation banning ICE agents from wearing masks in California*, The Hill (Sep. 20, 2025, 19:37 ET), https://perma.cc/CSY7-6HCA.

[2] Lindsey Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*, Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR.

Complaint of the United States          - 1 -

to adopt and publicly post a written policy regarding the use of masks by July 1, 2026.

5. The same day, Governor Newsom signed the "No Vigilantes Act" (Senate Bill 805), which requires, as of January 1, 2026, that non-uniformed federal law enforcement officers in California visibly display identification that includes their agency and either a name or badge number, or both, when performing their enforcement duties. Like the No Secret Police Act, the No Vigilantes Act imposes criminal penalties on federal officers for noncompliance. It further requires federal law enforcement agencies operating in California to maintain and publicly post a written policy on the visible identification of sworn personnel by January 1, 2026.

6. Both laws violate long-settled principles of the Supremacy Clause, under which States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state.").

7. The intergovernmental immunity doctrine is an outgrowth of this principle, and a state law violates intergovernmental immunity if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion).

8. The No Secret Police Act and No Vigilantes Act directly regulate the Federal Government by dictating permissible uniforms for federal agents and forcing federal agencies to adopt specified policies. But the Federal Government, not California, has authority to control its own agents and activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control,

Complaint of the United States                    - 2 -

direct[], and supervis[e]" all DHS employees).[3]

9.   The No Secret Police Act also discriminates against the Federal Government by applying its requirements to federal law enforcement officers but not California State officers. *See United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("A state or local law discriminates against the Federal Government if 'it treats someone else better than it treats' the government." (quoting *North Dakota*, 495 U.S. at 438)).

10.   Moreover, if enforced against the Federal Government, the laws would recklessly endanger the lives of federal agents and their family members and compromise the operational effectiveness of federal law enforcement activities.

11.   Accordingly, the Federal Government does not intend to comply with the challenged laws.

12.   Law enforcement officers thus face a real threat of criminal liability from state officials who have made clear their intent to target federal officers and disrupt federal law enforcement activities, including federal immigration enforcement.

13.   The United States therefore brings this declaratory and injunctive action to enjoin Defendants from enforcing the unconstitutional No Secret Police Act and the No Vigilantes Act against the Federal Government.

## JURISDICTION AND VENUE

14.   The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

15.   Because the Federal Government does not intend to comply with the challenged laws and because California officials have expressed their intent to target federal officials and subject them to criminal liability for any noncompliance, the United States has standing to bring this lawsuit in accordance with the pre-enforcement standing principles articulated by the Ninth Circuit in *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). *See also Susan B. Anthony List v. Driehaus*, 573

[3] *See also* 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

Complaint of the United States                                    - 3 -

U.S. 149, 161–64 (2014).

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendants' acts or omissions giving rise to this Complaint concern and impact federal law enforcement activities in this District, and throughout the State of California.

17. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

18. Plaintiff, the United States of America, enforces federal laws through its Executive agencies, including the Department of Justice and its component agencies—the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA)—as well as the Department of Homeland Security (DHS) and its component agencies—U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP).

19. Defendant State of California is a state of the United States.

20. Defendant Gavin Newsom is the Governor of California and is being sued in his official capacity.

21. Defendant Robert Bonta is the Attorney General of California and is being sued in his official capacity.

## THE SUPREMACY CLAUSE

22. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "regulat[es] the United States directly or discriminat[es] against the Federal

Complaint of the United States                          - 4 -

Government or those with whom it deals," *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted).

### FEDERAL LAW ENFORCEMENT

23. The President has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3.

24. Subordinate officers in various federal agencies assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

25. Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the States." *Davis*, 100 U.S. at 263.

26. Accordingly, federal law enforcement activities take place within the several States, including California.

27. For example, DHS, through ICE and CBP, is principally responsible for enforcing the nation's immigration laws.

28. Those laws are primarily contained in the Immigration and Nationality Act (INA), and, pursuant to Congress's power to "establish a uniform Rule of Naturalization," U.S. Const. art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona*, 567 U.S. at 395.

29. The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231.

30. As another example, the DEA enforces the nation's controlled substances laws. *See generally* The Controlled Substances Act (CSA), codified as amended at 21 U.S.C. §§ 801, *et seq.*

Complaint of the United States                    - 5 -

SA-79

31. In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[4]

32. Finally, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with state and local officials. *See id.* § 0.85.[5]

33. The above federal agencies perform a significant portion of their law enforcement activities in the State of California.

## FACTUAL BACKGROUND

34. On a single day, Governor Newsom signed into law two bills that purport to regulate "federal law enforcement agenc[ies]" operating in the State. *See* No Secret Police Act §§ 2(d)(2)(C), 3(e); *see also* No Vigilantes Act §§ 2(c)(2)(C), 10(d)(2). The Acts prohibit officers of those agencies from wearing facial coverings in the performance of their duties, *see* No Secret Police Act § 3, require officers who are not in uniform to visibly display identification, *see* No Vigilantes Act § 10, and direct the agencies to adopt written policies on the use of facial coverings and identification, *see* No Secret Police Act § 2; *see also* No Vigilantes Act § 2. Governor Newsom called both laws a "direct response"[6] to recent immigration enforcement activities in California.

### The No Secret Police Act

35. The No Secret Police Act (Senate Bill 627), which was signed into law on September 20, 2025 and takes effect on January 1, 2026, bans certain law enforcement officers from "wear[ing] a facial covering that conceals or obscures their facial identity in the

---

[4] *See also* DEA Mission Statement, DEA, https://perma.cc/99W4-98GL.
[5] *See also* FBI, About, Mission and Priorities, https://www.fbi.gov/about/mission (last visited Nov. 14, 2025).
[6] Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*, TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8.

performance of their duties," No Secret Police Act § 3, and requires law enforcement agencies operating in California to maintain and publicly post a written policy on the use of facial coverings by July 1, 2026, *id.* § 2.

36. The law broadly defines facial covering to mean "any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the facial identity of an individual" but does not include translucent face shields, N95 or medical masks, head devices necessary for underwater use, motorcycle helmets, or eyewear necessary to protect from retinal weapons. *Id.* § 3.

37. For purposes of the policy requirement, "law enforcement agency" means any entity of a city, county, or other local agency that employs a peace officer[7]; any law enforcement agency of another state; or any federal law enforcement agency. *Id.* § 2(d)(2). This definition does not include any California State agency.

38. The policy must include a purpose statement affirming the agency's commitment to transparency, accountability, and public trust; a restriction on the use of facial coverings to specific, limited circumstances; and the principle that generalized and undifferentiated fear about officer safety shall not be sufficient to justify the use of facial coverings. *Id.* § 2(b)(1).

39. The policy must prohibit sworn personnel from using a facial covering when performing their duties, subject to "narrowly tailored exemptions" to include active undercover operations; tactical operations where protective gear is required for physical safety; applicable law governing occupational health and safety; protection of identity during prosecution; and applicable law governing reasonable accommodations. *Id.* § 2(b)(2)–(3).

40. The mask ban applies to any "law enforcement officer," meaning "a peace officer . . . employed by a city, county, or other local agency" and "any officer or agent of a federal law enforcement agency or any law enforcement agency of another state,"

---

[7] Under California law, peace officers are public servants who enforce the law and have arrest authority. *See* Cal. Penal Code § 830, *et seq.*

Complaint of the United States                    - 7 -

including any person acting on behalf of a federal or out-of-state law enforcement agency. *Id*. § 3(e). As with the policy requirement, that definition excludes California State officers. *See id*.

41. The mask ban's "narrowly tailored exemptions" include the exemptions identified above, *see supra* ¶ 39, as well as active Special Weapons and Tactics (SWAT) team duties. *Id*. § 3(c).

42. Willful and knowing violations of the mask ban are "punishable as an infraction or a misdemeanor." *Id*. § 3(d). Those criminal penalties do not apply to law enforcement officers whose agency maintains and publicly posts a written policy on the use of face coverings compliant with the Act. *Id*. § 3(f).

43. Any law enforcement officer who commits an assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution while wearing a facial covering in violation of the Act "shall not be entitled to assert any privilege or immunity for their tortious conduct against a claim of civil liability, and shall be liable to that individual for the greater of actual damages or statutory damages of not less than ten thousand dollars ($10,000), whichever is greater." *Id*. § 3(g).

**The No Vigilantes Act**

44. The No Vigilantes Act, which was also signed into law on September 20, 2025, and in relevant part takes effect on January 1, 2026, requires non-uniformed law enforcement officers operating in California to visibly display identification—which must include their agency and either a name or badge number, or both a name and badge number—when performing enforcement duties. No Vigilantes Act § 10.

45. The Act also requires law enforcement agencies operating in the State to maintain and publicly post a written policy on the visible identification of sworn personnel. *Id*. § 2.

46. The policy requirement applies to any law enforcement agency, department, or other entity of the state or any political subdivision thereof that employs a peace officer; any law enforcement agency of another state; and any federal law enforcement agency. *Id*.

Complaint of the United States                     - 8 -

SA-82

§ 2(c)(2).

47. The policy must include a purpose statement affirming the agency's commitment to transparency, accountability, and public trust, *see id.* § 2(a)(1), and "[a] list of narrowly tailored exemptions" that includes undercover officers; officers engaged in plainclothes operations working with specified state agencies or the federal equivalents of those state agencies; officers wearing personal protective equipment (PPE) that prevents display; and exigent circumstances, *id.* § 2(a)(3)(A)–(D). An exemption is also permitted when there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the officer. *Id.* § 2(a)(3)(E).

48. The identification requirement applies to peace officers under California law and any federal law enforcement officer engaged in enforcement duties, meaning "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes." *Id.* § 10(d)(1)–(2).

49. The identification requirement contains exceptions, including for active undercover operations or investigative activities; plainclothes operations undertaken for certain state agencies and their federal equivalents; operations requiring PPE that prevents display; exigent circumstances; and active SWAT or tactical team duties. *Id.* § 10(b)(1)–(5).

50. A willful and knowing violation of the identification requirement is punishable as a misdemeanor under California law. *Id.* § 10(c). Criminal penalties for not displaying identification do not apply to personnel of an agency that maintains a written policy compliant with the Act. *Id.* § 10(e).

**The United States Will Not Comply with Either Law**

51. Federal law enforcement agencies cannot and will not comply with the challenged Acts, which are unconstitutional and recklessly disregard officers' safety and federal operational needs.

52. Now is an extraordinarily dangerous time to serve in federal law enforcement.

Complaint of the United States                    - 9 -

SA-83

53. ICE officers alone "are facing a more than 1000% increase in assaults against them"[8] and "an 8,000% increase in death threats against them."[9] These threats are coming from rioters, illegal aliens, as well as "highly sophisticated gangs like Tren de Aragua and MS-13, criminal rings, murderers, and rapists."[10]

54. The threats to federal officers are serious and potentially deadly. They range from taunting, online doxxing, and stalking, to "vehicles being used as weapons towards" officers[11] and even bounties being "placed on their heads for their murders."[12]

55. For instance, during ICE enforcement actions, individuals can be heard threatening to doxx and find out who officers and their family members are and where they live.

56. There are even public websites that seek and publish personal information about ICE and other federal officers to harass and threaten them and their families.

57. Officers are therefore facing an intensely hostile environment that jeopardizes their safety and that of their families. Indeed, there have been multiple instances where ICE officers have been followed, and their families have been contacted and threatened by individuals who uncovered their personal information.[13]

58. In October, a Halloween display in Houston included "a mock execution ground" with figures depicting ICE agents hanging by their necks "from homemade gallows with zip ties in their pockets" and "surrounded by coffins [and] barbed wire."[14]

---

[8] Press Release, DHS, Despite 1000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections (Sep. 22, 2025), https://perma.cc/K3P9-K4H9 [hereinafter Press Release, 1,000% Increase in Assaults].

[9] Press Release, DHS, 8000% Increase in Death Threats Against DHS, ICE Law Enforcement as They Risk Their Lives to Remove the Worst of the Worst (Oct. 30, 2025), https://perma.cc/VXK9-MSBQ [hereinafter Press Release, 8000% Increase in Death Threats].

[10] *See* Press Release, 1,000% Increase in Assaults, *supra* note 8.

[11] *See id.*

[12] *See* Press Release, 8000% Increase in Death Threats, *supra* note 9.

[13] *See id.*; *see also* Press Release, DHS, DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (Oct. 9, 2025), https://perma.cc/86TM-H9ZE [hereinafter Press Release, DHS Condemns Dangerous Doxxing].

[14] Press Release, DHS Condemns Dangerous Doxxing, *supra* note 13.

Complaint of the United States                    - 10 -

SA-84

59. Also in October, an illegal alien was arrested by DHS "after he posted on TikTok in Spanish soliciting the murder of ICE agents."[15]

60. Some doxxing and harassment incidents in California have resulted in federal charges. A man was arrested in September for posting an ICE attorney's personal information online and urging others to harass her.[16] And three women were indicted by a federal grand jury that month for livestreaming their pursuit of an ICE agent to his home and then posting his home address on Instagram.[17]

61. Sadly, the violent rhetoric, doxxing, harassment, and threats have also led to direct violence against federal officers. Earlier this month, shots were fired at CBP agents while conducting immigration enforcement operations in Chicago.[18] And on September 24, a sniper fired indiscriminately at an ICE facility in Dallas, killing several detainees.[19] Bullet casings found at the scene read: "Anti-ICE."[20]

62. The Ninth Circuit in *Newsom v. Trump*, 141 F.4th 1032, 1041 (9th Cir. 2025) found that the violence against federal officers and attempts to impede federal law enforcement were so severe in Los Angeles to justify deploying the National Guard.

63. Given the personal threats and violence that agents face, federal law enforcement agencies allow their officers to choose whether to wear masks to protect their identities and provide an extra layer of security.

64. Denying federal agencies and officers that choice would chill federal law enforcement and deter applicants for law enforcement positions.

65. The challenged laws would also compromise federal agencies' operational effectiveness.

---

[15] *See* Press Release, 8000% Increase in Death Threats, *supra* note 9.

[16] *See* ICE, California man accused of doxxing ICE employee now in custody (Sep. 26, 2025), https://perma.cc/F9YE-EU73.

[17] Associated Press, *Federal prosecutors charge 3 activists with 'doxing' of ICE agent in Los Angeles*, PBS (Sep. 29, 2025 14:15 ET), https://perma.cc/55RN-PP5H; *see also* Press Release, DHS Condemns Dangerous Doxxing, *supra* note 13.

[18] Homeland Security (@DHSgov), X (Nov. 8, 2025, 14:27 ET), https://perma.cc/J35L-MJE3.

[19] *See* Press Release, DHS, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sep. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[20] *Id.*

Complaint of the United States                    - 11 -

SA-85

66. If federal agents were forced to comply with the challenged laws, the laws would thwart plainclothes surveillance—the whole point of which is not to reveal officers' identities to mitigate the risk of evasion by targets. The challenged provisions would also enable suspects to identify officers who may be involved in future enforcement actions, including undercover operations. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, masking is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent.

67. Finally, the threat of criminal liability for noncompliance will only further exacerbate the chilling effect of these laws.

68. The threat of prosecution is not merely hypothetical. Federal agencies will not comply with these unconstitutional and dangerous laws. As a result, individual officers face the risk of criminal prosecution by California officials: Representatives Nancy Pelosi and Kevin Mullin released an official statement declaring that "state and local authorities may arrest federal agents if they break California law" and federal officers will not have immunity.[21] And San Francisco District Attorney Brooke Jenkins said she was open to charging federal officers for violations of California law.[22]

69. California presumably would not have expressly included federal law enforcement in the Acts' coverage if the State intended otherwise.

70. Thus, the No Secret Police Act and No Vigilantes Act have the purpose and likely effect of impeding federal law enforcement in the State of California. Indeed, as the politicians that sponsored these laws made clear, undermining federal law enforcement of which they disapprove is the whole point.[23]

---

[21] Press Release, Congresswoman Nancy Pelosi, Pelosi, Mullin Statement on Reports of Planned Federal Immigration Operation in Bay Area (Oct. 22, 2025), https://perma.cc/FJX9-JY24.
[22] Heather Knight and Kellen Browning, *Pelosi Says Police May Arrest Federal Agents Who Violate California Law*, New York Times (Oct. 22, 2025), https://perma.cc/D2L5-3XVK.
[23] *See* Miranda Jeyaretnam, *supra* note 6; Press Release, Scott Wiener Representing Senate District 11, Governor Newsom Signs Senator Wiener's Ban On Extreme Masking By ICE & Other Law Enforcement (Sep. 20, 2025), https://perma.cc/W9LR-ZL84.

Complaint of the United States                                    - 12 -

SA-86

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE

### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

71.   Plaintiff hereby incorporates paragraphs 1 through 70 of the Complaint as if fully stated herein.

72.   Defendants' enforcement of the challenged provisions of the No Secret Police Act and the No Vigilantes Act constitutes unlawful regulation of the Federal Government.

73.   The No Secret Police Act purports to ban federal agents from wearing certain masks while performing their duties in California and subjects those agents to criminal liability for noncompliance.

74.   The No Vigilantes Act purports to require non-uniformed federal agents to display visible identification while performing their duties in California, and it, too, carries criminal penalties for noncompliance.

75.   The challenged laws also purport to require federal law enforcement agencies to issue a mask policy by July 1, 2026 and a visible identification policy by January 1, 2026.

76.   The No Secret Police Act and the No Vigilantes Act therefore purport to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine.

77.   The Federal Government would be harmed if forced to comply with either Act, and also faces harm from the real threat of criminal liability for noncompliance.

78.   Accordingly, the challenged laws are invalid under the Supremacy Clause and their application to the Federal Government should be preliminarily and permanently enjoined.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE

### (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

79.   Plaintiff hereby incorporates paragraphs 1 through 78 of the Complaint as if fully stated herein.

80.   The challenged provisions of the No Secret Police Act unlawfully discriminate against the Federal Government.

Complaint of the United States                      - 13 -

SA-87

81.   Those provisions apply to federal law enforcement officers and agencies but not California State officers or agencies.

82.   The challenged provisions therefore subject federal officers to unfavorable and uncooperative treatment as compared to their State counterparts in California.

83.   The No Secret Police Act thereby constitutes unlawful discrimination against the Federal Government in violation of the intergovernmental immunity doctrine.

84.   The Federal Government would be harmed if forced to comply with the Act, and also faces harm from the real threat of criminal liability for noncompliance.

85.   Accordingly, the challenged provisions of the No Secret Police Act are invalid under the Supremacy Clause and their application to the Federal Government should be preliminarily and permanently enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1.   That this Court enter a judgment declaring that the challenged provisions of the No Secret Police Act and the No Vigilantes Act violate the Supremacy Clause and are therefore invalid as applied to federal agencies and officers;

2.   That this Court issue preliminary and permanent injunctions that prohibit Defendants, as well as their successors, agents, and employees, from enforcing the challenged provisions of the No Secret Police Act and the No Vigilantes Act against federal agencies and officers;

3.   That this Court award the United States its costs and fees in this action; and

4.   That this Court award any other relief it deems just and proper.

DATED: November 17, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

Complaint of the United States                      - 14 -

SA-88

Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division

BILAL A. ESSAYLI
First Assistant U.S. Attorney
Central District of California

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/   Elisabeth J. Neylan*
ELISABETH J. NEYLAN (N.Y. Bar Reg. No. 6125736)
CRISTEN C. HANDLEY (MO Bar No. 69114)
Trial Attorneys
United States Department of Justice
Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 616-3519
Email: Elisabeth.J.Neylan@usdoj.gov

*Attorneys for the United States*

Complaint of the United States                    - 15 -

1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

### HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

THE UNITED STATES OF AMERICA,  )
                               )
                Plaintiff,     )
                               )
     v.                        )          Case No.
                               )   CV 25-10999 CAS (AJRx)
STATE OF CALIFORNIA, et al.,   )
                               )
                Defendants.    )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
WEDNESDAY, JANUARY 14, 2026
11:03 AM
LOS ANGELES, CALIFORNIA

_____

**MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
(951) 328-4414

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

UNITED STATES DEPARTMENT OF JUSTICE
BY:  TIBERIUS DAVIS
        Attorney at Law
950 Pennsylvania Avenue, Suite 400
Washington, DC  20530
(202) 514-4357

**FOR THE DEFENDANTS:**

CALIFORNIA DEPARTMENT OF JUSTICE
CIVIL RIGHTS ENFORCEMENT
BY:  CAMERON A. BELL
        Attorney at Law
300 South Spring Street, Suite 4200
Los Angeles, California  90013
(213) 269-6761

CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF CHILDREN'S JUSTICE
BY:  LEE I. SHERMAN
        Attorney at Law
300 South Spring Street, Suite 1702
Los Angeles, California  90013
(213) 269-6202

**FOR AMICUS PROSECUTORS ALLIANCE ACTION:**

ADAMS, DUERK & KAMENSTEIN, LLP
BY:  M. ANTHONY BROWN
        Attorney at Law
445 South Figueroa Street, Suite 2300
Los Angeles, California  90071
(213) 408-4085

**UNITED  STATES  DISTRICT  COURT**

SA-91

3

**APPEARANCES, CONTINUED:**

**FOR AMICUS ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA:**

    BIRD, MARELLA, RHOW, LINCENBERG, DROOKS & NESSIM, LLP
    BY:  ALEXANDER H. TRAN
    BY:  EMILY GRANT
       Attorneys at Law
    1875 Century Park East, 23rd Floor
    Los Angeles, California  90067
    (310) 201-2100

State of California changed the legislation to apply to all law enforcement officers -- the masking?

MR. DAVIS: I believe so, Your Honor.

THE COURT: Okay. Okay. All right. Let's move ahead, then.

I want to come back to your earlier argument regarding why facial covering is essential to the activities of the law enforcement officers. I think we both agree that prior to 2025, federal law enforcement officers did not wear facial covering or failed to identify themselves. And I gather you've -- do you agree with that?

MR. DAVIS: I don't know that that's completely true, Your Honor. I just think it was less common than it is now.

THE COURT: Okay. Let's assume that.

And I think -- if I understand your argument, it is that times have changed. And today, unlike way back in ancient history in 2025, officers need to wear masks because of the type of work that they're undertaking.

MR. DAVIS: I think our first-line position, Your Honor, is it doesn't really matter. They don't get to regulate the Federal Government and determine this. That's a policy choice that they might disagree with, but they didn't when the presidential election -- they don't get to make that choice for the Federal Government.

**UNITED STATES DISTRICT COURT**

30

THE COURT: I understand. I understand. I may not agree with you, but I understand that's your position.

MR. DAVIS: So as far as the change pre-2024 to 2025 -- and I'll note that California required everybody to be masked for a while and didn't think that that was a problem for officers and transparency.

But post-2025, the President ran on increased immigration enforcement in the interior. There's obviously been a massive increase in doing so. In states that have strong sanctuary city policies, like California, it's really hard for them to engage in that sort of immigration enforcement because they can't coordinate with local officers, they can't go do safer arrests or have notice of criminals in state prisons and jails, they can't go to courthouses where it's safer to arrest. And the lack of coordination with local police officers makes it much harder to do their job.

And so what they tend to have to do is more open public operations, targeted investigations, things like that. And when they do that, it creates a lot of strong responses in certain communities. I mean, as the *Newsom* opinion from the *National Guard* case acknowledged, there were some pretty serious riots and protests in response to that.

And a lot of these protesters who often wear masks will film, will harass, will dox officers, sometimes engage in violence. And so officers, in response to that -- again,

31

8,000 percent increase in death threats, 1,000 -- now 1300 percent increase in assaults. We have specific examples of officers who have been doxed online, have been followed home, have had their families yelled at by masked individuals who are a part of the public, have had people -- have death threats sent to their family members. There's been shootings at ICE officers, explicitly because they're ICE officers.

Just the other day in New York, there were chants of, "Save a life, kill an ICE." The rhetoric in the political circumstances and the violence roundness is much heightened.

And I also think it's important to note that they're -- some of their declarants talked about how this wasn't in existence before but acknowledge that there are some bases for wearing masks and things like that.

But they don't acknowledge the fact that there are now websites that are dedicated to doxing and finding and tracking ICE, that there is now much easier ways to do facial identification and use AI to do so. And I -- masking is not a complete answer to all of this, but for individual officers in normal operations it does reduce the risk of these sorts of doxing, harassing, and threatening things happening. And when they can't do that and in their discretion aren't allowed to do that, it deters them and chills them from engaging in their law enforcement.

There's also the evasion point. Again, as I noted,

32

there's a lot of websites and doxing where people actively track where ICE officers are going and tell people ahead of time to try to do that. And when they know who the officers are, they can track them even when they're not masked ahead of time and say, okay, they're going in this direction, I'm going to give a warning on this website or to people in the community I know. And it helps the people evade officers. Again, their own declarant is engaged in some of this conduct.

THE COURT: But your argument is somewhat belied by the fact that masking is discretionary among ICE agents. In other words, there's not a policy that says, "Thou shall" -- "must mask." It's left to the individual discretion of the ICE officers as to whether to wear a mask or not.

And my question to you is how in the world do those who don't mask manage to operate without a mask?

MR. DAVIS: I think a lot of them do mask in these operations. But I think the discretion is important, and it's discretion for federal officers in the federal agencies to make these policies, the same way that California state agencies like the Bureau of Investigations or Bureau of Firearms, which are directly analogous to the FBI and ATF, have their own policies and can make their own policies in their discretion.

I think it's because the circumstances matter. There are some operations where maybe it's not necessary to do that or they don't think it's as high risk. There are some

And even though we think the Texas case from the Fifth Circuit is wrong, there it was general historical trespass on Texas property. And that applied to private individuals, it applied to the Government.

This both in person and in scope and expressly directs -- regulates federal officers as federal officers. It doesn't apply to private individuals. And the masking one, again, doesn't even apply to California. So I think that's the real difference.

THE COURT: Yeah. But what do you say to the State's argument that California has laws that -- criminal laws as to doxing so that really is kind of a false concern on your part because, if someone truly violates the law in doxing someone, there are criminal sanctions.

MR. DAVIS: I don't think it's a false concern. There's still harm to the officers when they're victims of a crime, even if it gets prosecuted later. I think that actually flips on the head for California, that impersonating law enforcement officers is also a crime so they shouldn't be worried about that on the other end.

So I don't think that that takes away from the harms. Again, the Albarran declaration that I pointed to, the guy was followed home, his family and him harassed, ICE now has to provide surveillance to them.

The Vargas declaration for CBP says similar things

UNITED STATES DISTRICT COURT

SA-97

44

about having -- when people are doxed, that the agency has to expend valuable resources, responding to the threats and providing additional protections. And it also takes away from the operational effectiveness. Vargas says this at 21.

So, again, there are still harms from the doxing just because some of the things they do might be illegal. And some of the things they do are not illegal, like tracking ICE online and posting and, you know, helping people evade is not necessarily a crime under California law, if they're blowing whistles, if they're putting things online. But it still undermines our operational effectiveness.

And I'll just note that, when California was up here and they were talking about the incidental, they sort of glided over the fact that, yes, the Ninth Circuit case law doesn't support their standard. Again, in *City of Arcata*, in *Boeing,* those are the only direct regulation cases and those did not do that.

And if you look at *Newsom*, which is a contractor case and, therefore, is much narrower immunity than direct regulation, it says there's no de minimis exception to inter-governmental immunity. And that was talking in the context of the discrimination part, but it was more broadly worded as there's no de minimis exception to inter-governmental immunity full on.

And I think the other thing that they point to is

**UNITED STATES DISTRICT COURT**

SA-98

45

they try to say that this is common police power, like murder, assault, sort of typical crimes. But that's not the case. The only things that they point to are regulations of their own officers, which, of course, the states are allowed to do, and that they make it illegal for private individuals to impersonate law enforcement. But we don't challenge that. Notably, they don't point to any laws regulating federal officers as federal officers as this law does. And it does not regulate private individuals like the impersonating of officers.

So I think it's quite clear that this is not a general law. Its intent, its purpose expressly in the names of -- or in the scope of the law is targeting federal officers.

The findings of one of the laws -- I forget which one it is -- explicitly says this is about ICE and immigration enforcement. Governor Newsom in signing the law said that. Mr. Wiener said that.

So I think it's pretty clear that this is directed at ICE. And *King County* took those sorts of things into account too when the executive order there was directly targeting ICE and purposely done so.

THE COURT: Okay. Let me ask you this, though. If I were to find this to be a law of general application -- and you've touched on it -- federal officers, you would still have the ability to assert supremacy clause immunity, would they

UNITED STATES DISTRICT COURT

SA-99