No. 26-926

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
                          *Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA; GAVIN NEWSOM, *in his official capacity as Governor of California*; ROBERT BONTA, *in his official capacity as Attorney General of California*,
                          *Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the Central District of California

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................i

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION .....................................................3

STATEMENT OF THE ISSUES .........................................................4

STATEMENT...................................................................................4

SUMMARY OF ARGUMENT ...........................................................8

STANDARD OF REVIEW ...............................................................13

ARGUMENT...................................................................................13

I.      The federal government is likely to prevail on the merits............13

      A.     The No Vigilantes Act directly regulates the United States in violation of the intergovernmental immunity doctrine. ......................13

      B.     The district court's contrary conclusion, and California's contrary arguments, are incorrect.......................................................18

II.     The other injunction factors strongly favor the government.........34

CONCLUSION................................................................................40

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ............................................................. 36

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ............................................................. 35

*Blackburn v. United States*,
    100 F.3d 1426 (9th Cir. 1996) ............................................................. 13

*Boeing Co. v. Movassaghi*,
    768 F.3d 832 (9th Cir. 2014) ......................................................... 21, 22

*CoreCivic, Inc. v. Governor of New Jersey*,
    145 F.4th 315 (3d Cir. 2025) ......................................................... 21, 22

*Creech v. Idaho Comm'n of Pardons & Parole*,
    94 F.4th 851 (9th Cir. 2024) ............................................................... 13

*DHS v. Texas*,
    144 S. Ct. 715 (2024) ........................................................................ 27

*Ga. Latino Alliance for Human Rights v. Gov. of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) ........................................................... 36

*Geo Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) (en banc) ................................ 10, 14, 21, 22, 23

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) .......................................................................... 14

*Hancock v. Train*,
    426 U.S. 167 (1976) ..................................................................... 14, 23

*Hernandez v. Mesa*,
    589 U.S. 93 (2020) ........................................................................... 23

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ............................................................ 10, 23, 24, 25, 26

i

*Martin v. United States,*
    605 U.S. 395 (2025) ........................................................................ 23

*Mayo v. United States,*
    319 U.S. 441 (1943) ............................................................... 1, 13, 14

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ...................................................... 13

*National TPS Alliance v. Noem,*
    150 F.4th 1000 (9th Cir. 2025) ..................................................... 34

*New York v. United States,*
    505 U.S. 144 (1992) ...................................................................... 17

*North Dakota v. United States,*
    495 U.S. 423 (1990) ................................................................. 14, 16

*Ohio v. Thomas,*
    173 U.S. 276 (1899) .................................................................. 29-30

*Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ................................................. 35, 36

*State of Arizona v. State of California,*
    283 U.S. 423 (1931) ...................................................................... 15

*Texas v. DHS,*
    123 F.4th 186 (5th Cir. 2024) ................................................. 26, 27

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ............................................. 15, 21, 22

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2010) ......................... 10, 14, 20, 21, 33, 38

*Winter v. NRDC,*
    555 U.S. 7 (2008) .......................................................................... 13

## Statutes and Regulations

28 U.S.C. § 1292 ................................................................................ 3

28 U.S.C. § 1331 ................................................................................ 3

28 U.S.C. § 1345 ................................................................................ 3

8 C.F.R. § 287.8(c)(2)(iii)(A)-(B) ................................................................... 38

Cal. Penal Code § 19 ................................................................................... 5

No Vigilantes Act,
Senate Bill No. 805, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025) ................ *passim*

No Secret Police Act,
Senate Bill No. 627, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025) .........................6

**Other**

Lindsay Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*,
Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR ......................2

Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*,
TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8 .........................18

Vikram D. Amar, *How the Ninth Circuit's Recent Oral Argument Demonstrates California Will and Should Lose on SB 805 (the 'No Vigilantes Act')—and Why the Constitutional Doctrine Needs More Clarity*,
Justia, March 6, 2026, https://verdict.justia.com/2026/03/06/how-the-ninth-circuits-recent-oral-argument-demonstrates-california-will-and-should-lose-on-sb-805-the-no-vigilantes-act-and-why-the-constitutional-doctrine-needs ...........25

Press Release, California announces new online portal to report misconduct by federal agents,,
Cal. (Dec. 3, 2025), https://www.gov.ca.gov/2025/12/03/ californiaannounces-new-online-portal-to-report-misconduct-by-federal-agent/. ......................... 36, 37

U.S. Postal Service,
Employee & Labor Relations Manual, § 831.332(c). .........................................25

*Regulate*,
Black's Law Dictionary (12th ed. 2024). ..........................................................15

## INTRODUCTION

For more than 200 years, the Supreme Court has repeatedly held that, absent express congressional authorization, states have no authority to directly regulate the federal government. Without such authorization, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). That straightforward prohibition applies without exception, and is not subject to balancing tests, burden analysis, or any other qualification. *See id.* at 445 ("No other adjustment of competing enactments or legal principles is possible."). This principle is so clear—and has been emphatically stated so many times—that most of this Court's modern intergovernmental-immunity cases involve federal contractors and other non-federal parties, since the prohibition against regulation of the federal government itself is so well-established.

This case involves a straightforward application of that principle. At issue is a California law that purports to require any non-uniformed "federal law enforcement officer" to "visibly display identification," dictates the required contents of that identification, sets forth a comprehensive list of narrowly drawn exceptions to that requirement, and subjects federal officers who do not comply to criminal penalties. The statute further purports to require federal agencies to create and prominently post written policies that parrot the statute's requirements and its

specific exceptions, and provides a safe harbor from prosecution of federal officials if but only if federal agencies promulgate and post such a conforming policy.

The district court erroneously concluded that this law—and a second law that purports to prohibit federal law enforcement officials from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties," which the court enjoined only because it was discriminatory—did not constitute a direct regulation of the federal government. The district court reached this conclusion even as it acknowledged that the challenged provisions "dictate how a federal officer may carry out his law enforcement duties"; even though the statute's legislative findings declare the law is about the "federal government['s]" "broad immigration enforcement efforts in California"; even though the Governor called both laws a "direct response" to immigration enforcement activities in California; and, while he ultimately signed the bill anyway, even though the Governor acknowledged as to the facial-covering ban that "[i]t appears we don't have the legal authority for federal agents, but we do for other law enforcement authorities." Lindsey Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*, Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR.

The district court's analysis is indefensible and the United States is certain to prevail on the merits. But in addition, the remaining preliminary-injunction factors strongly favor the federal government. As this Court has made clear, irreparable

harm is presumed in this context. But even beyond that, the record reflects severe, persistent threats to federal agents that necessitate existing personal-identity protections, including bounties placed on federal officials by Mexican criminals and doxxing of federal agents. As the federal government also made clear in detailed declarations from four federal law enforcement agencies, operational considerations often require law enforcement officials to conceal their identities and federal agency affiliations, judgments California has no authority to regulate under state law. And in any event, it is wholly untenable to allow a state to threaten arrest and criminal prosecution of federal officials based on a disagreement with the federal government about how those officials should perform their federal duties. Moreover, although there is no state interest that could possibly justify refusing to enjoin California's facially invalid law, California's asserted interests in enforcing that law against the federal government are at best marginal. A preliminary injunction is plainly warranted.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. ER-67. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The district court issued its order denying a preliminary injunction in relevant part on February 9, 2026. ER-3 The United States timely appealed on February 17, 2026. ER-80; *see* Fed. R. App. P. 4(a)(1)(B).

3

**STATEMENT OF THE ISSUES**

1. Whether the No Vigilantes Act—which requires any non-uniformed "federal law enforcement officer" to "visibly display identification" "when performing their enforcement duties," subject to narrowly drawn exceptions specified by the State and backed by criminal penalties—directly regulates the United States in violation of the Supremacy Clause and intergovernmental immunity doctrine.

2. Whether the United States established the equitable requirements for injunctive relief.

**STATEMENT**

**1.** This case concerns two California statutes enacted last fall, the No Vigilantes Act (California Senate Bill 805) and the No Secret Police Act (California Senate Bill 627). Both Acts took effect on January 1, 2026, but California agreed to stay enforcement of the laws against federal law enforcement agencies and officers until the district court ruled on the United States' motion for a preliminary injunction. ER-4.

**a.** The No Vigilantes Act purports to require non-uniformed law enforcement officers—defined to include "any federal law enforcement officer," No Vigilantes Act § 10(d)(2)—to conspicuously display identification (which must include the officer's agency and either a name or badge number, or both) "when performing

4

their enforcement duties." *Id.* § 10(a). The identification requirement contains certain exceptions, including for "[a]n officer wearing personal protective equipment that prevents display," *id.* § 10(b)(3), "[a]n officer engaged in protective operations involving elected officials, judicial officers, or other designated dignitaries where the display of identification would compromise the safety, anonymity, or tactical effectiveness of the protection detail," *id.* § 10(b)(6), and plainclothes operations for certain California agencies and their federal equivalents (which would not include any of the federal law enforcement agencies discussed below), *id.* § 10(b)(2). The law also exempts "[a]n officer engaged in active undercover operations or investigative activities," and "[a]n officer assigned to Special Weapons and Tactics (SWAT) or tactical team units and actively performing their SWAT or tactical team responsibilities," *id.* § 10(b)(1), (5), but does not define any of these terms. An exemption is also permitted for "[e]xigent circumstances, involving an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence." *Id.* § 10(b)(4). A willful and knowing violation of the identification requirement is criminally punishable as a misdemeanor, unless the employing agency has issued a written policy in accordance with a separate provision of the Act. *Id.* § 10(c), (e).[1]

---

[1] Under California law, misdemeanors are punishable by up to six months' imprisonment in county jail, a $1,000 fine, or both. Cal. Penal Code § 19.

That provision, Section 2 of the Act, purports to require law enforcement agencies operating in the State—again, expressly including "[a]ny federal law enforcement agency, *id.* § 2(c)(2)(C)—to maintain and publicly post a written policy on identification of "sworn personnel" by January 1, 2026, *id.* § 2(a). The policy must include a purpose statement affirming the agency's commitment to transparency, accountability, and public trust, *see id.* § 2(a)(1), and "[a] list of narrowly tailored exemptions" that mirrors Section 10's enumerated exceptions, *id.* § 2(a)(3)(A)–(E). The statute allows members of the public, as well as oversight and local governmental bodies, to challenge an agency's written policy, first by complaining to the agency and then, if the complaints are not addressed to its satisfaction, to institute an action in California state court. *Id.* § 2(b).

**b.** The No Secret Police Act bans law enforcement officers from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties" in California, again with certain limited exceptions. No Secret Police Act § 3(a). Willful and knowing violations of the mask ban are "punishable as an infraction or a misdemeanor," *id.* § 3(d), again subject to an exception if the federal government has issued a policy mirroring California's requirement, *id.* § 3(f). The facial-covering ban purports to apply to federal law enforcement officials but does not apply to California state officials.

6

**2.** In this litigation, as relevant here, the United States moved for a preliminary injunction against the provisions discussed above as applied to the federal government. The district court denied an injunction against the identification-display requirements and granted an injunction as to the facial-covering ban.

After rejecting certain of the State's threshold arguments in relevant part, the district court acknowledged that States are prohibited from directly regulating the federal government but held that for direct regulation to exist the United States must show that "the law itself obstructs the federal government's operations." ER-16. The district court held that, "[a]lthough the challenged provisions dictate how a federal officer may carry out his law enforcement duties," "the United States has not met its burden to show that enforcement of the challenged provisions . . . would interfere with or take control of federal law enforcement operations." ER-17. In particular, in the district court's view "[t]he United States has not shown that its current practices with respect to masking and identification are essential to federal law enforcement operations such that state regulations in those areas seek to interfere with or control federal law enforcement functions." ER-18.

The court thus declined to enjoin the identification provision on that basis. It held that the United States was likely to succeed in its challenge to the facial-covering ban because, although the district court believed that ban fell within the State's regulatory authority, it discriminates against the federal government because

it does not apply to state officials. ER-22-25. The court held that the equitable factors supported an injunction of the facial-covering ban, but not the identification requirements, largely based on its assessment of the merits. ER-25-32.

The district court stayed its order for ten days, and the United States noticed this appeal and asked the district court to grant a temporary injunction pending the United States' appeal, which the district court denied. Dist. Ct. Dkt. 69. This Court granted a temporary administrative injunction while it considered the federal government's motion for an injunction pending appeal. That motion has been fully briefed and argued.

## SUMMARY OF ARGUMENT

The district court erred in denying a preliminary injunction against the No Vigilantes Act.

I.     The United States is likely (indeed, certain) to prevail on the merits.

A.     The Supreme Court for more than two centuries has repeatedly stated that, absent express Congressional authorization, states have no authority to directly regulate the federal government. This is an absolute rule, unqualified by burden analysis, balancing tests, and other case-specific factors. Under that settled framework, the No Vigilantes Act is invalid as applied to the federal government, its agencies, and officers. The Act regulates the United States directly—it requires federal officers to display identification when conducting law enforcement activities,

8

sets forth the required contents of that identification, prescribes an exhaustive and narrow list of exceptions to that requirement of the State's choosing, and backs those requirements with criminal penalties. It also purports to direct federal law enforcement agencies to promulgate and prominently post identification policies, and purports to require the federal government in those policies to parrot the specific prohibitions and exceptions of the Act. California did all this based on its express and high-profile disagreement with how the federal government was conducting law enforcement operations in California—as the statute's legislative findings and the Governor expressly stated. Even the district court acknowledged that "the challenged provisions dictate how a federal officer may carry out his law enforcement duties." ER-17.

B. The district court's contrary analysis—and California's contrary arguments—do not withstand even minimal scrutiny. The district court held and California contends that the federal government must make a fact-specific showing that a state regulation is unduly burdensome for intergovernmental immunity to apply. That is wrong. States are categorically prohibited from directly regulating the federal government. That prohibition applies even if the federal government could comply with the state regulation with ease—and indeed, as this Court has held, even if the state simply bans the federal government from engaging in conduct that federal

9

law already prohibits. *See United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010).

None of the cases on which California and the district court rely conflicts with these settled principles. California and the district court stress cases involving regulation of federal contractors and other non-federal entities. But it is well established that "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (en banc). Indeed, *every single one* of the cases the district court cited dealing with federal contractors and other non-federal entities made clear that the analysis would have been fundamentally different if the federal government itself had been the subject of the regulation. California has also previously relied on cases involving congressional consent to state regulation, and the incorporation of state law into federal law, all of which are obviously inapt.

Finally, California, like the district court, has relied heavily on dicta from a 1920 case in which the Supreme Court stated that States might have authority to apply "general rules that might affect incidentally the mode of carrying out the employment" to the federal government "when the United States has not spoken" on the matter. *Johnson v. Maryland*, 254 U.S. 51, 56 (1920). That potential exception plainly should not be allowed to swallow the rule; indeed, in the 106 years since,

10

neither the Supreme Court nor this Court has relied on that decision to uphold any state regulation of federal officials' performance of their official duties. The Supreme Court's comment—which it made in the course of *rejecting* a state's effort to require federal postal workers to obtain a Maryland driver's license—likely refers to circumstances in which the federal government itself requires its employees to comply with state laws, such as routine traffic laws. But whatever the parameters of this possible exception might be, it obviously does not apply here. California's law is not a "general rule" that applies to everyone (like a speed limit) and merely sweeps in the federal government by happenstance. It is a law that applies to the federal government expressly, and imposes requirements that intentionally attach to (and only to) the performance of inherently governmental functions.

In any event, the United States readily satisfied even the district court's erroneous burden requirement. The United States submitted detailed declarations from four different law enforcement agencies explaining persistent violence, threats, and similar hostile acts to federal officers that necessitate existing personal-identity protections, as well as operational considerations that under various circumstances require federal officials to conceal their name and affiliation with federal law enforcement. The district court's only response to the first set of concerns—that violence, threats, and similar hostile acts against law enforcement officials are illegal—is a non-sequitur. And as to the second, the district court vaguely gestured

11

towards the law's exceptions. But the law expressly applies to law enforcement officers who are not in uniform, so those exceptions are plainly inadequate to protect all plainclothes operations, even if they were much clearer and thus provided clear mechanisms for federal officers to avoid the potential for criminal liability. And in all events, the United States cannot be required to clear its operations with California, or attempt to anticipate how an overzealous prosecutor or state law enforcement officer might interpret vague statutory language with deliberately undefined terms.

II.     The remaining preliminary-injunction factors overwhelmingly favor the United States. This Court has repeatedly held that irreparable harm is presumed when a plaintiff demonstrates a constitutional violation, and from a Supremacy Clause violation specifically. And the irreparable harm is particularly obvious here, where California asserts a right to arrest and prosecute federal officials based on California's policy disagreements with how they perform their official duties—and where, as the district court acknowledged, federal officials face a credible threat of prosecution. California's asserted countervailing interests—based primarily on a handful of alleged incidents where individuals illegally impersonated federal officers that would not necessarily be effectively addressed by this law anyway—is plainly not a basis for allowing California's facially invalid law to go into effect.

**STANDARD OF REVIEW**

This Court reviews the denial of a preliminary injunction for abuse of discretion, but reviews de novo the underlying issues of law. *Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851, 854 (9th Cir. 2024).

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). All of those factors support the United States here.

**I.     The federal government is likely to prevail on the merits.**

**A.     The No Vigilantes Act directly regulates the United States in violation of the intergovernmental immunity doctrine.**

The Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819). Accordingly, "states may not directly regulate the Federal Government's operations." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). Countless Supreme Court and Ninth Circuit precedents repeat this prohibition. *See,*

13

*e.g.*, *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (state law invalid "if it regulates the United States directly"); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."); *Hancock v. Train*, 426 U.S. 167, 179 (1976) (stating that "where Congress does not affirmatively declare its instrumentalities or property subject to regulation, the federal function must be left free of regulation" (quotation marks omitted)); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc).

Those cases establish that this prohibition is absolute unless Congress expressly authorizes otherwise (something no one contends here). Courts cannot apply balancing tests or ask how great the intrusions on federal operations are; "[n]o other adjustment of competing enactments or legal principles is possible." *Mayo*, 319 U.S. at 445. States cannot control federal operations even if state regulation would not meaningfully impair federal functions—and indeed, even if it would simply replicate federal requirements. *See United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010) ("A state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law."); *see also id.* at 992 ("[T]here is no exception to the doctrine of intergovernmental immunity for state statutes consistent with federal

14

law."). And as this Court has recognized (in discussing state laws that discriminate against the federal government), there is no "de minimis exception to the doctrine of intergovernmental immunity." *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019). Simply put, "[t]he United States may perform its functions without conforming to the police regulations of a state." *State of Arizona v. State of California*, 283 U.S. 423, 451 (1931). So clear are these principles that neither California nor the district court identified any case where a State was authorized to prescribe how federal officers carry out their official duties or otherwise directly regulate the federal government.

That settled framework makes this the easiest of cases. There can be no serious dispute that the No Vigilantes Act directly regulates the federal government. *See Regulate*, Black's Law Dictionary (12th ed. 2024) (defining "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules"). Indeed, the statute sets forth a detailed regulatory scheme. The No Vigilantes Act requires "any federal law enforcement officer," *see* No Vigilantes Act § 10(d)(2), who is not uniformed, when "performing their enforcement duties," to "visibly display identification," *id.* § 10(a), dictates the required contents of that identification, sets forth what purports to be a comprehensive list of narrowly drawn exceptions to that requirement, *id.* § 10(b)(1)-(6), and subjects federal officers who do not comply with the requirements to criminal penalties, *id.* § 10(c), (e). And that regulation is "direct";

15

it applies to the federal government and its employees, not merely to third parties who interface with the federal government. *North Dakota*, 495 U.S. at 436 ("There is no claim in this case, nor could there be, that North Dakota regulates the Federal Government directly … Both the reporting requirement and the labeling regulation operate against suppliers, not the Government…").

The exception to the criminal prohibition if the federal government has promulgated and publicly posted a written policy on display of identification, if anything, makes the intergovernmental-immunity problem even worse. For starters, the policy provision is not merely a safe harbor. It is a command to the federal government. The statute provides that, beginning January 1, 2026, "a law enforcement agency operating in California," expressly defined to include federal law enforcement agencies, "shall maintain and publicly post a written policy on the visible identification of sworn personnel." No Vigilantes Act § 2(a). And the policy must include a purpose statement affirming the agency's commitment to transparency, accountability, and public trust, *see id.* § 2(a)(1), and "[a] list of narrowly tailored exemptions" that mirrors the statute's substantive provision, *id.* § 2(a)(3)(A)-(E).

Telling the federal government it must promulgate and publicly post a specific written policy with content dictated by the state is obviously direct regulation. Indeed, not even the federal government has authority to require the states "'to enact

and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). A state no less obviously—indeed, even more obviously—lacks authority to require the federal government to enact and implement a state regulatory program; after all, the Supremacy Clause renders federal law supreme over state law and not the other way around.

The fact that no direct enforcement of the requirement to create a new federal policy is possible may mean, as the district court held, that the federal government lacks standing to challenge this requirement independently. But here, the policy requirement is intertwined with the identification requirements: violations of the identification requirement are criminally punishable, unless the relevant federal agency has issued a written policy that complies with the Act. No Vigilantes Act § 10(e). In other words, California is threatening federal officials with prosecution for performing their duties consistent with federal instructions, unless the federal government adopts and posts a written policy to the state's specifications. As the district court recognized with regard to the prohibition on masks, an injunction against the criminal provision redresses the government's injury. But the state command to create a new policy—and the ostensible need to create a new policy to protect federal officers from state prosecutions—underscores the invalidity of California's effort to criminalize the performance of federal functions by federal

17

officers in a manner inconsistent with the State's policies. And the fact that complying with California's criminal law requires a change in law enforcement policy underscores the impermissible intrusion into the federal government's operations.

Finally, although no inquiry into the State's purpose is needed—since the No Vigilantes Act constitutes direct regulation on its face and the prohibition against direct regulation is absolute—the express purpose of the law and the broader context makes clear that California in fact intended to regulate the federal government. The legislative findings declare the law is about the "federal government['s]" "broad immigration enforcement efforts in California" that sometimes involve "the absence of visible names, officer identification number, or other individually identifying information, the failure to be clearly and conspicuously identifiable as federal law enforcement." No Vigilantes Act § 1(a)–(b). And California's Governor called both laws a "direct response" to immigration enforcement activities in California.[2]

### B. The district court's contrary conclusion, and California's contrary arguments, are incorrect.

**1.** The district court nonetheless denied a preliminary injunction as to the identification provisions and it held that *both* these provisions and the masking ban were within the state's regulatory authority. The district court correctly noted that

---

[2] *See* Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*, TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8.

"the challenged provisions dictate how a federal officer may carry out his law enforcement duties." ER-17. That should have been the end of the analysis. But notwithstanding this acknowledgment, the court concluded that state requirements and prohibitions simply do not count as direct regulation of the federal government unless they *prevent* the federal government from carrying out its operations. That supposed requirement was likely not met here, according to the district court, because the United States did not show "that its current practices with respect to masking and identification are essential to federal law enforcement operations such that state regulations in those areas seek to interfere with or control federal law enforcement functions." ER-18; *see also* ER-19-20 (acknowledging "that there may be situations where masking or concealing identification is reasonable or even essential to federal operations" but opining that "[t]he United States has not identified any situation where a violation of the challenged provisions may be both reasonable and not exempted under the Acts").

All of this is plainly incorrect. The prohibition on direct state regulation of the federal government is absolute, and when it is triggered the state law is invalid without regard to burden analysis or balancing tests. When regulation expressly targets the federal government itself, that regulation is necessarily "direct" and thus forbidden; the existence of a direct regulation (which is all that is required for the federal government to be immune from that regulation) is distinct from the burdens

19

associated with that regulation. And the Supreme Court would obviously not have repeatedly announced a per se rule against direct state regulation if what it had in mind was fact-bound inquiries in every case about the burdens of the direct state regulation. Thus, in *Arcata*, for example, this Court invalidated a city ordinance that purported to prohibit military recruiters from recruiting minors. The Court did not probe whether it was "necessary" for the military to recruit minors or how inconvenient local regulation would be—a question that, presumably, would have required a court to conduct a fact-bound inquiry about the law's effect on military recruitment and in turn on military readiness. Nor did it make any difference to the Court whether the city ordinance merely mirrored federal law, because any "local law that directly regulates" the federal government "is invalid, even if it is no more restrictive than federal law." *Arcata*, 629 F.3d at 991-92; *see also id.* at 992 ("[T]here is no exception to the doctrine of intergovernmental immunity for state statutes consistent with federal law.").

It also makes no difference if, as the district court contended, the regulation at issue here would be within the State's police power if it were not imposed on federal officers. *See* ER-16 (purporting to distinguish *Arcata* on the grounds that "the challenged provisions, restricting law enforcement officers in California from wearing masks indiscriminately and requiring visible identification, are within the state's police powers"). That will generally be the case in intergovernmental-

immunity cases. State police powers are broad, and the problem arises not because certain types of conduct are outside the purview of what states are permitted to regulate, but rather because regulation that would be permissible if applied to a private party is not permissible if it regulates the federal government. The district court's faulty analysis of *Arcata* illustrates the point. The conduct the law in *Arcata* purported to prohibit obviously fell within the state's police powers in the sense that regulating communications to minors—especially commercial and job-related communications—is within a state's police power. But the particular restriction nonetheless fell outside the state's police powers because it regulated the federal government: "regulating the federal government's military recruitment efforts is not a power reserved to the states." 629 F.3d at 992. The same is true here: regulating federal law enforcement officers is not a power reserved to the states

**2.** In asserting otherwise, California and the district court have stressed three types of cases, each of which is obviously inapt.

**a.** First, the district court and California have relied on cases involving federal *contractors* and other contexts where regulations are not treated as directly regulating federal operations. *See, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022); *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025); *United States v. California*, 921 F.3d 865 (9th Cir. 2019); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839-40 (9th Cir. 2014). But "[p]rivate contractors do not stand on the

same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *GEO Grp.*, 50 F.4th at 750. Indeed, "a critical distinction exists between a state regulation like the one in [*Johnson v. Maryland*], which was applied to a federal employee, and [a state law] which only applies to private contractors." *Id.* at 755.

These cases are not just distinguishable—they *confirm* that direct regulation of federal operations is always impermissible. The entire point of this line of cases is that states can (sometimes but not always) regulate the activities of contractors and other non-federal entities only because the federal government is not the subject of the regulation. Indeed, every single one of the cases on which the district court and California have relied make this point, usually quite expressly. *Geo Grp.*, 50 F.4th at 755 ("The scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality."); *Core Civic*, 145 F.4th at 321 (noting that even New Jersey conceded that its law would be invalid if, like this law, it applied to the federal government itself: "New Jersey contends that a law regulates the federal government directly only if the law's text applies to it."); *California*, 921 F.3d at 880 (no direct regulation in that case because challenged law was "directed at the conduct of *employers*, not the United States or its agents, and no federal activity is regulated"); *Boeing*, 768 F.3d at 839 (noting that "California argues that Boeing must 'stand in

22

the government's shoes' in order to assert immunity from state regulation"). Even Judges of this Court who have opined that particular state regulations of federal contractors are permissible have acknowledged that the same regulation would be impermissible if applied to the federal government directly. *See Geo Grp., Inc.*, 50 F.4th at 765 n.2 (Murguia, J., dissenting) (challenged state law "directly regulates only federal contractors, not the federal government itself").

*Second*, California has relied on cases allowing state regulation where Congress has by statute expressly authorized such regulation. In *Hancock*, for example, the Supreme Court acknowledged that states could regulate the amount of pollutants a federal installation may discharge because the Clean Air Act authorized such state regulation. 426 U.S. at 180-81. Similarly, claims based on state tort law proceed because "Congress has entered the field and expressly bound the federal government to accept liability under state tort law on the same terms as a 'private individual.'" *Martin v. United States*, 605 U.S. 395, 412 (2025) (quoting 28 U.S.C. § 2674); *see also Hernandez v. Mesa*, 589 U.S. 93, 111 (2020) (discussing Federal Tort Claims Act). There is no argument here that Congress has expressly authorized the requirements in the No Vigilantes Act to be applied to the federal government— and indeed, California has never suggested that Congress has done so.

*Third*, the district court, apparently invoking the Supreme Court's decision in *Johnson v. State of Maryland*, 254 U.S. 51 (1920), found the state enactments at

23

issue here "analogous to traffic laws that, in a similar sense, dictate how a federal officer may operate a vehicle on state roads but are nonetheless enforceable against federal officers, subject to immunities." ER-17-18. In *Johnson*, the Supreme Court held that a State may not require a Post Office employee to obtain a license from the State because the federal government alone can determine the qualifications of its own officers. *Id.* at 55. In the course of its analysis, the Court suggested that federal officers might be subject to "general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920).

To our knowledge, this dictum has not been relied upon by the Supreme Court or this Court in the 106 years since to permit a state to regulate federal employees engaged in the performance of federal functions. The Court's offhand observation that such state laws might in some circumstances apply to federal employees—and the Court did not even take a definitive view on that point, *see* 254 U.S. at 56 ("[I]t very well may be…")—appears to simply reflect circumstances where the federal government itself expects its employees to comply with local laws. *Johnson* stated that such state authority, if it existed at all, would apply only "when the United States

has not spoken." 254 U.S. at 56.[3] In practice, the issue does not come up because the federal government generally instructs federal officials to follow local traffic law. *See, e.g.*, U.S. Postal Service, Employee & Labor Relations Manual, § 831.332(c). And even in the absence of an express federal direction to that effect, the Supreme Court may have envisioned some circumstances where it is reasonable to presume that the federal government expected its employees to do so (such as with local traffic laws). But beyond that, *Johnson* itself makes clear that it did not mean to create any gaping exception to the general rule that states cannot regulate federal officers carrying out federal functions. As noted, *Johnson* held that a state could not validly apply even routine requirements to obtain a driver's license to postal drivers. And the Court there noted that "even the most unquestionable and most universally applicable of state laws"—including state murder laws—"will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson*, 254 U.S. at 56-57; *see also Ohio v. Thomas,* 173 U.S. 276, 283 (1899) ("[W]hen discharging [their] duties under federal

---

[3] *See also* Vikram D. Amar, *How the Ninth Circuit's Recent Oral Argument Demonstrates California Will and Should Lose on SB 805 (the 'No Vigilantes Act')—and Why the Constitutional Doctrine Needs More Clarity*, Justia, March 6, 2026 (discussing *Johnson* and explaining that even traffic laws may be constitutionally applied to federal officers in their performance of official duties only "*if the federal government assents*"), *available at* https://verdict.justia.com/2026/03/06/how-the-ninth-circuits-recent-oral-argument-demonstrates-california-will-and-should-lose-on-sb-805-the-no-vigilantes-act-and-why-the-constitutional-doctrine-needs.

authority pursuant to and by virtue of valid federal laws, [federal officers] are not subject to arrest or other liability under the laws of the state in which their duties are performed.").

In any event, the precise reasons that federal drivers generally obey local traffic laws have no bearing on the dispute before this Court because the No Vigilantes Act is plainly not a "general" law that only "incidentally" affects the carrying out of federal employment. A "general" law, like a speed limit or a "a statute or ordinance regulating the mode of turning at the corners of streets," *Johnson*, 254 U.S. at 56, is a rule that applies to everyone, and that regulates conduct engaged in by the general public. That is what "general" means and what *Johnson* made clear it meant. And such a rule "incidentally" affects federal employment when it does so by happenstance, precisely because it applies to conduct engaged in by private, state, and federal actors alike. Section 10 of the No Vigilantes Act is obviously not such a law. It applies expressly to "federal law enforcement officers." And it purports to regulate an inherently governmental function—it applies solely to "law enforcement officers" and only "when performing their enforcement duties." No Vigilantes Act § 10(a). Neither *Johnson* nor any other case from the Supreme Court, this Court, or any other court remotely suggests that such a law is valid.

Finally, California has also previously relied on the Fifth Circuit's divided panel decision in *Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024), holding that the APA

26

waived sovereign immunity for a suit seeking to enjoin the government's cutting of concertina wire fence that Texas placed along its border with Mexico, based on state tort claims for conversion and trespass to chattels. That decision was incorrect—indeed, the Supreme Court vacated a previous injunction in that case the only time the issues were presented to that Court. *See DHS v. Texas*, 144 S. Ct. 715 (2024).[4] In any event, it too does not support California's position here. The Fifth Circuit's faulty analysis rested principally on its view that Texas was "seeking, not to 'regulate' Border Patrol, but only to safeguard its own property." *Texas*, 123 F.4th at 192; *id.* at 205 ("Texas is acting as a proprietor, not a regulator."). That is not the case here because there is no property interest involved. And in addition, the Fifth Circuit's analysis otherwise rested heavily on its conclusion—based on a factual finding by the district court to which the Fifth Circuit deferred—that federal officials were not in fact enforcing federal law in cutting the concertina wire. 123 F.4th at 207 (stating that "agents were 'cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland'"). By contrast, no one disputes here that ICE and other federal agencies are in fact engaged in law enforcement in California. Indeed, the identification requirement applies to

---

[4] After the change in Administration, the United States decided not to seek further review of the Fifth Circuit decision relied on by California.

federal officials only "when performing their enforcement duties." No Vigilantes Act § 10(a).[5]

**3.** This case only underscores why there is no basis for turning an absolute rule against direct state regulation of the federal government into a fact-bound analysis in every case of the asserted burdens of the state regulation. The district court expressed its opinion "that the presence of masked and unidentifiable individuals, including law enforcement, is more likely to heighten the sense of insecurity for all." ER-18-19. The court doubted that federal officers really need to withhold their identities, reasoning that federal agencies do not explicitly require masking or withholding identification in all situations. ER-19. And, in its equities discussion, the court praised California's laws as "serv[ing] the public interest by promoting transparency which is essential for accountability and public trust" and found "no cognizable justification for law enforcement officers to conceal their identities during their performance of routine, non-exempted law enforcement functions and interactions with the general public." ER-31.

―――――――――――――――――

[5] For similar reasons, the district court was wrong to suggest that immunity defenses in response to individual prosecutions would be sufficient. ER-20. If the validity of the No Vigilantes Act's application to federal officers depended on how it was applied, case-specific immunity defenses might be appropriate and sufficient. But here, the No Vigilantes Act is facially invalid insofar as it encompasses federal officials because it is a direct regulation of the federal government. And for all the reasons discussed in this brief, the threat of arrest and prosecution impose harm on the United States even if an individual officer ultimately mounts a successful immunity defense.

Those statements defeat the whole point of the intergovernmental immunity doctrine: a State cannot substitute its own judgment for the United States' about how federal officials should perform their duties. And the district court's approach is untenable on its face. It would mean that all 50 states could directly regulate federal operations on a limitless range of subjects—*e.g.*, the weapons agents carry, when they can use them, uniform requirements, use of K9 teams, investigative practices, as well as an even broader range of non-law-enforcement areas—subject to fact-bound assessments of whether the regulation substantially burdens federal operations (putting aside that several of the district court's points are not even really factual assessments but, rather, subjective value judgments). California has not previously denied this and simply asserted that if the federal government made a sufficient showing of burden in a particular case, the immunity analysis "could very well" be different. Opp'n to Motion for Injunction Pending Appeal at 24. And California has gone even further, suggesting that even some direct state regulation that concededly does impose substantial burdens on the federal government might be permissible if, in a court's judgment, the state's interests in applying its regulation are more compelling. *Id.* at 28. That is not the law.

And indeed, even on the district court's own terms, its analysis was mistaken. The district court held that the United States has a "burden to show that enforcement of the challenged provisions . . . would interfere with . . . federal law enforcement

29

operations." ER-17. There is no such burden, but in any event the federal government easily surmounted it.

As ICE's declarant explained, "enforc[ing]" the challenged provisions against DHS "would create significant obstacles to [ICE Enforcement and Removal Operations'] (ERO) ability to safely and effectively enforce federal laws in the State of California." ER-38. That is because "[p]rotecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes." ER-39; *see also* ER-46-47 (similar as to U.S. Customs and Border Protection (CBP)); ER-55-56 (similar as to Federal Bureau of Investigation (FBI)); ER-61-62 (similar as to the Drug Enforcement Administration (DEA)).

As to officer safety, "DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system," with $2,000 offered for gathering intelligence or doxxing agents, $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE and CBP officers/agents, and up to $50,000 for the assassination of high-ranking officials. ER-39-40. "[I]mmigration activists and other members of the public[] routinely photograph, film, and publish online ICE ERO enforcement actions to include" officers' personal identities and then post the interactions online for the sole purpose

of harassing government officials. ER-39. "During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as 'doxx these people,' 'find out who they are and where they live,' and 'we will find out who you are and who your family members are.'" ER-39. Protestors follow officers to their hotels and post their hotel locations online. ER-40-41. Doxxing is encouraged across the Internet, and activists who find out officers' identities continue on to search for those officers' family members and their homes. ER-41. Activists have similarly doxxed, harassed, and assaulted CBP officials. *See* ER-48-49. FBI Special Agents across the country have likewise been targeted for harm, including harassment, assault, and murder. ER-55.

The district court acknowledged that the United States' declarations "cite increases in threats and assaults against federal officers and detail specific incidents of federal officers suffering such harms," and stated that it did "not discount these real harms that impact federal officers." ER-18. But it reasoned that "these harms are the result of criminal behavior" and so "[a] rule that prohibits law enforcement officers from wearing masks or requires them to have visible identification does not facilitate or enable criminals to harm law enforcement officers." ER-18.

This assertion fails on multiple levels. For one, California's principal asserted interest purportedly justifying the identification display requirements—bad actors impersonating federal officers—is *also* the result of criminal behavior. In any event,

31

the fact that these harms are the result of criminal behavior is a non-sequitur. As ICE's declaration explained—reflecting common sense—"protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats." ER-41. And the district court's contention that requiring visible identification does not as a practical matter "enable" criminals to harm law enforcement officers (even if that is not the intent of the law) is a non-starter; of course it does. Even identifying officers as federal agents, apart from the requirement to identify them individually, makes them a target for these nefarious efforts.

As for operational considerations, "ICE routinely conducts investigations and surveillance in plainclothes to locate and apprehend illegal aliens, particularly in public courts or community areas where targets may attempt to evade detection" and a requirement to wear identification would obviously "compromise operational security by alerting targets to the presence of law enforcement and increasing the likelihood of flight." ER-44. And "[t]he visible identification requirement would therefore undermine ICE's ability to apprehend even those individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves." ER-44. Similarly, the FBI engages in "surveillance [that] hinges on an investigator's ability to remain undetected or unidentified." ER-56. And "most DEA investigations require Special

Agents to conduct surveillance and meet with confidential informants, and their ability to do so safely depends on not being identified as law enforcement." ER-61.

The district court observed that the No Vigilantes Act exempts active undercover operations or investigative activities. ER-6; ER-19-20. But to the extent the district court was suggesting that the state will exercise discretion responsibly in applying the No Vigilantes Act, a regulator's "promise of self-restraint does not affect [the court's] consideration of the ordinance's validity." *Arcata*, 629 F.3d at 992. And that aside, California does not define these (or many other) terms, and it is at best doubtful that the law exempts all or even most plainclothes operations. The No Vigilantes Act sets a baseline rule that "[a] law enforcement officer operating in California that is not uniformed . . . shall visibly display identification." No Vigilantes Act § 10(a). That rule would be meaningless if all officers engaged in plainclothes operations—that is, operations during which the officer is "not uniformed"—were exempt. In addition, the No Vigilantes Act contains express exemptions for certain plainclothes operations but only for certain specialized California agencies and their federal equivalents (which would not include ICE, CBP, DEA, or the FBI). No Vigilantes Act § 10(b)(2). Those exemptions, too, would make no sense if they were capacious enough to capture every plainclothes operation. At an absolute minimum, federal officials relying on their own interpretation of the exceptions would run the risk of criminal penalties if they turned

out to be wrong. The federal government does not have to clear undercover or other operations with California lest some zealous prosecutor later decide the exceptions were not met.

Concealing identification also assists in law enforcement operations because of the numerous activists in California who blow whistles or otherwise alert potential targets to the presence of law enforcement, a pattern of behavior the district court acknowledged. ER-19. But in contrast to its analysis of safety considerations, the district court dismissed this argument because it viewed such activities as *legal* (on the ground that alerting targets to the presence of law enforcement and related activities are protected by the First Amendment). ER-19. Even if that is correct—and it is likely at least not *categorically* correct—the mere fact that it would be lawful for members of the public to disseminate information does not mean that the government is compelled to provide the information in the first place. And as noted, none of this matters anyway because California lacks authority to directly regulate the federal government regardless of the perceived necessity and prudence of the federal practices at issue. The federal government will succeed on the merits.

## II.    The other injunction factors strongly favor the government.

Under this Court's sliding-scale approach to the preliminary-injunction factors, "a stronger showing of one element may offset a weaker showing of another." *National TPS Alliance v. Noem*, 150 F.4th 1000, 1016 (9th Cir. 2025)

(quotation marks omitted). Because the United States is certain, not merely likely, to prevail on the merits, a lesser showing is required for the remaining factors. But those factors decisively favor the United States as well.

Irreparable harm necessarily results from the enforcement of a preempted state law. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on Supremacy Clause violation); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("[T]he first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."). The district court correctly held that, as to the facial-covering ban, the United States' likelihood of success was sufficient to presume irreparable harm. ER-25. Similarly, since the identification requirements are invalid, that alone suffices to show irreparable harm.

But that is not all. Although the district court was wrong to require an interference with federal functions, the challenged requirements here would, for all the reasons given above, substantially hamper federal operations in California as well as endanger the lives and well-being of federal officers and their families. *See supra* pp. 30-31. On top of that, federal officers face a credible threat of prosecution—as even the district court recognized. ER-10. That independently qualifies as irreparable harm. *See Ga. Latino Alliance for Human Rights v. Gov. of*

*Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) (likelihood of irreparable harm because plaintiffs were "under the threat of state prosecution for crimes that conflict with federal law"); *accord Valle Del Sol*, 732 F.3d at 1029. It is difficult to imagine a more obvious sovereign irreparable harm than a state criminally prosecuting federal officials based on a policy disagreement with the federal government about how the federal government conducts law enforcement operations and mitigates threats to officer safety.

The balance of equities and the public interest likewise favor the United States. Because the challenged laws are invalid under the Supremacy Clause, they are not in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (public interest represented by "the Constitution's declaration that federal law is to be supreme"). But in addition, the challenged provisions are not just legally baseless—they are irresponsible and dangerous. By seeking to directly regulate the United States and criminally prosecute its officials based on the performance of their official duties, California has set up a direct conflict between state and federal authority. And indeed, shortly after the United States filed its motion for a preliminary injunction, California established an online portal soliciting information from the public "regarding potentially unlawful activity

36

by federal agents and officers across [California]."[6] The portal is explicitly intended to "help the California Department of Justice create a record of potential unlawful conduct by federal agents, and inform possible legal actions the state may take."

These statements, along with the challenged laws themselves, raise the serious possibility that California intends to have its state law enforcement pursue federal law enforcement officials, including by attempting to make arrests of federal officials and to criminally prosecute them. Although California has been coy about its future plans, it has pointedly refused to disclaim such intentions at every point in this litigation to date. And as discussed above, the statute was based on disagreement with the federal government's operations, as Section 1 of the Act states expressly, and the Governor has repeated. *See supra* p. 18. The public interest—and the rule of law—strongly support enjoining California's obviously unconstitutional law before California escalates the situation further.

These considerations make it unnecessary to consider California's asserted countervailing interests. Simply put, no reasonable analysis of the equitable factors can permit a state to enforce a facially invalid statute that purports to directly regulate the United States through criminal prosecutions of federal officials, all based on the

---

[6] See Press Release, California announces new online portal to report misconduct by federal agents, Cal. (Dec. 3, 2025), https://www.gov.ca.gov/2025/12/03/californiaannounces-new-online-portal-to-report-misconduct-by-federal-agent/.

state's policy disagreement with the federal government. In any event, California's asserted interests are marginal.

The statute's legislative findings state that "[s]everal news outlets have reported incidents of individuals impersonating federal law enforcement officers to harass or detain others." No Vigilantes Act § 1(e). But for starters, the No Vigilantes Act does not apply merely when law enforcement makes arrests and detentions (it applies to all law enforcement). And federal officials can, and often will, provide proof of their law enforcement status when making arrests and detentions, thereby conveying that targets may not lawfully resist. Indeed, as California has previously noted, federal regulations already require that, when making immigration arrests, the designated immigration officer must, "as soon as it is practical and safe to do so," "[i]dentify himself or herself as an immigration officer who is authorized to execute an arrest" and "[s]tate that the person is under arrest and the reason for the arrest," 8 C.F.R. § 287.8(c)(2)(iii)(A)-(B).

Of course, state regulation is invalid even if it is consistent with federal regulation. *Arcata*, 629 F.3d at 991-92. And the relevant point is that decisions about when federal law enforcement officers should or should not identify themselves is a question for the federal government. But at the very least, California cannot credibly claim that it has a substantial interest in enforcing its law based on a desire to prevent false arrests by people pretending to be federal officials, when its law applies to all

law enforcement activities (not just arrests) and where, as to that subset of activities, federal practices already largely accommodate California's professed concerns.

In addition, as even California acknowledges, Section 10 of the No Vigilantes Act contains exceptions. So even if the federal government decided to comply with the statute and make its best guess about how California prosecutors might interpret those vague exceptions, members of the public will not necessarily know whether non-uniformed individuals who do not display identification are in fact law enforcement officials. And of course, those already intent on breaking the law by impersonating federal officers can easily wear fake badges.

Again, however, the Supremacy Clause itself determines where the public interest lies. The question in this case is not whether or under what circumstances federal law enforcement officers should visibly display identification. The question is *who decides* when and how federal officers must identify themselves. And there can only be one answer to that question.

**CONCLUSION**

This Court should reverse the district court's order denying a preliminary injunction and direct entry of a preliminary injunction enjoining Section 10 of the No Vigilantes Act against the United States, federal agencies, and federal officials.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *andrew.bernie@usdoj.gov*

March 2026

**ADDENDUM**

**TABLE OF CONTENTS**

No Vigilantes Act (excerpts),
        Senate Bill No. 805, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025)................A1

No Secret Police Act (excerpts),
        Senate Bill No. 627, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025)................A6

**No Vigilantes Act**

**California Senate Bill No. 805**

\*\*\*

SECTION 1. The Legislature finds and declares all of the following:

(a) The federal government has launched broad immigration enforcement efforts in California, deploying personnel from various federal agencies.

(b) The increasing use of face coverings, the absence of visible names, officer identification number, or other individually identifying information, the failure to be clearly and conspicuously identifiable as federal law enforcement, or the use of unmarked vehicles during enforcement activities has raised concerns for public safety.

(c) Both the individuals involved and onlookers have reported confusion and fear that they were experiencing or witnessing a crime.

(d) In a widely reported incident, when two plain-clothed federal officers wearing masks tackled a woman on the sidewalk and forcibly placed her in an unmarked vehicle, the woman's family called 911 to report a kidnapping.

(e) Several news outlets have reported incidents of individuals impersonating federal law enforcement officers to harass or detain others, which undermines public trust in law enforcement, especially among vulnerable individuals.

(f) Charges filed against individuals include kidnapping and impersonating a police officer after allegedly detaining a group of Latino men, impersonating an officer on a university campus, and impersonating an officer in connection with the sexual assault of a woman while threatening her with deportation.

(g) While the federal government has publicly condemned impersonations, the use of face coverings and lack of consistent, visible personal and agency identification are making it difficult for individuals and state and local law enforcement to distinguish between authorized personnel and bad actors.

(h) The state has both the authority and responsibility, under its police powers, to maintain order and protect the safety and well-being of all people within its jurisdiction.

(i) In order to carry out this duty effectively, the state has the authority to establish identification requirements for law enforcement operating within the state so that the public and its agents can distinguish between individuals who are exercising law enforcement authority and those who are not, particularly in situations where a person is engaging in potentially unlawful behavior.

(j) Therefore, the state has a compelling interest in identifying and verifying who is and who is not validly claiming or operating under law enforcement authority within the state.

SEC. 2. Chapter 17.45 (commencing with Section 7288) is added to Division 7 of Title 1 of the Government Code, to read:

CHAPTER 17.45. LAW ENFORCEMENT POLICIES

7288. (a) By January 1, 2026, a law enforcement agency operating in California shall maintain and publicly post a written policy on the visible identification of sworn personnel. The policy shall include, at minimum, the following:

(1) A purpose statement affirming the agency's commitment to both of the following:

(A) Transparency, accountability, and public trust.

(B) Restricting situations in which sworn personnel do not visibly display identification to specific, clearly defined, and limited circumstances.

(2) A requirement that all sworn personnel visibly display identification that includes their agency and either a name or badge number, or both name and badge number, when performing enforcement duties.

(3) A list of narrowly tailored exemptions for the following:

(A) Officers engaged in active undercover operations or investigative activities.

(B) An officer engaged in plainclothes operations who is employed within the California Business, Consumer Services, and Housing Agency, California Health and Human Services Agency, California Labor and Workforce Development Agency, California Natural Resources Agency, California Department of

A2

Corrections and Rehabilitation, California Transportation Agency, California Environmental Protection Agency, California Government Operations Agency, or within any department, board, commission, or other entity in those agencies or the federal equivalents of these state agencies.

(C) Officers wearing personal protective equipment that prevents display.

(D) Exigent circumstances, involving an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence, including if the officer is responding to those circumstances while off-duty.

(E) When there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the peace officer.

(b) A policy adopted pursuant to this section shall be deemed consistent with Section 13654 of the Penal Code unless a verified written challenge to its legality is submitted to the head of the agency by a member of the public, an oversight body, or a local governing authority, at which time the agency shall be afforded 90 days to correct any deficiencies in the policy. If, after 90 days, the agency has failed to adequately address the complaint, the complaining party may proceed to a court of competent jurisdiction for a judicial determination of the agency's exemption provided by subdivision (e) of Section 13654 of the Penal Code. The agency and its employees' exemptions shall remain in effect unless a court rules the agency's policy is not in compliance with subdivision (e) of Section 13564 of the Penal Code, and all potential appeals to higher courts have been exhausted by the agency.

(c) For purpose of this section, the following terms have the following meanings:

(1) "Enforcement duties" means active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes.

(2) "Law enforcement agency" means all of the following:

(A) Any law enforcement agency, department, or other entity of the state or any political subdivision thereof, that employs any peace officer described in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code.

(B) Any law enforcement agency of another state.

A3

(C) Any federal law enforcement agency.

(3) "Visibly display identification" means to wear externally on the uniform in a size and location such as to be reasonably visible to member of the public with whom the officer interacts.

***

SEC. 10. Section 13654 is added to the Penal Code, to read:

13654. (a) A law enforcement officer operating in California that is not uniformed, and therefore is not required to clearly display identification pursuant to Section 830.10, shall visibly display identification that includes their agency and either a name or badge number or both name and badge number when performing their enforcement duties, unless expressly exempt under subdivision (b).

(b) This section does not apply to any of the following:

(1) An officer engaged in active undercover operations or investigative activities.

(2) An officer engaged in plainclothes operations who is employed within the California Business, Consumer Services, and Housing Agency, California Health and Human Services Agency, California Labor and Workforce Development Agency, California Natural Resources Agency, California Department of Corrections and Rehabilitation, California Transportation Agency, California Environmental Protection Agency, California Government Operations Agency, or within any department, board, commission, or other entity in those agencies or the federal equivalents of these state agencies.

(3) An officer wearing personal protective equipment that prevents display.

(4) Exigent circumstances, involving an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence, including if the officer is responding to those circumstances while off-duty.

(5) An officer assigned to Special Weapons and Tactics (SWAT) or tactical team units and actively performing their SWAT or tactical team responsibilities.

A4

(6) An officer engaged in protective operations involving elected officials, judicial officers, or other designated dignitaries where the display of identification would compromise the safety, anonymity, or tactical effectiveness of the protection detail.

(c) A willful and knowing violation of this section is punishable as a misdemeanor.

(d) For the purposes of this section, the following terms have the following meanings:

(1) "Enforcement duties" means active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes.

(2) "Law enforcement officer" means a peace officer as defined in Section 830, and any federal law enforcement officer.

(e) This section, and the penalties established herein, shall not apply to any law enforcement agency, or its personnel, if that agency maintains and publicly posts a written policy pursuant to Section 7288 of the Government Code.

A5

**No Secret Police Act**

**California Senate Bill No. 627**

\*\*\*

SECTION 1. The Legislature finds and declares all of the following:

(a) That the routine use of facial coverings by law enforcement officers has significant implications for public perception, officer-community interactions, and accountability.

(b) Whether intended or not, members of the public may experience fear or intimidation when approached by officers whose faces are obscured. This perception can heighten defensive behaviors and unnecessarily escalate situations.

(c) Facial coverings limit the visibility of facial expressions, which are essential components of nonverbal communication. In high-stress or emotionally charged interactions, the inability to read an officer's expression may lead to misinterpretation of tone or intent, increasing the risk of conflict escalation.

(d) The visibility of an officer's face is vital for promoting transparency, facilitating communication, and building trust between law enforcement agencies and the communities they serve.

(e) When officers are not readily identifiable, it increases the risk of impersonation by unauthorized individuals, which further undermines public trust, endangers public safety, and hinders legitimate law enforcement operations.

(f) The use of facial coverings by law enforcement should not obscure officer identity or hinder accountability, nor should those coverings be used in a manner that enables or conceals discriminatory or unlawful conduct.

SEC. 2. Chapter 17.45 (commencing with Section 7289) is added to Division 7 of Title 1 of the Government Code, to read:

CHAPTER 17.45. LAW ENFORCEMENT POLICIES

7289. (a) By July 1, 2026, a law enforcement agency operating in California shall maintain and publicly post a written policy regarding the use of facial coverings.

A6

(b) The policy shall include, but not be limited to, each of the following:

(1) A purpose statement affirming the agency's commitment to all of the following:

(A) Transparency, accountability, and public trust.

(B) Restricting the use of facial coverings to specific, clearly defined, and limited circumstances.

(C) The principle that generalized and undifferentiated fear and apprehension about officer safety shall not be sufficient to justify the use of facial coverings.

(2) A requirement that all sworn personnel not use a facial covering when performing their duties.

(3) A list of narrowly tailored exemptions for the following:

(A) Active undercover operations or assignments authorized by supervising personnel or court order.

(B) Tactical operations where protective gear is required for physical safety.

(C) Applicable law governing occupational health and safety.

(D) Protection of identity during prosecution.

(E) Applicable law governing reasonable accommodations.

(4) Opaque facial coverings shall only be used when no other reasonable alternative exists and the necessity is documented.

(5) Pursuant to the policy, a supervisor shall not knowingly allow a peace officer under their supervision to violate state law or agency policy limiting the use of a facial covering.

(c) A policy adopted pursuant to this section shall be deemed consistent with Section 185.5 of the Penal Code unless a verified written challenge to its legality is submitted to the head of the agency by a member of the public, an oversight body, or a local governing authority, at which time the agency shall be afforded 90 days

A7

to correct any deficiencies in the policy. If, after 90 days, the agency has failed to adequately address the complaint, the complaining party may proceed to a court of competent jurisdiction for a judicial determination of the agency's exemption pursuant to subdivision (f) of Section 185.5 of the Penal Code. The agency's policy and its employees' exemptions shall remain in effect unless a court rules the agency's policy is not in compliance with subdivision (f) of Section 185.5 of the Penal Code and all potential appeals to higher courts have been exhausted by the agency.

(d) For the purposes of this section, the following terms have the following meanings:

(1) "Facial covering" has the same meaning as in subdivision (b) of Section 185.5 of the Penal Code.

(2) "Law enforcement agency" means any of the following:

(A) Any entity of a city, county, or other local agency, that employs a peace officer described in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code.

(B) Any law enforcement agency of another state.

(C) Any federal law enforcement agency.

SEC. 3. Section 185.5 is added to the Penal Code, to read:

185.5. (a) A law enforcement officer shall not wear a facial covering that conceals or obscures their facial identity in the performance of their duties, except as expressly authorized in this section.

(b) (1) For purposes of this section, "facial covering" means any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the facial identity of an individual, including, but not limited to, a balaclava, tactical mask, gator, ski mask, and any similar type of facial covering or face-shielding item.

(2) A "facial covering" does not include any of the following:

A8

(A) A translucent face shield or clear mask that does not conceal the wearer's facial identity and is used in compliance with the employing agency's policy and procedures in Section 7289 of the Government Code.

(B) A N95 medical mask or surgical mask to protect against transmission of disease or infection or any other mask, helmet, or device, including, but not limited to, air-purifying respirators, full or half masks, or self-contained breathing apparatus necessary to protect against exposure to any toxin, gas, smoke, inclement weather, or any other hazardous or harmful environmental condition.

(C) A mask, helmet, or device, including, but not limited to, a self-contained breathing apparatus, necessary for underwater use.

(D) A motorcycle helmet when worn by an officer utilizing a motorcycle or other vehicle that requires a helmet for safe operations while in the performance of their duties.

(E) Eyewear necessary to protect from the use of retinal weapons, including, but not limited to, lasers.

(c) This section does not apply to either of the following:

(1) An officer subject to one or more of the exemptions set forth in paragraph (3) of subdivision (b) of Section 7289 of the Government Code.

(2) An officer assigned to Special Weapons and Tactics (SWAT) team units while actively performing their SWAT responsibilities.

(d) A willful and knowing violation of this section is punishable as an infraction or a misdemeanor.

(e) For the purposes of this section, "law enforcement officer" means a peace officer, as defined in Section 830, employed by a city, county, or other local agency as well as any officer or agent of a federal law enforcement agency or any law enforcement agency of another state or any person acting on behalf of a federal law enforcement agency or law enforcement agency of another state.

(f) The criminal penalties in this section shall not apply to any law enforcement officer if they were acting in their capacity as an employee of the agency and the

A9

agency maintains and publicly posts, no later than July 1, 2026, a written policy pursuant to Section 7289 of the Government Code.

(g) Notwithstanding any other law, any person who is found to have committed an assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution, while wearing a facial covering in a knowing and willful violation of this section shall not be entitled to assert any privilege or immunity for their tortious conduct against a claim of civil liability, and shall be liable to that individual for the greater of actual damages or statutory damages of not less than ten thousand dollars ($10,000), whichever is greater.

\*\*\*

A10

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1(a) because it contains 8,928 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman font.

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE