No. 26-926

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA, *et al*.,
*Defendants-Appellees*.

## On Appeal from the United States District Court
## for the Central District of California
No. 25-cv-10999
The Honorable Christina A. Snyder

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
  *Senior Assistant*
  *Attorneys General*
JOSHUA A. KLEIN
  *Supervising Deputy*
  *Solicitor General*
ANNA FERRARI
LEE I. SHERMAN
  *Supervising Deputy*
  *Attorneys General*

MICA L. MOORE
  *Deputy Solicitor General*
KRISTI A. HUGHES
ZELDA VASSAR
ASHA ALBUQUERQUE
ALYSSA ZHANG
CAMERON A. BELL
  *Deputy Attorneys General*
ZACHARY W. SORENSON
  *Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
(213) 269-6138
mica.moore@doj.ca.gov
*Attorneys for Defendants-Appellees*

April 21, 2026

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................... 1

Jurisdictional statement................................................................................... 3

Statement of the case...................................................................................... 3

    A.    Factual background ......................................................................... 3

    B.    Procedural history......................................................................... 10

Summary of argument.................................................................................... 12

Argument....................................................................................................... 14

I.    The federal government has not shown a likelihood of success on the merits ..................................................................................................... 14

    A.    Even where Congress has not spoken, the Supremacy Clause forbids States from discriminating against or impermissibly burdening the federal government....................................................... 14

    B.    SB 805 does not discriminate against federal officers, or impermissibly burden them............................................................. 19

    C.    Congressional silence does not create an automatic immunity from state law for federal officers................................................. 27

II.    The remaining equitable factors do not support a preliminary injunction .................................................................................................. 37

Conclusion .................................................................................................... 41

# TABLE OF AUTHORITIES

**Page**

CASES

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ...................................................................14, 38

*Am. Ass'n of Univ. Professors v. Rubio*
802 F. Supp. 3d 120 (D. Mass. 2025) ..............................................................8

*Askins v. U.S. Dep't of Homeland Sec.*
899 F.3d 1035 (9th Cir. 2018) ........................................................................24

*Babaria v. Blinken*
87 F.4th 963 (9th Cir. 2023) ...........................................................................14

*Blackburn v. United States*
100 F.3d 1426 (9th Cir. 1996) ........................................................................18

*Boeing Co. v. Movassaghi*
768 F.3d 832 (9th Cir. 2014) ..........................................................................19

*Cal. Redev. Ass'n v. Matosantos*
53 Cal. 4th 231 (2011) ....................................................................................26

*Case of Richard Curtis*
168 Eng. Rep. 67 (Crown 1757) .......................................................................4

*Clifton v. Cox*
549 F.2d 722 (9th Cir. 1977) ...........................................................18, 21, 34

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) ..........................................................................39

*Colorado v. Symes*
286 U.S. 510 (1932).................................................................17, 27, 34, 39

*CoreCivic, Inc. v. Governor of New Jersey*
145 F.4th 315 (3d Cir. 2025) ..........................................................................30

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ctr. for Competitive Pol. v. Harris*
784 F.3d 1307 (9th Cir. 2015) ..............................................................15

*Davis v. Mich. Dep't of Treasury*
489 U.S. 803 (1989)..............................................................................15

*Doe v. Reed*
561 U.S. 186 (2010)..............................................................................20

*Escobar Molina v. U.S. Dep't of Homeland Sec.*
2025 WL 3465518 (D.D.C. Dec. 2, 2025)...............................................8

*GEO Grp., Inc. v. Newsom*
50 F.4th 745 (9th Cir. 2022) ...............................................18, 21, 30

*GEO Grp., Inc. v. Inslee*
151 F.4th 1107 (9th Cir. 2025) ....................................................30, 31

*Graves v. New York ex rel. O'Keefe*
306 U.S. 466 (1939)..............................................................................17

*Hancock v. Train*
426 U.S. 167 (1976)........................................................................*passim*

*Hernandez v. Mesa*
589 U.S. 93 (2020)...............................................................17, 31, 32

*Idaho v. Horiuchi*
253 F.3d 359 (9th Cir. 2001) ........................................................17, 39

*In re Neagle*
135 U.S. 1 (1890)..................................................................................35

*Johnson v. Maryland*
254 U.S. 51 (1920).........................................................................*passim*

*M'Culloch v. Maryland*
17 U.S. 316 (1819).........................................................................15, 16

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Maryland v. King*
567 U.S. 1301 (2012)................................................................................39

*Mayo v. United States*
319 U.S. 441 (1943)...........................................................................28, 29

*McMahon v. Presidential Airways, Inc.*
502 F.3d 1331 (11th Cir. 2007) ..............................................................31

*Morgan v. California*
743 F.2d 728 (9th Cir. 1984) ...................................................................12

*Nieves v. Bartlett*
587 U.S. 391 (2019)..................................................................................23

*North Dakota v. United States*
495 U.S. 423 (1990)............................................................................15, 30

*Project Veritas v. Schmidt*
125 F.4th 929 (9th Cir. 2025) ..................................................................26

*Puente Arizona v. Arpaio*
821 F.3d 1098 (9th Cir. 2016) .................................................................20

*Semayne's Case*
77 Eng. Rep. 194 (K.B. 1604) ...................................................................4

*Slocum v. Mayberry*
15 U.S. 1 (1817)........................................................................................32

*Smith v. Marsh*
194 F.3d 1045 (9th Cir. 1999) .................................................................25

*Teal v. Felton*
53 U.S. 284 (1851)....................................................................................32

*Texas v. U.S. Dep't of Homeland Sec.*
123 F.4th 186 (5th Cir. 2024) ............................................................36, 37

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States ex rel. Drury v. Lewis*
200 U.S. 1 (1906).................................................................18, 35

*United States v. California*
921 F.3d 865 (9th Cir. 2019) .......................................28, 38

*United States v. City of Arcata*
629 F.3d 986 (9th Cir. 2010) .......................................16, 29

*United States v. Fresno Cnty.*
429 U.S. 452 (1977)....................................................15

*United States v. Hart*
26 F. Cas. 193 (C.C.D. Pa. 1817) ...............................16, 17

*United States v. Salerno*
481 U.S. 739 (1987).....................................................20

*United States v. Washington*
596 U.S. 832 (2022).................................................*passim*

*United States v. Williams*
553 U.S. 285 (2008).....................................................23

*Valle del Sol, Inc. v. Whiting*
732 F.3d 1006 (9th Cir. 2013) .......................................38

*Wheeldin v. Wheeler*
373 U.S. 647 (1963).....................................................32

*Wilson v. Arkansas*
514 U.S. 927 (1995)......................................................4

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)........................................................38

*Wolford v. Lopez*
116 F.4th 959 (9th Cir. 2024) .......................................14

# TABLE OF AUTHORITIES
## (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Article VI, cl. 2 .................................................................................14

**FEDERAL STATUTES**

United States Code, Title 28
  § 1442(a)(1) ................................................................................18, 35

**STATE STATUTES**

2025 Cal. Stat. ch. 126 (Senate Bill No. 805)
  § 1(b)........................................................................................................7
  § 1(c) ........................................................................................................7
  § 11............................................................................................................27

Cal. Gov. Code
  § 7288(a) .............................................................................................9, 25
  § 7288(a)(3)(E) ...................................................................................9, 26
  § 7289..................................................................................................10

Cal. Penal Code
  § 185.5(a) ..............................................................................................10
  § 185.5(c) ..............................................................................................10
  § 185.5(d) ..............................................................................................10
  § 185.5(e) ..............................................................................................10
  § 185.5(f)...............................................................................................10
  § 538d......................................................................................................5
  § 538d(f).................................................................................................10
  § 830.1......................................................................................................5
  § 830.10....................................................................................................5
  § 13653(a) .............................................................................................10
  § 13654(a) ...................................................................................*passim*
  § 13654(b).............................................................................2, 9, 20, 23
  § 13654(c).........................................................................................2, 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

§ 13654(d)(1) ........................................................................1, 9, 19, 23

§ 13654(e) ................................................................................2, 10, 25

Cal. Vehicle Code

§ 2800.1(a)(3) ...............................................................................5

§ 2800.1(a)(4) ...............................................................................5

## REGULATIONS

Code of Federal Regulations, Title 8

§ 287.8(c)(2)(iii) .......................................................................6, 22

## OTHER AUTHORITIES

65 Ops.Cal.Atty.Gen. 631 (1982) ...................................................5

*Book of General Laws and Liberties Concerning the Inhabitants of
Massachusetts* (1648), perma.cc/3PJ9-ECN6 .......................................4

City of San Bernardino, Press Release (Aug. 16, 2025),
https://www.sanbernardino.gov/m/newsflash/Home/Detail/630 ........................7

Findell et al., *The White House Marching Orders That Sparked the
L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025),
tinyurl.com/9yf9vte2.................................................................6

Frias, *Federal Agents Open Fire At Family Truck in San Bernardino*,
NBC L.A. (Aug. 16, 2025), tinyurl.com/45da48jy.................................7

Fuentes et al., *Viral Video Shows Mother Arrested by ICE at SFO*,
ABC News (Mar. 23, 2026), tinyurl.com/42sn9mfh.........................39

Goldman, *Fake ICE Agent Robs 2 People in N.J., Cops Say* (Jan. 28,
2026), tinyurl.com/mva8j49m .......................................................8

vii

# TABLE OF AUTHORITIES
## (continued)

**Page**

Judicial Council of California, Criminal Model Jury Instructions
(2025 ed.) ..................................................................................................5

Letter from Sen. Tillis to Secretary Noem (Feb. 2, 2026),
perma.cc/87WY-58BZ................................................................................8

Levin, *DOJ Cases Against Protesters Keep Collapsing as Officers'
Lies Are Exposed in Court*, The Guardian (Feb. 21, 2026),
tinyurl.com/4ntkz62z ...............................................................................21

Mejia, *'Amateur Hour at the U.S. Attorney's Office': L.A. Prosecutors
Face More Losses in Protest Cases*, L.A. Times (Apr. 6, 2026),
tinyurl.com/ynjy4bpj.................................................................................21

*Minutes of the Common Council of the City of New York*, 1784-1831
(Dec. 28 1807), perma.cc/8G75-XWRS......................................................4

Olivares, *Trump Administration Sets Quota to Arrest 3,000 People a
Day in Anti-Immigration Agenda*, The Guardian (May 29, 2025),
tinyurl.com/3xxbzxmp .................................................................................6

Tucker, *Man Accused of Impersonating ICE Officer, Sexually
Assaulting Woman at Raleigh Motel*, WBTV (Jan. 29, 2025),
tinyurl.com/3js5suc6..................................................................................8

U.S. Marshals Service, *The Badge and Other Forms of Identification*,
perma.cc/L58K-NY88 .................................................................................4

**INTRODUCTION**

In 2025, federal officers engaged in law enforcement activities unlike any in recent history. To satisfy demanding arrest quotas, officers conducted roving patrols across the country, often while dressed in plain clothes, driving in unmarked vehicles, and failing to display any form of identification. The widespread use of unidentified plainclothes agents has led to incidents where individuals were unable to distinguish legitimate law enforcement officers from criminals, putting both public and officer safety at risk. It has facilitated a rise in criminal impersonations, as documented by the FBI. And it represents a severe departure from established norms of accountability and transparency that have guided state and federal law enforcement for years.

The State enacted SB 805 to prevent impersonations and ensure that members of the public can identify law enforcement officers. The statute requires peace officers at every level of government to "visibly display identification," including "their agency" and "*either* a name *or* badge number." Cal. Penal Code § 13654(a) (emphasis added). The visible-identification requirement applies only when officers are engaged in "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes." *Id.* § 13654(d)(1). The statute also includes numerous exceptions that accommodate circumstances where it may be appropriate—or even necessary—for law

1

enforcement officers to conceal their identities, such as exceptions for officers "engaged in active undercover operations" or "investigative activities," and for "[e]xigent circumstances." *Id.* § 13654(b). Although willful and knowing violations of the statute can be prosecuted as misdemeanors, *see id.* § 13654(c), officers are shielded from liability if their agency "maintains and publicly posts a written policy" that incorporates the visible-identification requirement, *id.* § 13654(e).

The district court correctly denied a preliminary injunction. The federal government argues that it is "likely (indeed, certain) to prevail on the merits" of its challenge to SB 805, because in its view the Supremacy Clause categorically prohibits the application of state law to federal officers without congressional consent. Opening Br. 8. But that expansive understanding of intergovernmental immunity—which would free federal employees from complying even with ordinary traffic rules without congressional consent—is contrary to precedent. Although the limits of the doctrine are not well defined, the Supreme Court has repeatedly denied that federal officers possess a general impunity from state regulation. To the contrary, States have applied generally applicable traffic laws, health and safety regulations, tort laws, and criminal laws to the federal government and its agents, among other regulations.

2

SB 805 is not materially different from those permissible forms of state regulation. In light of the statute's broad exceptions and limited scope, the federal government cannot show that SB 805 will burden federal law enforcement operations in any significant way—let alone that it will do so in all or nearly all of its applications, as would be required for the facial relief the federal government seeks. By contrast, a preliminary injunction would prevent California from enforcing much-needed measures to protect public safety.

## JURISDICTIONAL STATEMENT

Defendants do not contest the jurisdictional statement included in the federal government's opening brief. *See* 9th Cir. R. 28-2.2.

## STATEMENT OF THE CASE

### A. Factual Background

1. Law enforcement officers wield authority that private persons do not. Officers are empowered to issue orders, make arrests, and exert force, including lethal force, where appropriate. Private persons, correspondingly, must comply with officers' orders, and may not resist actions even in circumstances where a person would otherwise possess a right to self-defense against a non-officer.

For that reason, governments have long required law enforcement officers to identify themselves before certain exercises of authority. The English common-law courts required sheriffs to "signify the cause of [their] coming" before forcibly entering into a house to conduct an arrest or "other execution of the [King's]

3

process." *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1604). That rule ensured "that the party hath notice, that the officer cometh not as a mere trespasser, but claiming to act under a proper authority." *Case of Richard Curtis*, 168 Eng. Rep. 67, 68 (Crown 1757); *Wilson v. Arkansas*, 514 U.S. 927, 932 & n.2 (1995) (collecting examples). In early America, Massachusetts and New York enacted laws requiring law enforcement officers to carry visually distinctive staffs when performing their duties, to denote their authority.[1] And U.S. Marshals—the first federal law enforcement agents—have long worn badges and carried identification cards. One illustrative policy from the 1880s directed that "[e]ach deputy [Marshal] will wear his badge of office outside, on the left lapel of his coat [while] on duty." U.S. Marshals Service, *The Badge and Other Forms of Identification*, perma.cc/L58K-NY88.

The practice of requiring law enforcement officers to display identification has continued to the present. In California, uniformed state and local officers must

---

[1] *See Book of General Laws and Liberties Concerning the Inhabitants of Massachusetts* 13 (1648), perma.cc/3PJ9-ECN6 (requiring constables to carry a "black staffe of five foot long, tipped at the upper end, about five inches with brasse, as a badge of his office . . . when he goeth to discharge any part of his office"); *Minutes of the Common Council of the City of New York*, 1784-1831, at 682 (Dec. 28 1807), perma.cc/8G75-XWRS (requiring staff to be "painted and numbered . . . with [officers'] respective numbers," and providing for fines "if [officers] appear with or use any other Staff than such as corresponds with their number").

4

"wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of the officer."  Cal. Penal Code § 830.10; *see id.* § 830.1.  It is a crime to fraudulently impersonate a peace officer.  *Id.* § 538d.  Other California laws implicitly recognize that members of the public may respond differently depending on whether a person issuing commands or exercising force is uniformed or in plain clothes.  For example, the crime of evading a pursuing peace officer requires proof that the officer's vehicle was "distinctively marked" and the officer was "wearing a distinctive uniform."  Cal. Veh. Code § 2800.1(a)(3), (4).  Similarly, it is also a crime to brandish a firearm in the presence of a peace officer, but only if the defendant "knew, or reasonably should have known, from the person's uniform or other identifying action[s] that the person was a peace officer" in the first instance.  Judicial Council of California, Criminal Model Jury Instructions, No. 981 (2025 ed.).  And peace officers may not wear official uniforms in certain private employment without the permission of their employing agency, to avoid creating confusion as to whether they are acting pursuant to official authority.  *See* 65 Ops.Cal.Atty.Gen. 631 (1982).

At the federal level, the federal government trains all of its law enforcement officers "to identify themselves and carry badges."  SER-67.  With respect to immigration enforcement, federal regulations require an immigration officer carrying out arrests to "[i]dentify himself or herself as an immigration officer who

5

is authorized to execute an arrest" "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii).  Until recently, it was "extremely uncommon" for Immigration and Customs Enforcement (ICE) officers to conduct enforcement operations without wearing clothing "clearly marked as 'ICE'" and keeping "a credential, bearing their badge and number, visible on their person."  SER-36.

2.  In the spring of 2025, the federal government expanded immigration enforcement operations across the country.  Federal officials announced a quota of 3,000 immigration-enforcement arrests per day.  Olivares, *Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda*, The Guardian (May 29, 2025), tinyurl.com/3xxbzxmp.  Consistent with that order, armed federal agents began to conduct roving patrols across the country and in California, targeting public locations, such as parking lots and bus stops.  *See, e.g.*, SER-20; SER-96-100; Findell et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), tinyurl.com/9yf9vte2 (reporting that an official at a meeting at ICE headquarters urged agents to "just go out there and arrest illegal aliens," including at "Home Depot" and "7-Eleven").  The officers often wore plain clothes and drove unmarked vans during their operations, and refused to provide their names, badge numbers, or agencies during encounters with civilians.  *See, e.g.*, SER-87-89; SER-91-92.

The officers' lack of visible identification led, in many instances, to members of the public being unable to identify federal agents as law enforcement officers. *See, e.g.*, SB 805 § 1(b), (c). This confusion has resulted in federal law enforcement officers being mistaken for criminals, creating serious risks of harm to both peace officers and members of the public. In one example, a woman's family called LAPD officers to report a kidnapping after unidentified federal agents "tackled [her] on the sidewalk and forcibly placed her in an unmarked vehicle." *Id.* § 1(d); *see* SER-87-89. Federal prosecutors filed—and then later moved to dismiss—charges against her for assaulting a federal officer. *See United States v. Velez*, No. 2:25-mj-03896, Dkts. 9, 32 (C.D. Cal. July 10, 2025). In another case, unidentified federal agents in unmarked vehicles forced a car to stop and, after being asked to provide identification, broke its windows.[2] When the driver began pulling away, agents fired several shots at the car. *See id.* Afterwards, the agents and the driver separately requested assistance from local police: the driver told police that "masked men had tried to pull him over, broke his car window, and shot at him," and said "he did not know who they were."[3]

---

[2] Frias, *Federal Agents Open Fire At Family Truck in San Bernardino*, NBC L.A. (Aug. 16, 2025), tinyurl.com/45da48jy.

[3] City of San Bernardino, Press Release, (Aug. 16, 2025), https://www.sanbernardino.gov/m/newsflash/Home/Detail/630.

The surge of confrontational activity by unidentified federal officials has allowed imposters masquerading as anonymous ICE agents to commit robberies, sexual assaults, and other crimes.[4]  In October 2025, the FBI issued a report warning that the "recent increase in ICE enforcement actions" had spurred "criminal actors impersonating ICE agents to commit violent crime."  SER-27. The FBI's report recommended that "law enforcement personnel adequately identify themselves during operations and cooperate with individuals who request further verification."  SER-29.  The FBI also warned that the "difficult[y] for the community to distinguish between legitimate officers conducting lawful law enforcement action and imposters engaging in criminal activity . . . damages trust between the local community and law enforcement officers."  SER-27.  Related concerns have been raised by courts and by lawmakers from both parties.[5]

In September 2025, California enacted two laws to address these issues.  *See* ER-4.  The first, SB 805, expands upon existing identification policies by requiring all law enforcement officers in California that are "not uniformed" to "visibly

---

[4] *E.g.*, Goldman, *Fake ICE Agent Robs 2 People in N.J., Cops Say*, NJ.com (Jan. 28, 2026), tinyurl.com/mva8j49m; Tucker, *Man Accused of Impersonating ICE Officer, Sexually Assaulting Woman at Raleigh Motel*, WBTV (Jan. 29, 2025), tinyurl.com/3js5suc6.

[5] *See also, e.g.*, Letter from Sen. Tillis to Secretary Noem (Feb. 2, 2026), perma.cc/87WY-58BZ; *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417, 2025 WL 3465518, at *37 (D.D.C. Dec. 2, 2025); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 174 (D. Mass. 2025).

8

display identification that includes their agency and either a name or badge number . . . when performing their enforcement duties." Cal. Penal Code § 13654(a). "Enforcement duties" are narrowly defined to include only "active and planned operations involving the arrest or detention of an individual, or deployment[s] for crowd control purposes." *Id.* § 13654(d)(1). The baseline visible-identification requirement is coupled with a broad set of exceptions, including exceptions that apply during "active undercover operations" and "investigative activities"; when officers use "personal protective equipment that prevents display"; and if "[e]xigent circumstances" exist, involving "an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence." *Id.* § 13654(b).

SB 805 also directs law enforcement agencies to publicly post written policies requiring visible identification, subject to the excepted circumstances. Cal. Gov. Code § 7288(a). Agencies may also provide additional exceptions from the visible-identification requirement that apply in circumstances where "there is specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety" of an officer. *Id.* § 7288(a)(3)(E). Although law enforcement officers may be charged with a misdemeanor if they engage in a "willful and knowing violation" of the visible-identification requirement, no such charge applies to an officer whose agency has adopted a

9

policy. Cal. Penal Code § 13654(c); *see id.* § 13654(e). Finally, SB 805 expands impersonation liability to include liability for impersonating "any federal law enforcement officer," *id.* § 538d(f), and authorizes officers to "request an alleged law enforcement officer to present identification" if there is "probable cause or reasonable suspicion to believe the alleged law enforcement officer has . . . impersonat[ed] a peace officer." *Id.* § 13653(a).

The second recently enacted law, SB 627, prohibits law enforcement officers from wearing facial coverings except in specified circumstances. Cal. Penal Code § 185.5(a), (c). SB 627 requires agencies to adopt written policies, and makes violations by officers a misdemeanor if their agency has not adopted a policy. *Id.* § 185.5(d), (f); Cal. Gov. Code § 7289. SB 627 applies to local and federal law enforcement agencies, but not state agencies. *Id.* § 185.5(e).

### B. Procedural History

The federal government sued the State, Governor Gavin Newsom, and Attorney General Rob Bonta. ER-3. It contended that SB 627 and SB 805 violate the intergovernmental-immunity doctrine as applied to federal law enforcement officers, and moved for a preliminary injunction forbidding the enforcement of each statute. ER-3-4.

The district court preliminarily enjoined defendants from enforcing SB 627's prohibition on wearing facial coverings. ER-22-25. The court concluded that the

federal government was likely to succeed on its challenge to SB 627's substantive facial-covering prohibition, because that provision "treats federal law enforcement officers differently than similarly situated state law enforcement officers," and thus "discriminates against the federal government." ER-25. The court held, however, that the federal government lacked standing to challenge SB 627 and 805's provisions requiring the adoption of written policies, because the provisions "do not carry any penalties for noncompliance" or impose "any compliance costs," since "no federal agency intends to issue the policy statements that California requires." ER-11.

The district court denied a preliminary injunction as to SB 805. It noted that the federal government had not "challenged [SB 805] as discriminatory against the federal government"—and that in any event, the visible-identification requirement "applies equally to local, state, and federal law enforcement officers." ER-22. The court further held that the requirement does not impermissibly "interfer[e] with or control[]" federal operations. ER-17 (quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)). It explained that SB 805 includes "numerous exempted circumstances" that cover instances where "concealing identification is reasonable or even essential to federal operations," and that the federal government "ha[d] not identified any situation where a violation of the challenged provisions may be both reasonable and not exempted" from SB 805. ER-19-20.

11

Even if such circumstances did exist, the court reasoned, "the burdensome effect of enforcement on the operations of the federal government is mitigated by Supremacy Clause immunity to prosecution," which shields a federal officer from prosecution in a particular case "when his acts are both (1) authorized by the laws of the United States and (2) necessary and proper to the execution of his responsibilities." ER-20 (quoting *Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984)). The court concluded that the effects of applying SB 805 were "likely to be minimal, and comparable to the effects of enforcement any other generally applicable rules" that may apply to federal conduct, "such as speed limits." ER-21.

The federal government filed this appeal and an emergency motion for an injunction pending appeal. C.A. Dkts 1, 4. This Court granted a "temporary administrative injunction pending full review" of that motion. C.A. Dkt. 10. The motion remains pending.

## SUMMARY OF ARGUMENT

The federal government did not meet the high bar for preliminary injunctive relief. Because SB 805 is generally applicable and at most incidentally burdens federal operations, it is comparable to numerous other state laws that have long been applied to federal officers. The federal government has not offered any persuasive evidence that complying with SB 805's visible-identification requirement—a requirement that extends no further than longstanding law

12

enforcement norms—would impair its law enforcement activities. Indeed, the visible-identification requirement is carefully tailored to allow concealment when necessary. And while California agrees that all law enforcement officers should be protected from harassment and "doxxing," the federal government does not explain how compliance with SB 805's narrow requirements will facilitate those harms, or otherwise interfere with federal operations.

The federal government contends that, whenever Congress has not waived the federal government's immunity, the Supremacy Clause imposes by default an *absolute* prohibition on the application of state regulation to federal officers, that allows for no distinction between permissible and impermissible forms of state regulation. That black-and-white account of intergovernmental immunity is wrong. The federal government's theory cannot be reconciled with precedents denying the existence of any such categorical bar, or with the existence of a case-specific Supremacy Clause defense to prosecutions for state criminal offenses. Endorsing it would run roughshod over the States' long-recognized interests in ensuring the safety and security of their residents.

## ARGUMENT

The denial of a preliminary injunction is reviewed for abuse of discretion. *Babaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023). To obtain a preliminary injunction, a plaintiff "must show a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a favorable balance of the equities, and favorable public interest in an injunction." *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). Alternatively, under the sliding-scale approach, "serious questions going to the merits" may establish entitlement to relief, but only if the plaintiff compensates for that lesser showing by establishing that the "balance of hardships tip sharply" in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). The federal government did not satisfy either standard below and has not demonstrated any abuse of discretion.

## I. THE FEDERAL GOVERNMENT HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Even Where Congress Has Not Spoken, the Supremacy Clause Forbids States From Discriminating Against or Impermissibly Burdening the Federal Government

The Supremacy Clause declares that the "Constitution, and the Laws of the United States, which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. State laws generally violate the Supremacy Clause only where preempted by a federal statute, and "principles of federalism dictate that [courts] apply a strong presumption against preemption."

14

*Ctr. for Competitive Pol. v. Harris*, 784 F.3d 1307, 1318 (9th Cir. 2015), *abrogated in part on other grounds*, 594 U.S. 595 (2021).

In rare circumstances, a state law may violate the Supremacy Clause under the doctrine of intergovernmental immunity. Intergovernmental immunity is a self-executing immunity that displaces state law even in the absence of any contrary federal law. The doctrine is premised on "the need to protect each sovereign's governmental operations from undue interference" by the other. *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814 (1989). Accordingly, evaluating claims of intergovernmental immunity may require "a functional approach" that is "accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality).

The concern "[at] the heart of the doctrine" is "preventing discrimination against the federal government." *United States v. Washington*, 596 U.S. 832, 841 (2022). Laws that single out the federal government for differential treatment present a structural reason for concern: While a "State's constituents can be relied on to vote out of office any legislature" that enacts abusive regulations, that "political check" is missing where a regulation falls "solely on a federal function." *United States v. Fresno Cnty.*, 429 U.S. 452, 458-459 (1977); *see M'Culloch v.*

15

*Maryland*, 17 U.S. 316, 428 (1819) (a "security against [the] abuse" of governmental power is the requirement that the government "act[] upon its constituents"). Many cases striking down state laws on intergovernmental-immunity grounds have thus involved discrimination against the federal government and its officers. *See, e.g.*, *M'Culloch*, 17 U.S. at 425-437 (tax on the Bank of the United States, without any comparable tax on banks chartered by Maryland); *Washington*, 596 U.S. at 835 (worker's compensation law that applied only to federal workers at a single federal facility); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (ordinances restricting federal government's military recruitment efforts).

A distinct prong of intergovernmental-immunity doctrine applies to state laws that impermissibly regulate the federal government. *Washington*, 596 U.S. at 835. The precise contours of that immunity are not well defined. But the Supreme Court has denied that the federal government is automatically immune from *all* state regulation that may be applied to federal activity. "That was decided long ago by Mr. Justice Washington in *Hart*," which established that federal employees "do[] not secure a general immunity from state law while acting in the course of [their] employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (citing *United States v. Hart*, 26 F. Cas. 193 (C.C.D. Pa. 1817) (No. 15,316)). Justice Washington's opinion in *Hart* had made clear that a federal mail carrier could

16

lawfully be subjected to state and local laws forbidding breaches of the peace.  26

F. Cas. at 194.  And the Supreme Court in *Johnson* recognized that local laws that

"might affect incidentally the mode of carrying out [federal] employment"—such

as generally applicable traffic laws "regulating the mode of turning at the corners

of streets"—may be applied to federal officials.  254 U.S. at 56.

Consistent with that principle, precedent leaves no doubt that States may

apply certain laws to federal officers.  The Supreme Court has recognized the

longstanding history of state tort actions "address[ing] abusive conduct by federal

officers."  *Hernandez v. Mesa*, 589 U.S. 93, 110 (2020).  It has upheld

nondiscriminatory state taxes on the salaries of federal officers and employees.

*Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 487 (1939).  And it has

suggested that state environmental regulations do not impose an impermissible

"prohibition on the Federal Government" if they "simply . . . regulate the amount

of pollutants which [a] federal installation[] may discharge."  *Hancock v. Train*,

426 U.S. 167, 180 (1976).

As to state criminal law, the Supreme Court has affirmed that federal officers

"merely because they are such," do not receive "immunity from prosecution in

state courts for crimes against state law."  *Colorado v. Symes*, 286 U.S. 510, 518

(1932); *see Idaho v. Horiuchi*, 253 F.3d 359, 361-362, 376-377 (9th Cir. 2001) (en

banc) (same), *vacated as moot* 266 F.3d 979 (9th Cir. 2001).  Instead, the

Supremacy Clause provides a case-specific defense that confers immunity on federal officers who can show that they held an "honest and reasonable belief" that the charged conduct was "necessary in the performance of [their] duty." *Clifton v. Cox*, 549 F.2d 722, 729 (9th Cir. 1977); *see, e.g.*, *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (in homicide charge, if decedent had surrendered, "it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by [a] Federal law"). Congress has also conferred procedural protections on federal officers charged with state crimes, such as the ability to remove prosecutions for state law crimes to federal court. *See* 28 U.S.C. § 1442(a)(1).

Courts also have struck down generally applicable laws that impose substantial burdens on federal operations. For example, in *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc), this Court invalidated a state law banning private detention facilities, because it would have required the federal government "to entirely transform its approach to detention [or] abandon its California facilities." In *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996), this Court declined to apply against the federal government an "intrusive regulation," *id.* at 1435, that would have required federal employees to place warning signs and safety ropes throughout "virtually every square inch" of Yosemite National Park, *id.* at 1436 n.5, thereby "destroy[ing] [its] visual beauty

18

and riparian environment," *id.* at 1435. And in *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014), this Court invalidated state standards for the "cleanup of radioactive contamination" where they "affect[ed] nearly all of [the federal government's] decisions with respect to the cleanup, including the environmental sampling that is required, the cleanup procedures to be used, and the money and time that will be spent."

### B. SB 805 Does Not Discriminate Against Federal Officers, or Impermissibly Burden Them

SB 805 is not barred under the principles above. It requires all law enforcement officers operating in California, whether local, state, or federal, to "visibly display identification that includes their agency and either a name or badge number" in specified circumstances. Cal. Penal Code § 13654(a). The visible-identification requirement is limited in scope. It applies only to "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes," *id.* § 13654(d)(1)—circumstances where an individual's identity as a law enforcement officer is key to whether members of the public must comply with his or her commands or refrain from defending themselves against exercises of force. And SB 805 includes broad exceptions for circumstances where concealment may be necessary to an officer's duties, including exceptions for "officer[s] engaged in active undercover operations or investigative activities," "officer[s] wearing personal protective equipment that

19

prevents display" of identification, "officer[s] engaged in protective operations" where "the display of identification might compromise the safety, anonymity, or tactical effectiveness of the protection detail," and officers responding to "[e]xigent circumstances," "including if the officer is responding to those circumstances while off-duty." *Id.* § 13654(b).

The federal government does not argue that SB 805 is discriminatory, but contends that the statute impermissibly regulates the federal government. *See* ER-13; ER-22. Because the federal government seeks an injunction prohibiting the State from enforcing SB 805 against any federal officer, "beyond the particular circumstances" before the Court, it must satisfy the demanding standard applicable to facial challenges. *Doe v. Reed*, 561 U.S. 186, 194 (2010). That standard requires a plaintiff to show that "no set of circumstances exist under which [the challenged act] would be valid." *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).[6] And it is not met here. Unlike in past cases, the federal government has not shown that compliance with SB 805 would "transform" law enforcement operations, *GEO*

---

[6] Although this Court has not previously addressed the standard for facial relief in intergovernmental-immunity cases, cases like *Puente* have applied the *Salerno* standard to facial preemption claims. *Puente*, 821 F.3d at 1104. Because preemption and intergovernmental immunity both arise from the Supremacy Clause, it would be anomalous to adopt different standards for facial claims under those two doctrines.

20

*Grp., Inc. v. Newsom*, 50 F.4th at 750, grant the State "a virtual power of review" over its activities, *id.* at 756, or otherwise impose a "level of control over federal operations that the Supremacy Clause does not tolerate," *id.* at 757—let alone that it would do so in any significant number of applications. Nor is there any reason to believe that in all (or nearly all) cases where SB 805 might apply, the federal officer would be covered by the case-specific defense for an officer who holds an "honest and reasonable" belief that his conduct was necessary to the performance of his duties. *Clifton*, 549 F.2d at 729, *see supra*, pp. 17-18.

The federal government contends that compliance with SB 805 would "substantially hamper" its immigration operations. Opening Br. 35. But there is a fundamental disconnect between the far-reaching harms that the federal government asserts and SB 805's narrow visible-identification requirement. For example, the federal government contends that compliance with SB 805 will lead to the harassment, assaulting, and "doxxing" of federal officers. *See id.* at 30.[7] California agrees that law enforcement agencies have an important interest in

---

[7] Recent reports provide reason to doubt the federal government's asserted threats to officer safety. For example, in Los Angeles, federal prosecutors have "lost every assault on a federal officer case they've brought to trial against immigration protesters." Mejia, *'Amateur Hour at the U.S. Attorney's Office': L.A. Prosecutors Face More Losses in Protest Cases*, L.A. Times (Apr. 3, 2026), tinyurl.com/ynjy4bpj; *see also* Levin, *DOJ Cases Against Protesters Keep Collapsing as Officers' Lies Are Exposed in Court*, The Guardian (Feb. 21, 2026), tinyurl.com/4ntkz62z.

21

protecting officer safety. SB 805 does not threaten that interest, however, because it does not require disclosure of personally identifying information. Law enforcement officers may satisfy the visible-identification requirement by disclosing only their agency and badge number. *See* Cal. Penal Code § 13654(a). Badge numbers are anonymous and can be "changed regularly." SER-38. The federal government suggests that "[e]ven identifying officers as federal agents . . . makes them a target for nefarious efforts." Opening Br. 32. But law enforcement officers—state and federal—have long worn uniforms, badges, and other insignia of their status. *Supra*, pp. 3-6. And SB 805's requirement applies only in circumstances where officers are asserting authority *as officers* over members of the public: during arrests and detentions, and crowd control operations.

The federal government next contends that complying with the visible-identification requirement will "compromise operational security," including "by alerting targets to the presence of law enforcement and increasing the likelihood of flight." Opening Br. 32. But as the federal government acknowledges, DHS regulations also require immigration officers to identify themselves as immigration officers as soon as it is practicable to do so. 8 C.F.R. § 287.8(c)(2)(iii); *see* Opening Br. 38. That longstanding regulatory requirement is difficult to square with the federal government's theory that officer identification will undermine its operations. In any event, SB 805 does not require ICE or any other law

22

enforcement agency to use marked vehicles or provide advance notice or warning of their operations to the public. Nor would compliance with SB 805 prevent officers from "conduct[ing] surveillance" or "meet[ing] with confidential informants." Opening Br. 33. SB 805 expressly exempts "investigative activities" from the identification requirement, including plainclothes investigations. Cal. Penal Code § 13654(a), (b).[8]

The federal government argues that the scope of the exceptions is "doubtful," because SB 805 does not expressly define all of its terms and there may be disagreement sometimes as to whether identification is required. Opening Br. 33. As the Supreme Court has observed, however, "[c]lose cases can be imagined under virtually any statute," *United States v. Williams*, 553 U.S. 285, 306 (2008), and their existence does not automatically render a statute facially invalid. And the federal government's suggestion that SB 805 is invalid because "zealous" State officers might interpret ambiguities in unusual ways (Opening Br. 34) inverts the ordinary presumption that public officers act in good faith. *See, e.g., Nieves v.*

---

[8] Compliance with SB 805 during "deployment[s] for crowd control purposes" also would not compromise federal law enforcement operations. Cal. Penal Code § 13654(d)(1). It is hard to see how law enforcement officers can effectively engage in crowd control at all, if members of the public are unable to identify them as officers that may issue lawful commands.

*Bartlett*, 587 U.S. 391, 400 (2019) (applying presumption of regularity to state prosecutor's charging decisions under state law).

The federal government asserts that the visible-identification requirement will assist "activists" who "blow whistles or otherwise alert potential targets to the presence of law enforcement." Opening Br. 34. To the extent the federal government's argument amounts to a concern about the identification requirement facilitating civilian oversight of law enforcement, it is misplaced. The First Amendment protects a right to document "matters of public interest," including "law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). And to the extent the federal government believes that operational security will sometimes require officers to move into place surreptitiously, such needs are not harmed by the statute, which requires visible identification only when officers begin to engage in arrest or detention operations, or when they are deployed for crowd-control purposes—at which time their known status as law enforcement officers is key to the target's duty to comply.

Finally, the federal government is wrong to suggest that SB 805's provision regarding agency policy statements proves that the visible-identification requirement violates intergovernmental immunity. *See* Opening Br. 16-18. The policy statement provision makes a safe harbor available, by removing criminal

24

penalties for any federal, state, or local agency that adopts an identification policy that includes provisions that track the visible-identification requirement. *See* Cal. Penal Code § 13654(e); Cal. Gov. Code § 7288(a). The district court did not reach the merits of the federal government's intergovernmental immunity challenge as to that provision. ER-8-11. It instead held that the federal government lacked standing to challenge the policy provision, because the provision does not include any penalty for noncompliance, or impose any compliance costs. *See id.*

The federal government's opening brief does not challenge the standing holding. Opening Br. 17. Indeed, it agrees that the absence of any enforcement mechanism for the policy provision "may mean" that it "lacks standing to challenge th[e] [policy provision] independently." *Id.*; *see Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived."). Nevertheless, the federal government argues that the policy provision helps to prove its challenge to the identification requirement, because it "underscores the impermissible intrusion into the federal government's operations." Opening Br. 18. The federal government contends that both provisions, read together, amount to a "threat[]" to comply with a "command to create a new policy" or else face criminal liability. *Id.* at 17.

Even assuming that the federal government can raise such substantive objections to the policy statement provision when it has decided not to appeal the

district court's holding as to standing, its argument is without force. The policy statement provision provides law enforcement agencies with additional flexibility: the agencies are not limited to SB 805's framework for enforcing the visible-identification requirement, but may select alternative mechanisms for enforcement, and may design additional exceptions where necessary to protect officer safety. *See* Cal. Gov. Code § 7288(a)(3)(E). And because the statute does not penalize any agency that chooses not to adopt a visible-identification policy, it does not "command" the federal government in any meaningful sense. Opening Br. 17.

In any event, any concerns about the policy provision should not affect enforcement of the visible-identification requirement. The severability of a state statute is determined by state law, *see Project Veritas v. Schmidt*, 125 F.4th 929, 958 (9th Cir. 2025), and California courts analyze severability by considering whether the "invalid provision" is "grammatically, functionally, and volitionally separable" from the remainder of the law. *Cal. Redev. Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011). Those three requirements are satisfied if the "invalid provision" can be removed "without affecting the wording or coherence of what remains," if "the remainder of the statute is complete in itself," and if the Legislature would have adopted the remainder had it "foreseen the partial invalidation of the statute." *Cal. Redev. Ass'n*, 53 Cal. 4th at 271 (internal quotation marks omitted). Here, the visible-identification requirement can be

26

understood and applied independently from the policy provision. SB 805 also contains an express severability clause, confirming the Legislature's preference for the visible-identification requirement to stand even if the policy statement provision were eliminated. SB 805 § 11.

### C. Congressional Silence Does Not Create an Automatic Immunity From State Law For Federal Officers

The federal government's primary argument is that the validity of a state regulation does not depend on whether it discriminates against federal actors or hinders their activities. Nor does it depend on whether Congress expressly or implicitly disapproves of the state regulation. Instead, the federal government proposes, the Supremacy Clause establishes an "absolute" prohibition on ever applying *any* state regulation to federal officers unless Congress has consented. Opening Br. 8, 14. In the federal government's view, because SB 805 applies to federal officials and was not specifically authorized by Congress, the statute is automatically unconstitutional. That argument misunderstands controlling law.

1. The federal government's categorical view of intergovernmental immunity would certainly be "straightforward" to apply. Opening Br. 1. But it is utterly at odds with precedent. Under Supreme Court caselaw, "[f]ederal officers and employees are not, merely because they are such, granted immunity from prosecution . . . for crimes against state law." *Colorado*, 286 U.S. at 518; *see also Johnson*, 254 U.S. at 56 ("[A]n employee of the United States does not secure a

27

general immunity from state law while acting in the course of his employment.").
And as this Court has observed, a position that "no obstruction is required in
intergovernmental immunity cases ignores the origins of the doctrine and the
occasions in which it has been applied" to prohibit state regulation—which have
often involved consideration of the practical effect of the challenged law on federal
operations. *United States v. California*, 921 F.3d at 880; *see supra*, pp. 18-19.

None of the federal government's authorities establishes that federal officers
enjoy unqualified immunity from state law. For example, *Mayo v. United States*,
319 U.S. 441, 442-443 (1943), held that Florida lacked power to require payment
of an inspection fee before fertilizer could be distributed pursuant to a federal soil
conservation program. The Court stated in passing that "the activities of the
Federal Government are free from regulation by any state." *Id.* at 445; *see*
Opening Br. 13. But the Court did not indicate that that highly general statement
was meant to state a rule at a literal level. *See Nat'l Pork Producers Council v.
Ross*, 598 U.S. 356, 373-374 (2023) ('[T]he language of an opinion is not always
to be parsed as though we were dealing with language of a statute.' Instead, we
emphasize, our opinions dispose of discrete cases and controversies and they must
be read with a careful eye to context." (citation omitted)). The Court's primary
concern in *Mayo* was that Florida's fee, if held enforceable, would allow a State to
impose an "exaction" that "would be required [to be paid] before executing a

function of government." *Mayo*, 319 U.S. at 447. The Court distinguished that circumstance from "federal activities" that may be "affected by state regulation" even in "the absence of specific Congressional consent," like a state income tax applied directly to federal employees. *Id.* at 446.

Similarly, in *Arcata*, this Court invalidated county ordinances banning the military and its agents from recruiting minors. 629 F.3d at 991. In a short passage, the Court held that the ordinances impermissibly sought to "regulate the [federal] government directly" by "constraining the conduct of federal agents." *Id.* But the Court's succinct analysis under the "direct regulation" prong should not be construed as establishing a sweeping rule that any state law that might be applied to federal officers would be unconstitutional. Indeed, the Court's principal concern appeared to be that the ordinances "specifically target[ed]" the federal government, rather than "affecting [it] incidentally as the consequence of a broad, neutrally applicable rule." *Id*; *cf. Washington*, 596 U.S. at 841 ("preventing discrimination against the Federal Government lies at the heart" of the intergovernmental-immunity doctrine).

2. The federal government next argues that the State and district court have misconstrued a series of cases which, it contends, properly construed, support its categorical rule. Opening Br. 21-26. But those cases only reveal that the

29

intergovernmental-immunity doctrine strikes a significantly more nuanced balance between federal and state authority than the federal government admits.

The federal government first suggests that absent congressional consent, precedent allows only that state laws can apply to federal contractors, not to federal employees. *See* Opening Br. 21-23. This argument focuses on cases upholding the application of state laws to federal contractors. *Id.* at 22 (citing, e.g., *GEO Grp. v. Newsom*, 50 F.4th 745 (9th Cir. 2022)). But the federal government draws the wrong conclusion from those cases.

The cited authorities recognize only that States possess "greater ability" to apply their laws to federal contractors than to the federal employees. *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116 (9th Cir. 2025); *see GEO Grp. v. Newsom*, 50 F.4th at 757 (similar). That "greater" ability to regulate federal contractors does not mean that it is "always *impermissible*" to apply state law to federal officers (Opening Br. 22), just as it does not suggest that it is always *permissible* to apply state law to federal contractors, *see, e.g.*, *GEO Grp. v. Newsom*, 50 F.4th at 757. Intergovernmental immunity is "not a formalist doctrine" and does not depend on such bright-line distinctions. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025); *see North Dakota*, 495 U.S. at 435 (intergovernmental-immunity claims require "a functional approach"). Nor would it make sense as a practical matter to draw such a stark distinction between contractors and federal

30

employees, given the reality that the federal government may often carry out critical functions through contractors. *See, e.g.*, *GEO Grp. v. Inslee*, 151 F.4th at 1111 (immigration detention); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1336 (11th Cir. 2007) (military transport and operational support). As to both federal contractors and federal employees, when Congress has not spoken to the issue, courts must determine whether the state regulation impermissibly burdens federal operations.

The next set of cases on which the federal government relies are cases that *have* endorsed the application of state law to federal officers, such as *Hernandez v. Mesa*, 589 U.S. 93 (2020), and *Hancock v. Train*, 426 U.S. 167 (1976). Opening Br. 23. The federal government describes those precedents as addressing areas of state law where Congress has "by statute expressly authorized such regulation," *id.*, implying that the absence of such express authorization would have been fatal to the state regulations at issue.

That argument fundamentally misunderstands the cases at issue. For example, the federal government suggests that the Supreme Court's acceptance of the application of state tort law to federal actors has depended on Congress's consent to such application through the Federal Tort Claims Act. *See* Opening Br. 23. But the history of States applying tort claims to federal officers long predates the FTCA. For years after the Founding, "the traditional way in which civil

31

litigation addressed abusive conduct by federal officers was by subjecting them to liability for common-law torts," including in state court. *Hernandez*, 589 U.S. at 111; *see id.* at 115-116 (Thomas, J., concurring). In *Slocum v. Mayberry*, 15 U.S. 1, 12 (1817), the Supreme Court—just two years before *M'Culloch*—held that a Rhode Island court could exercise jurisdiction over a replevin suit against a customs officer that had wrongfully seized cargo.[9] And in *Teal v. Felton*, 53 U.S. 284, 286-287 (1851), the Supreme Court unanimously upheld a New York court's damages judgment against a federal postmaster in an action for trover. The Court continued to affirm "the continuing viability" of state tort actions for years afterwards. *Hernandez*, 589 U.S. at 110. While Congress *today* has channeled such claims through the FTCA's detailed preemption scheme, the earlier history shows there is no categorical constitutional bar against applying state tort claims to federal officers.

*Hancock v. Train*, 426 U.S. 167 (1976), also does not support the federal government's proposed rule. *Hancock* held that a state environmental regulation requiring federal facilities to obtain a state permit violated the Supremacy Clause. *Id*. at 168. The Court distinguished that law from a hypothetical regulation

---

[9] *See also Wheeldin v. Wheeler*, 373 U.S. 647, 652 (1963) ("When it comes to suits for damages for abuse of power, federal officials are usually governed by local law" (citing *Slocum*, 15 U.S. at 10)).

"intended simply to regulate the amount of pollutants which the federal installations may discharge," which it implied would be constitutional. *Id.* at 180. The federal government suggests that *Hancock* accepted such regulation only because the Clean Air Act authorized States to set pollutant limits. Opening Br. 23. But that is not the explanation that the Court gave. Instead—in flat contradiction to the federal government's proposed rule here—*Hancock* explained that the Supremacy Clause does not "bar[] all state regulation which may touch the activities of the federal government." 426 U.S. at 179. What distinguished the (hypothetical) regulation the Court would have allowed from the permit requirement it struck down was that a regulation establishing allowable pollutant levels would not "prohibit[] operation" of federal facilities, whereas a permit requirement bars federal operations altogether where there is no permit. *Id.* at 180.

The federal government next suggests (Opening Br. 24) that the district court misunderstood *Johnson*'s acceptance of applying local laws that "might affect incidentally the mode of carrying out [federal] employment," such as traffic laws, to federal officials. 254 U.S. at 56; ER-17. The federal government dismisses *Johnson*'s statement as mere "dictum," in the form of an "offhand observation" that does not reflect a "definitive view" on whether state law may be applied to federal employees. Opening Br. 24. In the federal government's view, federal employees must comply with state traffic laws only because "the federal

33

government itself expects [them]" to do so. *Id.* The federal government contends that *Johnson* should be understood as reflecting only that in certain circumstances, it may be "reasonable to presume" that expectation, even where there is no federal statute expressly commanding federal employees to follow state law. *Id.* at 25. But that explanation does little to support the federal government's position in this case. The federal government provides no reason to think that Congress would not have wanted federal officers to follow SB 805—which mirrors law enforcement identification practices that federal officers have followed for decades.

In any event, *Johnson* does not mention any such "expectation," whether express or implied. To the contrary, *Johnson* suggested that federal officers' "subjection to local law" might occur "when the United States has not spoken." 254 U.S. at 56. The Supreme Court has continued to deny the existence of any default absolute immunity in a number of cases since *Johnson*, as has this Court.[10] The Supreme Court's establishment of a case-specific defense under the Supremacy Clause for federal officers facing state charges would also make no

---

[10] *See, e.g.*, *Hancock*, 426 U.S. at 179 ("Neither the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the Federal Government."); *Colorado*, 286 U.S. at 518 ("Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law"); *Clifton*, 549 F.2d at 728 ("[W]e do not mean to imply that the exercise of authority in and of itself places a federal officer beyond the reach of a state's criminal process.").

34

sense if there were a categorical bar prohibiting states from pursuing such prosecutions regardless of the facts. *See id.* at 57 (citing *In re Neagle*, 135 U.S. 1 (1890)); *Drury*, 200 U.S. at 8. Nor would Congress have had reason to enact a removal statute that contemplates such prosecutions. 28 U.S.C. § 1442(a)(1).

The federal government alternatively suggests that SB 805 is not the type of "general" law that *Johnson* endorses, because California's statute applies to the "inherently governmental function" of law enforcement, rather than "conduct engaged in by private, state, and federal actors alike." Opening Br. 26. But the federal government does not explain why that distinction should bear conclusive weight. SB 805 is not directed to the federal government's substantive enforcement decisions, but a discrete aspect of "the mode of carrying out" those policies. *Johnson*, 254 U.S. at 56. And while the statute applies to federal law enforcement officers (along with state and local officers), it does so only because such coverage is necessary to protect rights the public has against those who are not federal or state officers at all. Private persons cannot exercise their rights to ignore orders or resist unlawful exercises of force without the ability to distinguish legitimate law enforcement officers from persons engaged in kidnapping or assault. Taken to its logical conclusion, the federal government's rule would invalidate other nondiscriminatory laws that necessarily extend to federal agents' conduct, such as laws that impose standardized requirements on "emergency vehicle[s]"

35

operated by "any federal, state, or local agency . . . employing peace officers" so that drivers know whom they must pull over for. Cal. Veh. Code § 165.[11]

The better understanding is that the term "general" refers to generally applicable regulations that do not single out the federal government for differential treatment. That definition is consistent with the intergovernmental-immunity doctrine's core interest in preventing discrimination against federal operations. *Washington*, 596 U.S. at 841. SB 805 is "general" in the relevant sense, because it does not treat officer identification as an exclusively federal concern, but establishes a requirement that applies to all federal, state, and local law enforcement officers in the State. Cal. Penal Code § 13654(a).

Finally, *Texas v. U.S. Department of Homeland Security*, 123 F.4th 186 (5th Cir. 2024) does not support the federal government's preferred rule—but supports the State. There, the Fifth Circuit considered whether a suit filed by Texas against U.S. Border Patrol agents for trespass and conversion violated intergovernmental immunity. *Id.* at 205-209. Applying *Johnson*, the court held that the federal government was not immune from Texas's suit, because it did not "seek to control

---

[11] *See, e.g.*, Cal. Veh. Code § 25252 ("[e]very authorized emergency vehicle shall be equipped with at least one steady burning red warning lamp visible from at least 1,000 feet "); *id.* § 21806 (requiring drivers to pull over and stop "[u]pon the immediate approach of an authorized emergency vehicle which is sounding a siren and which has at least one lighted lamp exhibiting red light").

36

federal employees" and "at most, only incidentally affect[ed] [federal officers'] duties." *Id.* at 205; *see id.* at 207 (citing *Johnson*, 254 U.S. at 56-57). The federal government argues that the Fifth Circuit's analysis "rested principally" on the view that Texas was acting as a proprietor, and not a regulator in seeking to enforce its tort laws. Opening Br. 27. But the Fifth Circuit made clear that even assuming that Texas had acted as a regulator, the federal government's "intergovernmental argument would still fail," because "[i]t is well-settled that generally applicable state laws can apply to federal agents." *Id.* at 206.[12]

## II. THE REMAINING EQUITABLE FACTORS DO NOT SUPPORT A PRELIMINARY INJUNCTION

The federal government also has not shown that the remaining equitable considerations favor a preliminary injunction. It restates its view that SB 805 violates intergovernmental immunity, and contends that irreparable harm "necessarily results from the enforcement of a preempted state law." Opening Br.

---

[12] The Fifth Circuit's intergovernmental-immunity holding also did not depend on a factual finding "that federal officers were not in fact enforcing federal law" in carrying out the challenged conduct. Opening Br. 27. The Fifth Circuit acknowledged that federal officers were found to have "destroyed [Texas's] property" by cutting a concertina wire fence when doing so was "not necessary" to their federal responsibilities. 123 F.4th at 207. But the court recognized that Texas's request for prospective relief might "incidentally affect[] how agents do their job" on future occasions. *Id.* at 205; *see id.* at 192-193. And it concluded that such incidental effects did not establish that the suit violated intergovernmental immunity. *Id.* at 206-209.

35 (quoting *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). That argument adds nothing if SB 805 is constitutional, as shown above. And even in circumstances where irreparable harm may be presumed, a court must still "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). An even more favorable balance is required where the government raises "serious questions" on the merits but falls short of establishing a likelihood of success. *All. for the Wild Rockies*, 632 F.3d at 1132.

The federal government argues that SB 805 creates an intractable conflict between federal and state authority, by exposing federal officers to state criminal prosecution. Opening Br. 35-36. Such "[g]eneral pronouncements that a Supremacy Clause violation alone causes sufficient harm" do not automatically tip that balance in the federal government's favor. *United States v. California*, 921 F.3d at 894; *see id.* at 893-894. SB 805 presents no more conflict with federal authority than any other state criminal law that is capable of being applied to a federal officer in an appropriate case. Consistent with principles of federalism, our system has addressed such conflicts through other protections, including by providing federal officers with the right to remove to federal court, and the ability to raise case-specific Supremacy Clause defenses if they hold an "honest and

38

reasonable" belief that their conduct was necessary to their duties. *Supra*, pp. 17-18.

In contrast, the State and the public interest would face substantial and irreparable harm if SB 805 were enjoined. The State necessarily "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And allowing secret policing practices to continue unchecked in the State would undermine the public interest in accountability and public safety. "[V]isible identification" serves as a "critical check[] on law enforcement behavior," enabling the public to identify and report officers who engage in misconduct. SER-84. [13] When individuals cannot tell the difference between law enforcement agents and "a 'stick-up crew," SER-92, they are far more likely either to attack officers in self-defense, *see, e.g.*, SER-84, or to submit to the illegitimate (and perhaps dangerous) authority of *non*-officers they have a right to resist. The absence of

---

[13] In light of the presumably uncontested public interest in accountability, it is not at all clear why the federal government views California's portal for reporting officer misconduct with suspicion. *See* Opening Br. 36-37. As the federal government acknowledges, the portal is "intended to help the California Department of Justice create a record of potential unlawful conduct by federal agents, and inform possible legal actions," *id.*—legal actions that California has well-settled authority to undertake. *Colorado*, 286 U.S. at 518; *Idaho*, 253 F.3d at 376.

39

visible identification enables criminals to impersonate law enforcement agents and prey on innocent civilians—as the FBI has warned. *See* SER-27.

The State's interest in preventing those harms is far from "marginal." Opening Br. 38. And such harms have only continued since the federal government's appeal has been pending. *See, e.g.*, Fuentes et al., *Viral Video Shows Mother Arrested by ICE at SFO*, ABC News (Mar. 23, 2026), tinyurl.com/42sn9mfh (describing arrest by federal agents in plain clothes; agents refused to respond to a bystander who asked "Is this a kidnapping?" "Is this a federal agent?"). The federal government sought a preliminary injunction that would deprive the State of a reasonable, nondiscriminatory means to prevent these harms: a modest requirement that law enforcement agents interacting with California's citizenry follow a tradition that has guided officers at every level of government for decades. The district court's refusal to enjoin that requirement did not abuse its discretion.

## CONCLUSION

The district court's denial of a preliminary injunction should be affirmed.

Dated:  April 21, 2026

Respectfully submitted,

_/s/ Mica L. Moore_

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
MICA MOORE
  *Deputy Solicitor General*
ANNA FERRARI
LEE I. SHERMAN
  *Supervising Deputy Attorney General*
KRISTI A. HUGHES
ZELDA VASSAR
ASHA ALBUQUERQUE
ALYSSA ZHANG
CAMERON A. BELL
  *Deputy Attorneys General*
ZACHARY W. SORENSON
  *Associate Deputy Solicitor General*

  *Attorneys for Defendants-Appellees*

41

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court.

42

## CERTIFICATE OF COMPLIANCE

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**: 26-926

I am the attorney or self-represented party.

**This brief contains 9,283 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Mica L. Moore*      **Date:** 4/21/2026