No. 26-926

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA; GAVIN NEWSOM, *in his official capacity as Governor of California*; ROBERT BONTA, *in his official capacity as Attorney General of California*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California

## APPELLANTS' REPLY BRIEF

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................1

I.      The United States will succeed on the merits......................................................1

II.     The other injunction factors strongly favor the government.........................20

CONCLUSION....................................................................................................25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arizona Dream Act Coalition v. Brewer,*
757 F.3d 1053 (9th Cir. 2014)........................................................................20

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023)........................................................................20

*Blackburn v. United States,*
100 F.3d 1426 (9th Cir. 1996)............................................................. 3, 6, 9

*Boeing Co v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014)............................................................................9

*Claflin v. Houseman,*
93 U.S. 130 (1876) .........................................................................................12

*Colorado v. Symes,*
286 U.S. 510 (1932) .......................................................................................11

*Department of Homeland Sec. v. Texas,*
144 S. Ct. 715 (2024) .....................................................................................17

*E. Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ...........................................................................2

*Evansville-Vanderburgh Airport Auth. v. Delta Airlines,*
405 U.S. 707 (1972) .......................................................................................18

*Feldman v. Ariz. Sec'y of State's Off.,*
843 F.3d 366 (9th Cir. 2016)..........................................................................20

*GEO Group, Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022)............................................................................8

*Goodyear Atomic Corp. v. Miller,*
486 U.S. 174 (1988) .........................................................................................6

*Graves v. New York ex rel. O'Keefe,*
306 U.S. 466 (1939) .......................................................................................11

*Hancock v. Train,*
 426 U.S. 167 (1976) ................................................................6, 7

*North Carolina v. Ivory,*
 906 F.2d 999 (4th Cir. 1990) ...................................................18

*Jefferson County v. Acker,*
 527 U.S. 423 (1999) ................................................................18

*Johnson v. Maryland,*
 254 U.S. 51 (1920) ..................................................... 13, 14, 15

*K&D LLC v. Trump Old Post Office LLC,*
 951 F.3d 503 (D.C. Cir. 2020)..................................................18

*Mayo v. United States,*
 319 U.S. 441 (1943) ..................................................... 3, 13

*McCulloch v. Maryland,*
 17 U.S. (4 Wheat.) 316 (1819) ................................................5, 6

*McHenry County v. Raoul,*
 44 F.4th 581 (7th Cir. 2022)....................................................18

*North Dakota v. United States,*
 495 U.S. 423 (1990) ..................................................... 6, 18

*Slocum v. Mayberry,*
 15 U.S. (2 Wheat.) 1 (1817) ...................................................12

*Sol Inc. v. Whiting,*
 732 F.3d 1006 (9th Cir. 2013)..................................................20

*Teal v. Felton,*
 53 U.S. (12 How.) 284 (1852)...................................................12

*Texas v. U.S. Department of Homeland Security,*
 123 F.4th 186 (5th Cir. 2024)..................................................... 16, 17

*United States v. City of Arcata,*
 629 F.3d 986 (9th Cir. 2010)..................................................... 6, 7, 9

*United States v. California*,
  --- F.4th ----, 2026 WL 1088674 (9th Cir. Apr. 22, 2026)...... 1, 2, 4, 5, 13, 20, 23

*United States v. Washington*,
  596 U.S. 832 (2022) .................................................................................5

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ...............................................................................18

## Statutes

No Vigilantes Act,
  Senate Bill No. 805, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025) .................. 3, 22

Cal. Veh. Code § 165 ...............................................................................19

Cal. Veh. Code § 21806 ............................................................................19

## Other

Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to
  Conceal Identity*,
  TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8 ........................15

**INTRODUCTION**

The day after appellees (collectively, California) filed their answering brief in this appeal, this Court granted an injunction pending appeal in a unanimous published opinion, holding that "[t]he Supremacy Clause forbids the State from enforcing" the statute challenged here, Section 10 of the No Vigilantes Act, and concluding that the remaining injunction factors warranted an injunction pending appeal. *United States v. California*, --- F.4th ----, 2026 WL 1088674, at *1 (9th Cir. Apr. 22, 2026). The panel's holdings—on purely legal grounds—are correct and dispose of this appeal. California's contrary arguments are unpersuasive and misstate well-established law. This Court should reverse the district court's order denying a preliminary injunction and direct entry of a preliminary injunction enjoining Section 10 of the No Vigilantes Act against the United States, federal agencies, and federal officials.

**ARGUMENT**

**I.      The United States will succeed on the merits.**

The United States is likely—indeed, certain—to prevail on the merits of its challenge to Section 10 of the No Vigilantes Act.

**1.** Initially, this Court has already concluded, in a published opinion granting an injunction pending appeal, that the United States is likely to prevail because Section 10 cannot lawfully be applied to the federal government and its officials.

That opinion was issued after substantial briefing, and after oral argument. More importantly, nothing about its analysis was tentative, preliminary, or subject to change following further events—again, the panel squarely held that Section 10 was unlawful. *See California*, 2026 WL 1088674, at *1 ("We conclude that § 10 of the No Vigilantes Act attempts to directly regulate the United States in its performance of governmental functions. The Supremacy Clause forbids the State from enforcing such legislation."). The issues here are also purely legal. So this is not a case where, for example, further development of the record might make a difference to the proper outcome.

This Court has held that a published motions-panel opinion is generally not binding on the merits panel deciding the underlying appeal, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661-62 (9th Cir. 2021), but has also stated that such an opinion can be binding where the motions panel "answer[ed] the same legal question that is presented to the merits panel," *id.* at 661 n.3. That exception would seem to apply here—if it does not, it is hard to imagine a situation in which it would apply. But regardless of whether the motions-panel opinion is binding as a formal matter, at a minimum it should be entitled to exceedingly significant persuasive weight.

**2.** In any event, the unanimous motions-panel opinion is correct. The No Vigilantes Act directly regulates the United States in violation of the intergovernmental-immunity doctrine.

The Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). That is an absolute rule: "No other adjustment of competing enactments or legal principles is possible." *Id*. Simply put, "states may not directly regulate the Federal Government's operations." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996).

Section 10 of the No Vigilantes Act, on its face, purports to directly regulate the federal government. It requires all non-uniformed "federal law enforcement officer[s]," *see* No Vigilantes Act, S.B. 805, 2025 Gen. Assemb., Reg. Sess. § 10(d)(2) (Cal. 2025), to "visibly display identification" when "performing their enforcement duties," *id.* § 10(a); dictates the required contents of that identification; sets forth what purports to be a comprehensive list of narrowly drawn exceptions to that requirement, *id.* § 10(b)(1)-(6); and subjects federal officers who do not comply with the requirements to criminal penalties, *id.* § 10(c), (e). And that regulation is "direct"; it applies to the United States and its officials directly, as opposed to contractors or other third parties who interface with the federal government.

As the motions panel observed, Section 10 "seeks to control [federal officers']

3

conduct in performing law enforcement operations." *California*, 2026 WL 1088674, at \*5. "It purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.*; *see also* California Br. 22 (noting that Section 10's "requirement applies only in circumstances where officers are asserting authority *as officers* over members of the public: during arrests and detentions, and crowd control operations").

Strikingly, California's answering brief nowhere actually denies that Section 10 amounts to direct regulation of the federal government. That should be the end of the analysis.

**3.** None of California's contrary arguments have merit. Although California cobbles together a number of quotations from various cases, it notably identifies no case in which a state has been authorized to override the federal government's directions to its own officials regarding how to carry out their federal responsibilities. The absence of any such case is no coincidence and simply reflects the settled nature of the issue presented in this case.

**a.** Initially, California repeatedly states that the principal concern of the intergovernmental-immunity doctrine is preventing discrimination against the federal government. California Br. 15 ("Laws that single out the federal government

4

for differential treatment present a structural reason for concern or concern … ."); California Br. 16 ("Many cases striking down state laws on intergovernmental-immunity grounds have thus involved discrimination against the federal government and its officers."). By contrast, it derides the principle that state laws cannot "impermissibly regulate the federal government" as "not well defined." California Br. 16.

There is no reason to engage in an exercise of ranking the importance of the two elements of the intergovernmental-immunity doctrine, as both are crucial. The relevant point is that the Supreme Court has made clear that the doctrine "prohibit[s] state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (alterations and quotation marks omitted), *quoted in California*, 2026 WL 1088674, at *4. And the Court has hardly downplayed the importance of the fundamental principle that states may not directly regulate the federal government, instead making clear from the dawn of the Republic that "[i]t is of the very essence of supremacy, to remove all obstacles to [the federal government's] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819).

As we have pointed out, the cases laying out the common-sense principle that

a state may not directly regulate the federal government are legion. *See, e.g., North Dakota v. United States*, 495 U.S. 423, 435 (1990) (state law invalid "if it regulates the United States directly"); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."); *Hancock v. Train*, 426 U.S. 167, 179 (1976) (stating that "where Congress does not affirmatively declare its instrumentalities or property subject to regulation, the federal function must be left free of regulation" (quotation marks omitted)); *McCulloch*, 17 U.S. (4 Wheat.) at 317 (States "have no power" to "in any manner control" the "operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government"); *Blackburn*, 100 F.3d at 1435 (noting that "states may not directly regulate the Federal Government's operations"); *see also* Reply in Supp. of Emergency Mot. Under Circuit Rule 27-3 for Inj. Pending Appeal 2-3 (Feb. 26, 2026) (noting additional such cases). California is not entitled to wave them away on the ground that they are "highly general statement[s]," California Br. 28, or form part of a "succinct analysis," California Br. 29. Nor can California escape the controlling legal principle by pointing to aspects of the cases that were irrelevant to the application of the direct-regulation rule. California points out, for example, that the city ordinances at issue in *United States v. City of Arcata* were discriminatory,

6

but that separate holding played no part in this Court's determination that the ordinances were independently invalid simply because they sought "to directly regulate the conduct of agents of the federal government." 629 F.3d 986, 991 (9th Cir. 2010).

California fares no better in reading *Hancock v. Train* to say that it would not violate principles of intergovernmental immunity if a state sought to regulate discharges from federal facilities. This would be a stunning proposition, and California cannot seriously suggest that a state could limit emissions from federal facilities without Congressional authorization. In any event, the Supreme Court in *Hancock* said no such thing. In that case, Congress had enacted a statute requiring federal facilities to comply. *See* 426 U.S. at 168-69 (describing *Hancock* as "present[ing] an issue of statutory construction" concerning the Clean Air Act, namely "whether obtaining a permit to operate is among those 'requirements respecting control and abatement of air pollution' with which existing federal facilities must comply under [Section] 118 of the Clean Air Act"). That statutory holding in no respect undermines the fundamental constitutional rule at issue here.

It bears repeating that, in addition to consistently stating the relevant proposition in unequivocal terms, the cases are uniform in outcome. California cites no case in which any state has been authorized to engage in any sort of regulation remotely like the one at issue here. Such regulations are plainly precluded, as the

motions panel recognized.

**b.** California also conjures a "substantial-burden" test that has no foundation in the governing case law. It points to no case in which such a test was actually applied to a direct regulation of the federal government, and the cases on which California relies merely underscore the point that direct regulation is unconstitutional. In *GEO Group, Inc. v. Newsom*, the state regulation at issue was imposed on contractors rather than on the federal government, and this Court held that the regulation was sufficiently onerous as to constitute a regulation of the federal government itself. 50 F.4th 745, 760-61 (9th Cir. 2022) (en banc). That inquiry is necessary when a regulation applies to a federal contractor, but not where, as here, the state purports to regulate the federal government itself. That is why "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Id.* at 755.[1]

---

[1] California insists that the federal contractor cases do not stand for the proposition that it is always impermissible to apply state regulation to the federal government. California Br. 30. That is true but irrelevant. The relevant point is that the district court ignored the fact that the federal-contractor cases employ a different mode of analysis than the cases involving regulation of the federal government itself. This not only "make[s] sense as a practical matter," *but see* California Br. 30-31—federal contractors are not the federal government, so immunity determinations necessarily must analyze state regulation of those entities in terms of the relationship between that regulation and the work the federal contractor performs for the federal government—but is black-letter law.

In *Boeing Co v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), this Court held that a state enactment was unlawful because it "mandate[d] the ways in which Boeing render[ed] services that the federal government hired Boeing to perform," *id.* at 840; although the panel demonstrated the point by observing that the state law affected "nearly all of [the Department of Energy's] decisions," *id.* at 839, that observation in no way suggested that a state law affecting fewer of the government's decisions would somehow be permissible. In *Blackburn*, this Court's analysis of direct regulation did not consider the scope of the burden. The Court's observation that the state law would have required warning signs and safety ropes in "virtually every square inch" of Yosemite National Park, 100 F.3d at 1436 n.5, thereby "destroy[ing its] visual beauty and riparian environment," *id.* at 1435, related to a separate holding regarding incompatibility with various federal statutes. This Court in *Arcata* similarly did not conduct any sort of burden analysis in analyzing direct regulation of the federal government. It did not probe whether it was necessary for the military to recruit minors or how inconvenient local regulation would be. And the local regulation would have imposed no burden at all if (as the City contended) it simply mirrored federal law. Yet this Court said that was irrelevant even if true. 629 F.3d at 992 ("[T]here is no exception to the doctrine of intergovernmental immunity for state statutes consistent with federal law.").

In addition to failing to identify any case that has applied its "substantial-

burden" test to a direct state regulation of the federal government, California fails to show how such a test would even be capable of principled application. California has no answer to our previous point, *see* Opening Br. 29, that this sort of burden analysis would mean that California (and any of the other 49 states) could directly regulate the federal government's law enforcement operations on a limitless range of subjects—e.g., the weapons law enforcement officers carry, whether they are allowed to carry weapons at all, uniform requirements, use of K9 teams—subject only to judicial review based on fact-bound assessments of burden. Worse still, such assessments would often necessarily depend on policy-laden value judgments. California, for example, embraces the district court's assertion that the federal government failed to identify any "reasonable" practice that Section 10 prohibits. California Br. 11. And much of its briefing on burden simply amounts to California's policy view that the state statute properly strikes the balance between the competing interests. California Br. 19-27. There is a good reason that courts have not adopted this approach, which places the states, or the courts, in control of making policy determinations about the terms under which federal officials will carry out their responsibilities.

**c.** Much of the remainder of California's argument stems from an obvious strawman. We have not argued that every regulation of a federal employee or contractor is tantamount to a direct regulation of the federal government and

10

therefore impermissible. To take California's example, federal employees are subject to state income tax because application of such taxes does not amount to direct regulation of the federal government itself. *See Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 486-87 (1939).

Many of the cases on which California relies, in addition to reiterating the basic point that regulation of federal employees or contractors is not necessarily forbidden, engage in efforts to determine whether a particular application of a regulation affecting a federal official should be treated as a direct regulation of the federal government and therefore prohibited. In *Colorado v. Symes*, 286 U.S. 510 (1932), the question was whether the application of a state murder statute to a killing by a federal official was permissible because the official was acting on his own rather than as part of his federal responsibilities. For a federal official to obtain immunity from state prosecution, "[i]t must appear that the prosecution has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty." *Id.* at 519 (alteration and quotation marks omitted).

Similarly, California notes that, prior to the Federal Tort Claims Act, state courts sometimes entertained tort actions against federal officials. California Br. 31-32. But the point of those tort cases is that federal officials were subject to judge-

11

made tort liability for conduct that violated *federal* law or was taken without federal authority. In *Slocum v. Mayberry*, 15 U.S. (2 Wheat.) 1 (1817), for example, the Court held that a customs officer who had no authority to seize cargo under federal law was subject to suit in state court: "the act of congress neither expressly, nor by implication, forbids the state courts to take cognizance of suits instituted for property in possession of an officer of the United States not detained under some law of the United States; consequently, their jurisdiction remains." *Id.* at 12. And because the nature of those suits involved attempts to hold rogue federal officials liable for actions taken without federal authority—and since state courts are generally competent to adjudicate federal issues—the Supreme Court generally permitted state courts to hear such actions, absent a reason federal jurisdiction should be exclusive. *See Teal v. Felton*, 53 U.S. (12 How.) 284 (1852); *see also Claflin v. Houseman*, 93 U.S. 130, 136 (1876) ("[I]f exclusive jurisdiction be neither express nor implied, the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it.").

The relevant point in all of these cases is that states may impose consequences on federal officials when federal law does not justify the actions taken by those federal officials. That is because application of a state regulation to actions of a federal official who is not carrying out federal responsibilities does not amount to a direct regulation of the federal government. But here, as the motions panel correctly

observed, there is no need for any such inquiry. On its face, "the state law regulates the performance of 'governmental action[s]' which are 'carried on by the United States itself.'" *California*, 2026 WL 1088674, at *5 (alteration in original) (quoting *Mayo*, 319 U.S. at 448).

**d.** That leaves California's reliance on *Johnson v. Maryland*, 254 U.S. 51 (1920). California's discussion of that case reads as if the Supreme Court upheld a state effort to regulate federal officials. But the holding of *Johnson* was the opposite: the Court held that Maryland could not require federal postal drivers to obtain a license from the state. As the Court explained, "the immunity of the instruments of the United States from state control in the performance of their duties extends" to a requirement to satisfy the state regarding their qualifications. *Id.* at 57. This case is easier than that one. Maryland simply sought to require postal drivers to obtain a license that other drivers were required to obtain, and the Supreme Court held that even that was impermissible. And the Court took as a given "the immunity of the instruments of the United States from state control in the performance of their duties." *Id.* Here, California seeks precisely to assert control over federal officials in the performance of their duties.

Entirely ignoring the holding of *Johnson*, California fixates on the Supreme Court's statement that "[i]t very well may be that, when the United States has not spoken, the subjection to local law would extend to general rules that might affect

13

incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson*, 254 U.S. at 56. While the meaning of that highly hedged dictum—which explicitly left the issue open and which the Court has not relied on since—is not entirely clear, it obviously does not negate the holding of the very case in which it appears and strip the government of its immunity from state control over the performance of the duties of federal officials. It likely simply reflects doubt on the part of the Supreme Court that the federal government should be understood *to have authorized* its officials to violate traffic regulations or other similar generally applicable ordinances that do not inherently affect federal operations. That is likely why the Supreme Court limited its suggestion to situations "when the United States has not spoken." And as we previously explained, Opening Br. 25, any tradition of states enforcing speed limit and similar laws against federal officials is a function of federal consent, not freestanding state authority.[2] *Johnson* itself, after all, involved a "general" rule; the state simply sought to enforce its law requiring postal drivers to obtain a driver's license and pay a small fee, requirements imposed on all drivers. Yet the Supreme Court held that impermissible because it "require[d] qualifications in addition to

---

[2] To take just one example, if a state prohibited cars with right-side drive, the better reading of *Johnson*'s dictum is that it could not enforce such a "general" rule against federal postal carriers if the United States objected, and that this conclusion would not depend on burden analysis or any similar qualification.

those that the Government has pronounced sufficient." 254 U.S. at 57.

But even assuming that the *Johnson* dictum should be treated as if it were a holding that states may enforce some general laws that incidentally affect federal operations against federal officers even over the federal government's objection, Section 10 is not general and its effect is not incidental. It is not a "general" law such as (to take the example the Court gave in *Johnson*) "a statute or ordinance regulating the mode of turning at the corners of streets." 254 U.S. at 56. Rather, it is a law specifically targeted at law enforcement, a uniquely governmental function. And Section 10 does not merely affect the carrying out of federal functions "incidentally"—*i.e.*, unintentionally or by chance. It is a law that applies only to law enforcement officials, and only in the performance of law enforcement functions. Indeed, the statute's legislative findings (and the Governor) stated expressly that California enacted the law precisely because of its high-profile disagreement with the federal government's operations in the State.[3]

California insists that "the federal government does not explain why that distinction should bear conclusive weight." California Br. 35. The federal government does not believe that these distinctions *should* be conclusive; to the

---

[3] No Vigilantes Act § 1(a)-(b); Miranda Jeyaretnam, *California Bans ICE Agents From Wearing Masks to Conceal Identity*, TIME (Sep. 22, 2025, 5:00 ET), https://perma.cc/GS9L-EWT8 (Governor Newsom calling law a "direct response" to immigration enforcement activities in California).

contrary, the prohibition on state regulation of federal operations is absolute and there is no general exception of the sort California posits to begin with. But even if that position is rejected, at a minimum the exception should not be permitted to swallow the rule. At most, *Johnson* suggests that California might be able to apply its general laws such as those imposing speed limits to federal officials engaged in federal functions, not that California can apply all of its laws to federal officials. California suggests that "[t]he better understanding is that the term 'general' refers to generally applicable regulations that do not single out the federal government for differential treatment," California Br. 36, but that understanding would require a different outcome in *Johnson* itself, as the need for a commercial driver's license is not limited to federal officials. It would also replace the well-established framework governing intergovernmental immunity—under which *both* direct regulation of and discrimination against the federal government are proscribed—by eliminating the prohibition against direct regulation. There is plainly no basis for California to leverage a narrow hypothetical carve-out into a repudiation of a core principle of our federal system that has been recognized since *McCulloch v. Maryland* (including in *Johnson* itself).

For similar reasons, California's reliance on *Texas v. U.S. Department of Homeland Security*, 123 F.4th 186 (5th Cir. 2024), is misplaced. For one, the divided panel's holding in that case was that Congress in the Administrative Procedure Act

16

(APA) waived the United States' sovereign immunity for Texas's suit challenging federal agency action, the APA's definition of which expressly includes destruction of property. *Id.* at 199. California, by contrast, does not claim that Congress has affirmatively authorized enforcement of its statute here in any respect. And California acknowledges, and does not dispute, our argument "that the Fifth Circuit's analysis 'rested principally' on the view that Texas was acting as a proprietor, and not a regulator in seeking to enforce its tort laws." California Br. 37 (quoting Opening Br. 27). California contends only that the Fifth Circuit also stated that "even assuming that Texas had acted as a regulator," the court would reach the same result "because 'it is well-settled that generally applicable state laws can apply to federal agents.'" California Br. 37 (alteration omitted) (quoting *Texas*, 123 F.4th at 206).

As we have previously explained, the Fifth Circuit's decision was wrong, and a previous injunction in that case was vacated by the Supreme Court the only time the relevant issues were presented there. *See Department of Homeland Sec. v. Texas*, 144 S. Ct. 715 (2024). But in any event, the state enactment at issue here is not a "generally applicable state law." Even if, as the Fifth Circuit mistakenly held, a state is allowed to apply the common-law tort of trespass to the federal government, that does not mean that the state can create a regulation specific to law enforcement and

17

enforce it against the federal government.[4]

**e.** Finally, California's reliance on the standards governing facial challenges, California Br. 20-21, adds nothing. California's argument is just a restatement of its incorrect assertion that intergovernmental immunity depends on fact-bound assessments of burden. As noted, that is incorrect. Section 10 as applied to the federal government is invalid in all applications because it is direct regulation of the federal government that Congress has not authorized.

Indeed, California's argument here only confirms that the validity of state laws purporting to directly regulate the government does not turn on burden analysis in the first place. The premise of California's argument is that, to obtain relief, the United States must "show that [Section 10] will burden federal law enforcement …

---

[4] In support of its assertion, the Fifth Circuit merely provided a string cite of cases, which it did not meaningfully analyze or discuss. Those cases are plainly inapt, involving state regulation of non-federal entities, *North Dakota*, 495 U.S. at 434, nondiscriminatory income taxes collected from federal officials, *Jefferson County v. Acker*, 527 U.S. 423, 428 (1999), de minimus fees collected from airline passengers, *Evansville-Vanderburgh Airport Auth. v. Delta Airlines*, 405 U.S. 707, 720-21 (1972), prohibitions imposed on state and local officials, *McHenry County v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022), a case that was not an intergovernmental-immunity case at all, *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 507 (D.C. Cir. 2020), a case where the only discussion of state law concerned whether it qualified as a predicate offense for purposes of a federal statute, *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007), the Supreme Court's decision in *Johnson*, and a decision involving application of general state traffic laws to federal officials, where the defendant "has not alleged a defense of federal immunity" and federal officials had instructed him to obey all local laws, *North Carolina v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990).

in [a] significant way"—and indeed, that the United States needed to show "that it will do so in all or nearly all of its applications, as would be required for the facial relief the federal government seeks." California Br. 3. This proposition proves far too much. Suppose (to take just a few of many possible examples) California passed a nondiscriminatory law prohibiting law enforcement officers from carrying guns, or prohibiting use of dogs in law enforcement operations, or requiring law-enforcement officials to carry out law enforcement operations on horseback rather than in cars.[5] Surely California cannot suggest that a facial challenge would fail because at least *some* federal officers could perform at least *some* tasks unarmed, or without K9 teams, or on horseback, without a significant impact on federal operations. Yet that would be the clear import of California's position in this case. Just as in those hypothetical cases, the United States is not compelled in this case to await enforcement action by the state or to demonstrate that the state regulation of federal operations is unduly burdensome in a particular circumstance.

---

[5] California in fact suggests that its laws "impose standardized requirements on 'emergency vehicle[s],'" including those operated by federal agencies. California Br. 35-36 (alteration in original) (quoting Cal. Veh. Code § 165). Although we have not reviewed this scheme closely, these provisions appear to establish a category of vehicles that, under state law, California drivers must pull over for, Cal. Veh. Code § 21806, not regulate the federal government directly. But if California's statutes actually command that federal vehicles contain certain features, it obviously could not enforce that command over the federal government's objection.

19

## II. The other injunction factors strongly favor the government.

As the motions panel held, "irreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity," 2026 WL 1088674, at *7, "plaintiffs who establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction," *id.* at *6 (alterations omitted) (quoting *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)), and "[n]o further balancing is [legally] necessary," *id.* at *7. As with the likelihood-of-success prong, the motion panel's analysis is at the very least highly persuasive. As the motions panel recognized, "'[t]he standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction.'" *Id.* at *4 (quoting *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc)). In any event, the motions panel was correct.

**1.a.** Irreparable harm necessarily results from the enforcement of a preempted state law, *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on Supremacy Clause violation), in keeping with the general principle that a constitutional violation and injury alone is ordinarily sufficient to qualify as irreparable injury, *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). California's assertion that a more searching assessment is required where the

20

challenger shows only "serious questions" on the merits, California Br. 38 (quotation marks omitted), is irrelevant even if true. The federal government has shown it is likely to succeed on the merits (and since the issues here are purely legal and have been thoroughly analyzed in a published opinion, that is an understatement), not merely raised "serious questions."

**b.** The serious possibility that California will use the law to arrest and prosecute federal officials—which California again does not disclaim—also qualifies as irreparable harm, and that sort of serious escalation based on California's disagreement with the policy choices of the federal government is not in the public interest. California's insistence that "[Section 10] presents no more conflict with federal authority than any other state criminal law that is capable of being applied to a federal officer in an appropriate case," California Br. 38, ignores that the state law here directly targets federal law-enforcement officials.

**c.** To make matters worse, although the United States need not show a significant burden on law-enforcement operations (or any burden), the law at issue here imposes a serious burden. Federal agencies enforcing immigration law often conduct "investigations and surveillance in plainclothes to locate and apprehend illegal aliens," and other federal law-enforcement agencies routinely must conceal their federal law enforcement status in a number of contexts, including engaging in surveillance and meeting with confidential informants. Opening Br. 32 (quotation

marks omitted). And when U.S. Immigration and Customs Enforcement officials in particular are conducting operations, activists blow whistles or otherwise alert potential targets to the presence of law enforcement, a pattern of behavior the district court acknowledged. ER-19.

None of California's responses are persuasive. California relies on what it describes as Section 10's "broad exceptions," California Br. 9, 19, 23—even though the Act itself describes them as "narrowly tailored exemptions," No Vigilantes Act § 2(a)(3)—but it should be clear that California intends for its enactment to limit plainclothes operations as that is the core of the statutory bar, *id.* § 10(a). And California concedes that the failure to identify key terms, such as those related to undercover activities could lead to "disagreement sometimes as to whether identification is required," California Br. 23. California emphasizes the presumption that public officials act in good faith, California Br. 23, but that is not responsive. The point is that the difficulties that federal officials would face in attempting to conform federal operations to state regulation and guess at how dozens of state law enforcement agencies and state prosecutors might interpret open-ended statutory terms is itself a wholly unjustified intrusion on federal authority and itself qualifies as irreparable harm.

California's contention that Section 10 does not require use of marked vehicles or mandate "advance notice or warning" of operations, California Br. 23, is

22

a non-sequitur; it does require them to visibly display their law enforcement identification when performing their enforcement duties (which as a practical matter of course does provide a form of warning and notice). Nor is it responsive to note that federal regulations require immigration officers to identify themselves as soon as practicable upon effectuating an arrest, as that is not the only circumstance in which the state law applies. California Br. 22 (discussing 8 C.F.R. § 287.8(c)(2)(iii)). California's insistence that officers need only display a badge number and agency affiliation rather than reveal their identity—an argument made possible only because their unconstitutional effort to prohibit officers from wearing masks was enjoined by the district court—may mitigate the harm to some degree but does not eliminate the risk of identification as a federal officer or even of piecing together available information to ascertain an individual's identity. Finally, even if alerting potential targets to the presence of law enforcement is protected by the First Amendment, California Br. 24—a question we do not address here—the federal government is under no obligation to assist behavior that is disruptive to law enforcement (whether constitutionally protected or not) by providing the information that enables such disruption.

**2.** The balance of equities and the public interest likewise favor the United States. As the motions panel noted, "[n]o further balancing is necessary" where a state statute likely violates the Supremacy Clause. 2026 WL 1088674, at *7. And as

23

we argued in our opening brief, there is no possible scenario where a reasonable analysis of the equitable factors would permit a state to enforce a facially invalid statute that purports to directly regulate the United States through criminal prosecutions of federal officials. Opening Br. 37.

But even assuming there could ever be such a scenario, this would not be it. California again raises the specter that targets of federal immigration enforcement will be unaware that the people making the arrest are federal officers and will therefore attack them, as well as criminals impersonating law enforcement officials. California Br. 39. But California does not meaningfully respond to any of the points in our opening brief: (i) Federal regulations already require that, when making immigration arrests, the designated immigration officers must identify themselves, "as soon as it is practical and safe to do so," 8 C.F.R. § 287.8(c)(2)(iii)(A)-(B); (ii) it is often in federal officers' interests to provide proof of their law-enforcement status when making arrests and detentions (thereby conveying that targets may not lawfully resist); (iii) Section 10's identification requirement sweeps far more broadly than arrests and detention; (iv) the statute's exceptions are such that members of the public will not necessarily know whether non-uniformed individuals who do not display identification are in fact law enforcement officials anyway (particularly if California is right to now describe those exceptions, contrary to the language of the statute itself, as "broad"); and (v) criminals already intent on impersonating law

24

enforcement can easily wear fake badges. Opening Br. 38-39. And again, none of this matters anyway because California is simply not permitted to enforce its patently unconstitutional law.

In short, the public interest plainly favors an injunction.

## CONCLUSION

This Court should reverse the district court's order denying a preliminary injunction and direct entry of a preliminary injunction enjoining Section 10 of the No Vigilantes Act against the United States, federal agencies, and federal officials.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *andrew.bernie@usdoj.gov*

May 2026

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(2) and Circuit Rule 32-1(b) because it contains 6,039 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman font.

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE